**No. 26-____**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE TENTH CIRCUIT**

In re Donald J. Trump, *in his official capacity as President of the United States,* et al.,

Petitioners.

On Petition for a Writ of Mandamus to the United States District Court for the District of Colorado

# PETITION FOR A WRIT OF MANDAMUS

BRETT A. SHUMATE
*Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY
J. KAIN DAY
*Attorneys, Appellate Staff*
*Civil Division, Room 7235*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-4214*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY ........................................................ 1

STATEMENT ........................................................................................ 5

ARGUMENT ......................................................................................... 15

Mandamus Is Warranted to Block Discovery from the President's Closest Advisors ........................................................................ 15

A. The District Court Ignored the High Respect Owed to the Executive Office of the President........................................... 16

B. The District Court Failed to Resolve the Government's Threshold Legal Challenges Before Ordering Discovery ..... 32

C. The District Court Made No Effort to Tailor Discovery from Senior Executive Branch Officials ................................ 33

CONCLUSION ..................................................................................... 39

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Armstrong v. Exec. Off. of the President*,
90 F.3d 553 (D.C. Cir. 1996) ........................................................ 28-29

*Cheney v. U.S. District Court for D.C.*,
542 U.S. 367 (2004) ............. 1-4, 11-12, 14-22, 24-27, 29, 30-33, 35-37

*In re Cheney*,
544 F.3d 311 (D.C. Cir. 2008) (per curiam) ..................................... 37

*Clinton v. Jones*,
520 U.S. 681 (1997) ......................................................................... 16

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ......................................................................... 26

*Hikma Pharms. USA Inc. v. Amarin Pharma, Inc.*,
146 S. Ct. 1391 (2026) ....................................................................... 8

*Karnoski v. Trump*,
926 F.3d 1180 (9th Cir. 2019) .................................................... 16, 26

*Kissinger v. Reps. Comm. for Freedom of the Press*,
445 U.S. 136 (1980) ......................................................................... 28

*Meyer v. Bush*
981 F.2d 1288 (D.C. Cir. 1993) ............................................... 5, 28, 29

*In re Musk*,
169 F.4th 445 (4th Cir. 2026) ............................................... 16, 26, 37

*Nixon v. Fitzgerald*,
457 U.S. 731 (1982) .................................................. 16-17, 20, 21, 37

*Protect Democracy Project, Inc. v. National Sec. Agency*,
10 F.4th 879 (D.C. Cir. 2021) ........................................................... 31

*Public Citizen, Inc. v. OMB*,
598 F.3d 865 (D.C. Cir. 2010) ............................................................ 6

*Shelby County v. Holder*,
570 U.S. 529 (2013) ........................................................................ 7

*Trump v. Mazars USA, LLP*,
591 U.S. 848 (2020) ...................................................................... 27

*Trump v. Thompson*,
20 F.4th 10 (D.C. Cir. 2021) ......................................................... 31

*Trump v. United States*,
603 U.S. 593 (2024) ...................................................................... 26

*United States v. Nixon*,
418 U.S. 683 (1974) ................................................................. 17, 29

*In re United States*,
583 U.S. 29 (2017) ................................................................... 31, 32

*In re United States*,
624 F.3d 1368 (11th Cir. 2010) ...................................................... 36

**Statutes**

5 U.S.C. § 552(e) ........................................................................... 28

28 U.S.C. § 1292(d) ....................................................................... 32

28 U.S.C. § 1651 .............................................................................. 1

**Rules**

Fed. R. App. P. 21 ............................................................................ 1

Fed. R. Civ. P. 30 .............................................................. 9, 24, 25

Fed. R. Civ. P. 33 ............................................................................ 9

**Other Materials**

Harold C. Relyea, Cong. Res. Serv., *The Executive Office of the President: A Historical Overview* 1 (Nov. 26, 2008).................................. 5

H.R. Conf. Rep. No. 93–1380 (1974) ............................................. 28

Karen Morfitt, Tina Peters has been released from prison in Colorado after serving time for voting machine tampering, CBS Colo. (June 1, 2026) .......... 7

Jackson, J., Practice Standards (last revised December 1, 2024).......... 10

## INTRODUCTION AND SUMMARY

Pursuant to 28 U.S.C. § 1651 and Fed. R. App. P. 21, the federal government respectfully requests that this Court issue a writ of mandamus to block a district court order that permits plaintiff to compel unbounded civil discovery from the Executive Office of the President—the organization in the White House that houses the President's closest advisors. This request is occasioned by the district court's oral ruling, with no briefing, that the Executive Office of the President must respond to discovery requests like "any other party." A187; *see also* A144 (Courtroom Minutes). This Court has never suggested anything of the kind, and the Supreme Court has instructed the exact opposite. *See Cheney v. U.S. District Court for D.C.*, 542 U.S. 367, 385 (2004) ("This Court has held, on more than one occasion, that the high respect that is owed to the office of the Chief Executive is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery[.]" (quotation marks and alterations omitted)).

Although there is no imminent court-imposed discovery deadline, the district court's ruling leaves the Executive Office of the President without recourse in the event that plaintiff demands prompt compliance

with its voluminous discovery demands (which it has indicated an intention to do in the event that the district court declines to reconsider or stay its order). Discovery is currently set to close on October 30, 2026, and the district court has authorized plaintiff to propound up to 50 interrogatories and to take at least 20 fact depositions—double the usual limits under the federal rules. Plaintiff has already issued multiple demands for documents from the Executive Office of the President. And plaintiff has made clear that, contrary to the express teachings of *Cheney*, it intends to focus most of its remaining discovery efforts on that Office, without even attempting first to obtain the information it seeks from the defendant agencies in the ordinary course. Accordingly, the government respectfully requests a ruling on this petition as soon as reasonably practicable. By separate motion, the government also requests a stay of discovery pending this Court's ruling on this mandamus petition.[1]

The underlying suit, brought by the State of Colorado, alleges retaliation against the State by a wide swath of federal actors, including but not limited to the President and the Executive Office of the President.

[1] If plaintiff seeks to enforce any discovery demands in the interim, the defendants reserve the right to seek an immediate administrative stay pending the Court's ruling on their stay motion.

The government has moved to dismiss the only counts of the complaint that provide any conceivable basis for discovery against the Executive Office of the President. Nevertheless, before even resolving that fully briefed motion, the district court has ordered virtually unbounded discovery into the inner workings of the Executive Office. According to the district court, plaintiff is free to seek discovery from the President's closest advisers relating to (highly privileged) communications not merely regarding the specific decisions challenged in plaintiff's complaint, but also some decisions made with regard to other States, and even possible actions that White House officials *merely considered* but never took.

This Court's intervention is badly needed. The government is not aware of any prior case, in any circuit, in which a court has allowed a plaintiff in a civil case to obtain such open-ended, wide-ranging discovery from the Executive Office of the President. The district court, in its oral ruling, cited no prior example. Nor did the court offer any plausible basis for reconciling its decision with *Cheney*, the Supreme Court's seminal decision on White House discovery in civil litigation. To the contrary, the district court admitted on the record that it was not sure it had ever read

*Cheney*. A168. It is hardly surprising, then, that the district court's decision cannot be squared with the principles announced in *Cheney*.

The district court entirely ignored its obligation to be "mindful of the burdens" it "imposed on the Executive Branch." *Cheney*, 542 U.S. at 391. In addition to not resolving the government's pending dispositive motion before ordering extensive discovery, the court neither required plaintiff to exhaust other available avenues of discovery nor took any steps to tailor or constrain the White House discovery it authorized. None of this is how discovery in litigation targeting the Presidency is supposed to work.

Although mandamus relief is "drastic and extraordinary," *Cheney*, 542 U.S. at 380 (quotation marks omitted), the district court's order is similarly drastic and extraordinary. Mandamus is warranted when, as here, there are "no other adequate means" to obtain redress, the applicant shows a "clear and indisputable" right to relief, and relief "is appropriate under the circumstances." *Id.* at 380-81 (quotation marks omitted).

## STATEMENT

**1.** The Executive Office of the President, a component of the White House, was created in 1939 to house the most immediate advisors to the President. *See* Harold C. Relyea, Cong. Res. Serv., *The Executive Office of the President: A Historical Overview* 1 (Nov. 26, 2008). Over time, the entities within the Executive Office have changed, *see id.*, and each President has authority to organize and staff his Executive Office as he sees fit. Now, the Executive Office is home to the White House Chief of Staff, the White House Counsel, the Homeland Security Advisor, the National Security Advisor, and dozens of other key counselors to the President. These individuals represent the most important presidential advisors for the most important issues facing our Nation.

Also within the Executive Office of the President is the Office of Management and Budget (OMB). As the D.C. Circuit has explained, the Director of OMB is the advisor who is "functionally, if not actually, closest to the President." *Meyer v. Bush*, 981 F.2d 1288, 1294 (D.C. Cir. 1993). This follows from the Director's responsibility to aid "the President in managing the entire executive branch." *Id.* Specifically, OMB is tasked with helping "the President prepare the federal budget" and ensuring

"that legislation, testimony, reports, and policies prepared by other federal agencies are consistent with Administration policy." *Public Citizen, Inc. v. OMB*, 598 F.3d 865, 867 (D.C. Cir. 2010). Among other critical responsibilities, OMB ensures that federal programs and federal dollars are used only for projects that are consistent with administration priorities—often directing agencies to fully and properly consider administration priorities in undertaking their discretionary activities.

**2.** In October 2025, the State of Colorado sued the President, the Departments of War and the Air Force, and two senior officials, seeking to enjoin the President's decision as Commander in Chief to move a military base. Since then, this case has ballooned to encompass myriad and disparate allegations that the federal government is "engage[d] in a widespread campaign of retribution against entities and individuals across the country." A51. Now, plaintiff challenges a host of actions (and hypothesized, planned, or possible actions, which have not been pleaded) and names the President, the Executive Office of the President, and nine different Executive agencies as defendants. *See* A60-63 (listing parties), A140-41. Specifically, plaintiff claims the federal government, through the agencies, is "unlawfully punish[ing] the State of Colorado" for its

decisions to "allow[] mail-in voting" and to prosecute and imprison Tina Peters.[2] *See* A51-52.

As relevant here, Colorado has brought two constitutional claims against all defendants, including the Executive Office of the President. A123-25. Together, these claims seek to cobble together disparate constitutional provisions and principles into an omnibus anti-retaliation doctrine. Count I relies on the Tenth Amendment, the Elections Clause, principles of state sovereignty, and the separation of powers. A123-24. Plaintiff argues that the federal government is attempting to regulate whether Colorado utilizes mail-in voting and whether Colorado prosecutes certain individuals through a campaign of retaliation. Count II relies on the doctrine of equal sovereignty discussed in *Shelby County v. Holder*, 570 U.S. 529 (2013). A124-25. That doctrine, plaintiff claims, bars the federal government from treating the States differently in sensitive areas of state and local policymaking.

[2] Of course, many other states allow mail-in voting. Ms. Peters has also been released from state prison after her sentence was commuted. *See, e.g.*, Karen Morfitt, Tina Peters has been released from prison in Colorado after serving time for voting machine tampering, CBS Colo. (June 1, 2026), https://perma.cc/53KW-FTZ4.

In district court, the federal government has moved to dismiss these Counts for failure to state a claim, arguing that federal officials are free to make discretionary decisions based on political considerations and that plaintiff has not pleaded any facts that would "rule out" that "obvious alternative explanation[]" for the defendants' conduct, *see Hikma Pharms. USA Inc. v. Amarin Pharma, Inc.*, 146 S. Ct. 1391, 1399 (2026) (quotation marks omitted). The government's motion is fully briefed and awaiting decision by the district court.

**3.** In anticipation of this dismissal motion, defendants asked the district court to delay discovery at least until the "contours" of any permissible discovery were more "concrete." A29; *see also* A28-29. Declining that invitation, the district court ordered the parties to propose a discovery schedule. A21. It justified that decision in a text order, "[a]nticipating the possibility that the motion might not entirely dispose of the case" and based on "the importance of the issues" at play. A21 (Dkt. 71). Thereafter, the district court entered a scheduling order authorizing double the ordinary number of interrogatories and depositions. *Compare* A39 (allowing 20 depositions and 50

interrogatories), *with* Fed. R. Civ. P. 33(a)(1) (25 interrogatories), *and* Fed. R. Civ. P. 30(a)(2)(i) (10 depositions).

Plaintiff has since propounded written discovery requests on all defendants, including the Executive Office of the President. These requests seek information not only about the specific government actions that plaintiff alleged were retaliatory in its Second Amended Complaint, *see, e.g.*, A253 (Interrogatory No. 1); A206 (Request for Production No. 1), but also about government actions that are "not described" in the Second Amended Complaint, *see, e.g.*, A297 (Interrogatory No. 4), that were "considered" but not taken, *see, e.g.*, A302 (Interrogatory No. 7), and that have nothing to do with plaintiff's core retaliation claim, *see, e.g.*, A319 (Interrogatory No. 13, addressing sanctuary-city laws). Some requests explicitly seek communications between the Executive Office of the President and any other defendant. A332 (Interrogatory No. 17); A220 (Request for Production No. 4). And discovery is far from over. Plaintiff may still notice at least 20 fact depositions and one Rule 30(b)(6) deposition for the defendant agencies collectively. A166; *see also* A39. Plaintiff may also serve 28 additional interrogatories, 16 additional

requests for production, and 30 requests for admission. A166; *see also* A39.

As relevant here, defendants objected to any discovery from the President, the Executive Office of the President, or the White House. *See, e.g.*, A253-54 (Interrogatory No. 1). As defendants explained in those objections, discovery from the President and his most senior advisors would infringe upon the separation of powers and the special reticence with which courts intrude upon the President and his advisors for purposes of discovery. *See, e.g.*, A253-54 (Interrogatory No. 1).

The parties exchanged correspondence about these objections, met and conferred over the phone, and ultimately reached an impasse. At that point—following the district court's standing order—plaintiff contacted the district court to schedule a videoconference hearing. *See* Jackson, J., Practice Standards 4 (last revised December 1, 2024), https://perma.cc/Y9Z4-8SMR. Plaintiff's request to compel discovery characterized the relevant dispute—that the Executive Office of the President had "object[ed] to and refuse[d] to participate in discovery"—but offered no legal or factual argument. A356. And when the parties

offered to provide "any additional information," the court indicated that "[n]o additional materials [were] required at [that] time." A353.

**4**. On August 11, the district court heard argument on plaintiff's request to compel discovery from the Executive Office of the President. During that hearing, the federal government repeatedly requested the opportunity to submit "briefing" on the proper scope of discovery from the Executive Office of the President "prior to the Court entering a ruling." A165; *see also* A171; A190. That question involves considerations not present in an ordinary discovery dispute, the federal government explained, and it should not be decided based on a few emails and a brief hearing. *See* A165. Indeed, much of the argument centered on the precise bounds of the Supreme Court's seminal decision on such discovery, *Cheney v. United States District Court for the District of Columbia*, 542 U.S. 367 (2004). Yet the district court admitted on the record that it had "not read *Cheney* recently" and was "not sure" that it had "read it at all." A168. As the judge himself explained, that knowledge gap was "not surprising" because the judge's usual "procedure is to try to resolve discovery disputes in phone calls . . . without extensive motion practice, briefing, et cetera." A168. And without briefing, the

district court did not "know the answers [about] the scope of *Cheney*." A168.

Undeterred, the district court decided that it "need[ed] to resolve a discovery dispute" that very "morning" and did so in an oral decision. A184; *see* A187. The district court declared "nuts to" the Executive Office of the President's objection to discovery, ordering it to participate "in discovery like any other party." A187. Indeed, the court could not "even conceive that" the Executive Office could be "a party" but refuse "to participate in discovery." A187. "It just doesn't work that way," the court said. A187. At times, the district court seemed to recognize that plaintiff is attempting to "figure out *from the top down* what's going on where an administration is apparently targeting Colorado for retribution and retaliation"—rather than first seeking discovery from the defendant agencies, whose actions are actually the subject of the complaint. *See* A178. Although the district court left "it to [the] lawyers to decide whether you think you need further motion practice," *see* A184, the court pointedly expressed doubt that any motion for reconsideration would be "a worthwhile use of [the federal government's] time." A191. After the district court ruled, the federal government asked for a 14-day stay of the

court's order, allowing time for the government to consider its appellate options, but the district court refused. A191.

Soon after the hearing, the district court entered courtroom minutes, summarizing its oral ruling. A144. In relevant part, the minutes recount "that Defendant Executive Office of President, including its component Office of Management and Budget, [we]re ordered to participate in discovery." A144. But those minutes offer no further legal or factual analysis.

**5**. Thereafter, defendants proposed an agreement under which plaintiff would temporarily forgo enforcement of discovery from the Executive Office of the President, defendants would temporarily forgo a petition for mandamus relief, and the district court would be given an opportunity to reconsider its order based on full briefing. Although plaintiff purported to be open to that proposal, it also insisted that the Executive Office of the President be prepared to fully comply with all discovery "within a week" of any decision on reconsideration, A362, meaning that the Executive Office of the President would effectively need to immediately begin conducting searches and review thousands of documents, line by line, to assert privileges and protect the President's

Article II right to deliberative confidentiality. Those are the very burdens that *Cheney* explains the Executive Office of the President normally should *not* be forced to incur, at least where the plaintiff has not exhausted other avenues for discovery and when the plaintiff has not established that discovery is necessary for the case. *See Cheney*, 542 U.S. at 388-90. In light of that demand, the parties did not reach an agreement to stay the Executive Office's discovery obligations. Instead, defendants have requested that the district court grant a stay of discovery pending mandamus, and that motion remains pending. A24-25 (Dkt. Nos. 103-05).

Plaintiff has also filed what purports to be a "motion for further proposed findings" in district court. A193-204. Generally, that motion offers little in the way of proposed findings—instead making pages of legal argument about the implications of precedent (*e.g.*, A194-95; A198-202) and attempting to characterize the district court's oral ruling in a favorable way (*e.g.*, A193; A196). Plaintiff's motion remains pending in the district court.

In a separate motion filed concurrently with this petition, the federal government asks this Court to stay the district court's discovery

order pending final resolution of this petition—and if the Court denies the petition, to stay discovery from the Executive Office for at least 14 days thereafter to permit the Solicitor General an opportunity to seek relief from the Supreme Court.

## ARGUMENT

### MANDAMUS IS WARRANTED TO BLOCK DISCOVERY FROM THE PRESIDENT'S CLOSEST ADVISORS

The district court has entered an unprecedented discovery order compelling the Executive Office of the President to answer broad discovery requests as if the President's closest advisors were just "any other party" to civil litigation. A187. Worse, it did so without briefing; without reviewing the relevant discovery requests; and, by its own admission, without even reading the Supreme Court's seminal decision on discovery from the White House, *Cheney v. United States District Court for the District of Columbia*, 542 U.S. 367 (2004). *See* A168. It is hardly surprising, then, that the district court's decision cannot be squared with the principles announced in *Cheney*. The Executive Office of the President is not an ordinary litigant, *see Cheney* 542 U.S. at 381, and the district court ignored long-standing precedent when it failed to recognize that Office's "unique position in the constitutional scheme" or

"the paramount necessity of protecting the Executive Branch" from vexatious and unnecessary discovery, *id.* at 382 (quotation marks omitted).

Mandamus relief is warranted when an applicant has "no other adequate means" to obtain redress, the applicant shows a "clear and indisputable" right to relief, and this Court is satisfied that relief "is appropriate under the circumstances." *Cheney*, 542 U.S. at 380-81 (quotation marks omitted). Courts regularly grant mandamus to prevent or limit discovery that intrudes upon the separation of powers. *E.g.*, *Cheney*, 542 U.S. at 382; *In re Musk*, 169 F.4th 445 (4th Cir. 2026); *Karnoski v. Trump*, 926 F.3d 1180, 1203-07 (9th Cir. 2019). As in those cases, the government readily satisfies the requirements for mandamus here.

### A. The District Court Ignored the High Respect Owed to the Executive Office of the President

**1.** The Supreme Court has repeatedly held that "[t]he high respect that is owed to the office of the Chief Executive . . . is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery." *Clinton v. Jones*, 520 U.S. 681, 707 (1997). That office's "unique position in the constitutional scheme" "counsel[s] judicial

deference and restraint." *Nixon v. Fitzgerald*, 457 U.S. 731, 749, 753 (1982). And because discovery against the Executive Office of the President raises the prospect of a "'constitutional confrontation'" between the Executive and Judicial Branches, the Supreme Court has made clear that it is reserved for exceptional circumstances and that such confrontations "should be avoided whenever possible." *Cheney*, 542 U.S. at 389-90 (quoting *United States v. Nixon*, 418 U.S. 683, 692 (1974)). This confrontation is especially problematic when it involves senior advisors whose sole responsibility is advising the President or Vice President. *Cf. id.* (addressing discovery against the Vice President and cabinet members).

The Supreme Court's decision in *Cheney* illustrates these principles. There, President George W. Bush had established a "National Energy Policy Development Group" within the Executive Office of the President to help develop national energy policy over five months. 542 U.S. at 373. The Group was headed by the Vice President and staffed exclusively by other senior government officials. *Id.* Because the Group was composed entirely of federal government employees, it was not

subject to the Federal Advisory Committee Act's open-meeting and disclosure requirements. *See id.* at 373-74.

The plaintiffs in *Cheney* sued, arguing that the Group was subject to the Act's requirements on the theory that several private persons were *de facto* members of the Group. 542 U.S. at 374. The plaintiffs then moved for broad discovery into the Group's meetings and activities so that they could establish the private individuals' *de facto* membership. *Id.* at 375. The district court granted that request, dismissing the Office of the President's asserted interests in protecting the autonomy of the Office's work and the confidentiality of its communications on the ground that the government "could assert executive privilege to protect sensitive materials from disclosure." *Id.* at 375, 377, 388-89.

After the D.C. Circuit denied the government's mandamus petition, the Supreme Court reversed. *See Cheney*, 542 U.S. at 376-78. The Court emphasized that the case did not present "a routine discovery dispute" and that the courts had failed to take adequate account of the "special considerations" that "control when the Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications are implicated." *Id.* at 385. Given

the separation-of-powers concerns present in those circumstances, the Court made clear that discovery into the actions of the "Office of the President" should be permitted only as a last resort, that district courts must "explore other avenues" to avoid it, and that courts must ensure that any permitted discovery is "precisely identified" and no broader than necessary to serve its purpose. *Id.* at 387, 390.

**2.** The district court's decision here cannot be reconciled with *Cheney*. At its core, *Cheney* stands for the principle that the "Office of the President" cannot be treated like "an ordinary individual" in litigation even if it is a named defendant. *Cheney*, 542 U.S. at 381-82 (quotation marks omitted). Yet the district court ordered that Office to participate in discovery just "*like any other party*," saying "nuts to" any objection based on *Cheney*. A187 (emphasis added). In doing so, the district court failed to respect the "special considerations" at play when a party seeks discovery from the Executive Office of the President—committing the same mistake as the district court in *Cheney*. *See* 542 U.S. at 385. And at times, it even suggested that discovery should proceed "from the top down," rather than from the bottom up, as *Cheney* requires. *See* A178-79. It is difficult to imagine a plainer legal error, and

as a result, the federal government has a "clear and indisputable" right to mandamus relief. *See Cheney*, 542 U.S. at 381.

Compounding this error, nothing about the district court's analysis reflects the "judicial deference and restraint" the Supreme Court has required in this context. *Nixon*, 457 U.S. at 753. Repeatedly, the federal government sought leave to brief the propriety of discovery from the Executive Office of the President. *See, e.g.*, A165; A171; A190. That issue involves considerations absent from an ordinary discovery dispute, justifying further briefing and consideration. A165. Indeed, having received no briefing before argument due to its standard procedures, the district court itself admitted that it was unprepared to fully engage with the parties' arguments. The district court stated on the record that it "not read *Cheney* recently" and was "not sure" that it had "read [that decision] at all." A168. As a result, the district court was unfamiliar with "the scope of *Cheney*," *see* A168, despite that decision taking centerstage in the parties' dispute. The district court had not reviewed any of the discovery requests at issue—notwithstanding the parties' offer to provide additional materials before the hearing (A353-54) and the court's usual practice of reviewing any disputed written discovery (*see* A36-37).

Undeterred by this knowledge gap, the district court felt compelled to issue an immediate decision on plaintiff's request to compel broad discovery from the most senior advisors in the Executive Branch. A184 ("I need to resolve a discovery dispute this morning."). The court even went so far as suggesting that additional briefing from defendants would not be "a worthwhile use of their time." *See* A191. Issuing an unprecedented decision without full information hardly bespeaks "judicial deference and restraint." *Nixon*, 457 U.S. at 753.

Put bluntly, the district court made a snap decision to compel civil discovery from the most senior presidential advisors without briefing, without reading the relevant caselaw, and based chiefly on the court's opinion that the Executive Office of the President should be treated "like any other party" when plaintiff has brought an unprecedented claim alleging an amorphous scheme of retaliation against a State. Under *Cheney*, that is manifestly inadequate to take the drastic step of ordering discovery from senior members of the Executive Branch.

**3.** During the hearing in district court, plaintiff previewed several arguments in support of its request for discovery from the Executive Office of the President. *See* A147-55. Many of those arguments tracked

the district court's start-from-the-top reasoning, focusing on plaintiff's claim that the Executive Office of the President is at the "heart of this case" and arguing the merits. *See* A147. Those arguments fail for the same reasons detailed above. Plaintiff's remaining efforts to circumvent *Cheney* are similarly meritless.

**i.** First, plaintiff argued that the Executive Office of the President has unique knowledge that is key to plaintiff's claims and that no agency defendant could provide. *See, e.g.*, A153-54. That was true in *Cheney* itself, which concerned meetings within the White House that involved the Vice President and the President's closest advisors. *See* 542 U.S. at 373-74. The fundamental lesson of *Cheney* is that, when plaintiffs seek civil discovery from the White House, the expedient completion of discovery is not the primary consideration. *Cheney* requires courts to recognize that imposing discovery burdens on the Executive Office of the President invariably raises profound separation-of-powers concerns, and that those concerns strongly counsel hesitation—including exhaustion of other avenues of discovery—before opening the doors of the White House to civil plaintiffs.

The record here belies plaintiff's assertion that unbounded discovery from senior White House advisers is the only possible way for plaintiff to litigate its case.

Indeed, plaintiff's own argument in the district court—attempting to craft a narrative of retaliation based on "evidence produced from the agencies"—is to the contrary. A149. The only evidence submitted to the district court before its hearing was a single email, produced by the U.S. Department of Agriculture, in which an advisor at the Executive Office of the President scheduled a meeting to prioritize Colorado for purposes of ensuring that grants and federal support remain in line with Administration priorities. A358-59 (US-USDA_0000084-85). The email instructed the attendees, many of whom represented defendant-agencies, to come prepared to discuss immediate actions to ensure that federal programs continue to advance Administration priorities. A358.

Plaintiff points to this email as evidence that discovery from the Executive Office of the President is essential. In fact, the email demonstrates the opposite. It shows there is responsive documentary material—including the email itself—available from the defendant federal agencies, without need for discovery from the Executive Office of

the President. And it demonstrates that numerous agency officials were invited to the meeting at issue and may possess knowledge of what transpired. Plaintiff could, for example, complete document discovery from the agencies and then take a Rule 30(b)(6) deposition in an effort to understand the government's relevant decision-making process. The only explanation for the district court's failure to even consider this approach was its erroneous insistence that the Executive Office of the President should be treated, for purposes of discovery, like any other litigant.

Plaintiff attempts to highlight agency defendants "pointing [plaintiff] back towards [the Executive Office] because that's where they say the decision was made." A150; *see also* A149-51. As a result, plaintiff claims, discovery from the Executive Office is needed to identify "the motivation for targeting" as alleged in the complaint. *See* A152. But this argument too is inconsistent with the record. In interrogatory responses, defendants identified dozens of individuals outside the Executive Office of the President who played a role in the actions plaintiff characterizes as retaliatory, *see* A257-88 (Interrogatory No. 1), and provided some

narrative explanation for the agencies' actions, A292-97 (Resp. to Interrogatory No. 2).

At a minimum, it is plainly insufficient under *Cheney* for a plaintiff to declare that it prefers to start at the top of the Executive Branch and deploy most or all of its allotted discovery (here, twice the normal amount) at that level. Plaintiff has not sought to depose even a single agency fact witness or Rule 30(b)(6) designee about any of the challenged agency actions. Plaintiff simply prefers to focus on the Executive Office of the President, and the district court has allowed it to do so. That is exactly what *Cheney* forbids.

Because plaintiff does not seriously dispute that it has failed fully to "explore other avenues" for obtaining the information it seeks, *Cheney*, 542 U.S. at 390, mandamus is warranted. Plaintiff's attempt to shift blame onto the government—asserting that defendants have raised "various roadblocks" to discovery, and so on—does not compel a different conclusion. A152. The Executive Office of the President is not required to roll over in the face of plaintiff's unreasonable discovery demands, abetted by a district court that is unwilling to enforce limits.

**ii.** In the district court hearing, plaintiff suggested four possible grounds for distinguishing *Cheney*. *See, e.g.*, A152-54. None is persuasive.

*First*, plaintiff argued that *Cheney* is inapplicable because plaintiff has asserted constitutional claims. The federal government is not aware of any legal authority supporting such an argument, and plaintiff has cited none. Indeed, courts regularly apply the separation-of-powers principles announced in *Cheney* to suits involving constitutional claims. *E.g.*, *Karnoski*, 926 F.3d at 1189, 1203 (First and Fifth Amendments); *Musk*, 169 F.4th at 447 (separation of powers and Appointments Clause). That makes sense. The mere fact that a plaintiff has alleged some constitutional violation does not ameliorate the separation-of-powers concerns that motivated the Supreme Court in *Cheney*. If it did, plaintiffs would easily be able to circumvent *Cheney* by tacking on a purported constitutional claim to statutory claims. Indeed, federal statutes generally do not—and often cannot—apply to the President himself, *see Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992); *Trump v. United States*, 603 U.S. 593, 607 (2024) (quotation marks omitted), so *Cheney* matters most precisely for constitutional claims.

*Second*, plaintiff suggested that *Cheney* should not apply because the defendant agencies are "already asserting executive privilege elsewhere" and, thus, the Executive Office of the President is not uniquely situated. A154. That argument makes little sense. If true, there is no benefit to plaintiff from receiving another set of privilege objections from that Office. But forcing the Executive Office to go through the process of raising those objections imposes an immense amount of harm, as *Cheney* recognized. *See Cheney*, 542 U.S. at 389 (forcing Executive Office to "winnow" discovery requests through privilege claims would be a burden).

*Third*, plaintiff insisted that discovery can sometimes be obtained even from the President. But plaintiff predicated that argument entirely on cases involving criminal proceedings and personal-capacity civil suits, which raise fundamentally different considerations from civil litigation against a sitting President and his Executive Office concerning his administration of the laws. *See* A182-83. The Supreme Court's decision in *Cheney* distinguished criminal proceedings at length, noting that the distinction "between criminal and civil proceedings is not just a matter of formalism." 542 U.S. at 384. And the very authorities plaintiff

references recognize there are "distinctions . . . between official and personal information" when it comes to disclosure. *Trump v. Mazars USA, LLP*, 591 U.S. 848, 865 (2020).

*Fourth*, plaintiff asserted that *Cheney*'s separation-of-powers rationale does not apply to the Office of Management and Budget (OMB), a component of the Executive Office of the President. In part, plaintiff based this argument on OMB's obligation to respond to document requests under the Freedom of Information Act (FOIA). A150; A152-53; *see also Meyer v. Bush*, 981 F.2d 1288, 1294 (D.C. Cir. 1993) (OMB records are "subject to FOIA").

As an initial matter, that contention obviously cannot justify the district court's order, which does not distinguish between OMB and other parts of the Executive Office. Plaintiff has propounded discovery not just to OMB, but on the entire Executive Office, including all of its components and high-ranking officials. Even if discovery were proper as to OMB—which, as we discuss below, it is not—plaintiff would have no right to discovery against the remainder of the Executive Office. *Cf. Kissinger v. Reps. Comm. for Freedom of the Press*, 445 U.S. 136, 156 (1980) (although "FOIA does render the 'Executive Office of the

President' an agency subject to the Act" it was never intended to reach "'the President's immediate personal staff or units in the Executive Office whose sole function is to advise and assist the President'" (first quoting 5 U.S.C. § 552(e); and then quoting H.R. Conf. Rep. No. 93–1380, p. 15 (1974))); *see also, e.g.*, *Armstrong v. Exec. Off. of the President*, 90 F.3d 553 (D.C. Cir. 1996) (National Security Council and staff exempt from FOIA); *see also Meyer*, 981 F.2d at 1293 & n. 3 (D.C. Cir. 1993) (discussing White House Counsel and White House staff as clear examples of entities not subject to FOIA). Under *Cheney*, the district court must not only require plaintiff to exhaust other avenues before requiring the Executive Office of the President to respond to discovery requests, but must also tailor any discovery to minimize the intrusion on the Executive Branch. Plaintiff's reliance on a legal theory that applies (at most) to a single portion of the Executive Office of the President only underscores the problems with the district court's blunderbuss approach.

In any event, plaintiff's argument fails even as to OMB. That Office is home to some of the most senior Executive Branch officials who are charged with advising the President. It is located within the Executive Office of the President precisely for that reason. Indeed, as the D.C.

Circuit has explained, the Director of OMB is the advisor who is "functionally, if not actually, closest to the President." *Meyer*, 981 F.2d at 1294. Thus, discovery on OMB threatens a "constitutional confrontation" between the Executive and Judicial Branches, such that caution is warranted before ordering any such discovery. *See Cheney*, 542 U.S. at 389-90 (quoting *Nixon*, 418 U.S. at 692).

Plaintiff makes much of the fact that OMB has produced a limited number of documents in some other cases, *see* A151-52, and that OMB is subject to FOIA, but that does not change the constitutional considerations at play. As to the former, plaintiff's unbounded demands—encompassing not mere information in OMB's possession about actions taken by multiple agencies under a host of statutory authorities, but also actions that government officials merely *contemplated* taking—raise obvious and profound separation-of-powers questions. OMB is not required to oppose every discovery request to the maximum amount possible merely to preserve its ability to oppose especially egregiously requests like plaintiff's.

Moreover, plaintiff failed to acknowledge critical differences between discovery in civil litigation and document requests under FOIA.

In district court, OMB would be subject not only to document production demands, but also to depositions and requests for admission. That burden can be much more significant than simple FOIA litigation. District court litigation involving the White House also invariably spawns privilege disputes that do not arise under FOIA, exacerbating tensions between the Executive and Judicial Branches. *Cheney*, 542 U.S. at 389-90. In district court, for example, litigants may assert that "a strong showing of need" overrides a claim of executive privilege—*i.e.*, the privilege that protects many internal Executive Branch communications. *E.g.*, *Trump v. Thompson*, 20 F.4th 10, 26 (D.C. Cir. 2021) (quotation marks omitted); *see Cheney*, 542 U.S. at 389 (discussing "the difficult task of balancing" in this context). But that argument is not available in FOIA proceedings. *See Protect Democracy Project, Inc. v. National Sec. Agency*, 10 F.4th 879, 889 (D.C. Cir. 2021) (FOIA Exemption 5, which prohibits disclosure of materials covered by executive privilege, cannot be overcome by a showing of need). That is why there is no equivalent decision to *Cheney* in the world of FOIA—there is no need for it.

### B. The District Court Failed to Resolve the Government's Threshold Legal Challenges Before Ordering Discovery

Mandamus is appropriate on another basis as well: the district court ordered discovery from the Executive Office of the President before resolving "the Government's threshold arguments" raised in a motion to dismiss. *See In re United States*, 583 U.S. 29, 32 (2017).

Before the district court, defendants explained why plaintiff's constitutional claims against the Executive Office of the President fail as a matter of law. "[T]hose arguments, if accepted," would dispose of all claims against the Executive Office of the President and would, therefore, "eliminate the need for the District Court" to order White House discovery. *Id.* Under *Cheney*, the district court could not order White House discovery before resolving those legal questions. *Cheney* 542 U.S. at 390 (explaining that White House discovery should be a last resort). And even if the district court rejects defendants' threshold arguments, it should at least "consider certifying that ruling for interlocutory appeal under 28 U.S.C. § 1292(b)" before ordering discovery. *In re United States*, 583 U.S. at 32.

Failure to follow this process, alone, is a sufficient basis for mandamus relief. *In re United States*, 583 U.S. at 31-32 (granting mandamus because "District Court should have . . . stay[ed] implementation" of its challenged order to resolve "threshold arguments").

### C. The District Court Made No Effort to Tailor Discovery from Senior Executive Branch Officials

There is yet another basis for mandamus on this record: even if the district court could permissibly allow some discovery, notwithstanding plaintiff's failure to exhaust other avenues for relief, the district court entirely failed to be "mindful of the burdens" it "imposed on the Executive Branch" and to tailor discovery accordingly. *Cheney*, 542 U.S. at 391.

*Cheney* is again instructive. There, plaintiffs argued that the Task Force in the Executive Office of the President was subject to disclosure requirements under the Federal Advisory Committee Act because of *de facto* private members, and asked for broad discovery to prove that those disclosure obligations applied. *Id.* at 374-75. Nonetheless, the Court explained that the "everything under the sky" discovery covering "[a]ll documents identifying . . . any staff . . . of the Task Force" and virtually all of the Task Force's activities was "overly broad." *Id.* at 386-87. And

courts must first consider narrowing the requested discovery before enforcing compliance. *Id.* at 390 (discussing the "sound precedent" for a district court to narrow a subpoena *sua sponte*).

The discovery requests here parallel those in *Cheney*. Plaintiff is engaged in a fishing expedition, *e.g.*, seeking discovery about government actions that are "not described" in the Second Amended Complaint, *see, e.g.*, A297 (Interrogatory No. 4), that were "considered" but not taken, *see, e.g.*, A302 (Interrogatory No. 7), and that have nothing to do with plaintiff's core retaliation claim, *see, e.g.*, A319 (Interrogatory No. 13, addressing sanctuary-city laws). And there is no reason to believe that plaintiff will stop there.

In district court, plaintiff attempted to minimize the burden its requests would impose. It claimed to not "seek[] a broad search of all sorts of things" and that its requests were "specifically focused on the targeting of Colorado." A154. But the district court never reviewed plaintiff's discovery requests, which speak for themselves. As just one example, plaintiff seeks:

> All documents . . . describing or relating to any communications between individuals in the Executive Office of the President . . . and any individuals at any Defendant agency . . . regarding any guidance, instructions, requests, or

> communications relating to taking, considering, or proposing any action . . . against some but not all states.

A220. This request is not limited in time, limited to the plaintiff,[3] limited to actions alleged in the complaint, limited to particular officials or custodians, or otherwise tailored to ensure the narrowest necessary intrusion into the Executive Branch. Instead, plaintiff intends to subject the Executive Office of the President to dragnet inquiry into its relative treatment of the several States. That is precisely the sort of intrusion on core Executive function that *Cheney* prohibits.

Plaintiff also suggested that the Executive Office of the President could avoid the burden of being subjected to discovery by stipulating to relevant facts. A154-55. This is a red herring. Parties are never obligated to stipulate to facts or legal conclusions, and the fact that the Executive Office of the President is unwilling to stipulate to plaintiff's preferred factual narrative cannot justify discovery in violation of the separation of powers.

---

[3] The Court did limit discovery as to other States to those that have been "linked together with Colorado as targets," but at least some discovery may still be permitted. *See* A144.

The district court was also required to consider the types of discovery plaintiff proposed to propound and the precise identities of the officials from whom discovery would be sought. Consistent with its view that the entire Executive Office of the President must comply with discovery like any other litigant, the district court declined even to shield the President's closest advisors, such as the Chief of Staff and the White House Counsel, from document requests or even deposition. When discovery is sought from persons in such close operational proximity to the President, the constitutional concerns that motivated *Cheney* are at their apex. It is difficult to imagine a greater intrusion on "the autonomy of [the Executive Branch's] office" than extensive discovery from the President's personal staff and advisors. *Cheney*, 542 U.S. at 385. The district court clearly and unmistakably erred in handing plaintiff a blank check with barely a cautionary word.

For similar reasons, it is well-settled that courts must hesitate before compelling high-level Executive Branch officials to sit for depositions. "[T]he compelled appearance of a high-ranking officer of the executive branch in a judicial proceeding implicates the separation of powers," *In re United States*, 624 F.3d 1368, 1372 (11th Cir. 2010), and

"[t]he duties of high-ranking executive officers should not be interrupted by judicial demands for information that could be obtained elsewhere," *In re Cheney*, 544 F.3d 311, 314 (D.C. Cir. 2008) (per curiam); *see also Musk*, 169 F.4th 445.

With the district court's support, plaintiff has thus far resisted consenting to any tailoring of its discovery ambitions, asserting that it is instead the obligation of the Executive Office of the President to "lodge objections" to plaintiff's myriad demands. A195. But *Cheney* rejected that precise argument as well. *Cheney*, 542 U.S. at 389 (holding that the Vice President and his senior staff could not be compelled to "winnow" discovery through particularized objections). Because the district court entirely failed in its responsibility to tailor discovery from the Executive Office, mandamus would be warranted even if some discovery were otherwise appropriate.

* * *

The district court's far-reaching discovery order contravenes well-established principles of "judicial deference and restraint" in the conduct of litigation involving the Office of the President and ignores the substantial separation-of-powers concerns that plaintiff's discovery

requests raise. *Nixon*, 457 U.S. at 753. The Executive Office of the President is not just "any other party," and it cannot be treated as such for purposes of discovery. *Contra* A187.

Because the government has no alternative means for remedying the court's clear violation of established law and the irreparable intrusion on the functioning of the Executive Branch that it represents, mandamus is warranted. The Court should make clear that discovery into the Executive Office of the President is not appropriate at this time, and that even at the point plaintiff has exhausted all other avenues of discovery, the district court must appropriately account for the significant separation-of-powers concerns at play when determining whether such White House discovery is appropriate at all and, if so, whether it is appropriately tailored.

## CONCLUSION

For the foregoing reasons, this Court should grant this petition for a writ of mandamus to quash the discovery order. The Court should also grant a stay of the discovery order pending resolution of this petition, as requested in the accompanying stay motion.

Respectfully submitted,

BRETT A. SHUMATE
*Assistant Attorney General*

MARK R. FREEMAN
DANIEL TENNY

*s/ J. Kain Day*
J. KAIN DAY
*Attorneys, Appellate Staff*
*Civil Division, Room 7235*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-4214*
*j.kain.day@usdoj.gov*

August 2026

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limit of Federal Rule of Appellate Procedure 21(d)(1) because it contains 7,215 words. This motion also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 21(d) and 32(c) because it was prepared using Microsoft Word 365 in Century Schoolbook 14-point font, a proportionally spaced typeface.

*s/ J. Kain Day*
J. Kain Day

## CERTIFICATE OF SERVICE

I certify that, on August 25, 2026, I electronically filed this petition through this Court's CM/ECF system. I also certify that an original and three copies of the petition will be delivered to the Tenth Circuit. I further certify that the petition has been served on counsel by email on August 25, 2026, and will also be served by first-class mail. Finally, I certify that the petition has been served on the district court via email on August 25, 2026, and will be delivered personally in hard copy.

*s/ J. Kain Day*
J. Kain Day

# ADDENDUM

## TABLE OF CONTENTS

**Docket Entries**

Docket Sheet ........................................................................................ A1

Joint Status Report,
Dkt. No. 67 (March 6, 2026) ............................................................ A26

Scheduling Order,
Dkt. No. 76 (April 16, 2026)............................................................. A31

Second Amended Complaint,
Dkt. No. 78 (May 6, 2026)................................................................ A50

Courtroom Minutes,
Dkt. No. 101 (August 11, 2026) ...................................................... A143

Discovery Hearing Transcript,
Dkt. No. 102 (August 11, 2026) ...................................................... A145

Plaintiff's Motion for Further Proposed Findings,
Dkt. No. 106 (August 19, 2026) ...................................................... A193

**Written Discovery**

Defendants' Objections and Responses to Plaintiff's First Set of
Requests for Production (June 18, 2026) ...................................... A205

Defendants' First Supplemental Objections and Responses to
Plaintiff's First Set of Interrogatories (July 29, 2026).................. A252

**Email Correspondence**

Email and Attachment fr. Moskowitz to Jackson Chambers, et al.,
Request for Discovery Hearing (August 10, 2026)......................... A353

Email fr. Morgan to Fox, et al., Request for Conferral (August 17,
2026)................................................................................................ A360

# 1:25cv3428, State Of Colorado, The V. Trump Et Al

US District Court Docket

United States District Court, Colorado

(Denver)

**This case was retrieved on 08/24/2026**

## Header

**Case Number:** 1:25cv3428
**Date Filed:** 10/29/2025
**Assigned To:** Judge R. Brooke Jackson
**Nature of Suit:** Other Civil Rights (440)
**Cause:** - Fed. Question: Violation of Constitutional Rights
**Lead Docket:** None
**Other Docket:** None
**Jurisdiction:** U.S. Government Defendant

**Class Code:** Open
**Statute:** 28:1331vc
**Jury Demand:** None
**Demand Amount:** $0
**NOS Description:** Other Civil Rights

## Participants

### Litigants

State of Colorado, The
**Plaintiff**

### Attorneys

Reed W. Morgan
ATTORNEY TO BE NOTICED
Colorado Attorney General's Office
Ralph L. Carr Colorado Judicial Center 1300 Broadway
Denver, CO 80203
USA
720-508-6335 Email:Reed.Morgan@coag.Gov

Sarah H. Weiss
ATTORNEY TO BE NOTICED
Colorado Department of Law
1300 Broadway 10th Floor
Denver, CO 80203
USA
720-508-6910 Email:Sarah.Weiss@coag.Gov

Talia Boxerman Kraemer
ATTORNEY TO BE NOTICED
Colorado Department of Law
1300 Broadway
Denver, CO 80203
USA
646-342-9201 Email:Talia.Kraemer@coag.Gov

David Z. Moskowitz
ATTORNEY TO BE NOTICED
Colorado Department of Law
1300 Broadway 10th Floor
Denver, CO 80203
USA
720-508-6784 Email:David.Moskowitz@coag.Gov

| Litigants | Attorneys |
|---|---|
| Donald J. Trump<br>in his official capacity as President of the United States \|<br>**Defendant** | Adam Samuel Fox<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>1100 L Street Nw<br>Washington, DC 20005<br>USA<br>202-598-3791 Email:Adam.S.Fox@usdoj.Gov<br><br>Alexander J. Severance<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>1100 L Street Nw<br>Washington, DC 20005<br>USA<br>202-598-3123 Email:Alexander.J.Severance@usdoj.Gov<br><br>Marianne F. Kies<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>Civil Division, Federal Programs Branch 1100 L Street Nw 11th Floor Unit 11302<br>Washington, DC 20005<br>USA<br>202-353-1819 Email:Marianne.F.Kies@usdoj.Gov<br><br>Tyler J. Becker<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>950 Pennsylvania Avenue Nw<br>Washington, DC 20530<br>USA<br>202-514-4052 Email:Tyler.Becker@usdoj.Gov |
| Department of Defense<br>**Defendant** | Adam Samuel Fox<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>1100 L Street Nw<br>Washington, DC 20005<br>USA<br>202-598-3791 Email:Adam.S.Fox@usdoj.Gov<br><br>Alexander J. Severance<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>1100 L Street Nw<br>Washington, DC 20005<br>USA<br>202-598-3123 Email:Alexander.J.Severance@usdoj.Gov<br><br>Marianne F. Kies<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>Civil Division, Federal Programs Branch 1100 L Street Nw 11th Floor Unit 11302<br>Washington, DC 20005<br>USA<br>202-353-1819 Email:Marianne.F.Kies@usdoj.Gov<br><br>Tyler J. Becker<br>ATTORNEY TO BE NOTICED |

| Litigants | Attorneys |
|---|---|
| | U.S. Department of Justice<br>950 Pennsylvania Avenue Nw<br>Washington, DC 20530<br>USA<br>202-514-4052 Email:Tyler.Becker@usdoj.Gov |
| Pete Hegseth<br>in his official capacity as Secretary of Defense \|<br>**Defendant** | Adam Samuel Fox<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>1100 L Street Nw<br>Washington, DC 20005<br>USA<br>202-598-3791 Email:Adam.S.Fox@usdoj.Gov<br><br>Alexander J. Severance<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>1100 L Street Nw<br>Washington, DC 20005<br>USA<br>202-598-3123 Email:Alexander.J.Severance@usdoj.Gov<br><br>Marianne F. Kies<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>Civil Division, Federal Programs Branch 1100 L Street Nw 11th Floor Unit 11302<br>Washington, DC 20005<br>USA<br>202-353-1819 Email:Marianne.F.Kies@usdoj.Gov<br><br>Tyler J. Becker<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>950 Pennsylvania Avenue Nw<br>Washington, DC 20530<br>USA<br>202-514-4052 Email:Tyler.Becker@usdoj.Gov |
| Department of the Air Force<br>**Defendant** | Adam Samuel Fox<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>1100 L Street Nw<br>Washington, DC 20005<br>USA<br>202-598-3791 Email:Adam.S.Fox@usdoj.Gov<br><br>Alexander J. Severance<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>1100 L Street Nw<br>Washington, DC 20005<br>USA<br>202-598-3123 Email:Alexander.J.Severance@usdoj.Gov<br><br>Marianne F. Kies<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>Civil Division, Federal Programs Branch 1100 L Street Nw 11th Floor Unit 11302<br>Washington, DC 20005 |

| Litigants | Attorneys |
|---|---|
| | USA<br>202-353-1819 Email:Marianne.F.Kies@usdoj.Gov<br><br>Tyler J. Becker<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>950 Pennsylvania Avenue Nw<br>Washington, DC 20530<br>USA<br>202-514-4052 Email:Tyler.Becker@usdoj.Gov |
| Troy Meink<br>in his official capacity as Secretary of the Air Force \|<br>**Defendant** | Adam Samuel Fox<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>1100 L Street Nw<br>Washington, DC 20005<br>USA<br>202-598-3791 Email:Adam.S.Fox@usdoj.Gov<br><br>Alexander J. Severance<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>1100 L Street Nw<br>Washington, DC 20005<br>USA<br>202-598-3123 Email:Alexander.J.Severance@usdoj.Gov<br><br>Marianne F. Kies<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>Civil Division, Federal Programs Branch 1100 L Street Nw 11th Floor Unit 11302<br>Washington, DC 20005<br>USA<br>202-353-1819 Email:Marianne.F.Kies@usdoj.Gov<br><br>Tyler J. Becker<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>950 Pennsylvania Avenue Nw<br>Washington, DC 20530<br>USA<br>202-514-4052 Email:Tyler.Becker@usdoj.Gov |
| Sean P. Duffy<br>in his official capacity as Secretary of Transportation \|<br>**Defendant** | Adam Samuel Fox<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>1100 L Street Nw<br>Washington, DC 20005<br>USA<br>202-598-3791 Email:Adam.S.Fox@usdoj.Gov<br><br>Alexander J. Severance<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>1100 L Street Nw<br>Washington, DC 20005<br>USA<br>202-598-3123 Email:Alexander.J.Severance@usdoj.Gov |

| Litigants | Attorneys |
|---|---|
| | Marianne F. Kies<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>Civil Division, Federal Programs Branch 1100 L Street Nw 11th Floor Unit 11302<br>Washington, DC 20005<br>USA<br>202-353-1819 Email:Marianne.F.Kies@usdoj.Gov<br><br>Tyler J. Becker<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>950 Pennsylvania Avenue Nw<br>Washington, DC 20530<br>USA<br>202-514-4052 Email:Tyler.Becker@usdoj.Gov |
| Brooke Rollins<br>in her official capacity as Secretary of Agriculture \|<br>**Defendant** | Adam Samuel Fox<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>1100 L Street Nw<br>Washington, DC 20005<br>USA<br>202-598-3791 Email:Adam.S.Fox@usdoj.Gov<br><br>Alexander J. Severance<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>1100 L Street Nw<br>Washington, DC 20005<br>USA<br>202-598-3123 Email:Alexander.J.Severance@usdoj.Gov<br><br>Marianne F. Kies<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>Civil Division, Federal Programs Branch 1100 L Street Nw 11th Floor Unit 11302<br>Washington, DC 20005<br>USA<br>202-353-1819 Email:Marianne.F.Kies@usdoj.Gov<br><br>Tyler J. Becker<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>950 Pennsylvania Avenue Nw<br>Washington, DC 20530<br>USA<br>202-514-4052 Email:Tyler.Becker@usdoj.Gov |
| Chris Wright<br>in his official capacity as Secretary of Energy \|<br>**Defendant** | Adam Samuel Fox<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>1100 L Street Nw<br>Washington, DC 20005<br>USA<br>202-598-3791 Email:Adam.S.Fox@usdoj.Gov<br><br>Alexander J. Severance<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice |

| **Litigants** | **Attorneys** |
|---|---|
| | 1100 L Street Nw<br>Washington, DC 20005<br>USA<br>202-598-3123 Email:Alexander.J.Severance@usdoj.Gov<br><br>Marianne F. Kies<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>Civil Division, Federal Programs Branch 1100 L Street Nw 11th Floor Unit 11302<br>Washington, DC 20005<br>USA<br>202-353-1819 Email:Marianne.F.Kies@usdoj.Gov<br><br>Tyler J. Becker<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>950 Pennsylvania Avenue Nw<br>Washington, DC 20530<br>USA<br>202-514-4052 Email:Tyler.Becker@usdoj.Gov |
| DOUG BURGUM<br>in his official capacity as Secretary of the Interior \|<br>**Defendant** | Adam Samuel Fox<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>1100 L Street Nw<br>Washington, DC 20005<br>USA<br>202-598-3791 Email:Adam.S.Fox@usdoj.Gov<br><br>Alexander J. Severance<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>1100 L Street Nw<br>Washington, DC 20005<br>USA<br>202-598-3123 Email:Alexander.J.Severance@usdoj.Gov<br><br>Marianne F. Kies<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>Civil Division, Federal Programs Branch 1100 L Street Nw 11th Floor Unit 11302<br>Washington, DC 20005<br>USA<br>202-353-1819 Email:Marianne.F.Kies@usdoj.Gov<br><br>Tyler J. Becker<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>950 Pennsylvania Avenue Nw<br>Washington, DC 20530<br>USA<br>202-514-4052 Email:Tyler.Becker@usdoj.Gov |
| Kristi Noem<br>in her official capacity as Secretary of Homeland Security \|<br>**Defendant** | Adam Samuel Fox<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>1100 L Street Nw<br>Washington, DC 20005<br>USA |

## Litigants

## Attorneys

202-598-3791 Email:Adam.S.Fox@usdoj.Gov

Alexander J. Severance
ATTORNEY TO BE NOTICED
U.S. Department of Justice
1100 L Street Nw
Washington, DC 20005
USA
202-598-3123 Email:Alexander.J.Severance@usdoj.Gov

Marianne F. Kies
ATTORNEY TO BE NOTICED
U.S. Department of Justice
Civil Division, Federal Programs Branch 1100 L Street Nw 11th Floor Unit 11302
Washington, DC 20005
USA
202-353-1819 Email:Marianne.F.Kies@usdoj.Gov

Tyler J. Becker
ATTORNEY TO BE NOTICED
U.S. Department of Justice
950 Pennsylvania Avenue Nw
Washington, DC 20530
USA
202-514-4052 Email:Tyler.Becker@usdoj.Gov

Karen S. Evans
in her official capacity as Acting Director of the Federal Emergency Management Agency |
**Defendant**

Adam Samuel Fox
ATTORNEY TO BE NOTICED
U.S. Department of Justice
1100 L Street Nw
Washington, DC 20005
USA
202-598-3791 Email:Adam.S.Fox@usdoj.Gov

Alexander J. Severance
ATTORNEY TO BE NOTICED
U.S. Department of Justice
1100 L Street Nw
Washington, DC 20005
USA
202-598-3123 Email:Alexander.J.Severance@usdoj.Gov

Marianne F. Kies
ATTORNEY TO BE NOTICED
U.S. Department of Justice
Civil Division, Federal Programs Branch 1100 L Street Nw 11th Floor Unit 11302
Washington, DC 20005
USA
202-353-1819 Email:Marianne.F.Kies@usdoj.Gov

Tyler J. Becker
ATTORNEY TO BE NOTICED
U.S. Department of Justice
950 Pennsylvania Avenue Nw
Washington, DC 20530
USA
202-514-4052 Email:Tyler.Becker@usdoj.Gov

| Litigants | Attorneys |
|---|---|
| Pam Bondi<br>in her official capacity as Attorney General \|<br>**Defendant** | Adam Samuel Fox<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>1100 L Street Nw<br>Washington, DC 20005<br>USA<br>202-598-3791 Email:Adam.S.Fox@usdoj.Gov<br><br>Alexander J. Severance<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>1100 L Street Nw<br>Washington, DC 20005<br>USA<br>202-598-3123 Email:Alexander.J.Severance@usdoj.Gov<br><br>Marianne F. Kies<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>Civil Division, Federal Programs Branch 1100 L Street Nw 11th Floor Unit 11302<br>Washington, DC 20005<br>USA<br>202-353-1819 Email:Marianne.F.Kies@usdoj.Gov<br><br>Tyler J. Becker<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>950 Pennsylvania Avenue Nw<br>Washington, DC 20530<br>USA<br>202-514-4052 Email:Tyler.Becker@usdoj.Gov |
| Brian Stone<br>in his official capacity as Acting Director of the National Science Foundation \|<br>**Defendant** | Adam Samuel Fox<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>1100 L Street Nw<br>Washington, DC 20005<br>USA<br>202-598-3791 Email:Adam.S.Fox@usdoj.Gov<br><br>Alexander J. Severance<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>1100 L Street Nw<br>Washington, DC 20005<br>USA<br>202-598-3123 Email:Alexander.J.Severance@usdoj.Gov<br><br>Marianne F. Kies<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>Civil Division, Federal Programs Branch 1100 L Street Nw 11th Floor Unit 11302<br>Washington, DC 20005<br>USA<br>202-353-1819 Email:Marianne.F.Kies@usdoj.Gov<br><br>Tyler J. Becker<br>ATTORNEY TO BE NOTICED |

| Litigants | Attorneys |
|---|---|
| | U.S. Department of Justice<br>950 Pennsylvania Avenue Nw<br>Washington, DC 20530<br>USA<br>202-514-4052 Email:Tyler.Becker@usdoj.Gov |
| Executive Office of the President<br>**Defendant** | Adam Samuel Fox<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>1100 L Street Nw<br>Washington, DC 20005<br>USA<br>202-598-3791 Email:Adam.S.Fox@usdoj.Gov<br><br>Alexander J. Severance<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>1100 L Street Nw<br>Washington, DC 20005<br>USA<br>202-598-3123 Email:Alexander.J.Severance@usdoj.Gov<br><br>Marianne F. Kies<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>Civil Division, Federal Programs Branch 1100 L Street Nw 11th Floor Unit 11302<br>Washington, DC 20005<br>USA<br>202-353-1819 Email:Marianne.F.Kies@usdoj.Gov<br><br>Tyler J. Becker<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>950 Pennsylvania Avenue Nw<br>Washington, DC 20530<br>USA<br>202-514-4052 Email:Tyler.Becker@usdoj.Gov |
| Department of Transportation<br>**Defendant** | Adam Samuel Fox<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>1100 L Street Nw<br>Washington, DC 20005<br>USA<br>202-598-3791 Email:Adam.S.Fox@usdoj.Gov<br><br>Alexander J. Severance<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>1100 L Street Nw<br>Washington, DC 20005<br>USA<br>202-598-3123 Email:Alexander.J.Severance@usdoj.Gov<br><br>Marianne F. Kies<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>Civil Division, Federal Programs Branch 1100 L Street Nw 11th Floor Unit 11302<br>Washington, DC 20005 |

| Litigants | Attorneys |
|---|---|
| | USA<br>202-353-1819 Email:Marianne.F.Kies@usdoj.Gov<br><br>Tyler J. Becker<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>950 Pennsylvania Avenue Nw<br>Washington, DC 20530<br>USA<br>202-514-4052 Email:Tyler.Becker@usdoj.Gov |
| Department of Agriculture<br>**Defendant** | Adam Samuel Fox<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>1100 L Street Nw<br>Washington, DC 20005<br>USA<br>202-598-3791 Email:Adam.S.Fox@usdoj.Gov<br><br>Alexander J. Severance<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>1100 L Street Nw<br>Washington, DC 20005<br>USA<br>202-598-3123 Email:Alexander.J.Severance@usdoj.Gov<br><br>Marianne F. Kies<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>Civil Division, Federal Programs Branch 1100 L Street Nw 11th Floor Unit 11302<br>Washington, DC 20005<br>USA<br>202-353-1819 Email:Marianne.F.Kies@usdoj.Gov<br><br>Tyler J. Becker<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>950 Pennsylvania Avenue Nw<br>Washington, DC 20530<br>USA<br>202-514-4052 Email:Tyler.Becker@usdoj.Gov |
| Department of Energy<br>**Defendant** | Adam Samuel Fox<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>1100 L Street Nw<br>Washington, DC 20005<br>USA<br>202-598-3791 Email:Adam.S.Fox@usdoj.Gov<br><br>Alexander J. Severance<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>1100 L Street Nw<br>Washington, DC 20005<br>USA<br>202-598-3123 Email:Alexander.J.Severance@usdoj.Gov |

| Litigants | Attorneys |
|---|---|
| | Marianne F. Kies<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>Civil Division, Federal Programs Branch 1100 L Street Nw 11th Floor Unit 11302<br>Washington, DC 20005<br>USA<br>202-353-1819 Email:Marianne.F.Kies@usdoj.Gov<br><br>Tyler J. Becker<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>950 Pennsylvania Avenue Nw<br>Washington, DC 20530<br>USA<br>202-514-4052 Email:Tyler.Becker@usdoj.Gov |
| Department of the Interior, The<br>**Defendant** | Adam Samuel Fox<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>1100 L Street Nw<br>Washington, DC 20005<br>USA<br>202-598-3791 Email:Adam.S.Fox@usdoj.Gov<br><br>Alexander J. Severance<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>1100 L Street Nw<br>Washington, DC 20005<br>USA<br>202-598-3123 Email:Alexander.J.Severance@usdoj.Gov<br><br>Marianne F. Kies<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>Civil Division, Federal Programs Branch 1100 L Street Nw 11th Floor Unit 11302<br>Washington, DC 20005<br>USA<br>202-353-1819 Email:Marianne.F.Kies@usdoj.Gov<br><br>Tyler J. Becker<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>950 Pennsylvania Avenue Nw<br>Washington, DC 20530<br>USA<br>202-514-4052 Email:Tyler.Becker@usdoj.Gov |
| Department of Homeland Security<br>**Defendant** | Adam Samuel Fox<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>1100 L Street Nw<br>Washington, DC 20005<br>USA<br>202-598-3791 Email:Adam.S.Fox@usdoj.Gov<br><br>Alexander J. Severance<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice |

## Litigants

## Attorneys

1100 L Street Nw
Washington, DC 20005
USA
202-598-3123 Email:Alexander.J.Severance@usdoj.Gov

Marianne F. Kies
ATTORNEY TO BE NOTICED
U.S. Department of Justice
Civil Division, Federal Programs Branch 1100 L Street Nw 11th Floor Unit 11302
Washington, DC 20005
USA
202-353-1819 Email:Marianne.F.Kies@usdoj.Gov

Tyler J. Becker
ATTORNEY TO BE NOTICED
U.S. Department of Justice
950 Pennsylvania Avenue Nw
Washington, DC 20530
USA
202-514-4052 Email:Tyler.Becker@usdoj.Gov

Federal Emergency Management Agency
**Defendant**

Adam Samuel Fox
ATTORNEY TO BE NOTICED
U.S. Department of Justice
1100 L Street Nw
Washington, DC 20005
USA
202-598-3791 Email:Adam.S.Fox@usdoj.Gov

Alexander J. Severance
ATTORNEY TO BE NOTICED
U.S. Department of Justice
1100 L Street Nw
Washington, DC 20005
USA
202-598-3123 Email:Alexander.J.Severance@usdoj.Gov

Marianne F. Kies
ATTORNEY TO BE NOTICED
U.S. Department of Justice
Civil Division, Federal Programs Branch 1100 L Street Nw 11th Floor Unit 11302
Washington, DC 20005
USA
202-353-1819 Email:Marianne.F.Kies@usdoj.Gov

Tyler J. Becker
ATTORNEY TO BE NOTICED
U.S. Department of Justice
950 Pennsylvania Avenue Nw
Washington, DC 20530
USA
202-514-4052 Email:Tyler.Becker@usdoj.Gov

Department of Justice
**Defendant**

Adam Samuel Fox
ATTORNEY TO BE NOTICED
U.S. Department of Justice
1100 L Street Nw
Washington, DC 20005
USA

| Litigants | Attorneys |
|---|---|
| | 202-598-3791 Email:Adam.S.Fox@usdoj.Gov<br><br>Alexander J. Severance<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>1100 L Street Nw<br>Washington, DC 20005<br>USA<br>202-598-3123 Email:Alexander.J.Severance@usdoj.Gov<br><br>Marianne F. Kies<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>Civil Division, Federal Programs Branch 1100 L Street Nw 11th Floor Unit 11302<br>Washington, DC 20005<br>USA<br>202-353-1819 Email:Marianne.F.Kies@usdoj.Gov<br><br>Tyler J. Becker<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>950 Pennsylvania Avenue Nw<br>Washington, DC 20530<br>USA<br>202-514-4052 Email:Tyler.Becker@usdoj.Gov |
| National Science Foundation<br>**Defendant** | Adam Samuel Fox<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>1100 L Street Nw<br>Washington, DC 20005<br>USA<br>202-598-3791 Email:Adam.S.Fox@usdoj.Gov<br><br>Alexander J. Severance<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>1100 L Street Nw<br>Washington, DC 20005<br>USA<br>202-598-3123 Email:Alexander.J.Severance@usdoj.Gov<br><br>Marianne F. Kies<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>Civil Division, Federal Programs Branch 1100 L Street Nw 11th Floor Unit 11302<br>Washington, DC 20005<br>USA<br>202-353-1819 Email:Marianne.F.Kies@usdoj.Gov<br><br>Tyler J. Becker<br>ATTORNEY TO BE NOTICED<br>U.S. Department of Justice<br>950 Pennsylvania Avenue Nw<br>Washington, DC 20530<br>USA<br>202-514-4052 Email:Tyler.Becker@usdoj.Gov |

| Litigants | Attorneys |
|---|---|
| JACOB VALINE<br>**Amicus** | |
| The Greater Colorado Springs Chamber of Commerce and Economic Development Corporation<br>**Amicus** | Wayne W. Williams<br>ATTORNEY TO BE NOTICED<br>Wayne Williams, Law Offices of<br>3472 Research Parkway Suite 104-200<br>Colorado Springs, CO 80920<br>USA<br>719-439-1870 Email:Waynewilliamslaw@comcast.Net |
| State of Alabama<br>**Amicus** | Matthew Ryan Duggan<br>LEAD ATTORNEY;ATTORNEY TO BE NOTICED<br>Alabama Attorney General's Office<br>501 Washington Avenue<br>Montgomery, AL 36130<br>USA<br>334-242-7300 Email:Matt.Duggan@alabamaag.Gov<br><br>Alexander Barrett Bowdre<br>ATTORNEY TO BE NOTICED<br>Alabama Attorney General's Office<br>501 Washington Avenue<br>Montgomery, AL 36130<br>USA<br>334-242-7300 Fax: 334-353-8400<br>Email:Barrett.Bowdre@alabamaag.Gov |
| State of California<br>**Amicus** | Vanessa K. Ing<br>ATTORNEY TO BE NOTICED<br>California Department of Justice<br>455 Golden Gate Avenue 11th Floor<br>San Francisco, CA 94102<br>USA<br>415-510-3464 Email:Vanessa.Ing@doj.Ca.Gov |

## Proceedings

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 1 | 10/29/2025 | COMPLAINT against Department of Defense, Department of the Air Force, Pete Hegseth, Troy Meink, Donald J. Trump (Filing fee $ 405,Receipt Number ACODC-10634936)Attorney David Z. Moskowitz added to party State of Colorado(pty:pla), filed by State of Colorado. (Attachments: # 1 Civil Cover Sheet)(Moskowitz, David) (Entered: 10/29/2025) | |
| 2 | 10/29/2025 | Case assigned to Judge R. Brooke Jackson and drawn to Magistrate Judge Cyrus Y. Chung. Text Only Entry. (echa, ) (Entered: 10/29/2025) | |
| 3 | 10/29/2025 | Magistrate Judge consent form issued pursuant to 28 U.S.C. 636(c). (echa, ) (Entered: 10/29/2025) | |
| 4 | 10/29/2025 | SUMMONS REQUEST as to Donald J. Trump, in his official capacity as President of the United States by Plaintiff State of Colorado, The. (Moskowitz, David) (Entered: 10/29/2025) | |
| 5 | 10/29/2025 | SUMMONS REQUEST as to Department of Defense by Plaintiff State of Colorado, The. (Moskowitz, David) (Entered: 10/29/2025) | |
| 6 | 10/29/2025 | SUMMONS REQUEST as to Pete Hegseth, in his official capacity as Secretary of Defense by Plaintiff State of Colorado, The. (Moskowitz, David) (Entered: 10/29/2025) | |
| 7 | 10/29/2025 | SUMMONS REQUEST as to Department of the Air Force by Plaintiff State of Colorado, The. (Moskowitz, David) (Entered: 10/29/2025) | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 8 | 10/29/2025 | SUMMONS REQUEST as to Troy Meink, in his official capacity as Secretary of the Air Force by Plaintiff State of Colorado, The. (Moskowitz, David) (Entered: 10/29/2025) | |
| 9 | 10/29/2025 | NOTICE of Entry of Appearance by Talia Boxerman Kraemer on behalf of State of Colorado, TheAttorney Talia Boxerman Kraemer added to party State of Colorado, The(pty:pla) (Kraemer, Talia) (Entered: 10/29/2025) | |
| 10 | 10/29/2025 | NOTICE of Entry of Appearance by Sarah H. Weiss on behalf of State of Colorado, TheAttorney Sarah H. Weiss added to party State of Colorado, The(pty:pla) (Weiss, Sarah) (Entered: 10/29/2025) | |
| 11 | 10/30/2025 | Administrative Notice re: [4-8]: The summonses will not be issued due to an incomplete case caption. The summonses must list all parties; "et al." cannot substitute the listing of all parties named in the case per Fed Civ. Rule 4. Please file completed summons for issuance using the event "Summons Request." (Text Only Entry) (jrobe, ) (Entered: 10/30/2025) | |
| 12 | 10/30/2025 | SUMMONS REQUEST as to Donald J. Trump, in his official capacity as President of the United States by Plaintiff State of Colorado, The. (Moskowitz, David) (Entered: 10/30/2025) | |
| 13 | 10/30/2025 | SUMMONS REQUEST as to Department of Defense by Plaintiff State of Colorado, The. (Moskowitz, David) (Entered: 10/30/2025) | |
| 14 | 10/30/2025 | SUMMONS REQUEST as to Pete Hegseth, in his official capacity as Secretary of Defense by Plaintiff State of Colorado, The. (Moskowitz, David) (Entered: 10/30/2025) | |
| 15 | 10/30/2025 | SUMMONS REQUEST as to Department of the Air Force by Plaintiff State of Colorado, The. (Moskowitz, David) (Entered: 10/30/2025) | |
| 16 | 10/30/2025 | SUMMONS REQUEST as to Troy Meink, in his official capacity as Secretary of the Air Force by Plaintiff State of Colorado, The. (Moskowitz, David) (Entered: 10/30/2025) | |
| 17 | 10/31/2025 | MOTION to Leave to File Amicus Brief, by Amicus Jacob Valine. (Attachments: # 1 Proposed Amicus Brief)(ccuen, ) (Entered: 10/31/2025) | |
| 18 | 10/31/2025 | ORDER denying 17 Motion to File Amicus Brief. Mr. Valine, thank you for your motion and tendered amicus brief. I admire your brevity. However, courts consider multiple factors in deciding whether to grant leave to file an amicus brief, including whether counsel is capable of making arguments without the assistance of the amicus, the strength of the information and arguments, and the usefulness of the information and arguments presented. See, e.g., Oregon-California Trails Ass'n v. Walsh, 451 F. Supp. 3d 1007, 1073 (D. Colo. 2020). Your brief indicates that the proposed move of the Space Command could adversely affect your anticipated career path, and that you support the plaintiff's position. However, in terms of the factual and legal bases for or against the position of the plaintiffs, I am certain that excellent counsel on both sides will be able to present the facts and make the arguments. The Court will do its best to make the right decision on the facts and the law presented. I wish you well in your career. by Judge R. Brooke Jackson on 10/31/25. Text Only Entry(rbj) (Entered: 10/31/2025) | |
| 19 | 11/04/2025 | MINUTE ORDER. The Court orders that the parties confer and attempt to agree on a schedule and then file a proposed scheduling order no later than 45 days after the answer, motion to dismiss, or other response to the complaint is filed pointing out any areas of disagreement. The parties shall email the proposed order to Jackson_Chambers@cod.uscourts.gov in Word format and e-file it into CM/ECF. Without holding a Scheduling Conference, the Court will review and enter the order making such amendments and rulings as are appropriate and will provide the parties with potential trial preparation conference and trial dates for you to choose from. If the parties prefer that the Court hold a Scheduling Conference, please notify Chambers by email by the date the proposed scheduling order is due, and the Court's staff will provide the parties with | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | a Scheduling Conference date. The proposed scheduling order should be prepared as described in the Local Rules. Instructions for the preparation of a scheduling order and a form scheduling order can be downloaded from the Courts website: http://www.cod.uscourts.gov/CourtOperations/RulesProcedures/Forms.aspx. By Judge R. Brooke Jackson on November 4, 2025. by Judge R. Brooke Jackson on 11/4/2025. Text Only Entry (rbjlc9, ) (Entered: 11/04/2025) | |
| 20 | 11/12/2025 | SUMMONS issued by Clerk. (norlin, ) (Entered: 11/12/2025) | |
| 21 | 11/18/2025 | SUMMONS Returned Executed upon defendant(s) Department of Defense served on 11/18/2025, answer due 1/20/2026; Department of the Air Force served on 11/18/2025, answer due 1/20/2026; Pete Hegseth served on 11/18/2025, answer due 1/20/2026; Troy Meink served on 11/18/2025, answer due 1/20/2026; Donald J. Trump served on 11/18/2025, answer due 1/20/2026. (Attachments: # 1 Affidavit of Certified Mail Service on Defendants)(Moskowitz, David) (Entered: 11/18/2025) | |
| 22 | 12/03/2025 | NOTICE of Entry of Appearance by Marianne F. Kies on behalf of All Defendants Attorney Marianne F. Kies added to party Department of Defense(pty:dft), Attorney Marianne F. Kies added to party Department of the Air Force(pty:dft), Attorney Marianne F. Kies added to party Pete Hegseth(pty:dft), Attorney Marianne F. Kies added to party Troy Meink(pty:dft), Attorney Marianne F. Kies added to party Donald J. Trump(pty:dft) (Kies, Marianne) (Entered: 12/03/2025) | |
| 23 | 01/05/2026 | Unopposed MOTION for Extension of Time to File Answer or Otherwise Respond re 1 Complaint, by Defendants Department of Defense, Department of the Air Force, Pete Hegseth, Troy Meink, Donald J. Trump. (Kies, Marianne) (Entered: 01/05/2026) | |
| 24 | 01/05/2026 | ORDER granting 23 Motion for Extension of Time to Answer or Otherwise Respond re 23 Unopposed MOTION for Extension of Time to File Answer or Otherwise Respond re 1 Complaint, All Defendants. The Complaint raises constitutional and statutory issues related to the President's executive authority and federalism, the motion is unopposed, and it is the defendants' first request. Therefore, there is good cause to grant the instant motion. By Judge R. Brooke Jackson on 1/5/2025. Text Only Entry (rbjlc9,) (Entered: 01/05/2026) | |
| 25 | 01/08/2026 | NOTICE of Filing Amended Pleading re 1 Complaint, by Plaintiff State of Colorado, The (Attachments: # 1 Exhibit Amended Complaint Redline)(Moskowitz, David) (Entered: 01/08/2026) | |
| 26 | 01/08/2026 | AMENDED COMPLAINT against Department of Defense, Department of the Air Force, Pete Hegseth, Troy Meink, Donald J. Trump, Sean P. Duffy, Brooke Rollins, Chris Wright, Doug Burgum, Kristi Noem, Karen S. Evans, Pam Bondi, Brian Stone, Executive Office of the President, Department of Transportation, Department of Agriculture, Department of Energy, Department of the Interior, The, Department of Homeland Security, Federal Emergency Management Agency, Department of Justice, National Science Foundation, filed by State of Colorado, The. (Attachments: # 1 Exhibit #1 - Letter)(Moskowitz, David) (Entered: 01/08/2026) | |
| 27 | 01/08/2026 | SUMMONS REQUEST as to Pam Bondi re 26 Amended Complaint,, by Plaintiff State of Colorado, The. (Moskowitz, David) (Entered: 01/08/2026) | |
| 28 | 01/08/2026 | SUMMONS REQUEST as to Karen Evans re 26 Amended Complaint,, by Plaintiff State of Colorado, The. (Moskowitz, David) (Entered: 01/08/2026) | |
| 29 | 01/08/2026 | SUMMONS REQUEST as to Federal Emergency Management Agency re 26 Amended Complaint,, by Plaintiff State of Colorado, The. (Moskowitz, David) (Entered: 01/08/2026) | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 30 | 01/08/2026 | SUMMONS REQUEST as to Doug Burgum re 26 Amended Complaint,, by Plaintiff State of Colorado, The. (Moskowitz, David) (Entered: 01/08/2026) | |
| 31 | 01/08/2026 | SUMMONS REQUEST as to Department of Agriculture re 26 Amended Complaint,, by Plaintiff State of Colorado, The. (Moskowitz, David) (Entered: 01/08/2026) | |
| 32 | 01/08/2026 | SUMMONS REQUEST as to Department of the Interior re 26 Amended Complaint,, by Plaintiff State of Colorado, The. (Moskowitz, David) (Entered: 01/08/2026) | |
| 33 | 01/08/2026 | SUMMONS REQUEST as to Department of Homeland Security re 26 Amended Complaint,, by Plaintiff State of Colorado, The. (Moskowitz, David) (Entered: 01/08/2026) | |
| 34 | 01/08/2026 | SUMMONS REQUEST as to Department of Energy re 26 Amended Complaint,, by Plaintiff State of Colorado, The. (Moskowitz, David) (Entered: 01/08/2026) | |
| 35 | 01/08/2026 | SUMMONS REQUEST as to Department of Justice re 26 Amended Complaint,, by Plaintiff State of Colorado, The. (Moskowitz, David) (Entered: 01/08/2026) | |
| 36 | 01/08/2026 | SUMMONS REQUEST as to Department of Transportation re 26 Amended Complaint,, by Plaintiff State of Colorado, The. (Moskowitz, David) (Entered: 01/08/2026) | |
| 37 | 01/08/2026 | SUMMONS REQUEST as to Sean Duffy re 26 Amended Complaint,, by Plaintiff State of Colorado, The. (Moskowitz, David) (Entered: 01/08/2026) | |
| 38 | 01/08/2026 | SUMMONS REQUEST as to Executive Office of the President re 26 Amended Complaint,, by Plaintiff State of Colorado, The. (Moskowitz, David) (Entered: 01/08/2026) | |
| 39 | 01/08/2026 | SUMMONS REQUEST as to Kristi Noem re 26 Amended Complaint,, by Plaintiff State of Colorado, The. (Moskowitz, David) (Entered: 01/08/2026) | |
| 40 | 01/08/2026 | SUMMONS REQUEST as to National Science Foundation re 26 Amended Complaint,, by Plaintiff State of Colorado, The. (Moskowitz, David) (Entered: 01/08/2026) | |
| 41 | 01/08/2026 | SUMMONS REQUEST as to Brooke Rollins re 26 Amended Complaint,, by Plaintiff State of Colorado, The. (Moskowitz, David) (Entered: 01/08/2026) | |
| 42 | 01/08/2026 | SUMMONS REQUEST as to Brian Stone re 26 Amended Complaint,, by Plaintiff State of Colorado, The. (Moskowitz, David) (Entered: 01/08/2026) | |
| 43 | 01/08/2026 | SUMMONS REQUEST as to Chris Wright re 26 Amended Complaint,, by Plaintiff State of Colorado, The. (Moskowitz, David) (Entered: 01/08/2026) | |
| 44 | 01/09/2026 | Unopposed MOTION for Leave to File Excess Pages by Plaintiff State of Colorado, The. (Moskowitz, David) (Entered: 01/09/2026) | |
| 45 | 01/12/2026 | ORDER granting 44 Motion for Leave to File Excess Pages. Plaintiff has shown good cause for leave to file a 25-page opening brief in light of the substantial factual and legal issues involved. The Court notes that the motion is unopposed. Defendants are likewise permitted to file a 25-page brief in opposition. By Judge R. Brooke Jackson on 1/12/2026. Text Only Entry (rbjlc9, ). (Entered: 01/12/2026) | |
| 46 | 01/12/2026 | MOTION for Preliminary Injunction by Plaintiff State of Colorado, The. (Attachments: # 1 Exhibit #1 - Declaration of Abby McClelland, # 2 Exhibit #2 - 1995 Code of Federal Regulations)(Moskowitz, David) (Entered: 01/12/2026) | |
| 47 | 01/14/2026 | Unopposed MOTION to Expedite Briefing Schedule for Preliminary Injunction Motion (Dkt. 46) by Plaintiff State of Colorado, The. (Moskowitz, David) (Entered: 01/14/2026) | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 48 | 01/14/2026 | ORDER granting 47 Motion to Expedite. For good cause shown, the Court grants Plaintiff's Motion to Expedite and Orders the briefing schedule proposed by the parties therein. By Judge R. Brooke Jackson on 1/14/2026. Text Only Entry (rbjlc9, ). (Entered: 01/14/2026) | |
| 49 | 01/16/2026 | SUMMONS issued by Clerk. (ccuen, ) (Entered: 01/16/2026) | |
| 50 | 01/21/2026 | NOTICE of Entry of Appearance by Tyler J. Becker on behalf of All Defendants Attorney Tyler J. Becker added to party Pam Bondi(pty:dft), Attorney Tyler J. Becker added to party Doug Burgum(pty:dft), Attorney Tyler J. Becker added to party Department of Agriculture(pty:dft), Attorney Tyler J. Becker added to party Department of Defense(pty:dft), Attorney Tyler J. Becker added to party Department of Energy(pty:dft), Attorney Tyler J. Becker added to party Department of Homeland Security(pty:dft), Attorney Tyler J. Becker added to party Department of Justice(pty:dft), Attorney Tyler J. Becker added to party Department of Transportation(pty:dft), Attorney Tyler J. Becker added to party Department of the Air Force(pty:dft), Attorney Tyler J. Becker added to party Department of the Interior, The(pty:dft), Attorney Tyler J. Becker added to party Sean P. Duffy(pty:dft), Attorney Tyler J. Becker added to party Karen S. Evans(pty:dft), Attorney Tyler J. Becker added to party Executive Office of the President(pty:dft), Attorney Tyler J. Becker added to party Federal Emergency Management Agency(pty:dft), Attorney Tyler J. Becker added to party Pete Hegseth(pty:dft), Attorney Tyler J. Becker added to party Troy Meink(pty:dft), Attorney Tyler J. Becker added to party National Science Foundation(pty:dft), Attorney Tyler J. Becker added to party Kristi Noem(pty:dft), Attorney Tyler J. Becker added to party Brooke Rollins(pty:dft), Attorney Tyler J. Becker added to party Brian Stone(pty:dft), Attorney Tyler J. Becker added to party Donald J. Trump(pty:dft), Attorney Tyler J. Becker added to party Chris Wright(pty:dft) (Becker, Tyler) (Entered: 01/21/2026) | |
| 51 | 01/21/2026 | SUMMONS Returned Executed upon defendant(s) Pam Bondi served on 1/21/2026, answer due 3/23/2026; Doug Burgum served on 1/21/2026, answer due 3/23/2026; Department of Agriculture served on 1/21/2026, answer due 3/23/2026; Department of Defense served on 1/21/2026, answer due 3/23/2026; Department of Energy served on 1/21/2026, answer due 3/23/2026; Department of Homeland Security served on 1/21/2026, answer due 3/23/2026; Department of Justice served on 1/21/2026, answer due 3/23/2026; Department of Transportation served on 1/21/2026, answer due 3/23/2026; Department of the Air Force served on 1/21/2026, answer due 3/23/2026; Department of the Interior, The served on 1/21/2026, answer due 3/23/2026; Sean P. Duffy served on 1/21/2026, answer due 3/23/2026; Karen S. Evans served on 1/21/2026, answer due 3/23/2026; Executive Office of the President served on 1/21/2026, answer due 3/23/2026; Federal Emergency Management Agency served on 1/21/2026, answer due 3/23/2026; Pete Hegseth served on 1/21/2026, answer due 3/23/2026; Troy Meink served on 1/21/2026, answer due 3/23/2026; National Science Foundation served on 1/21/2026, answer due 3/23/2026; Kristi Noem served on 1/21/2026, answer due 3/23/2026; Brooke Rollins served on 1/21/2026, answer due 3/23/2026; Brian Stone served on 1/21/2026, answer due 3/23/2026; Donald J. Trump served on 1/21/2026, answer due 3/23/2026; Chris Wright served on 1/21/2026, answer due 3/23/2026. (Attachments: # 1 Affidavit)(Moskowitz, David) (Entered: 01/21/2026) | |
| 52 | 01/22/2026 | BRIEF in Opposition to 46 MOTION for Preliminary Injunction filed by Defendants Pam Bondi, Doug Burgum, Department of Agriculture, Department of Defense, Department of Energy, Department of Homeland Security, Department of Justice, Department of Transportation, Department of the Air Force, Department of the Interior, The, Sean P. Duffy, Karen S. Evans, Executive Office of the President, Federal Emergency Management Agency, Pete Hegseth, Troy Meink, | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | National Science Foundation, Kristi Noem, Brooke Rollins, Brian Stone, Donald J. Trump, Chris Wright. (Attachments: # 1 Ex. 1 - Corley Declaration)(Becker, Tyler) (Entered: 01/22/2026) | |
| 53 | 01/23/2026 | MINUTE ORDER The Court has reviewed the motion for a preliminary injunction and the response. Without commenting on the merits of either partys position at this time, the Courts impression is that the parties have not conferred, and that the parties might benefit from good faith discussion about the recertification process and a more realistic timeframe. Accordingly, the Court tentatively sets oral argument at 9:00 a.m. on January 28, 2026. The Court directs counsel for the parties to confer over the weekend, in person or by video teleconference, with the goal of negotiating a more practical timeframe for recertification and other details of the process. The parties are directed to inform the court by January 27, 2026, and preferably sooner, whether they have reached an agreement that would render the need for a hearing and a possible preliminary injunction moot. By Judge R. Brooke Jackson on 1/23/2026. Text Only Entry (rbjlc9, ). (Entered: 01/23/2026) | |
| 54 | 01/24/2026 | Unopposed MOTION for Leave to Appear at January 28, 2026 Hearing By Telephone or Video in Light of Inclement Weather by Defendants Pam Bondi, Doug Burgum, Department of Agriculture, Department of Defense, Department of Energy, Department of Homeland Security, Department of Justice, Department of Transportation, Department of the Air Force, Department of the Interior, The, Sean P. Duffy, Karen S. Evans, Executive Office of the President, Federal Emergency Management Agency, Pete Hegseth, Troy Meink, National Science Foundation, Kristi Noem, Brooke Rollins, Brian Stone, Donald J. Trump, Chris Wright. (Becker, Tyler) (Entered: 01/24/2026) | |
| 55 | 01/26/2026 | NOTICE re 53 Minute Order,,, JOINT NOTICE by Plaintiff State of Colorado, The (Moskowitz, David) (Entered: 01/26/2026) | |
| 56 | 01/26/2026 | Unopposed MOTION for Leave to File Excess Pages by Plaintiff State of Colorado, The. (Attachments: # 1 Attachment)(Moskowitz, David) (Entered: 01/26/2026) | |
| 57 | 01/26/2026 | ORDER denying 56 Motion for Leave to File Excess Pages by Judge R. Brooke Jackson on 1/26/26. Text Only Entry(rbj) (Entered: 01/26/2026) | |
| 58 | 01/26/2026 | ORDER granting 54 Motion for Leave. The Court will hold the hearing in the courtroom. Any attorney may attend in person or by video teleconference or by telephone. The courtroom deputy will contact counsel with information about the video and audio connections. by Judge R. Brooke Jackson on 1/. Text Only Entry(rbj) (Entered: 01/26/2026) | |
| | 01/26/2026 | MINUTE ENTRY for proceedings held before Judge R. Brooke Jackson: Set/Reset Hearings. Oral Argument set for 1/28/2026 09:00 AM in Courtroom C203 before Judge R. Brooke Jackson. (rbjlc9, ) Text Only Entry (Entered: 01/26/2026) | |
| 59 | 01/26/2026 | MOTION for Reconsideration re 57 Order on Motion for Leave to File Excess Pages by Plaintiff State of Colorado, The. (Attachments: # 1 Draft Reply Brief)(Moskowitz, David) (Entered: 01/26/2026) | |
| 60 | 01/26/2026 | ORDER granting 59 Motion for Reconsideration. Granted because the Court does not have the time to continue the back and forth with the plaintiff on the issue. Counsel perhaps has overlooked that its task is not just to make a record for appeal, nor does the length of a reply brief affect its record. The task is to persuade the court to do something. A shotgun motion that raises all possible arguments is not necessarily persuasive. A lengthy reply brief filed when the Court is attempting to study the unnecessarily long motion and reply and to provide a decision on a very short timeframe is not persuasive. Whether the Court will have the time to study the entire reply brief in this context is questionable. by Judge R. Brooke Jackson on 1/26/26. Text Only Entry(rbj) (Entered: 01/26/2026) | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 61 | 01/27/2026 | REPLY to Response to 46 MOTION for Preliminary Injunction filed by Plaintiff State of Colorado, The. (Attachments: # 1 Exhibit #3 - Minnesota Pilot Project, # 2 Exhibit #4 - Enforcement Letter, # 3 Exhibit #5 - Corley Declaration, # 4 Exhibit #6 - Transcript Excerpt, # 5 Exhibit #7 - McClelland Supplemental Declaration, # 6 Exhibit #8 - Rollins Social Media Post)(Moskowitz, David) (Entered: 01/27/2026) | |
| 62 | 01/27/2026 | NOTICE by Defendants Pam Bondi, Doug Burgum, Department of Agriculture, Department of Defense, Department of Energy, Department of Homeland Security, Department of Justice, Department of Transportation, Department of the Air Force, Department of the Interior, The, Sean P. Duffy, Karen S. Evans, Executive Office of the President, Federal Emergency Management Agency, Pete Hegseth, Troy Meink, National Science Foundation, Kristi Noem, Brooke Rollins, Brian Stone, Donald J. Trump, Chris Wright (Attachments: # 1 Supplemental Corley Declaration)(Becker, Tyler) (Entered: 01/27/2026) | |
| 63 | 01/28/2026 | MINUTE ENTRY for Oral Argument Hearing held on 1/28/2026 before Judge R. Brooke Jackson. Granting Plaintiff's 46 Motion for Preliminary Injunction as stated on the record; Written order to follow. Court Reporter: Kevin Carlin. (hguer) (Entered: 01/28/2026) | |
| 64 | 02/19/2026 | TRANSCRIPT of Oral Argument held on 01/28/2026 before Judge Jackson. Pages: 1-77. NOTICE - REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov. Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (kcarl, ) (Entered: 02/19/2026) | |
| 65 | 02/19/2026 | Joint MOTION for Extension of Time to File Answer or Otherwise Respond and to Set Deadlines by Defendants Pam Bondi, Doug Burgum, Department of Agriculture, Department of Defense, Department of Energy, Department of Homeland Security, Department of Justice, Department of Transportation, Department of the Air Force, Department of the Interior, The, Sean P. Duffy, Karen S. Evans, Executive Office of the President, Federal Emergency Management Agency, Pete Hegseth, Troy Meink, National Science Foundation, Kristi Noem, Brooke Rollins, Brian Stone, Donald J. Trump, Chris Wright. (Kies, Marianne) (Entered: 02/19/2026) | |
| 66 | 02/19/2026 | ORDER granting 65 Motion for Extension of Time to Answer or Otherwise Respond All Parties. by Judge R. Brooke Jackson on 2/19/26. Text Only Entry(rbj) (Entered: 02/19/2026) | |
| 67 | 03/06/2026 | Joint STATUS REPORT by Plaintiff State of Colorado, The. (Moskowitz, David) (Entered: 03/06/2026) | |
| 68 | 03/16/2026 | ORDER GRANTING PRELIMINARY INJUNCTION. Colorado's Motion for Preliminary Injunction, ECF No. 46 , is hereby GRANTED, and USDA is PRELIMINIARILY ENJOINED from compelling Colorado's participation in the pilot project or taking any adverse action against Colorado for its refusal to comply with any of the demands of the Recertification Letter, by Judge R. Brooke Jackson on 3/16/2026. (ccuen, ) (Entered: 03/16/2026) | |
| 69 | 03/24/2026 | LETTER Pre-Motion to Dismiss (Per Practice Standards) by Defendants Pam Bondi, Doug Burgum, Department of Agriculture, Department of Defense, Department of Energy, Department of Homeland Security, Department of Justice, Department of Transportation, Department of the Air Force, Department of the Interior, The, Sean P. Duffy, Karen S. Evans, Executive Office of the President, Federal Emergency | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | Management Agency, Pete Hegseth, Troy Meink, National Science Foundation, Kristi Noem, Brooke Rollins, Brian Stone, Donald J. Trump, Chris Wright. (Kies, Marianne) (Entered: 03/24/2026) | |
| 70 | 03/26/2026 | RESPONSE to 69 Letter,, Regarding Defendants' Proposed Motion to Dismiss by Plaintiff State of Colorado, The. (Moskowitz, David) (Entered: 03/26/2026) | |
| 71 | 03/30/2026 | MINUTE ORDER. The Court has reviewed the parties letters, ECF no. 69, ECF No. 70. Without expressing any opinion on the merits of their respective opinions with one exception -- the Court does not object to the defendants filing their motion. The exception is that the Court will not consider, and asks that the defendants not include, issues on which the Court has already ruled in this case. The Courts page limits for motions, responses, and replies will be enforced. Anticipating the possibility that the motion might not entirely dispose of the case, and the importance of the issues in the case, the Court directs the parties to confer and to submit a joint discovery schedule within 10 days of the date of this order. If the parties cannot agree on a discovery schedule, the Court will set the schedule. By Judge R. Brooke Jackson on 3/30/2026. Text Only Entry (rbjlc9, ). (Entered: 03/30/2026) | |
| 72 | 04/03/2026 | Unopposed MOTION for Extension of Time to File Discovery Schedule by Defendants Pam Bondi, Doug Burgum, Department of Agriculture, Department of Defense, Department of Energy, Department of Homeland Security, Department of Justice, Department of Transportation, Department of the Air Force, Department of the Interior, The, Sean P. Duffy, Karen S. Evans, Executive Office of the President, Federal Emergency Management Agency, Pete Hegseth, Troy Meink, National Science Foundation, Kristi Noem, Brooke Rollins, Brian Stone, Donald J. Trump, Chris Wright. (Kies, Marianne) (Entered: 04/03/2026) | |
| 73 | 04/03/2026 | ORDER granting 72 Motion for Extension of Time to File by Judge R. Brooke Jackson on 4/3/26. Text Only Entry(rbj) (Entered: 04/03/2026) | |
| 74 | 04/10/2026 | NOTICE of Entry of Appearance by Alexander J. Severance on behalf of All Defendants Attorney Alexander J. Severance added to party Pam Bondi(pty:dft), Attorney Alexander J. Severance added to party Doug Burgum(pty:dft), Attorney Alexander J. Severance added to party Department of Agriculture(pty:dft), Attorney Alexander J. Severance added to party Department of Defense(pty:dft), Attorney Alexander J. Severance added to party Department of Energy(pty:dft), Attorney Alexander J. Severance added to party Department of Homeland Security(pty:dft), Attorney Alexander J. Severance added to party Department of Justice(pty:dft), Attorney Alexander J. Severance added to party Department of Transportation(pty:dft), Attorney Alexander J. Severance added to party Department of the Air Force(pty:dft), Attorney Alexander J. Severance added to party Department of the Interior, The(pty:dft), Attorney Alexander J. Severance added to party Sean P. Duffy(pty:dft), Attorney Alexander J. Severance added to party Karen S. Evans(pty:dft), Attorney Alexander J. Severance added to party Executive Office of the President(pty:dft), Attorney Alexander J. Severance added to party Federal Emergency Management Agency(pty:dft), Attorney Alexander J. Severance added to party Pete Hegseth(pty:dft), Attorney Alexander J. Severance added to party Troy Meink(pty:dft), Attorney Alexander J. Severance added to party National Science Foundation(pty:dft), Attorney Alexander J. Severance added to party Kristi Noem(pty:dft), Attorney Alexander J. Severance added to party Brooke Rollins(pty:dft), Attorney Alexander J. Severance added to party Brian Stone(pty:dft), Attorney Alexander J. Severance added to party Donald J. Trump(pty:dft), Attorney Alexander J. Severance added to party Chris Wright(pty:dft) (Severance, Alexander) (Entered: 04/10/2026) | |
| 75 | 04/13/2026 | Proposed Scheduling Order by Defendants and by Plaintiff State of Colorado, The. (Moskowitz, David) (Entered: 04/13/2026) | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| 76 | 04/16/2026 | SCHEDULING ORDER. Discovery due by 10/30/2026. Dispositive Motions due by 12/4/2026. Please observe the process described in the Court's practice standards regarding conferral and letters of intent before filing a dispositive motion. This must be done in advance of the deadline, by Judge R. Brooke Jackson on 4/16/2026. (PLEASE READ ATTACHED ORDER) (ccuen, ) (Entered: 04/16/2026) | |
| 77 | 04/28/2026 | NOTICE Regarding Service of Administrative Records by Defendants Pam Bondi, Doug Burgum, Department of Agriculture, Department of Defense, Department of Energy, Department of Homeland Security, Department of Justice, Department of Transportation, Department of the Air Force, Department of the Interior, The, Sean P. Duffy, Karen S. Evans, Executive Office of the President, Federal Emergency Management Agency, Pete Hegseth, Troy Meink, National Science Foundation, Kristi Noem, Brooke Rollins, Brian Stone, Donald J. Trump, Chris Wright (Attachments: # 1 Exhibit USDA Cert and Index, # 2 Exhibit DOT Cert and Index, # 3 Exhibit DoW Cert and Index)(Kies, Marianne) (Entered: 04/28/2026) | |
| | 04/30/2026 | Set/Reset Hearings: Bench Trial set for 4/5/2027 09:00 AM in Courtroom C203 before Judge R. Brooke Jackson. by Judge R. Brooke Jackson on 4/30/26. Text Only Entry (rbjlc8, ) (Entered: 04/30/2026) | |
| 78 | 05/06/2026 | AMENDED COMPLAINT against Doug Burgum, Department of Agriculture, Department of Defense, Department of Energy, Department of Homeland Security, Department of Transportation, Department of the Air Force, Department of the Interior, The, Sean P. Duffy, Karen S. Evans, Executive Office of the President, Federal Emergency Management Agency, Pete Hegseth, Troy Meink, National Science Foundation, Kristi Noem, Brooke Rollins, Brian Stone, Donald J. Trump, Jacob Valine, Chris Wright, filed by State of Colorado, The.(Moskowitz, David) (Entered: 05/06/2026) | |
| 79 | 05/06/2026 | NOTICE of Filing Amended Pleading re 78 Amended Complaint,, by Plaintiff State of Colorado, The (Attachments: # 1 Redlined Amended Complaint)(Moskowitz, David) (Entered: 05/06/2026) | |
| 80 | 06/01/2026 | STIPULATION Regarding Department of Transportation Awards by Plaintiff State of Colorado, The. (Moskowitz, David) (Entered: 06/01/2026) | |
| 81 | 06/08/2026 | MINUTE ORDER Trial Preparation Conference set for 3/16/2027 at 10:00 AM in Courtroom C203 before Judge R. Brooke Jackson. by Judge R. Brooke Jackson on 6/8/26. Text Only Entry (rbjlc8, ) (Entered: 06/08/2026) | |
| 82 | 06/17/2026 | Partial MOTION to Dismiss for Failure to State a Claim , Partial MOTION to Dismiss for Lack of Jurisdiction by Defendants Doug Burgum, Department of Agriculture, Department of Defense, Department of Energy, Department of Homeland Security, Department of Transportation, Department of the Air Force, Department of the Interior, The, Sean P. Duffy, Karen S. Evans, Executive Office of the President, Federal Emergency Management Agency, Pete Hegseth, Troy Meink, National Science Foundation, Kristi Noem, Brooke Rollins, Brian Stone, Donald J. Trump, Chris Wright. (Attachments: # 1 Affidavit Kies Declaration, # 2 Exhibit 1 to Kies Decl., # 3 Exhibit 2 to Kies Decl.)(Kies, Marianne) (Entered: 06/17/2026) | |
| 83 | 06/24/2026 | Unopposed MOTION to File Amicus Brief by Amicus The Greater Colorado Springs Chamber of Commerce and Economic Development Corporation. (Attachments: # 1 Proposed Order (PDF Only), # 2 Amicus Brief, # 3 Exhibit Ex. A to Amicus Brief, # 4 Exhibit Ex. B to Amicus Brief, # 5 Exhibit Ex. C to Amicus Brief)(Williams, Wayne) (Entered: 06/24/2026) | |
| 84 | 06/24/2026 | Unopposed MOTION to File Amicus Brief In Support of Federal Defendants' Partial Motion to Dismiss by Amicus State of Alabama. (Attachments: # 1 Proposed Document Amicus Brief)(Bowdre, | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | Alexander) (Entered: 06/24/2026) | |
| 85 | 06/26/2026 | ORDER granting 83 Motion to File Amicus Brief by Judge R. Brooke Jackson on 6/26/26. Text Only Entry(rbj) (Entered: 06/26/2026) | |
| 86 | 06/26/2026 | ORDER granting 84 Motion to File Amicus Brief by Judge R. Brooke Jackson on 6/26/26. Text Only Entry(rbj) (Entered: 06/26/2026) | |
| 87 | 07/02/2026 | Unopposed MOTION for Extension of Time to File Response/Reply as to 82 Partial MOTION to Dismiss for Failure to State a Claim Partial MOTION to Dismiss for Lack of Jurisdiction by Plaintiff State of Colorado, The. (Moskowitz, David) (Entered: 07/02/2026) | |
| 88 | 07/02/2026 | ORDER granting 87 Motion for Extension of Time to File Response/Reply Plaintiff Reply Brief due by 7/22/2026. by Judge R. Brooke Jackson on 7/2/26. Text Only Entry(rbjlc8, ) (Entered: 07/02/2026) | |
| 89 | 07/22/2026 | RESPONSE to 82 Partial MOTION to Dismiss for Failure to State a Claim Partial MOTION to Dismiss for Lack of Jurisdiction filed by Plaintiff State of Colorado, The. (Attachments: # 1 Exhibit #1 - Excerpt from Defendants' Responses to Interrogatories, # 2 Exhibit #2 - Declaration of Kay Kelly)(Moskowitz, David) (Entered: 07/22/2026) | |
| 90 | 07/29/2026 | Unopposed MOTION to File Amicus Brief / Unopposed Motion For Leave to File Brief of California, Minnesota, New York, Connecticut, Delaware, Hawaii, Illinois, Maine, Maryland, Massachusetts, Michigan, Nevada, New Jersey, New Mexico, Oregon, Rhode Island, Vermont, Washington, and the District of Columbia as Amici Curiae by Amicus State of California. (Attachments: # 1 Exhibit A- Proposed Brief of Amici Curiae, # 2 Proposed Order (PDF Only))(Ing, Vanessa) (Entered: 07/29/2026) | |
| 91 | 07/30/2026 | ORDER granting 90 Motion to File Amicus Brief by Judge R. Brooke Jackson on 7/30/26. Text Only Entry(rbjlc8, ) (Entered: 07/30/2026) | |
| 92 | 07/30/2026 | Joint MOTION for Protective Order by Plaintiff State of Colorado, The. (Attachments: # 1 Proposed Stipulated Protective Order)(Moskowitz, David) (Entered: 07/30/2026) | |
| 93 | 07/31/2026 | ORDER granting 92 Motion for Protective Order by Judge R. Brooke Jackson on 7/31/26. Text Only Entry(rbj) (Entered: 07/31/2026) | |
| 94 | 08/03/2026 | MOTION for Extension of Time to File Response/Reply as to 82 Partial MOTION to Dismiss for Failure to State a Claim Partial MOTION to Dismiss for Lack of Jurisdiction by Defendants Pam Bondi, Doug Burgum, Department of Agriculture, Department of Defense, Department of Energy, Department of Homeland Security, Department of Justice, Department of Transportation, Department of the Air Force, Department of the Interior, The, Sean P. Duffy, Karen S. Evans, Executive Office of the President, Federal Emergency Management Agency, Pete Hegseth, Troy Meink, National Science Foundation, Kristi Noem, Brooke Rollins, Brian Stone, Donald J. Trump, Chris Wright. (Severance, Alexander) (Entered: 08/03/2026) | |
| 95 | 08/03/2026 | ORDER granting 94 Motion for Extension of Time to File Response/Reply by Judge R. Brooke Jackson on 8/3/26. Text Only Entry(rbjlc8, ) (Entered: 08/03/2026) | |
| 96 | 08/04/2026 | MINUTE ORDER Discovery Hearing set for 8/11/2026 10:00 AM MDT by VTC before Judge R. Brooke Jackson. VTC instructions will be sent by email to the parties in advance of the hearing. by Judge R. Brooke Jackson on 8/4/26. Text Only Entry (rbjlc8, ) (Entered: 08/04/2026) | |
| 97 | 08/04/2026 | NOTICE of Entry of Appearance by Matthew Ryan Duggan on behalf of State of Alabama (Duggan, Matthew) (Entered: 08/04/2026) | |
| 98 | 08/04/2026 | NOTICE of Entry of Appearance by Reed W. Morgan on behalf of State of Colorado, TheAttorney Reed W. Morgan added to party State of Colorado, The(pty:pla) (Morgan, Reed) (Entered: 08/04/2026) | |
| 99 | 08/07/2026 | NOTICE of Entry of Appearance by Adam Samuel Fox on behalf of All Defendants Attorney Adam Samuel Fox added to party Pam | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | Bondi(pty:dft), Attorney Adam Samuel Fox added to party Doug Burgum(pty:dft), Attorney Adam Samuel Fox added to party Department of Agriculture(pty:dft), Attorney Adam Samuel Fox added to party Department of Defense(pty:dft), Attorney Adam Samuel Fox added to party Department of Energy(pty:dft), Attorney Adam Samuel Fox added to party Department of Homeland Security(pty:dft), Attorney Adam Samuel Fox added to party Department of Justice(pty:dft), Attorney Adam Samuel Fox added to party Department of Transportation(pty:dft), Attorney Adam Samuel Fox added to party Department of the Air Force(pty:dft), Attorney Adam Samuel Fox added to party Department of the Interior, The(pty:dft), Attorney Adam Samuel Fox added to party Sean P. Duffy(pty:dft), Attorney Adam Samuel Fox added to party Karen S. Evans(pty:dft), Attorney Adam Samuel Fox added to party Executive Office of the President(pty:dft), Attorney Adam Samuel Fox added to party Federal Emergency Management Agency(pty:dft), Attorney Adam Samuel Fox added to party Pete Hegseth(pty:dft), Attorney Adam Samuel Fox added to party Troy Meink(pty:dft), Attorney Adam Samuel Fox added to party National Science Foundation(pty:dft), Attorney Adam Samuel Fox added to party Kristi Noem(pty:dft), Attorney Adam Samuel Fox added to party Brooke Rollins(pty:dft), Attorney Adam Samuel Fox added to party Brian Stone(pty:dft), Attorney Adam Samuel Fox added to party Donald J. Trump(pty:dft), Attorney Adam Samuel Fox added to party Chris Wright(pty:dft) (Fox, Adam) (Entered: 08/07/2026) | |
| 100 | 08/10/2026 | REPLY to Response to 82 Partial MOTION to Dismiss for Failure to State a Claim Partial MOTION to Dismiss for Lack of Jurisdiction filed by Defendants Pam Bondi, Doug Burgum, Department of Agriculture, Department of Defense, Department of Energy, Department of Homeland Security, Department of Justice, Department of Transportation, Department of the Air Force, Department of the Interior, The, Sean P. Duffy, Karen S. Evans, Executive Office of the President, Federal Emergency Management Agency, Pete Hegseth, Troy Meink, National Science Foundation, Kristi Noem, Brooke Rollins, Donald J. Trump, Chris Wright, Amicus Jacob Valine. (Severance, Alexander) (Entered: 08/10/2026) | |
| 101 | 08/11/2026 | MINUTE ENTRY for proceedings held before Judge R. Brooke Jackson: Discovery Hearing held on 8/11/2026. Court Reporter: Kevin Carlin. (msmot, ) (Entered: 08/11/2026) | |
| 102 | 08/12/2026 | TRANSCRIPT of Discovery Hearing held on 08/11/2026 before Judge Jackson. Pages: 1-48. NOTICE - REDACTION OF TRANSCRIPTS: Within seven calendar days of this filing, each party shall inform the Court, by filing a Notice of Intent to Redact, of the party's intent to redact personal identifiers from the electronic transcript of the court proceeding. If a Notice of Intent to Redact is not filed within the allotted time, this transcript will be made electronically available after 90 days. Please see the Notice of Electronic Availability of Transcripts document at www.cod.uscourts.gov. Transcript may only be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber prior to the 90 day deadline for electronic posting on PACER. (kcarl, ) (Entered: 08/12/2026) | |
| 103 | 08/17/2026 | MOTION to Stay August 11, 2026, Discovery Order Until Final Resolution of Petition for Writ of Mandamus by Defendants Pam Bondi, Doug Burgum, Department of Agriculture, Department of Defense, Department of Energy, Department of Homeland Security, Department of Justice, Department of Transportation, Department of the Air Force, Department of the Interior, The, Sean P. Duffy, Karen S. Evans, Executive Office of the President, Federal Emergency Management Agency, Pete Hegseth, Troy Meink, National Science Foundation, Kristi Noem, Brooke Rollins, Brian Stone, Donald J. Trump, Chris Wright. (Attachments: # 1 Proposed Order (PDF Only))(Fox, Adam) (Entered: | |

| # | Date | Proceeding Text | Source |
|---|---|---|---|
| | | 08/17/2026) | |
| 104 | 08/17/2026 | RESPONSE to 103 MOTION to Stay August 11, 2026, Discovery Order Until Final Resolution of Petition for Writ of Mandamus filed by Plaintiff State of Colorado, The. (Moskowitz, David) (Entered: 08/17/2026) | |
| 105 | 08/18/2026 | REPLY to Response to 103 MOTION to Stay August 11, 2026, Discovery Order Until Final Resolution of Petition for Writ of Mandamus filed by Defendants Pam Bondi, Doug Burgum, Department of Agriculture, Department of Defense, Department of Energy, Department of Homeland Security, Department of Justice, Department of Transportation, Department of the Air Force, Department of the Interior, The, Sean P. Duffy, Karen S. Evans, Executive Office of the President, Federal Emergency Management Agency, Pete Hegseth, Troy Meink, National Science Foundation, Kristi Noem, Brooke Rollins, Brian Stone, Donald J. Trump, Chris Wright. (Fox, Adam) (Entered: 08/18/2026) | |
| 106 | 08/19/2026 | MOTION for Order to Make Proposed Further Findings by Plaintiff State of Colorado, The. (Attachments: # 1 Proposed Further Findings, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4)(Moskowitz, David) (Entered: 08/19/2026) | |
| 107 | 08/20/2026 | MINUTE ORDER:The Court has received proposed findings from the plaintiff. If the defendants with to file specific objections or their own proposed findings, please do so no later than August 28, 2026. by Judge R. Brooke Jackson on 8/20/26. Text Only Entry (rbj) (Entered: 08/20/2026) | |

Copyright © LexisNexis CourtLink, Inc. All Rights Reserved.
*** THIS DATA IS FOR INFORMATIONAL PURPOSES ONLY ***

End of Document

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 25-cv-3428-RBJ

THE STATE OF COLORADO,

Plaintiff,

v.

DONALD J. TRUMP, in his official capacity as President of the United States,
PETE HEGSETH, in his official capacity as Secretary of Defense,
TROY MEINK, in his official capacity as Secretary of the Air Force,
SEAN DUFFY, in his official capacity as Secretary of Transportation,
BROOKE ROLLINS, in her official capacity as Secretary of Agriculture,
CHRIS WRIGHT, in his official capacity as Secretary of Energy,
DOUG BURGUM, in his official capacity as Secretary of the Interior,
KRISTI NOEM, in her official capacity as Secretary of Homeland Security,
KAREN EVANS, in her official capacity as Acting Director of the Federal Emergency Management Agency,
PAM BONDI, in her official capacity as Attorney General,
BRIAN STONE, in his official capacity as Acting Director of the National Science Foundation,
EXECUTIVE OFFICE OF THE PRESIDENT,
DEPARTMENT OF DEFENSE,
DEPARTMENT OF THE AIR FORCE,
DEPARTMENT OF TRANSPORTATION,
DEPARTMENT OF AGRICULTURE,
DEPARTMENT OF ENERGY,
DEPARTMENT OF THE INTERIOR,
DEPARTMENT OF HOMELAND SECURITY,
FEDERAL EMERGENCY MANAGEMENT AGENCY,
DEPARTMENT OF JUSTICE,
NATIONAL SCIENCE FOUNDATION,

Defendants.

---

**JOINT STATUS REPORT**

---

Pursuant to this Court's February 19, 2026, Order (ECF 66), the Parties respectfully submit this Joint Status Report to apprise the Court of their respective positions regarding next steps in

the litigation. The Parties have been unable to reach agreement, despite extensive meet-and-confer discussions, including via email and a lengthy videoconference on March 2, 2026. The Parties' respective positions are set forth, in brief, below. All Parties agree that the Court's resolution of this dispute at the outset would aid them and the Court to ensure efficient proceedings moving forward.

**Plaintiff's Position**

Rule 16 requires that, "unless the judge finds there is good cause for delay," a scheduling order must be entered "within the earlier of 90 days after any defendant has been served with the complaint or 60 days after any defendant has appeared." Fed. R. Civ. P. 16(b)(2). That time has passed, and there is no good cause for delay. Colorado's position is that, pursuant to Rule 16 and this District's local rules and standard practice, the parties should prepare a scheduling order and conduct a Rule 26(f) conference, so that this case can be expeditiously completed by the fall. Colorado has prepared a draft scheduling order and shared it with Defendants, including deadlines for production of the administrative records relevant to the Administrative Procedure Act claims and for discovery for the constitutional claims. In order to depart from that standard practice, Defendants would need to obtain a stay of discovery under the familiar factors outlined in *String Cheese Incident, LLC v. Stylus Shows, Inc.*, No. 02-cv-01934-LTB-PAC, 2006 WL 8944955 (D. Colo. Mar. 30, 2006). The mere fact that some Defendants intend to move to dismiss some claims on ripeness or standing grounds, similar to what they argued (and lost) on the preliminary injunction, is not grounds for delay. The Court should order the parties to submit a proposed scheduling order by March 16, 2026. If Defendants wish to seek a stay, Colorado is amenable to a conference with the Court or an expedited briefing schedule to resolve that dispute in as efficient

a manner as possible, but that should not hold up the scheduling order. Additional briefing on the parties' respective proposals laid out here is not necessary.

Recent events only underscore the need to move forward expeditiously. Last month, the President admitted the direct link between the prosecution of Tina Peters and the Administration's targeting of Colorado, proclaiming "they're suffering a big price, Colorado" for Tina Peters and further threatened that "they better let her out fast."[1] Since this case was filed—and even since the complaint was amended in December—the Administration continues to retaliate against Colorado. Colorado has had to file two new cases to prevent actions targeting Colorado and a handful of other disfavored States, and that targeting is likely to continue. *See Illinois v. Vought*, No. 1:26-cv-01566 (N.D. Ill.); *New York v. Administration for Children and Families*, No. 1:26-cv-00172 (S.D.N.Y.). In one of the newly filed cases, the court already ordered expedited discovery, which showed that the Administration omitted all the relevant documents to the constitutional claims from the administrative record. Based on that same litigation, Colorado has ample reason to believe that discovery in this litigation will be highly contested, including extremely aggressive deliberative process redactions by the Administration, which will prolong the discovery process. For all these reasons, Colorado wishes to begin discovery expeditiously.

**Defendants' Position**

On March 27, 2026, Defendants will file at least a partial Motion to Dismiss the Amended Complaint for lack of subject-matter jurisdiction, including because Plaintiffs' claims against certain Defendants fail to meet Article III standing requirements, are not ripe, and/or are otherwise non-justiciable. Because jurisdiction is a requisite for this Court to compel any action, including

[1] Interview: Dan Bongino Interviews Donald Trump on His Podcast - February 2, 2026, https://f2.link/dt260202a.

merits discovery, *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998), the Court should reserve setting a case schedule and imposing discovery obligations until the Motion to Dismiss is decided. Until that time, neither the Parties nor the Court will know the actual scope of the case moving forward (such as which Defendants remain), and therefore what the substance and timing of any administrative record or extra-record discovery should be. *See* Fed. R. Civ. P. 26(b)(1); *e.g.*, *Burkitt v. Pomeroy*, 2016 WL 696107, at *1, *3 (D. Colo. Feb. 22, 2016) (staying discovery pending motion to dismiss, observing that "[q]uestions of jurisdiction . . . should be resolved at the earliest stages of litigation, so as to conserve the time and resources of the Court and the parties"). Even if the court does not wait to *resolve* the Motion to Dismiss to consider discovery, it should at least wait until the Motion to Dismiss is *filed* so that it can assess the proper contours of discovery in a concrete context.

Should the Court appreciate further explication of the parties' respective proposals, Defendants respectfully ask that the Court direct each side to submit streamlined briefing, no longer than 5 pages each, explaining their respective positions, in sequence, to avoid the inefficiencies that come with separate positions in a single document, as here. Further, Defendants respectfully submit that fulsome briefing on a Motion to Stay Discovery at this time, as proposed by Plaintiff, is an unnecessary use of the Court's and Parties' limited resources, particularly given Defendants' impending dispositive deadline. Alternatively, or additionally, Defendants would welcome the opportunity to appear at a hearing before the Court, with a virtual option. Defendants appreciate the Court's consideration.

PHILIP J. WEISER
Attorney General of Colorado

*/s/ David Moskowitz*
David Moskowitz
Deputy Solicitor General
Talia Kraemer
Assistant Solicitor General
Sarah H. Weiss
Senior Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov
talia.kraemer@coag.gov
sarah.weiss@coag.gov

*Counsel for Plaintiff*

BRETT A. SHUMATE
Assistant Attorney General

JOSEPH E. BORSON
Assistant Director
Civil Division
Federal Programs Branch

*/s/ Marianne F. Kies*
MARIANNE F. KIES
Trial Attorney
U.S. Department of Justice
Civil Division
Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
(202) 353-1819
Marianne.F.Kies@usdoj.gov

*Counsel for Defendants*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 25-cv-3428-RBJ

THE STATE OF COLORADO,

Plaintiff,

v.

DONALD J. TRUMP, in his official capacity as President of the United States,
PETE HEGSETH, in his official capacity as Secretary of Defense,
TROY MEINK, in his official capacity as Secretary of the Air Force,
SEAN DUFFY, in his official capacity as Secretary of Transportation,
BROOKE ROLLINS, in her official capacity as Secretary of Agriculture,
CHRIS WRIGHT, in his official capacity as Secretary of Energy,
DOUG BURGUM, in his official capacity as Secretary of the Interior,
MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security,
KAREN EVANS, in her official capacity as Senior Official Performing the Duties of Administrator of the Federal Emergency Management Agency,
TODD BLANCHE, in his official capacity as Acting Attorney General,
BRIAN STONE, in his official capacity as Senior Official Performing the Duties of Director of the National Science Foundation,
EXECUTIVE OFFICE OF THE PRESIDENT,
DEPARTMENT OF DEFENSE,
DEPARTMENT OF THE AIR FORCE,
DEPARTMENT OF TRANSPORTATION,
DEPARTMENT OF AGRICULTURE,
DEPARTMENT OF ENERGY,
DEPARTMENT OF THE INTERIOR,
DEPARTMENT OF HOMELAND SECURITY,
FEDERAL EMERGENCY MANAGEMENT AGENCY,
DEPARTMENT OF JUSTICE,
NATIONAL SCIENCE FOUNDATION,

Defendants.

---

## SCHEDULING ORDER

---

### 1. DATE OF SCHEDULING CONFERENCE AND APPEARANCES OF COUNSEL AND PRO SE PARTIES

Any scheduling conference will be set at the convenience and direction of the Court.

Defendants respectfully request the opportunity to appear remotely, via videoconference, at any such hearing. Plaintiff would not oppose any such remote appearance.

Appearing for Plaintiff: David Moskowitz, Sarah H. Weiss, and Talia B. Kraemer, 1300 Broadway, 10th Floor, Denver, CO, 80203, (720) 508-6000.

Appearing for Defendants: Marianne F. Kies (202-353-1819) and Alexander J. Severance (202-598-3123), 1100 L Street NW, Washington, DC 20005.

## 2. STATEMENT OF JURISDICTION

### a. Plaintiff

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States.

Venue is proper in this district under 28 U.S.C. § 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities. Plaintiff, the State of Colorado, is a sovereign State in the United States of America. A substantial part of the events or omissions giving rise to this Amended Complaint occurred and continue to occur within this district.

### b. Defendants

The Court does not have subject-matter jurisdiction over this case. *See* ECF 69. In brief, first, Plaintiffs' constitutional claims are not cognizable and also present political questions. Second, Plaintiffs lack standing, and the vast majority of their claims are unripe. Third, Plaintiffs' Administrative Procedure Act ("APA") claim against the Department of War and the Department of the Air Force, brought under 10 U.S.C. § 483, is additionally foreclosed because Colorado is outside § 483's zone of interest, and because the adequacy of agency responses to Congressional reporting requirements is not justiciable.

Defendants do not challenge venue.

### 3. STATEMENT OF CLAIMS AND DEFENSES

**a. Plaintiff**

Colorado brings claims challenging various actions and threats by Defendants that were targeted against Colorado because of the State's lawful exercise of sovereign authority. In particular, Colorado alleges that Defendants have announced the relocation of Space Command Headquarters, terminated or threatened to terminate hundreds of millions of dollars in funding, announced plans to dismantle the National Center for Atmospheric Research in Boulder, denied emergency disaster assistance, and threatened numerous other actions because of Colorado's lawful exercise of sovereign powers, including relating to the regulation of elections and administration of criminal justice. Colorado brings constitutional claims under the Tenth Amendment, state sovereignty principles, the Elections Clause, the Spending Clause, separation of powers, and the equal sovereignty principle. Colorado also alleges various violations of the Administrative Procedure Act ("APA"). Colorado seeks injunctive and declaratory relief as well as remedies under the APA for unlawful agency action.

**b. Defendant**

The State of Colorado brings this action against the President, several federal agencies, and corresponding agency heads, challenging what Colorado characterizes as a federal "campaign of retribution" against the State. Specifically, Colorado alleges that the following agency actions were taken in purported retaliation for the State's allowing mail-in voting and prosecuting Mesa County Clerk and Recorder Tina Peters: (i) the Department of War's ("DOD") and Department of Air Force's ("USAF") decision to relocate U.S. Space Command headquarters from Colorado Springs to Huntsville, Alabama; (ii) the Department of Agriculture's ("USDA") decision to implement a

pilot program for five Colorado counties as part of a SNAP fraud reduction effort; (iii) the Department of Energy's ("DOE") alleged "plans to terminate $615 million" in funds earmarked for Colorado; (iv) the National Science Foundation's ("NSF") announcement that it is "reviewing the structure" of funding surrounding the National Center for Atmospheric Research ("NCAR") in Boulder; (v) the Department of Interior's ("DOI") alleged compilation of a list of grants earmarked for Colorado for "possible termination"; (vi) the Department of Transportation's ("DOT") alleged termination of $109 million in funding for Colorado; and (vii) the Federal Emergency Management Agency's ("FEMA") alleged denial of disaster declaration requests. *See generally id.* The Amended Complaint alleges, against all Defendants, that the challenged actions are "retaliation" for the State's exercise of its sovereign authority, in violation of various constitutional provisions (Counts I and II). Colorado also separately challenges other agency actions under the APA and Spending Clause (Counts III through VI).

As set forth in Section 2 above, the Court lacks subject-matter jurisdiction over Plaintiffs' claims. In addition, Plaintiffs' claims fail on the merits because Defendants' challenged actions, to the extent they have occurred, are lawful.

## 4. UNDISPUTED FACTS

During oral and written meet-and-confers beginning on April 3, 2026, the parties have discussed stipulated facts as a means of narrowing the scope of this case and thereby any discovery. The parties have not yet reached agreement. However, the parties will promptly update the Court if they are able to agree to stipulated facts.

## 5. COMPUTATION OF DAMAGES

Plaintiff does not seek money damages.

## 6. REPORT OF PRECONFERENCE DISCOVERY

**AND MEETING UNDER FED. R. CIV. P. 26(f)**

**a. Date of Rule 26(f) meeting.**

An initial Federal Rule of Civil Procedure 26(f) meeting was held on April 3, 2026, via videoconference. A supplemental meeting was held on April 10, 2026, via videoconference. The parties have also conferred via email.

**b. Names of each participant and party he/she represented.**

Appearing for Plaintiff: David Moskowitz and Sarah H. Weiss, 1300 Broadway, 10th Floor, Denver, CO, 80203, (720) 508-6000.

Appearing for Defendants: Marianne F. Kies (202-353-1819) and Alexander J. Severance (202-598-3123), 1100 L Street NW, Washington, DC 20005.

**c. Statement of when Rule 26(a)(1) disclosures were made or will be made.**

Rule 26(a)(1) disclosures will be made on May 8, 2026. Such disclosures will be limited to Plaintiff's non-APA, constitutional claims (i.e., Counts 1, 2, and 5).

**d. Proposed changes, if any, in timing or requirement of disclosures under Fed. R. Civ. P. 26(a)(1) and Administrative Records.**

The parties propose that Rule 26(a)(1) disclosures will be made on May 8, 2026. Such disclosures will be limited to Plaintiff's non-APA, constitutional claims (i.e., Counts 1, 2, and 5). Defendants shall produce the administrative records for the APA claims (i.e., Counts 3, 4, and 6) on April 28, 2026.

**e. Statement concerning any agreements to conduct informal discovery.**

None.

**f. Statement concerning any other agreements or procedures to reduce discovery and other litigation costs, including the use of a unified exhibit numbering system.**

The parties agree that they will serve by email or electronic means, such as through a file-

sharing system, all discovery requests and written responses and any other materials that are not filed through the CM/ECF system.

The parties agree that the production of privileged or protected documents (including electronic documents) without the intent to waive that privilege or protection does not constitute a waiver, so long as the disclosing party identifies the inadvertently disclosed documents within a reasonable time after production. If such documents are identified, they will be returned promptly to the disclosing party and/or, as appropriate, destroyed. The Court believes that as a matter of professionalism and as officers of the Court, any party or counsel that discovers, or his advised of, the existence of a document that appears to have been inadvertently produced due to a potential privilege should desist from further review, alert opposing counsel, resolve any dispute about it, and return the document without making or retaining any copies or records of the document. We all make mistakes, and it is difficult inadvertent production, especially in large document cases. There should be no need for a "claw back order" on this. The Court can address disputes if they arise.

The parties agree that they shall not seek discovery of documents created after the filing of the Complaint (ECF 1) that are privileged because they are sent solely among litigating counsel for either party (i.e., the Colorado Department of Law representing Plaintiff or the U.S. Department of Justice representing Defendants), or that are privileged because they are sent solely among a party and that party's litigating counsel, and where there has been no subsequent waiver of privilege. If any discovery request is susceptible of a construction that calls for the production of such documents, those documents need not be produced or identified on any privilege log.

The parties will not file motions or responses concerning discovery disputes without court permission. Rather, after counsel have conferred by telephone or in person, they will

contact Chambers and set a telephonic hearing. If the dispute concerns responses to paper discovery (interrogatories, etc.), please provide the Court with the disputed question and responses before the hearing. If the dispute turns on the application of one or two specific cases, they will advise Chambers of the citations to those cases.

**g. Statement as to whether the parties anticipate that their claims or defenses will involve extensive electronically stored information, or that a substantial amount of disclosure or discovery will involve information or records maintained in electronic form.**

The parties anticipate that a substantial amount of the relevant information or records will be electronically stored information maintained in electronic form, including messaging data, emails, photos, videos, and other electronic documents. The parties will produce spreadsheets, PowerPoint presentations, photos, videos, and other electronic records that do not easily transfer to image in native format. For Word documents, emails, pdf documents, and other similar files that may be easily legible in image format, the parties will produce such records in TIFF format with bates stamp, OCR text, and metadata preserved so long as that is technically feasible. The parties will negotiate a further protocol for the production of such records and information. Either party may request production of any native document produced in TIFF format.

**h. Statement summarizing the parties' discussions regarding the possibilities for promptly settling or resolving the case.**

The parties do not currently believe settlement is feasible but will continue to explore settlement as the case proceeds. The Court believes that reasonable compromises by both could potentially resolve the case, or at least parts of the case, and achieve substantial savings of taxpayer monies and judicial resources. The Court directs counsel to make another good faith effort to resolve the disputes, in whole or in part, including the possibility of mediation, at this time and, to the extent unsuccessful, to continue to do so periodically thereafter. Bear in mind that largescale

changes like relocation or dismantling of agencies or programs have a significant impact on people, regardless of the party's right to proceed or impede, and you and your clients like the Court are in the public service business.

## 7. CONSENT

All parties have not consented to the exercise of jurisdiction of a magistrate judge.

## 8. DISCOVERY LIMITATIONS[1]

All "extra-record" discovery in this case—meaning, discovery outside the scope of any Administrative Record, discussed here in this Section 8—will be limited at this time to information relevant to Plaintiff's non-APA claims (Counts 1, 2, and 5). Plaintiff reserves the right to move for completion of the Administrative Record and/or discovery as appropriate under the Administrative Procedure Act. Neither side will serve requests for written discovery, or seek depositions, until after Plaintiff has received and reviewed the Administrative Records relevant to the APA claims (Counts 3, 4, and 6). Defendants reserve the right to seek a stay or a protective order from written discovery or depositions.

**a. Modifications which any party proposes to the presumptive numbers of depositions or interrogatories contained in the Federal Rules.**

The discovery limitations are based on a per side basis, rather than a per party basis, so as to avoid issues with counting given the parties on each side (i.e., each discovery request sent from

[1] The parties agree that their respective positions regarding proposed changes to the presumptive numbers of depositions or written discovery contained in the Federal Rules is subject to change pending any future agreement on stipulated facts. Therefore, the parties' proposals herein are tentative. The parties will promptly update the Court if their proposals change due to, *inter alia*, agreement on stipulated facts.

Colorado to the United States counts as one request, regardless of the number of responding subordinate agencies, and vice versa).

The parties agree that Federal Rule of Civil Procedure 30(b)(6) depositions will count as one deposition even if multiple witnesses need to be designated to cover the topics requested. Colorado shall have one 30(b)(6) deposition of (collectively) the Agency Defendants, and (collectively) Defendants shall have one 30(b)(6) deposition of Colorado. These 30(b)(6) depositions do not count towards the fact-witness deposition limit.

The parties reserve the right to seek appropriate protection from an unduly burdensome or otherwise objectionable 30(b)(6) deposition.

If any side designates expert witnesses, the other side may depose those witnesses without counting against the fact-witness total.

**Plaintiff's Position as to Fact Depositions and Interrogatories**

Each side may take 35 fact-witness depositions and issue 50 interrogatories to the other side.

**Defendants' Position as to Fact Depositions and Interrogatories**

Each side may take 10 fact-witness depositions and issue 25 interrogatories to the other side.

The Court limits the parties to 20 fact witness depositions and 50 interrogatories. If a party has a good faith belief that more depositions will be needed after the first 15 are taken, and the parties cannot agree after conferral, the party may apply to the Court for leave to take additional depositions.

The requesting party may not include with any interrogatory or set of interrogatories a list of instructions or definitions. Rather, the requesting party should use clear, plain English in posing its questions.

The responding party should interpret the questions reasonably, without parsing words, and with the application of your knowledge of what the requesting party was likely getting at and a dose of common sense. If there is a bona fide question by either party as to the meaning of a word or words, counsel are directed to confer and work it out.

The responding party may not make a general objection and then, in response to each interrogatory, include language along these lines: "[Responding party] incorporates its general objection, but without waiving that objection, responds as follows:…." If the responding party has what it believes is a legitimate, bona fide to a particular question, counsel should confer with opposing counsel to attempt to clarify or resolve the issue. If there still is a dispute about a particular question, then note the objection and do not respond to the question. Otherwise, just answer the question and get on with it.

**b. Limitations which any party proposes on the length of depositions.**

None (i.e., Federal Rule of Civil Procedure 30(d)(1) will govern the duration of depositions).

**c. Limitations which any party proposes on the number of requests for production and/or requests for admission.**

**<u>Plaintiff's Position as to Requests for Production and Admissions</u>**

Each side may issue 50 requests for production and 25 requests for admission to the other side. The limit on requests for admission excludes those used solely for the purposes of authenticating documents.

**<u>Defendants' Position as to Requests for Production and Admissions</u>**

Each side may issue 30 requests for production and 20 requests for admission to the other side.

The Court limits the parties to 30 requests for production and 30 requests for admission. If a party has a good faith belief that more requests are needed after the initial numbers are served, and the parties cannot agree after conferral, the party may apply to the Court for leave to serve additional requests. The Court's directions above concerning interrogatories and responses apply equally to requests for production and requests for admissions.

**d. Deadline for service of Interrogatories, Requests for Production of Documents and/or Admissions:**

August 31, 2026.

**e. Other Planning or Discovery Orders**

None.

## 9. CASE PLAN AND SCHEDULE

**a. Deadline for Joinder of Parties and Amendment of Pleadings:**

The parties propose that the deadline for joinder of parties and amendment of pleadings cutoff shall be July 31, 2026. Should there be a delay in obtaining discovery, for example, because of disputes related to Executive and deliberative process privilege, Plaintiff may seek to extend the deadline. Defendants reserve the right to oppose any such extension. The Court expects the parties to assert executive privilege, deliberative process privilege, and other privileges only when the applicability of the privilege is clear and the need to assert is compelling. The parties do, after all, work for the People of the United States. Any assertion of privilege must be accompanied by a privilege log that clearly identifies the nature of the document and the legal basis for the claim of

privilege. The Court will not become involved unless and until counsel have made a good faith effort to resolve the privilege issue and have considered alternatives such as redaction or disclosure to opposing counsel on an eyes only basis for the limited purpose of explaining and supporting the claim of privilege. Please note as well that the fact that an attorney is copies on an email or other document does not, in itself, establish that the document is privileged. The Court is willing to conduct ex parte reviews of allegedly privileged documents, though it does not wish to devote the time to that unhappy task unless it is truly necessary. Please also remember that an ex parte review can raise questions about the credibility of the party or counsel claiming the privilege if it is clear that the claim was not warranted.

**b. Discovery Cutoff:**

October 30, 2026.

**a. Dispositive Motion Deadline:**

December 4, 2026. Please observe the process described in the Court's practice standards regarding conferral and letters of intent before filing a dispositive motion. This must be done in advance of the deadline.

**d. Expert Witness Disclosure:**

**1. The parties shall identify anticipated fields of expert testimony, if any.**

None currently.

**2. Limitations which the parties propose on the use or number of expert witnesses.**

The parties do not currently intend to use expert witnesses. If that intention changes, the parties will discuss any reasonable limitations on the use or number of expert witnesses.

**3. The parties shall designate all affirmative experts and provide opposing counsel with all information specified in Fed. R. Civ. P. 26(a)(2) on or before:**

September 25, 2026.

**4. The parties shall designate all rebuttal experts and provide opposing counsel with all information specified in Fed. R. Civ. P. 26(a)(2) on or before:**

November 6, 2026.

**e. Identification of Persons to Be Deposed:**

**Plaintiff:** Colorado intends to depose the key individuals at each agency involved in the actions to punish or threaten punishment against Colorado for its exercise of sovereign authority. The amended complaint includes 11 federal agencies, and Colorado expects that, for most agencies, it will generally be able to obtain necessary information from 3 or fewer witnesses. For some agencies, such as the Executive Office of the President, that play a coordinating role across the federal government, more witnesses will likely be necessary. The specific witnesses selected will depend on the discovery produced by Defendants, as they are in sole possession of key information regarding the actions and the identity of those witnesses involved.

**Defendants:** Defendants intend to depose individuals who communicated with Defendants regarding the actions challenged in this case. Defendants further intend to depose individuals with knowledge of Colorado's claimed irreparable harm. The specific witnesses selected will depend on the discovery produced by Plaintiff.

To the extent that the parties can achieve compromise resolutions of at least some parts, if not the entirety, of the case at an early time, the number of agencies and depositions should be reduced accordingly  That is a worthy goal.

**10. DATES FOR FURTHER CONFERENCES**

**a. Status conferences will be held at the following dates and times:**

_______________, 20__ at __ o'clock ____m.

**b. A final pretrial conference will be held at the following date and time:**

_______________, 20__ at __ o'clock ____m.

A final pretrial order is not required. The Court will conduct a Trial Preparation Conference and resolve any remaining disputes concerning trial witnesses, trial exhibits, in limine issues (rare in bench trials), and court procedures.

**11. OTHER SCHEDULING MATTERS**

**a. Identify those discovery or scheduling issues, if any, on which counsel after a good faith effort, were unable to reach an agreement.**

The parties diligently worked to resolve all disputes. There is only a narrow dispute as to the number of discovery requests appropriate for this case (paragraphs 8.a and 8.c).

**Plaintiff's Position**

Due to the complexity of the case, the number of federal agency Defendants, and the number of federal actions at issue, Plaintiff believes that its proposed discovery request limits are appropriate. There are 11 Defendant federal agencies and voluminous threatened or completed actions at issue. Had Plaintiff separated this case into separate cases, Plaintiff would receive far more discovery requests than it seeks here. Plaintiff proposes a total of 35 depositions, approximately three fact-witness depositions per Defendant agency. Under Defendants' proposal, Plaintiff cannot even take one fact-witness deposition for each agency, which will significantly hurt Plaintiff's ability to obtain necessary discovery. Depositions are likely to be especially important because the Trump Administration often use non-official channels, such as Signal, or otherwise attempts to avoid documenting its actions, limiting information available for written discovery. For example, in a related case where the Trump Administration targeted Colorado and

other States, the Administration has claimed that there are no agency records, privileged or otherwise, as to how the States were selected for adverse actions. *Illinois v. Vought*, 1:26-cv-01566 (N.D. Ill) (ECF No. 77). Plaintiff has offered to stipulate as to critical facts in this case and is more than willing to revisit the number of requests necessary should any stipulations be reached (see note 2). But at present Plaintiff bears the burden to establish the retaliatory motive as to each agency and each agency action, which necessitates Plaintiff's proposed limitations.

Finally, the six-month timetable, to which all parties agreed, is reasonable and standard within this district. And we are well past the deadline for entry of a scheduling order under Rule 16(b)(2), so there is no basis for Defendants' attempt to yet again delay discovery. The proposed order authorizes discovery only into the constitutional claims, which are not based on any administrative record, so there is no basis to delay entering a scheduling order until after the production of the administrative records.

**Defendants' Position**

This is not a complicated case. There is one Plaintiff, and it brings six related claims—half of which are, by law, limited to an administrative record. Notwithstanding, for its three constitutional claims, Plaintiff asks the Court to direct 35 fact-witness depositions (more than three times the default limit, Fed. R. Civ. P. 30(a)(2)), 50 interrogatories (twice the default limit, Fed. R. Civ. P. 33(a)(1)), 50 requests for production, and 25 requests for admission, per side.[2] Plaintiff asks the Court to sanction this departure from standard civil practice because: (i) they elected to

[2] A request for production directed to all of the Agency defendants would only count as one against Plaintiff's total, even though all 10 Agency Defendants would have to independently compile information to respond to it. Put differently: Although there is only one Plaintiff, there are ten Agency Defendants, and it will take Defendants at least ten times the amount of work to respond to each of Plaintiff's written discovery requests.

sue several different agencies (including two parent agencies for sub-agencies); (ii) Defendants have not stipulated to facts (*see supra* n.2); and (iii) Plaintiff *might* not ultimately obtain the information they believe they need despite receiving Administrative Records and the default fact discovery already authorized by the Federal Rules (which includes, *inter alia*, 10 fact-witness depositions *as well as* a 30(b)(6) deposition on an as-yet unknown number of topics).[3] Plaintiff has further requested that all discovery be completed on an extremely expedited, six-month timetable (by October 30, 2026). The volume of discovery Plaintiff contemplates is neither necessary nor proportional to the of this case. Nor is expedition warranted. In any case, Plaintiff cannot demand this enormous volume of discovery and simultaneously require its completion within six months, when they have already received preliminary injunctive relief and no other emergency motion is pending. Plaintiff remains free to move for additional preliminary injunctive relief to address perceived exigencies; it has not established entitlement to expedition of all discovery in the case.

Defendants respectfully submit that the Court should direct the discovery limits proposed by Defendants for this initial scheduling order and revisit them later only if and when Plaintiff demonstrates "good cause" for its proposed departure from the Federal Rules. *See, e.g.*, *Ybanez v. Milyard*, 2012 WL 1936557, at *2 (D. Colo. May 29, 2012) (Hon. R. Brooke Jackson) (enforcing default numerical limit on discovery because plaintiff "ha[d] not shown that the limits placed on [such discovery] have, in fact, unfairly interfered with his ability to obtain necessary and appropriate discovery"). If that occurs, Defendants expressly reserve the right to seek an extension

[3] Speculation that "the Trump Administration often use non-official channels, such as Signal, or otherwise attempts to avoid documenting its actions," *see supra*, is not good cause to justify Plaintiff's request.

of the deadlines set forth herein, as it will not be feasible for the Government to, in the next six months, defend 35 fact-witness depositions; prepare for and defend a 30(b)(6) deposition (which will itself encompass at least 10 more, representative witnesses, given the number of Agencies Plaintiff has sued); answer and verify 50 interrogatories; identify, collect, review, and produce (in load file format) documents in response to 50 requests for production; and answer 25 requests for admission.

Moreover, Defendants respectfully request that the Court reserve issuing a Discovery Schedule until after Plaintiff receives the Administrative Records and demonstrates its entitlement to information beyond them.

**b. Anticipated length of trial and whether trial is to the court or jury.**

Five-day bench trial, which may be slightly longer or shorter depending on the areas of dispute remaining. Please confer and attempt to agree on a trial date. Given your agreed dispositive motions date of December 4, 2026, you should be looking at dates ln approximately April or May 2027. If you eliminate or at least limit the dispositive motions, which often makes sense in a bench trial case, the Court could set an earlier date. Due to its senior status, the Court has a reasonably flexible schedule and would make every effort in a case of this significance to accommodate whatever date you agree upon. The Court suggests that you select a couple of trial dates and submit them to Chambers. The Court will then select a trial date and a Trial Preparation Conference date (which can be conducted remotely) and issue a minute order.

**c. Identify pretrial proceedings, if any, that the parties believe may be more efficiently or economically conducted in the District Court's facilities at 212 N. Wahsatch Street, Colorado Springs, Colorado 80903-3476; Wayne Aspinall U.S. Courthouse/ Federal Building, 402 Rood Avenue, Grand Junction, Colorado 81501-2520; or the U.S. Courthouse/Federal Building, La Plata County Courthouse, 1060 E. 2nd Avenue, Suite 150, Durango, Colorado 81301.**

None.

## 12. NOTICE TO COUNSEL AND PRO SE PARTIES

The parties filing motions for extension of time or continuances must comply with D.C.COLO.LCivR 6.1(c) by submitting proof that a copy of the motion has been served upon the moving attorney's client, all attorneys of record, and all *pro se* parties.

Counsel will be expected to be familiar and to comply with the Pretrial and Trial Procedures or Practice Standards established by the judicial officer presiding over the trial of this case.

Counsel and unrepresented parties are reminded that any change of contact information must be reported and filed with the Court pursuant to the applicable local rule.

## 13. AMENDMENTS TO SCHEDULING ORDER

This scheduling order cannot be altered or amended except upon a showing of good cause.

DATED at Denver, Colorado, this 16th day of April, 2026.

BY THE COURT:

Hon. R. Brooke Jackson
United States District Judge

APPROVED AS SUBMITTED ON April 13, 2026

PHILIP J. WEISER
Attorney General of Colorado

*/s/ David Moskowitz*
David Moskowitz
Deputy Solicitor General
Talia Kraemer
Assistant Solicitor General
Sarah H. Weiss
Senior Assistant Attorney General
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov
talia.kraemer@coag.gov
sarah.weiss@coag.gov

Counsel for Plaintiff

BRETT A. SHUMATE
Assistant Attorney General

JOSEPH E. BORSON
Assistant Director
Civil Division
Federal Programs Branch

*/s/ Marianne F. Kies*
MARIANNE F. KIES
Trial Attorney
U.S. Department of Justice
Civil Division
Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
(202) 353-1819
Marianne.F.Kies@usdoj.gov

Counsel for Defendants

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 25-cv-3428-RBJ

THE STATE OF COLORADO,

Plaintiff,

v.

DONALD J. TRUMP, in his official capacity as President of the United States,
PETE HEGSETH, in his official capacity as Secretary of Defense,
TROY MEINK, in his official capacity as Secretary of the Air Force,
SEAN DUFFY, in his official capacity as Secretary of Transportation,
BROOKE ROLLINS, in her official capacity as Secretary of Agriculture,
CHRIS WRIGHT, in his official capacity as Secretary of Energy,
DOUG BURGUM, in his official capacity as Secretary of the Interior,
MARKWAYNE MULLIN, in his official capacity as Secretary of Homeland Security,
KAREN EVANS, in her official capacity as Acting Director of the Federal Emergency Management Agency,
BRIAN STONE, in his official capacity as Acting Director of the National Science Foundation,
EXECUTIVE OFFICE OF THE PRESIDENT,
DEPARTMENT OF DEFENSE,
DEPARTMENT OF THE AIR FORCE,
DEPARTMENT OF TRANSPORTATION,
DEPARTMENT OF AGRICULTURE,
DEPARTMENT OF ENERGY,
DEPARTMENT OF THE INTERIOR,
DEPARTMENT OF HOMELAND SECURITY,
FEDERAL EMERGENCY MANAGEMENT AGENCY,
NATIONAL SCIENCE FOUNDATION,

Defendants.

---

**SECOND AMENDED COMPLAINT FOR**
**DECLARATORY AND INJUNCTIVE RELIEF**

---

Plaintiff, the State of Colorado, through its Attorney General, hereby alleges the following:

## INTRODUCTION

1. President Trump and his Administration continue to engage in a widespread campaign of retribution against entities and individuals across the country. Even the President's Chief of Staff acknowledges that "when there's an opportunity [for retribution], he will go for it." This civil action concerns the Trump Administration's campaign to unlawfully punish the State of Colorado for its exercise of sovereign powers reserved for the States under the Constitution. The President and his Administration are displeased that Colorado has exercised its sovereign authority to regulate elections by allowing mail-in voting and has exercised its sovereign authority to prosecute those who violate Colorado laws in order to undermine election integrity. In response, the Trump Administration has unleashed an array of threatened and actual punishments against Colorado, all in violation of the Constitution and federal law.

2. This case initially began when President Trump decided to remove U.S. Space Command Headquarters from the City of Colorado Springs to punish the State of Colorado for allowing eligible voters to vote by mail. In issuing his decision, the President was clear about his motivations, announcing that "[t]he problem I have with Colorado" is that "they do mail-in voting" and that this "played a big factor" in the decision. That decision was unconstitutional because the Constitution does not permit the Executive to punish or retaliate against States for lawfully exercising sovereign powers reserved for the States.

3. The President has threatened other executive action to coerce Colorado and other States to end mail-in voting. He has demanded that States, like Colorado, that allow mail-in

voting "must do what the Federal Government, as represented by the President of the United States, tells them, FOR THE GOOD OF OUR COUNTRY, to do."

4. The President likewise threatened to punish Colorado for the way it exercised its sovereign authority to administer criminal justice. *Oregon v. Ice*, 555 U.S. 160, 168 (2009) (administering criminal justice "among the basic sovereign prerogatives States retain"). Mere weeks before the Space Command Headquarters announcement, the President threatened "to take harsh measures" against Colorado for the conviction and imprisonment under Colorado law of former Mesa County Clerk and Recorder Tina Peters for her attempt to undermine election integrity. As part of his threat, President Trump again negatively referenced "Mail-in Ballot" voting. The President has ordered the Department of Justice to "take all necessary action" to secure Ms. Peters' release. He has repeatedly demanded that Colorado "FREE TINA!"

5. The President then announced on December 11 that he had issued a full pardon to Ms. Peters. But the President's pardon power applies to federal offenses, not Ms. Peters' state convictions. When Colorado refused to release Ms. Peters, the President attacked Governor Polis on December 15, referring to him as "pathetic" and complaining that the Governor would not "allow our wonderful Tina" to be released from her prison sentence.

6. The next day, on December 16, the Trump Administration instituted a weeklong series of punishments and threats targeted against Colorado:

- On December 16, the Trump Administration revealed through the press that it was terminating $109 million in transportation funds for Colorado. The Trump Administration directed this action solely against Colorado. No funding for any other

States was terminated, even though many other States are participants in the same programs.

- The same day, the Trump Administration revealed through a reporter that it planned to terminate $615 million in Department of Energy funds earmarked only for Colorado. Both President Trump and Office of Management and Budget ("OMB") Director Russell Vought reposted this media report.
- The same day, the Trump Administration revealed through the press that it planned to dismantle the National Center for Atmospheric Research ("NCAR") in Boulder, Colorado. A White House official directly tied this threat to Governor Polis's refusal to cooperate, stating: "Maybe if Colorado had a governor who actually wanted to work with President Trump, his constituents would be better served."
- Two days later, on December 18, the Department of Agriculture ("USDA") ordered Colorado to recertify eligibility and conduct in-person interviews for more than 100,000 Colorado households receiving Supplemental Nutrition Assistance Program ("SNAP") benefits in five counties within a mere 30 days, all during the winter holidays. If Colorado failed to complete this impossible and unlawful task, USDA threatened sanctions, including the potential removal of Colorado from the SNAP program. This unlawful order was directed only against Colorado and Minnesota, another State that is the recipient of recent and repeated attacks by the Trump Administration.

- Two days later, on December 20, late on a Saturday night, the Federal Emergency Management Agency ("FEMA") denied two disaster relief assistance requests from Colorado related to devastating wildfires and flooding.
- Three days after that, on December 23, DOT announced the results of the fiscal year 2025 Safe Streets and Roads for All competitive grant program. Colorado was one of only two states whose communities did not receive any awards.

This series of events, and its timing, reveal a clear and unmistakable campaign of punishment and threats against Colorado in response to Colorado's lawful exercise of sovereign powers.

7. Worse yet, Colorado faces unbounded future "harsh measures" unless and until the State agrees to bend its sovereign authority in a manner directed by the President. Already, documents provided to the press indicate that the Trump Administration has ordered the Department of the Interior to compile a list of all grants going to Colorado, its instrumentalities, and political subdivisions for possible termination, totaling more than $100 million. And the President continues to affirm his displeasure with Colorado's unwillingness to conform to his demands, attacking Colorado's public officials—"wish[ing] them only the worst" and that they "rot in Hell"—all because of Colorado's "Mail In Ballot System" and refusal to release Tina Peters from her prison sentence.

8. President Trump confirmed the direct link between the prosecution of Tina Peters and the Administration's targeting of Colorado, proclaiming "they're suffering a big price, Colorado" for Tina Peters and further threatened that "they better let her out fast." Interview:

Dan Bongino Interviews Donald Trump on His Podcast - February 2, 2026, https://f2.link/dt260202a.

9. At the foundation of our republic, the Constitution established a "system of 'dual sovereignty,'" with States retaining "'a residuary and inviolable sovereignty.'" *Printz v. United States*, 521 U.S. 898, 918–19 (1997) (quoting The Federalist No. 39 (James Madison)). These State sovereign powers were reflected directly in the original Constitution and further enshrined through the Tenth Amendment: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

10. One of the core State sovereign powers is the authority to regulate elections. As the Supreme Court has repeatedly explained, "the Framers of the Constitution intended the States to keep for themselves, as provided in the Tenth Amendment, the power to regulate elections." *Shelby County v. Holder*, 570 U.S. 529, 543 (2013) (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 461–462 (1991) and *Sugarman v. Dougall*, 413 U.S. 634, 647 (1973)). While the Constitution gives Congress certain authorities to regulate the time and manner for electing Senators and Representatives, U.S. Const. art. I, § 4, cl. 1, the Constitution provides the President and the Executive Branch with no such authority. The States alone have the power to regulate elections for President and state and local offices. The President's decision to move U.S. Space Command Headquarters in retaliation for Colorado's use of mail-in voting thus offends the fundamental design of the Constitution in two ways, violating both federalism and separation-of-powers principles.

11. Colorado has lawfully exercised its sovereign authority by creating an election system that is the envy of other States, considered the "gold standard" by many experts for free and fair elections. As part of that system, eligible voters are allowed to cast their ballots through the mail, at a drop-off box, or in person. The advantages of this system are well documented, including increased security, lower administrative costs, increased accessibility, higher voter turnout, higher voter satisfaction, and more informed voters. Since the system was put in place in 2013, there is not a shred of evidence that the outcome of any election within Colorado has been altered by fraud. This system has been embraced, implemented, administered, and supported by both Democratic and Republican Colorado public officials.

12. Another core State sovereign power is the authority to administer criminal justice. "[T]he States' 'powers to undertake criminal prosecutions'" trace their roots to the "authority originally belonging to them before admission to the Union and preserved to them by the Tenth Amendment." *Puerto Rico v. Sanchez Valle*, 579 U.S. 59, 69 (2016) (quoting *Heath v. Alabama*, 474 U.S. 82, 89 (1985)). "State prosecutions therefore have their most ancient roots in an 'inherent sovereignty' unconnected to, and indeed pre-existing, the U.S. Congress." *Id.* As part of this sovereign power, States retain the sole sovereign authority to pardon state offenses. The President and the Executive Branch have no authority to direct or control how a State exercises these sovereign powers that are expressly reserved for the States by the Constitution.

13. Colorado lawfully exercised its sovereign authority to prosecute Tina Peters for violating Colorado state criminal laws that uphold election integrity. Her prosecution was entirely apolitical, focused only on the facts and the law. Ms. Peters was prosecuted by a

Republican District Attorney and was convicted, after receiving a fair trial and due process, by a unanimous jury of her peers in Mesa County. A bipartisan group of elected Colorado county clerks and recorders affirmed that Ms. Peters' actions were "deliberate violations of Colorado law" and that her convictions were "the result of a lawful judicial process rooted in factual evidence and decided by the community she served." The Executive's actions to punish Colorado for lawfully administering criminal justice by prosecuting those who violate Colorado laws in order to undermine election integrity violates the Constitution, offending fundamental principles of federalism.

14. The Executive's actions and threats to punish Colorado based on Colorado's lawful exercise of its sovereign powers violate the Tenth Amendment, the Elections Clause, State sovereignty, and separation-of-powers principles. Under the Constitution, the Executive may not directly command Colorado as to the exercise of its sovereign powers. *See, e.g.*, *Murphy v. NCAA*, 584 U.S. 453, 472 (2018) (discussing how the federal government lacks power to directly compel states); *New York v. United States*, 505 U.S. 144, 166 (1992) (same). Nor may the Executive achieve this same result by punishing Colorado into submission. The Supreme Court has long recognized that the Constitution prohibits the use of retaliation, punishment, or other coercive action in response to the exercise of constitutional right or power. Any other rule would render the Constitution's grants of powers and rights to the States and the people meaningless. It would allow the Executive to unlawfully seize powers not granted by the Constitution to "produce a result which (it) could not command directly." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958)); *cf. United*

*States v. Goodwin*, 457 U.S. 368, 372 (1982) (an individual "certainly may not be punished for exercising a protected statutory or constitutional right").

15. The President and the Executive Branch wield vast powers with the capability to impose grave harms. The Constitution prohibits using those powers to try to extract additional authority reserved for the States, as the Trump Administration has done here. If allowed to stand, the Trump Administration's actions here would fundamentally alter the balance of power between the States and the federal government, upsetting the Constitution's foundational structure. Future Presidents, Republican and Democratic alike, could use the same tactics and wield the Executive's vast powers to punish States, for example, for imposing stringent voter identification laws, or for not redistricting congressional districts to the President's liking, or for prosecuting or not prosecuting individuals according to the President's demands.

16. For similar reasons, the Executive's actions also contravene the principle of equal sovereignty. "Not only do States retain sovereignty under the Constitution, there is also a 'fundamental principle of *equal* sovereignty' among the States." *Shelby Cnty.*, 570 U.S. at 544 (quoting *Nw. Austin Mun. Util. Dist. V. Holder*, 557 U.S. 193, 203 (2009)). The principle of equal sovereignty serves to bar unjustified disparate treatment among the States in "sensitive areas of state and local policymaking" reserved by the Constitution for the States, such as the power to regulate elections and administer criminal justice. *See, e.g.*, *id.*; *Nw. Austin*, 557 U.S. at 203. The Executive's actions, and threatened future action, undermine and violate equal sovereignty by singling out Colorado for harmful action because the Trump Administration dislikes how Colorado exercises sovereign powers reserved to it by the Constitution. The

Constitution does not permit the Executive to single out States for punishment based on their exercise of core sovereign powers. And yet, that is exactly what President Trump and his Administration have done.

17. In addition to violating the Constitution, the Executive Branch's actions also violate numerous federal laws. For example, with respect to the relocation of Space Command Headquarters, Defendants violated statutory requirements mandating detailed processes and public disclosures through the submission of reports to Congress before taking action to relocate a major military headquarters. Likewise, USDA's SNAP order was issued without lawful authority, violates numerous substantive and procedural requirements, unlawfully creates new reporting and recordkeeping requirements contrary to the Paperwork Reduction Act, and is arbitrary and capricious. Similarly, the Department of Transportation's ("DOT") funding termination decision violates the Administrative Procedure Act ("APA") because it is arbitrary and capricious. Accordingly, Colorado seeks relief pursuant to the APA for the numerous unlawful agency actions that are contrary to law, arbitrary and capricious, in excess of statutory authority or limitation, and/or without observance of procedure required by law.

18. The State of Colorado brings this action seeking a declaration that the Executive's actions to punish Colorado based on Colorado's lawful exercise of its sovereign powers, and threats to impose further harmful action, are unconstitutional and unlawful. Colorado also seeks injunctive relief prohibiting the agency defendants from implementing these unconstitutional and unlawful actions. Finally, Colorado seeks relief under the APA to vacate and set aside, and to stay enforcement of, unlawful agency actions.

## JURISDICTION AND VENUE

19. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States.

20. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities. Plaintiff, the State of Colorado, is a sovereign State in the United States of America. A substantial part of the events or omissions giving rise to this Amended Complaint occurred and continue to occur within this district.

## PARTIES

21. Plaintiff State of Colorado is a sovereign State in the United States of America. Colorado is represented by Phil Weiser, the Attorney General of Colorado. The Attorney General is the chief legal representative of the State and is authorized by Colorado Revised Statutes § 24-31-101 to pursue this action on behalf of the State of Colorado.

22. Defendant Donald J. Trump is President of the United States. President Trump is sued in his official capacity.

23. Defendant Department of Defense is a cabinet agency within the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

24. Defendant Pete Hegseth is the Secretary of Defense. The commander of U.S. Space Command reports to the Secretary of Defense. Secretary Hegseth is sued in his official capacity.

25. Defendant Department of the Air Force is an agency within the Department of Defense and is an agency within the meaning of 5 U.S.C. § 552(f).

26. Defendant Troy Meink is the Secretary of the U.S. Air Force. The Secretary of the Air Force oversees the Department of the Air Force and carries out varied functions subject to the authority, direction, and control of the Secretary of Defense. Secretary Meink is sued in his official capacity.

27. Collectively, Defendants Department of Defense, Department of the Air Force, Secretary Hegseth, and Secretary Meink are referred to as "DOD Defendants."

28. Defendant Executive Office of the President is an agency within the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f). The Executive Office of the President employs the White House staff and agencies, including OMB, and coordinates actions across U.S. government agencies.

29. Defendant Department of Transportation is a cabinet agency within the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

30. Defendant Sean Duffy is the Secretary of Transportation. Secretary Duffy is sued in his official capacity.

31. Collectively, Defendants DOT and Secretary Duffy are referred to as "DOT Defendants."

32. Defendant Department of Agriculture is a cabinet agency within the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

33. Defendant Brooke Rollins is the Secretary of Agriculture. Secretary Rollins is sued in her official capacity.

34. Collectively, Defendants USDA and Secretary Rollins are referred to as "USDA Defendants."

35. Defendant National Science Foundation ("NSF") is an agency within the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

36. Defendant Brian Stone is currently performing the duties of the Director of the National Science Foundation. He is sued in his official capacity.

37. Defendant Department of Homeland Security ("DHS") is a cabinet agency within the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

38. Defendant Markwayne Mullin is the Secretary of Homeland Security. Secretary Mullin is sued in his official capacity.

39. Defendant Federal Emergency Management Agency ("FEMA") is an agency within the Department of Homeland Security and is an agency within the meaning of 5 U.S.C. § 552(f).

40. Defendant Karen Evans is currently performing the duties of the Director of the Federal Emergency Management Agency. She is sued in her official capacity.

41. Defendant Department of Energy ("DOE") is a cabinet agency within the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

42. Defendant Chris Wright is Secretary of Energy. Secretary Wright is sued in his official capacity.

43. Defendant Department of the Interior is a cabinet agency within the Executive Branch of the federal government and is an agency within the meaning of 5 U.S.C. § 552(f).

44. Defendant Doug Burgum is the Secretary of the Interior. Secretary Burgum is sued in his official capacity.

45. Collectively, all Defendants other than President Trump are referred to as "Agency Defendants."

## ALLEGATIONS

### I. The Constitution reserves certain sovereign powers for the States and prohibits the Executive from punishing States for lawfully exercising those sovereign powers.

46. Federalism, the system of dual sovereignty between the States and the federal government, serves as one of the core structural designs of the Constitution. The Founders viewed federalism and separation of powers as key to protecting liberty and avoiding abuse from centralized power. "[T]he power surrendered by the people is first divided between two distinct governments, and then the portion allotted to each subdivided among distinct and separate departments. Hence a double security arises to the rights of the people." The Federalist No. 51 (James Madison). As the Supreme Court has emphasized, "the Constitution divides authority

between federal and state governments for the protection of individuals. State sovereignty is not just an end in itself: 'Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power.'" *New York*, 505 U.S. at 181 (quoting *Coleman v. Thompson*, 501 U.S. 722, 759 (1991)). "Just as the separation and independence of the coordinate branches of the Federal Government serve to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Gregory*, 501 U.S. at 458.

47. The Constitution thus reflects that the States retained "certain exclusive and very important portions of sovereign power," The Federalist No. 9 (Alexander Hamilton), "a residuary and inviolable sovereignty," The Federalist No. 39 (James Madison). These State sovereign powers were further enshrined through the Tenth Amendment: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

48. "[T]he Framers of the Constitution intended the States to keep for themselves, as provided in the Tenth Amendment, the power to regulate elections." *Shelby Cnty.*, 570 U.S. at 543 (quoting *Gregory*, 501 U.S. at 461–462 and *Sugarman*, 413 U.S. at 647). The Elections Clause provides: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. Const. art. I, § 4, cl. 1. The Constitution thus gives the States the power to regulate elections. While Congress may pass laws to alter State regulations regarding the time

and manner for electing Senators and Representatives, the President and the Executive Branch were given no such authority. Further, the States alone have the power to regulate elections for President and state and local offices.

49. Another core State sovereign power is the authority to administer criminal justice. "[T]he States' 'powers to undertake criminal prosecutions'" trace their roots to the "authority originally belonging to them before admission to the Union and preserved to them by the Tenth Amendment." *Sanchez Valle*, 579 U.S. at 69 (quoting *Heath*, 474 U.S. at 89). As a result, "[p]rior to forming the Union, the States possessed 'separate and independent sources of power and authority,' which they continue to draw upon in enacting and enforcing criminal laws." *Id.*. "State prosecutions therefore have their most ancient roots in an 'inherent sovereignty' unconnected to, and indeed pre-existing, the U.S. Congress." *Id.* As part of this sovereign power, States retain the sole sovereign authority to pardon state offenses. While Congress may override state criminal laws in certain circumstances through the Supremacy Clause, the President and the Executive Branch have no authority to direct or control how a State exercises these sovereign powers that are expressly reserved by the Constitution for the States.

50. The Constitution prohibits the Executive from commanding the States as to their exercise of these core sovereign powers. *See, e.g.*, *Murphy*, 584 U.S. at 472; *New York*, 505 U.S. at 166. The Executive may not achieve this same result by punishing a State into submission. The Supreme Court has long recognized that the Constitution prohibits the use of retaliation, punishment, or other coercive action in response to the lawful exercise of a constitutional right or power. Any other rule would render the Constitution's grants of powers and rights to the States

and the people meaningless. That would allow the federal government to unlawfully seize powers not granted by the Constitution to "'produce a result which (it) could not command directly.'" *Perry*, 408 U.S. at 597 (quoting *Speiser*, 357 U.S. at 526); *cf. Goodwin*, 457 U.S. at 372 (an individual "certainly may not be punished for exercising a protected statutory or constitutional right").

51. The Supreme Court has repeatedly upheld "the principle that a government official cannot do indirectly what she is barred from doing directly." *NRA v. Vullo*, 602 U.S. 175, 190 (2024) (citing *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67–69 (1963)). In the context of constitutionally protected rights, this means that the government cannot use or threaten retaliation to punish or suppress the exercise of a protected right. *See, e.g.*, *NRA*, 602 U.S. at 191 (holding a government official violates the First Amendment when "reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech").

52. The same principle applies equally to a State's exercise of sovereign powers reserved by the Constitution. Indeed, the Supreme Court has emphasized that the federal government can never exceed its authority relative to the States, not even by "consent." *New York*, 505 U.S. at 182. Retaliation and punishment violate the constitutional design by seeking to coerce States to "voluntarily" give up their sovereign powers.

53. The Executive similarly may not single out States based on their exercise of core sovereign powers under the principle of equal sovereignty. "Not only do States retain sovereignty under the Constitution, there is also a 'fundamental principle of *equal* sovereignty'

among the States." *Shelby Cnty.*, 570 U.S. at 544. Our Nation "was and is a union of States, equal in power, dignity, and authority." *Coyle v. Smith*, 221 U.S. 559, 567 (1911). The principle of equal sovereignty serves to bar unjustified disparate treatment among the States in "sensitive areas of state and local policymaking" reserved by the Constitution for the States, such as the power to regulate elections. *See, e.g.*, *Shelby Cnty.*, 570 U.S. at 544 (quoting *Lopez v. Monterey County*, 525 U.S. 266, 282 (1999)); *Nw. Austin*, 557 U.S. at 203.

54. Just as the Constitution does not permit singling out States for additional scrutiny in how they regulate elections absent exceptional conditions, *Shelby Cnty.*, 570 U.S. at 544, 555–57, the Constitution forbids the Executive from singling out States for punishment based on their lawful exercise of core sovereign powers. Were it not so, the Executive could achieve the same results prohibited in *Shelby County* by taking or threatening harmful executive actions to coerce States into "voluntarily" submitting to the preclearance requirements struck down by the Supreme Court. The Constitution does not permit such an end-run and does not permit the Executive to single out States for punishment based on their exercise of sovereign powers. Such unjustified disparate treatments, targeted at disfavored exercise of sovereign powers reserved to the States, violates the principle of equal sovereignty.

### II. Colorado has lawfully exercised its sovereign authority to regulate elections through the use of mail-in voting.

55. In 2013, the Colorado General Assembly enacted House Bill 13-1303, the "Voter Access and Modernized Elections Act." Governor Hickenlooper signed the bill into law on May 10, 2013. H.B. 13-1303, 69th Gen. Assem., 1st Reg. Sess. (Colo. 2013).

56. Under this Act and accompanying regulations, eligible Colorado voters are permitted to vote in state and federal elections by mailing in their ballot, depositing their ballot at a drop-off location, or voting in person. *See, e.g.*, C.R.S. § 1-7.5-103.

57. The law has been a resounding success. For example, a 2016 study by the Pew Charitable Trusts found that the law decreased administrative costs by an average of 40%, decreased the use of provisional ballots by nearly 98%, increased voter turnout, and increased voter satisfaction. In a survey of voters, 95% were satisfied or very satisfied with their voting experience. Pew Charitable Trs., *Colorado Voting Reforms: Early Results* (Mar. 2016), https://www.pew.org/en/research-and-analysis/issue-briefs/2016/03/colorado-voting-reforms-early-results.

58. Other studies have shown similarly positive outcomes. One study concluded that Colorado's voting system increased turnout, on average, by eight percentage points. Adam Bonica, et al., *All-mail Voting in Colorado Increases Turnout and Reduces Turnout Inequality*, 72 Electoral Studies (Aug. 2021), https://doi.org/10.1016/j.electstud.2021.102363. This has led Colorado to have one of the highest voter turnout rates in the nation.

59. Colorado's voting system improves accessibility for all groups, including persons with disabilities and individuals who cannot easily vote in person on Election Day due to mobility or other challenges. It also leads to more informed voters because eligible voters receive their ballots and have additional time to research candidates and issues, without the time pressure of the voting booth. In addition to these benefits, security is increased by an all-paper ballot system that is easily audited and more secure than electronic voting.

60. Nor is this a partisan issue: empirical evidence shows that vote-by-mail systems have no impact on partisan turnout or vote share. *See, e.g.*, Daniel M. Thompson, et al., *Universal Vote-by-Mail Has No Impact on Partisan Turnout or Vote Share*, 117 Procs. of the Nat'l Acad. of Sci. 14052 (2020), https://doi.org/10.1073/pnas.2007249117.

61. The Act enjoys broad bipartisan support within Colorado. *See, e.g.*, *Consensus on Mail Voting*, The Daily Sentinel, Grand Junction, Colorado (Sept. 24, 2025). The Act has been implemented by Republican and Democratic Secretaries of States alike and by a bipartisan group of clerks across Colorado. As one Republican state House representative and President Trump supporter recently stated: "Coloradans love being able to vote from home . . . . [T]his is what the overwhelming majority of Coloradans want."

62. A voting system that works for Coloradans is especially important because of the active role Colorado citizens play in their own democratic self-government through the initiative and referendum process. This mail-in voting system is also highly resilient, proving effective through challenging circumstances like the COVID-19 pandemic.

63. Since the system was put in place in 2013, there is no evidence that the outcome of any election within Colorado has been altered by fraud. To the contrary, Colorado's system ensures secure, free, and fair elections.

64. The facts in Colorado do not bear out the claim that mail-in voting entails "massive voter fraud" or "crooked elections," as President Trump has falsely claimed. Nor do States that allow mail-in voting want "dishonest elections." Colorado and other similar States impose strenuous security requirements, with detailed security auditing, to ensure free and fair

elections. The President's claim that foreign countries and others print millions of illegal ballots is likewise completely false. President Trump's statements and beliefs on mail-in voting, particularly Colorado's mail-in voting, are simply untethered from the facts.

65. In sum, the well-documented advantages of Colorado's system include increased security, lower administrative costs, increased accessibility, higher voter turnout, higher voter satisfaction, and more informed voters. Colorado's voting system is considered to be the "gold standard" by many policy experts for free and fair elections. Bonica, *supra*, at 1. The system is the envy of other States, and numerous States have attempted to emulate Colorado's system.

66. Most importantly, Colorado has exercised its sovereign power to create and implement this voting system through duly enacted legislation, as the Constitution expressly provides and as the Framers envisioned. Sovereignty means the freedom to choose, regardless of the President's view about the wisdom, efficacy, or appropriateness of that judgment, so long as that choice does not violate other specific provisions of the Constitution.

## III. Colorado has lawfully exercised its sovereign authority to prosecute those who violate Colorado laws in order to undermine election integrity.

67. Colorado takes election integrity seriously. Though election-related crimes are rare, Colorado prosecutes any individuals, regardless of political party, who may violate Colorado law to undermine election integrity.

68. Tina Peters was the Mesa County Clerk and Recorder. As an elected public official, a core function of her duties was to administer elections and uphold election integrity and security. In reality, she did the opposite. Ms. Peters was prosecuted by the Mesa County

District Attorney after evidence revealed that she sought to defeat election security protocols through misuse of her official position, arranging for an unauthorized individual to unlawfully gain access to and copy election equipment through false pretenses, and then covering up her involvement in the crime.

69. Colorado elections are managed with a computer server called the election management system or EMS. The system software is updated every other year through a confidential and secure process called the "trusted build" ("Build") that is regulated and administered by the Colorado Secretary of State. During the Build, staff from the Secretary of State's Office upload an updated and certified version of the software to each county's server. Prior election records must be backed up before the Build; the vendor provides instructions to the counties through the Secretary of State on how to do this backup of records. Paper ballots for each election are also retained under seal for 25 months.

70. Ms. Peters and her office were investigated after video and still images of Mesa County's 2021 Build were posted online. The investigation revealed, among other things, that, contrary to Secretary of State requirements, Ms. Peters arranged for an unauthorized individual to gain access to the Mesa County election equipment so that he could make forensic images of the election server both before and after the Build and also witness the Build. Without the Secretary of State's awareness or authorization, Ms. Peters surreptitiously recorded the Build with her iPhone and also had the forensic images and her video recording sent to this individual and/or his associates. Ms. Peters repeatedly deceived public servants about the true identity of this unauthorized individual, falsely misrepresenting to the Secretary of State's Office that the

unauthorized individual was a county employee, to a Mesa County IT employee that he was a state employee who needed system access, and to her own staff that he was a new county employee. Ms. Peters sought to cover her trail by, among other things, directing that security cameras be turned off in the room with the election equipment and directing her staff not to comply with the investigation or talk to police and to purchase "burner phones."

71. Ms. Peters was found guilty by a jury of three counts of attempting to influence a public servant in violation of C.R.S. § 18-8-306, in relation to repeatedly deceiving public servants to get them to provide the unauthorized individual with access to the elections server and Build. She was also found guilty of one count each of: conspiracy to commit criminal impersonation in violation of C.R.S. §§ 18-5-113(1)(b)(I) and 18-2-201, first-degree official misconduct in violation of C.R.S. §18-8-404(1), violation of duty in violation of C.R.S. §1-13-107, and failure to comply with Secretary of State requirements in violation of C.R.S. §1-13-114(1). The trial court sentenced Ms. Peters to a total term of eight years and nine months imprisonment, though she will be eligible for parole at an earlier date, beginning in 2028. In reaching this sentence, the trial court found that Ms. Peters had done "immeasurable damage" to local elections and trust in the electoral process and lacked remorse for her conduct. The Colorado Court of Appeals affirmed Ms. Peters' convictions on April 2, 2026 but remanded for resentencing.

72. The prosecution of Ms. Peters was apolitical. No court has ever found any evidence of prosecutorial impropriety or bias. Ms. Peters was prosecuted by a Republican District Attorney. She was convicted, after receiving a fair trial and due process, by a unanimous

jury of her peers in Mesa County, a politically conservative county that voted overwhelmingly for President Trump. A bipartisan group of elected Colorado county clerks and recorders affirmed that Ms. Peters' actions were "deliberate violations of Colorado law" and that her convictions were "the result of a lawful judicial process rooted in factual evidence and decided by the community she served."

73. It is fully within Colorado's lawful sovereign authority to prosecute individuals, like Ms. Peters, who violate Colorado criminal laws. Her actions undermined election integrity through her attempt to circumvent election security protocols. Colorado administers criminal justice through its court system, providing full due process and numerous layers of appeal, which Ms. Peters is currently exercising. It is likewise fully within Colorado's lawful sovereign authority—delegated by the Colorado Constitution, art. IV, section 7, to the Governor, subject to regulation by the General Assembly—to determine whether to grant a pardon for offenses against the State of Colorado.

## IV. President Trump and his Administration have repeatedly threatened and punished Colorado based on its exercise of sovereign powers.

74. Colorado has faced increasing threats from President Trump and his Administration because the President dislikes how Colorado has exercised its sovereign powers to regulate elections by allowing mail-in voting and to prosecute those who violate Colorado laws to undermine election integrity. Those threats have become increasingly pointed. The purpose is clear: to coerce Colorado to end mail-in voting and to release Tina Peters from prison. When the threats alone did not work, the Trump Administration followed through, employing various punishments against Colorado for its exercise of sovereign powers. The threats continue,

and statements reported in the media by Administration officials suggest that the Trump Administration continues to evaluate additional ways to punish Colorado.

75. Beginning in late spring, the President issued various threats against Colorado for the prosecution of Ms. Peters to coerce state officials to release her. On May 5, 2025, President Trump demanded that Colorado free Ms. Peters and directed DOJ to "take all necessary action" to secure her release. The President posted: "Tina is an innocent Political Prisoner being horribly and unjustly punished in the form of Cruel and Unusual Punishment . . . . Colorado must end this unjust incarceration of an innocent American. I am hereby directing the Department of Justice to take all necessary action to help secure the release of this 'hostage' being held in a Colorado prison by the Democrats, for political reasons. FREE TINA PETERS, NOW!"



Donald J. Trump
@realDonaldTrump

Radical Left Colorado Attorney General Phil Weiser ignores Illegals committing Violent Crimes like Rape and Murder in his State and, instead, jailed Tina Peters, a 69-year-old Gold Star mother who worked to expose and document Democrat Election Fraud. Tina is an innocent Political Prisoner being horribly and unjustly punished in the form of Cruel and Unusual Punishment. This is a Communist persecution by the Radical Left Democrats to cover up their Election crimes and misdeeds in 2020. The same Democrat Party that flies to El Salvador to try to free an MS-13 Terrorist, is cruelly imprisoning, perhaps for life, a grandmother whose brave and heroic son gave his life for America. Colorado must end this unjust incarceration of an innocent American. I am hereby directing the Department of Justice to take all necessary action to help secure the release of this "hostage" being held in a Colorado prison by the Democrats, for political reasons. FREE TINA PETERS, NOW!

**7.75k** ReTruths **21.7k** Likes May 05, 2025, 6:12 PM

76. By August, the President's threats became extremely overt: "If [Tina Peters] is not released, I am going to take harsh measures!!!" The President further tied this threat to Colorado's use of mail-in voting.

> **Donald J. Trump**
> @realDonaldTrump
>
> FREE TINA PETERS, a brave and innocent Patriot who has been tortured by Crooked Colorado politicians, including the big Mail-In Ballot supporting the governor of the State. Let Tina Peters out of jail, RIGHT NOW. She did nothing wrong, except catching the Democrats cheat in the Election. She is an old woman, and very sick. If she is not released, I am going to take harsh measures!!!
>
> **15.7k** ReTruths **53.7k** Likes Aug 21, 2025, 6:07 AM

77. Around the same time, on August 18, 2025, the President threatened to take executive action to coerce Colorado and other States to end mail-in voting. He demanded that States, like Colorado, that allow mail-in voting "must do what the Federal Government, as represented by the President of the United States, tells them, FOR THE GOOD OF OUR COUNTRY, to do."

78. When this threat yielded no results, the President took a first action to punish Colorado. On September 2, 2025, President Trump announced that he was relocating U.S. Space Command permanent headquarters from Peterson Space Force Base in Colorado Springs, Colorado. When issuing his decision, the President announced that "[t]he problem I have with Colorado" is that "they do mail-in voting" and that this "played a big factor" in the decision.

79. U.S. Space Command is one of eleven combatant commands within the Department of Defense. The loss of U.S. Space Command Headquarters will cost Colorado thousands of jobs, harm to its economy, loss of tax revenue, and uproot the lives of hundreds of

Colorado civilians and their families from their homes and communities in El Paso County, Colorado. President Trump estimated that his decision would create 30,000 jobs and hundreds of billions in investment for the new location, diverting those jobs and investment from Colorado.

80. Of course, mail-in voting and the manner by which a State regulates its elections has nothing to do with where a major military headquarters should strategically be located. But President Trump made clear that this was a "big factor" in the decision in order to coerce Colorado to end mail-in voting.

81. In the fall, the President and his Administration continued their focus on Tina Peters, escalating attacks against Colorado.

82. On November 12, 2025, Defendant DOJ, through the Bureau of Prisons, sent Colorado a letter requesting that Tina Peters be released into federal custody. Ed Martin, DOJ Pardon Attorney, explained in an interview that DOJ's efforts to release Ms. Peters were being led at the highest levels by Deputy Attorney General Todd Blanche and were intended to exert "the right kind of pressure on them." He continued: "If you're Colorado . . . if the feds say we want something, you change your tune."

83. When that pressure failed to work, President Trump and his Administration again escalated the attacks. On December 3, 2025, the President again demanded that Colorado "FREE TINA" and attacked Colorado Governor Polis as the "SLEAZEBAG Governor of Colorado" for not bending to his wishes to release her from prison.

84. On December 11, 2025, the President announced that he had issued a full pardon for Ms. Peters: "Tina is sitting in a Colorado prison for the 'crime' of demanding Honest

Elections. Today I am granting Tina a full pardon for her attempts to expose Voter Fraud in the Rigged 2020 Presidential Election!" Several days later, Defendant DOJ released a copy of the official pardon, indicating that it was issued (though not announced) on December 5, 2025.

85. Under the Constitution, the President's pardon power extends only to offenses against the United States (i.e., federal crimes). Colorado, through its Governor, retains exclusive sovereign authority to issue pardons for state crimes. As a result, the President's pardon had no effect on Ms. Peters' state convictions.

86. Days later, on December 15, 2025, after Colorado refused to release Ms. Peters from prison based on the pardon, the President escalated his rhetoric again. He attacked Governor Polis in an Oval Office media event, describing him as "weak and pathetic" and complaining that Governor Polis would not "allow our wonderful Tina to come out of a jail."

87. The next day, on December 16, 2025, the Trump Administration instituted a weeklong series of punishments and threats targeted against Colorado.

**December 16: DOT cuts $109 million in transportation funding only for Colorado.**

88. The first action began on December 16, 2025, when the Trump Administration announced through the press that it was terminating $109 million in transportation funding for Colorado. The Trump Administration directed this action solely against Colorado. No funding terminations for any other States were announced at that time, even though many other States were participants in the same programs. The fact pattern appears to match a common one from the Trump Administration, in which federal agencies are tasked with identifying and mass terminating funding for a targeted entity, here the State of Colorado.

89. The evidence shows Colorado was singled out. For example, Congress appropriated specific funding to repair or replace nonoperational electric vehicle chargers. DOT issued dozens of awards pursuant to this appropriation, yet only Colorado's award was singled out for termination in this action. Similarly, DOT administers the BUILD/RAISE grant program, which provides grants for surface transportation infrastructure projects with significant local or regional impact. DOT has issued hundreds of these grants, yet it terminated funding only for one award to build a transit station in Fort Collins, Colorado. Likewise, DOT has issued billions of dollars of awards under the Consolidated Rail Infrastructure and Safety Improvements ("CRISI") program, yet it chose to terminate only two awards in this action, both in Colorado.

90. The funding termination did not follow normal procedures. Colorado officials learned about their lost funding not from any notice from the agency, but through the press. When Colorado officials contacted DOT following the press report to ask if the funding was being cut, DOT staff were unaware of any decision. Later documentation from DOT failed to provide any details or reasoned justification for the decision.

**December 16: The Trump Administrations reveals to a reporter that DOE is threatening to cut $615 million in funding for Colorado.**

91. Also on December 16, the Trump Administration communicated to a reporter its plans to terminate $615 million in DOE funds earmarked only for Colorado. Like the DOT funding cuts, the DOE cuts are directly targeted at Colorado. DOE has not yet formalized these cuts into any final action, and they remain a threat hanging over Colorado.

92. But tellingly, both President Trump and OMB Director Russell Vought reposted on social media information about these cuts, evidencing the Administration's desire to publicize the threatened cuts to harm Colorado.







**December 16: The Trump Administration threatens to dismantle the National Center for Atmospheric Research in Boulder.**

93. The same day, the Trump Administration announced through the press that it planned to dismantle National Center for Atmospheric Research in Boulder, Colorado. OMB Director Vought further announced that "any vital activities such as weather research" that might survive the dismantling "will be moved to another entity or location" (i.e., not Colorado). A White House official directly tied this threat to Governor Polis's refusal to cooperate with President Trump's demands, stating: "Maybe if Colorado had a governor who actually wanted to work with President Trump, his constituents would be better served."

94. NCAR was established in 1960 by the National Science Foundation as the first federally funded research and development center. For more than six decades, across administrations from both parties, NCAR has served as "a world-class research center leading, promoting and facilitating innovation in the atmospheric and related Earth and Sun systems science." NCAR employs over 800 scientists, engineers, and support staff engaging in cutting-edge atmospheric research and developing advanced tools, data, and resources used by scientists around the country and the globe.

95. If NCAR were dismantled, it would cause immeasurable damage to scientific advancement, harming everyday Americans who regularly benefit from NCAR's many breakthrough discoveries. But it would also cause significant economic damage to Colorado, including the loss of jobs, contracts, and tax revenue.

96. Since that time, the Trump Administration has taken numerous steps towards completing the dismantling of NCAR, including issuing a "Dear Colleague" letter seeking proposals related to the dismantling of NCAR and divesting the stewardship and operations of a supercomputing center. The Administration has thus begun to carry out its threat against Colorado, with every reason to believe it will fully carry through.

**December 18: USDA unlawfully orders Colorado to participate in a SNAP "pilot project" requiring it to recertify and conduct in-person interviews with over 100,000 households within 30 days or face severe consequences.**

97. Two days later, on December 18, USDA arbitrarily ordered Colorado to comply with an unlawful SNAP "pilot project." The "pilot project" purports to require Colorado and five Colorado counties to recertify eligibility for all SNAP households, without exception, within 30

days over the winter holidays, including conducting in-person interviews with more than 100,000 households. Colorado was given no advance warning or time to prepare.

98. This was not a real "pilot project" where States voluntarily agree to participate in innovative methods to improve a program. Instead, it was a targeted attack against Colorado and Minnesota, another jurisdiction being singled out by the Administration. To remove any doubt about animus, the USDA released a social media post from Secretary Rollins, making clear the intent of the "pilot project" was just to punish disfavored jurisdictions.


Secretary Brooke Rollins
@SecRollins

.@GovTimWalz, there is nothing you can do NOW that changes the fact you stood idly by as criminals stole MILLIONS from the American taxpayer and hungry families. The attached requires you to verify SNAP participants in the next 30 days.

Tick. Tock. ⏰

99. The "pilot project" itself is unlawful, violating numerous statutes and regulations. But it also makes no sense for USDA to select Colorado other than to punish the State. Colorado already recertifies most households every six months, twice the rate required by federal regulations and more often than many other States. USDA's own analyses likewise show that Colorado consistently performs better than the national average with regard to payment errors, often in the top 20 performing States.

100. Even if the "pilot project" were lawful, it is logistically impossible to complete the requirements and interview 100,000 households in person within a mere 30 days, an insurmountable requirement that USDA is undoubtedly aware of. Yet, USDA threatens to

impose severe sanctions against Colorado, including the possible sanction of removing Colorado from the SNAP program, if Colorado fails to comply with the illegal and impossible demand.

**December 20: The Trump Administration denies Colorado disaster relief.**

101. Two days later, on December 20, FEMA denied two disaster relief assistance requests from Colorado related to devastating wildfires and flooding. Last August, Colorado suffered two catastrophic wildfires in Rio Blanco County causing roughly $27 million in damage, including harm to critical electric infrastructure. Separately, in October, Colorado suffered record-breaking severe flooding in three counties, causing at least $13 million in damage, including to drinking water and wastewater infrastructure.

102. FEMA has long applied guidelines and indicators for disaster relief requests to ensure States are treated fairly and consistently. The two Colorado requests were well within those guidelines and exceeded financial impact indicators. Indeed, in more than three decades, Colorado has not had any request that exceeded financial impact indicators denied.

103. Late on a Saturday night during the week of retribution, however, FEMA denied both of Colorado's requests. FEMA offered no explanation as to how the requests did not meet guidelines or indicators. Issuing these denials near midnight on a weekend is highly abnormal, further indicating that the action was issued outside typical protocols and decisionmaking processes.

104. Colorado appealed the two denials of disaster relief on January 16, 2026. FEMA denied both appeals on April 10, 2026.

**December 23: Colorado was denied DOT safe streets funding.**

105. Three days later, DOT took additional retributive action against Colorado, this time in the form of denying funding.

106. The Safe Streets and Roads for All Program ("SS4A") is a competitive grant program intended to improve safety on American roadways that has been funded since fiscal year 2022. In every previous funding cycle, Colorado communities received awards. Yet, on December 23, when DOT announced the awards for fiscal year 2025, Colorado was one of only two States to receive no awards. Follow-up meetings with DOT indicated that many of Colorado's applications received the highest recommendation by DOT staff, but political appointees denied all awards to Colorado. DOT's decision to deny SS4A funding to Colorado is unrelated to the program's goals and instead presents further evidence of retaliation against the State.

**The Administration's retribution campaign continues with threat of more to come.**

107. This series of events and its timing reveal a clear and unmistakable coordinated campaign of retaliation and punishment through official federal government actions by Defendants against Colorado in direct response to Colorado's lawful exercise of sovereign powers. The President has made clear his demand, and his Administration is following through on his threat to take "harsh measures."

108. There is no evidence to suggest these punishments will stop. In fact, the continued messages to the press and via social media from the President and senior Administration officials make clear that the retribution will continue against Colorado. Retaliation is particularly

pernicious because it is open-ended. Colorado faces not only the current punishments but also unbounded future "harsh measures" unless and until the State concedes and bends its sovereign authority in a manner directed by the President. Indeed, the President remains fixated on Colorado and its public officials for their refusal to concede to his coercion and pressure. Just one week ago, the President stated that he wished the District Attorney who prosecuted Ms. Peters and the Governor "only the worst" and that "they rot in Hell"—all because of Colorado's "Mail In Ballot System" and refusal to release Tina Peters from her prison sentence.

> **Donald J. Trump**
> @realDonaldTrump
>
> God Bless Tina Peters, who is now, for two years out of nine, sitting in a Colorado Maximum Security Prison, at the age of 73, and sick, for the "crime" of trying to stop the massive voter fraud that goes on in her State (where people are leaving in record numbers!). Hard to wish her a Happy New Year, but to the Scumbag Governor, and the disgusting "Republican" (RINO!) DA, who did this to her (nothing happens to the Dems and their phony Mail In Ballot System that makes it impossible for a Republican to win an otherwise very winnable State!), I wish them only the worst. May they rot in Hell. FREE TINA PETERS!
>
> **7.46k** ReTruths **24.7k** Likes Dec 31, 2025, 10:27 AM

109. Documents provided to the press indicate that the Trump Administration has already ordered the Department of the Interior to compile a list of all grants earmarked for Colorado, its instrumentalities, and political subdivisions for possible termination. This would total more than $100 million in additional losses for Colorado.

**The punishment and threats against Colorado are unconstitutional.**

110. The Executive's punishments and threats against Colorado are unconstitutional. The President and the Executive Branch wield vast federal powers with the capability to impose grave harms. The Constitution prohibits using those powers to extract additional authority reserved by the Constitution for the States, as the President has done here, and as he threatens to continue to do with further "harsh measures" in the future. The Constitution likewise prohibits singling out States based on their lawful exercise of sovereign authority. The President has no constitutional authority to directly command Colorado to end mail-in voting or to release Tina Peters from her prison sentence. Nor may he indirectly try to compel Colorado to bend to his wishes through threats and punishment.

111. If allowed to stand, the President's actions would fundamentally alter the balance of power between the States and the federal government and the Constitution's foundational structure. Future Presidents, Republican and Democratic alike, could use the same tactics and wield the Executive's vast powers to punish States for exercising their sovereign authority to the President's liking. Once that door is opened and a precedent is set, there is no reason to believe that such coercive tactics could not or will not recur with future Presidents in their interactions with States.

## V. In punishing Colorado, the Trump Administration has also violated numerous federal statutes.

112. Many of the Trump Administration's unconstitutional retaliatory actions also violate federal law in other ways. The relocation of Space Command Headquarters violates legal mandates for providing advance disclosures and reasoned analysis to Congress. USDA's arbitrary and capricious SNAP order was issued without lawful authority and violates numerous

substantive and procedural requirements, as well as the Spending Clause. And DOT's funding termination decision violates the APA because it is arbitrary and capricious.[1]

**A. The President decides to relocate U.S. Space Command because Colorado utilizes mail-in voting while DOD Defendants violate statutory requirements for moving a major headquarters.**

113. After numerous threatened attacks, the Trump Administration's first punishment directed against Colorado for exercising its sovereign authority was the President's decision to relocate U.S. Space Command Headquarters out of Colorado Springs, Colorado. The President's decision made clear his motivations, announcing that "[t]he problem I have with Colorado" is that "they do mail-in voting" and that this "played a big factor" in the decision.

114. Underscoring the unconstitutional processes and motivations driving this decision, DOD Defendants violated numerous statutory directives regarding the process for moving a major headquarters.

**1. U.S. Space Command is established as a combatant command with a permanent headquarters in Colorado Springs.**

115. U.S. Space Command was authorized by the 2018 National Defense Authorization Act and was formally established on August 29, 2019. John S. McCain National Defense Authorization Act, Pub. L. 115-232, § 1601, 132 Stat. 1636, 2101–2105 (2018). It is one

[1] Many of the allegations described earlier remain threats not yet acted upon or are otherwise nonfinal and, therefore, are not ripe for challenge under the APA. If the Administration were to follow through on those threats or finalize those actions, Colorado reserves its rights to amend the complaint or to file separate civil actions challenging any future actions.

of eleven combatant commands under the umbrella of the Department of Defense. Its mission is to "plan[], execute[], and integrate[] military spacepower into multi-domain global operations in order to deter aggression, defend national interests, and when necessary, defeat threats." To accomplish its mission, U.S. Space Command "employs joint forces from the U.S. Army, Marine Corps, Navy, Air Force and Space Force."

116. Since its inception, U.S. Space Command has always been headquartered—both provisionally and then permanently—at Peterson Space Force Base (previously Peterson Air Force Base), in Colorado Springs, Colorado.

117. Initially, the headquarters were temporary while the Department of Defense underwent a "basing" process to finalize the permanent headquarters location. At one point, in January 2021, the Secretary of the Air Force provisionally recommended relocating Space Command. But the Government Accountability Office ("GAO") and Department of Defense Inspector General ("DOD IG") found significant concerns with the process and recommendation. For example, the GAO concluded that the basing process had suffered from "significant shortfalls in its transparency and credibility." DOD IG likewise made numerous recommendations to improve shortfalls with the process.

118. The Air Force followed those recommendations and conducted further review. Following that review, on July 31, 2023, the Department of Defense announced that President Biden selected Peterson Space Force Base as U.S. Space Command's permanent headquarters. A press release explained that Peterson Space Force Base would "ensure[] peak readiness in the space domain" and "enable the command to most effectively plan, execute and integrate military

spacepower into multi-domain global operations." President Biden chose Peterson Space Force Base after consulting with the Secretary of Defense and other senior military leaders, and both the Secretary of Defense and the commander of U.S. Space Command supported his decision.

119. Peterson Space Force Base has remained the permanent headquarters of Space Command headquarters ever since. Space Command achieved "full operational capability" in December 2023. General Stephen N. Whiting, a four-star general, serves as Commander of U.S. Space Command.

**2. President Trump announced his decision to move U.S. Space Command to punish Colorado's use of mail-in voting.**

120. On September 2, 2025, President Trump announced his decision to move the U.S. Space Command permanent headquarters from Peterson Space Force Base in Colorado Springs, Colorado.

121. In making the announcement, President Trump stated that Colorado's state laws authorizing mail-in voting "played a big factor" for his decision:

> "The problem I have with Colorado, one of the big problems, they do mail-in voting. They went to all mail-in voting, so they have automatically crooked elections, and we can't have that. When a State is for mail-in voting, that means they want dishonest elections because that's what that means. So that played a big factor also."

*See also, e.g.*, Rebecca Shabad, *Trump Says He's Moving Space Command HQ to Alabama Because of Colorado's Mail-in Voting System*, NBC News (Sep. 2, 2025), https://www.nbcnews.com/politics/white-house/trump-moving-space-command-hq-alabama-colorado-mail-voting-system-rcna228647.

122. In his announcement, President Trump estimated that his decision would create 30,000 jobs and hundreds of billions in investment elsewhere. The clear implication was that Colorado would lose these jobs and investments, directly harming Colorado's citizens, economy, and businesses and causing Colorado to lose substantial tax revenue.[2]

123. DOD Defendants were all present during the announcement and indicated that they were moving forward to implement the President's decision.

124. On the same day, September 2, 2025, Defendant Department of Defense issued a news release entitled, "Trump Announces Relocation of U.S. Space Command." *See* https://www.war.gov/News/News-Stories/Article/Article/4291622/trump-announces-relocation-of-us-space-command/. The release confirmed the decision to move the U.S. Space Command headquarters and that the "move will result in more than 30,000 jobs for the state of Alabama, as well as hundreds of billions of dollars in investments."

125. DOD Defendants have confirmed that they are moving forward with carrying out the President's decision. Through a spokesperson, DOD Defendants issued a statement to the Denver Post: "U.S. Space Command will expeditiously carry out the direction of the President following last week's announcement of Huntsville, Alabama, as the command's permanent headquarters location, while continuing to execute our vital mission."

[2] As of December 1, 2024, there were 1,308 personnel authorized to work at U.S. Space Command headquarters in the Colorado Springs vicinity, including over 800 authorized civilian employees. U.S. Space Command also had at least 32 service contracts with companies located in Colorado covering countless numbers of civilian contractors.

126. DOD Defendants conducted a "groundbreaking" ceremony on December 12, 2025, as part of their efforts to carry out the President's decision. At the ceremony, Secretary Hegseth announced the Department of Defense was "deadly serious" about accelerating construction.

127. Since then, the Administration has established a transition team to ensure the move is conducted as expeditiously as possible; it has relocated hundreds of personnel to Alabama; and General Whiting held an event to unveil a conceptual rendering of the new building for local politicians in Huntsville.

128. In addition to harming Colorado's economy and jobs and costing substantial tax revenue, the move will cost federal taxpayers billions of dollars to move a fully operational and highly sophisticated permanent command headquarters. Civilian employees and contractors will also be harmed, either by losing their jobs or upending the lives they have built in Colorado to keep their jobs at the new headquarters' location.

129. President Trump has indicated that he intends to take further harmful executive action to end mail-in voting, including through a forthcoming executive order. *See, e.g.*, Bart Jansen, *Trump Threatens Executive Order to End Mail-In Voting; Says Putin Agrees*, USA Today (updated Aug. 19, 2025), https://www.usatoday.com/story/news/politics/2025/08/18/trump-mail-in-voting/85707446007/. He has demanded that States, like Colorado, that allow mail-in voting "must do what the Federal Government, as represented by the President of the United States, tells them, FOR THE GOOD OF OUR COUNTRY, to do." Continuing on this unlawful attack, President Trump issued another Executive Order on March 31, 2026 that

unconstitutionally interferes with the ability of Colorado (and other States) to conduct free and fair elections through mail-in voting.

### 3. President Trump's decision to move U.S. Space Command Headquarters violates the Constitution.

130. President Trump's decision to move U.S. Space Command Headquarters to punish Colorado for utilizing mail-in voting violates the Constitution. For the reasons explained earlier, the President's decision to punish Colorado, and his threats to impose further harmful executive action, based on Colorado's lawful exercise of its sovereign authority to regulate elections violate the Tenth Amendment, the Elections Clause, State sovereignty, separation of powers, and equal sovereignty principles. The President lacks any authority under the Constitution to regulate the manner of elections. That power is reserved exclusively for the States and, in some circumstances, Congress, but never for the President.

### 4. DOD Defendants violated federal law dictating required processes and notifications before moving a major headquarters location.

131. DOD Defendants' actions to carry out the relocation also violate federal law. Federal law requires the military to follow certain procedures before taking action to relocate a major headquarters location. DOD Defendants failed to comply with these statutory requirements, underscoring the unconstitutional processes and motivations that underly Space Command's relocation.

132. DOD Defendants violated 10 U.S.C. § 483, which imposes detailed processes and congressional notification requirements on decisions regarding the "relocation of a major headquarters."

133. U.S. Space Command headquarters is a "major headquarters" within the meaning of section 483, because it is "the headquarters of a military unit or command that is the appropriate command of a general officer or flag officer." 10 U.S.C. § 483(f)(2). U.S. Space Command is a unified combatant command currently led by General Stephen N. Whiting.

134. DOD Defendants were required to provide the congressional defense committees with certain notice and analysis required by statute within seven days of: (1) issuing any formal internal guidance initiating the decision-making process for relocating U.S. Space Command headquarters; (2) selecting 2–5 most likely candidate locations for the headquarters; and (3) selecting a preferred location for the headquarters. 10 U.S.C. § 483(b).

135. Among other information, the required notice must include:

- A description of the manner in which "joint and all-domain training capabilities" were comparatively analyzed among candidate locations;
- A description of the manner in which "airspace and training areas" were comparatively analyzed among candidate locations;
- A description of the manner in which "community support" was comparatively analyzed among candidate locations, "including consultation with appropriate State officials and officials of units of local government . . . regarding matters affecting the local community"; and

- An explanation of how candidate locations scored in reference to the preceding criteria and a summary of any score cards used in choosing the preferred location.

10 U.S.C. § 483(c).

136. Further, the statute provides that "[n]o irrevocable action may be taken to effect or implement a basing decision" until 14 days have passed from the date the Secretary notified Congress. *Id.* § 483(d).

137. Upon information and belief, DOD Defendants have failed to follow the statutorily mandated processes, failed to provide the requisite notices to Congress, and have taken and intend to take irrevocable actions to effect or implement the relocation.

**B. USDA singles out Colorado, ordering the State to comply with new unlawful and impossible requirements or face removal from the SNAP program.**

138. On December 18, USDA arbitrarily ordered Colorado to comply with an unlawful "pilot project" purporting to require the State and five selected counties to recertify SNAP eligibility for 100% of its households, without exception, within 30 days over the winter holidays, including conducting in-person interviews for more than 100,000 Colorado households. Colorado was given no advance warning or time to prepare.

139. The Trump Administration only directed this "pilot project" at Colorado and Minnesota, another jurisdiction being singled out for attack by the Administration.

140. Not only did this action unconstitutionally target Colorado for punishment, the purported "pilot project" itself is unlawful many times over, as detailed below. It is also logistically impossible for Colorado to comply with these demands within the 30 days allotted.

Yet, USDA threatens to impose severe sanctions against Colorado, including potentially removing it from the SNAP program, if Colorado fails to comply with the illegal and impossible demand.

141. That USDA is willing to engage in unlawful action to punish Colorado is unsurprising. This action follows an unprecedented series of unlawful actions taken by USDA in recent months with respect to the SNAP program. Federal courts have repeatedly enjoined those unlawful actions.

a. First, USDA unlawfully demanded highly sensitive data and threatened Colorado and 20 other States with severe sanctions for failing to provide this data. A federal district court granted a preliminary injunction, finding "the SNAP Act prohibits [the States] from disclosing to USDA the information demanded" and that USDA was violating the law in other ways. *California v. USDA*, No. 3:25-cv-06310-MMC, 2025 WL 2939227, at *10 (N.D. Cal. Oct. 15, 2025).

b. Second, USDA unlawfully withheld SNAP benefits during the government shutdown, notwithstanding that it had billions of dollars in contingency funds available, and the agency had for decades recognized that those funds were to be used during a government shutdown. Multiple district courts enjoined this purposefully callous and unlawful action aimed at harming American citizens across the country. *Massachusetts v. USDA*, No. 1:25-cv-13165-IT, 2025 WL 3040441, at *5–7 (D. Mass. Oct. 31, 2025); *R.I. State Council of Churches v.*

*Rollins*, No. 25-cv-569-JJM-AEM, 2025 WL 3050100, at *1–2 (D.R.I. Nov. 1, 2025).

c. Finally, USDA issued unlawful guidance related to the One Big Beautiful Bill Act. USDA then compounded that error by unlawfully purporting to require the States to fully comply with the flawed guidance by the next day, notwithstanding that USDA's own regulations provide a 120-day exclusionary period that is intended to provide States with reasonable time to implement new changes in the law or guidance. Yet again, a federal district court enjoined USDA from enforcing its unlawful action. *New York v. Rollins*, No. 6:25-cv-02186-MTK (D. Or. Dec. 15, 2025) (minute order granting Motion for Preliminary Injunction), Dkt. 64.

**1. SNAP provides essential food security for millions of Americans.**

142. For more than six decades, the United States has embraced a simple and enduring idea: that it has a continuing responsibility to ensure low-income Americans do not go hungry.

143. Beginning in 1939, the United States government delivered its first Food Stamp Program to under-nourished Americans. In 1964, Congress enacted the "Food Stamp Act," making the Food Stamp Program permanent. *See* Pub. L. No. 88-525, 78 Stat. 703. In 2008, Congress changed the name from the Food Stamp Program to the Supplemental Nutrition Assistance Program and replaced the Food Stamp Act of 1977 with the Food and Nutrition Act of 2008 ("FNA"). *See* Pub. L. No. 110-234, 122 Stat. 1092; *see generally* Food and Nutrition Service, *A Short History of SNAP*, https://www.fns.usda.gov/snap/history.

144. Finding that the limited food purchasing power of low-income households contributes to hunger and malnutrition of Americans, Congress established SNAP "to promote the general welfare, to safeguard the health and well-being of the Nation's population by raising levels of nutrition among low-income households." 7 U.S.C. § 2011.

145. The goal of SNAP is "to 'alleviate . . . hunger and malnutrition' by 'increasing [the] food purchasing power' of low-income households." *Hall v. USDA*, 984 F.3d 825, 831 (9th Cir. 2020) (quoting 7 U.S.C. § 2011). To achieve this end, SNAP provides monthly benefits to eligible households that can be used to buy food. *See Hall*, 984 F.3d at 831.

146. To qualify for SNAP, applicants must demonstrate that their household satisfies specified financial requirements, along with other eligibility criteria. *See* 7 C.F.R. § 273.1.

147. During fiscal year 2024, an average of 41.7 million individuals in 22.2 million households, or roughly 1 in 8 Americans, receive SNAP. In 2023, 35% of SNAP recipients were children. Drew Desilver, Pew Rsch. Ctr., *What the data says about food stamps in the U.S.* (Nov. 14, 2025), https://www.pewresearch.org/short-reads/2025/11/14/what-the-data-says-about-food-stamps-in-the-us/.

148. In 2024, an average of 594,526 Coloradans received SNAP benefits each month, including over 300,000 children and 114,000 elderly individuals, totaling more than $1.4 billion in SNAP benefits annually.

**2. Colorado administers SNAP on behalf of USDA and undertakes robust program integrity efforts that go beyond federal requirements.**

149. At the federal level, SNAP is overseen by USDA's Food and Nutrition Service. 7 C.F.R. § 271.3(a). But the States are responsible for the administration of SNAP, including creating and processing applications for benefits, making eligibility determinations, issuing benefits, and ensuring program integrity. 7 C.F.R. § 271.4(a); *see* 7 U.S.C. § 2020(a)(1).

150. In Colorado, the Colorado Department of Human Services' ("CDHS") Office of Economic Security administers SNAP. Colorado's SNAP program is county implemented and state supervised and administered. Colorado's 64 counties determine SNAP eligibility and authorized benefits, while CDHS administers and supervises the SNAP program. C.R.S. § 26-2-301(1), (2). This model allows Coloradans to work directly with their local county Department of Social/Human Services to apply for SNAP and to recertify ongoing eligibility. 10 C.C.R. 2506-1:4.000.1, 4.201, 4.202.

151. Local county offices determine whether a household qualifies for SNAP by reviewing financial information from an applicant including income, expenses, and assets. Local county offices also verify nonfinancial criteria such as identity of the applicant and household composition. *See* 10 C.C.R. 2506-1:4.300, 4.400. Colorado counties are not permitted to apply additional conditions or processing requirements beyond those set forth under the state's SNAP rules. 10 C.C.R. 2506-1:4.201(A).

152. Successful applications for SNAP benefits must include an interview of the applicant household that is either face-to-face or by phone. 10 C.C.R. 2506-1:4.204(A). The

option to undergo a telephonic interview in lieu of a face-to-face interview is consistent with federal law, which permits states to use telephonic interviews. 7 C.F.R. § 273.2(e)(2). In fact, federal regulations *require* that if a household meets hardship criteria and "requests to not have an in-office interview, the State agency must offer to the household to conduct the interview by telephone." *Id.*

153. Colorado continues to ensure households remain eligible after initial approval. In fact, Colorado goes above and beyond federal recertification requirements. For most households, USDA requires States to recertify eligibility every 12 months. 7 C.F.R. § 273.10(f). But Colorado has voluntarily chosen to recertify household eligibility generally every six months, twice as often as required. 10 C.C.R. 2506-1:4.208.1(B). Colorado rules require that these households be interviewed at least every twelve months. 10 C.C.R. 2506-1:4.209(C).

154. For a minority of households containing only disabled and elderly individuals, both federal regulations and Colorado rules provide for recertification on a less frequent basis. 7 C.F.R. § 273.10(f). Under federal regulations, certification is allowed for up to 24 months for a household in which all adult members are elderly or disabled. *Id*. Again, Colorado is more stringent, limiting this 24-month certification only to households where all members are both elderly or disabled adults and have no earned income. 10 C.C.R. 2506-1:4.208.1(A).

155. Colorado also ensures deceased individuals do not receive SNAP benefits. The Colorado Benefits Management System interfaces with the Social Security Administration's Death Master File on a daily basis. When a match is made, Colorado takes steps to verify if a

SNAP recipient is deceased and, if so, to discontinue benefits. County Burial Assistance programs also provide death information that the counties act on to discontinue benefits.

156. Colorado also takes numerous steps to ensure that SNAP recipients are not receiving benefits in other states.

157. The federal government's own studies concluded that SNAP fraud is rare. For example, the Congressional Research Service concluded in an April 2025 report that "SNAP fraud is rare, according to available data and reports" and that error rates generally reflect inadvertent errors in calculating eligibility and benefit levels, not fraud.

158. Colorado's substantial program integrity efforts have resulted in Colorado performing consistently better than the national average in limiting payment errors. Since data has been published following the COVID-19 pandemic, Colorado has performed better than the national average every single year, often in the top twenty performing States.

159. Colorado nevertheless employs robust integrity teams to investigate any potential fraud. Integrity teams provide direct training to eligibility staff on how to prevent and detect fraud, as well as education on county-specific fraud trends. If an eligibility staff member suspects a household is fraudulently representing their circumstances but is unable to substantiate the suspicion through available databases or verification requests, they are expected to make a fraud referral for further investigation by county integrity staff.

160. County integrity staff investigate every fraud referral received. These teams conduct extensive investigations, using desk and field research to substantiate the household's actual circumstances. These efforts include online databases that validate identity and residency;

interviews with outside entities such as employers, landlords, and neighbors; subpoenas for income, tax, and bank records; and interviews with the household. When evidence supports intentional violations, county staff pursue disqualification and/or refer for prosecution.

161. Even if there is insufficient evidence, integrity staff still deliver the results of the investigation to eligibility staff so cases can be processed with the information discovered in the investigation, with case closures and/or claims created for any benefits incorrectly paid to the household.

162. Colorado also utilizes all federally required fraud prevention and detection systems.

### 3. USDA orders Colorado to participate in an unlawful and illogical "pilot project" or face severe sanctions.

163. On December 17, 2025, USDA sent Governor Polis a letter (the "Recertification Letter") requiring Colorado "to participate in a . . . [SNAP] pilot project conducted pursuant to 7 U.S.C. 2026(b)(1)(A), to increase the efficiency of SNAP and improve the delivery of SNAP benefits to eligible households" or face noncompliance procedures. Ex. 1.

164. The Recertification Letter came without any warning. The "pilot project" was created without any reasoned decisionmaking. USDA published no notice nor requested any comment from the public. It did not issue operational procedures or guidance or an evaluation plan or criteria.

165. The only stated basis for the forced pilot project is a vague reference to "ongoing fraud affecting federally funded benefits across the nation," and an unsupported statement that

USDA has made "multiple requests to the State of Colorado to fulfill its administrative responsibilities." *Id.*

166. USDA ordered Colorado to recertify, within 30 days, during the winter holidays, all SNAP households in five of Colorado's largest counties: Adams, Arapahoe, Jefferson, Boulder, and Douglas counties (collectively "Recertification Counties").

167. USDA threatened in the letter that "[f]ailure to participate in this pilot project as specified by USDA will trigger noncompliance procedures codified in 7 U.S.C. 2020(g). It may also affect Colorado's continued participation in SNAP." Ex. 1.

168. It is unclear what "ongoing fraud" USDA is referring to and how Colorado may be involved. USDA has not previously issued any letters or warnings to Colorado regarding SNAP beneficiary fraud. The USDA letter likewise does not explain how a "pilot project" directed at two states, and specifically Colorado, will address fraud "across the nation."

169. Further, contrary to the letter's statement, Colorado has not received "multiple requests" for the State "to fulfill its administrative responsibilities." The only request that Colorado has received from the Trump Administration was a request for a large amount of sensitive participant data in July 2025. Colorado repeatedly wrote letters to the Administration that it could not lawfully release such data without a mutually agreed upon data and security protocol required by the SNAP statute. USDA Defendants completely ignored those letters and issued a warning letter. A federal court ultimately enjoined USDA's unlawful actions. *See California*, 2025 WL 2939227.

170. Colorado has not received any requests related to fulfilling its duties to certify household eligibility or detect fraud.

**4. The "pilot project" is unlawful.**

171. The purported "pilot project" violates the law in many ways. In particular, USDA Defendants have violated numerous procedural requirements and statutory limitations, and the Recertification Letter is the quintessential arbitrary and capricious agency action prohibited by the APA.

172. USDA Defendants failed to meet numerous procedural requirements before implementing the "pilot project." First, USDA Defendants were required to engage in notice-and-comment rulemaking because the Recertification Letter constitutes a legislative rule. Second, USDA regulations require certain notice requirements must be met for demonstration projects that impact the public. Third, USDA was required to comply with the Paperwork Reduction Act, which prohibits agencies from conducting or sponsoring a new or revised collection of information, such as here, without first completing numerous procedural requirements, including an internal analysis of the burden, publishing the proposed collection in the Federal Register, providing an opportunity for public comment, obtaining approval from the Director of OMB, and obtaining an OMB control number to be displayed on the collection request. 44 U.S.C. §§ 3507, 3506. USDA Defendants failed to comply with any of these requirements.

173. USDA Defendants also violated substantive law in creating the "pilot project." First, USDA Defendants have no lawful authority to mandate pilot project participation by an

unwilling state. The FNA only permits pilot projects agreed to by both USDA and the participating State agencies or other eligible entities. *See, e.g.*, 7 U.S.C. § 2017(f)(2)(A) (authorizing pilot projects "at the request of 1 or more State agencies"). Second, USDA Defendants cannot unilaterally impose new duties and obligations upon participants in pilot projects. Congress gave the Secretary the authority only to "waive any requirement" of the FNA in connection with a pilot project, not to impose new ones. 7 U.S.C. § 2026(b)(1)(A). Third, the "pilot project" violates various statutory restrictions imposed by Congress for the types of allowable SNAP demonstration projects. Fourth, the "pilot project" would require Colorado to violate several provisions of the FNA and its implementing regulations, and USDA has not waived any of those requirements. Finally, USDA Defendants lack authority to take the remedial measures threatened in the Recertification Letter.

174. USDA Defendants also violated the APA's reasoned decisionmaking requirements. The Recertification Letter is arbitrary and capricious because the reasons for imposing the "pilot project" upon Colorado are unsupported, irrational, and pretextual; because USDA Defendants rely on factors that Congress has not intended for USDA to consider; because the proposed "pilot project" would not remedy the recipient fraud it supposedly targets; because it fails to consider the harms and costs it would impose on Colorado, the Recertification Counties, SNAP recipients and applicants, and recipients of other state services who would be harmed while all resources are redirected toward recertification; because it fails to consider the significant reliance interests of those same groups; because it fails to consider important aspects of the problem, including the impossibility of complying with the demands; and because the

USDA Defendants imposed the "pilot project" as part of the Trump Administration's retribution campaign against Colorado.

**5. Complying with the "pilot project" would force Colorado to violate numerous federal and state regulations.**

175. Requiring household members in Recertification Counties to report in-person for a recertification interview violates numerous federal and state regulations. Through the Recertification Letter, USDA has not waived any statutory or regulatory requirements.

176. USDA's regulations provide that "State agencies may not require households to report for an in-office interview during their certification period." 7 C.F.R. § 273.2(e)(1). "For example, State agencies may not require households to report en masse for an in-office interview during their certification periods simply to review their case files, or for any other reason." *Id.* Home visits are not a lawful option either. In addition to requiring significantly more resources, USDA's regulations prohibit home-based interviews unless a household meets specified hardship criteria and requests an in-home interview. 7 C.F.R. §§ 273.2(e)(2), 273.14(b)(3).

177. Consistent with these regulations, Colorado rules do not allow CDHS or the local counties offices to require SNAP recipients to report for an in-person interview. 7 C.F.R. § 273.2(e)(1), 10 C.C.R. 2506-1:4.204(A). Another Colorado rule prohibits denying benefits for failing or refusing to appear for a recertification interview scheduled prior to the last month of the household's certification period. 10 C.C.R. 2506-1:4.209(C). To comply with USDA's December directive, these rules would have to be changed following the requirements of the

Colorado Administrative Procedure Act, but USDA's 30-day deadline provides no adequate time for Colorado to change its rules.

178. Federal and state regulations likewise require advance notice to SNAP recipients and time following the visit to provide documentation. USDA requires Colorado to provide at least one month's notice before recertifications, 7 C.F.R. § 273.14(b)(1)(i), which is not possible within the timeframes required by the Recertification Letter.

179. USDA regulations also require Colorado to schedule interviews so that a household has at least 10 days following the interview to provide verification documents for the recertification. 7 C.F.R. § 273.14(b)(3)(iii); *see also* 10 C.C.R. 2506-1:4.209(C). In other words, to complete recertifications by January 16, 2026, an interview would need to take place on or before January 6.

**6. The "pilot project's" demands are logistically impossible to comply with.**

180. Setting aside the impossibility of completing the task consistent with federal and state regulations, there is no logistical or practical way to meet the demand. Approximately 106,500 households receive SNAP benefits in the Recertification Counties, constituting about 32% of SNAP households statewide. It is impossible to recertify them all within 30 days of receipt of the Recertification Letter when using the normal recertification process required by 7 C.F.R. § 273.14.

181. But that process is made significantly more burdensome through the imposition of a new requirement: in-person interviews. USDA's regulations recognize that in-person interviews often impose unnecessary burdens. See 7 C.F.R. § 273.2(e)(2). USDA therefore

encourages State agencies to permit telephone interviews, *see id.* § 273.14(b)(1)(iii), and it requires State agencies to permit telephone interviews in cases of "household hardship," which must include, at a minimum, "illness, transportation difficulties, care of a household member, hardships due to residency in a rural area, prolonged severe weather, or work or training hours that prevent the household from participating in an in-office interview." *Id.* §§ 273.14(b)(3), 273.2(e)(2).

182. Recertification Counties routinely permit telephone interviews for SNAP recipients for reasons that include, but are not limited to, hardships associated with reduced public transportation in rural areas, lack of a vehicle, presence of a disability, lack of childcare, or challenges presented by work schedules.

183. Adding to the difficulty, the thirty-day period from December 17, 2025 to January 16, 2026 includes multiple major holidays. This period includes some of the most important holidays of the year for many Coloradans, often involving travel, planned time away from work, school and daycare closures, and important family obligations, limiting the availability of both employees and recipients to complete the recertifications.

184. In reality, the time allotted by USDA for completing over 100,000 interviews is significantly shorter than thirty days because interviews cannot begin immediately upon receipt of the letter on December 17 but can only be scheduled over time with significant effort by county staff and voluntary cooperation by recipients. County staff would need to assign an interview time, mail a letter to each recipient with notice of the assigned time, and correspond with individual recipients in the event the recipient needed to reschedule. And as noted above,

the interview would need to be completed to give the households at least ten days to provide verification documents after it ended.

185. It is estimated that an experienced eligibility worker could complete approximately six recertifications each day if also completing in-person interviews. This means it would take approximately 7,900 worker hours *each day* in order to complete more than 100,000 interviews in 18 business days, at an enormous cost to Colorado.

186. None of the Recertification Counties have close to the requisite number of workers needed to perform the required tasks. Each county would need to perform more than ten times as many recertifications as occur during a normal month. All of this would have to be completed with no preparation time and no notice to SNAP recipients.

187. None of the five counties have adequate staff levels with the necessary expertise to perform an in-person interview and recertification of every household within 30 days, not only because of the high volume, but because staff will still need to perform at least some of their regular duties.

188. Additionally, the Recertification Counties lack adequate physical space for the number of in-person interviews required by the Recertification Letter. Privacy and confidentiality would both be compromised. *See* 7 C.F.R. § 273.2(3)(1) ("Facilities must be adequate to preserve the privacy and confidentiality of the interview."). The Recertification Counties do not have the space or the resources to complete this burdensome task, especially with no advance time for planning.

189. Attempting to complete this colossal process in the timeframe provided would cause substantial harm to county residents who need assistance with other programs or services because all available staff would be required to work exclusively on SNAP recertifications.

190. The Recertification Counties would experience significant human resources and labor relations issues by attempting to demand that their staff complete this logistically impossible task.

191. Further, future recertifications must occur on a regular cadence. See 7 C.F.R. §§ 273.10(f), 273.14(a). Currently, those recertifications are spaced throughout the year. But recertifying all existing households within a single thirty-day period creates a recurring glut of recertifications at regular intervals for years to come. The Recertifying Counties would likely need to hire additional staff to repeat those recertifications despite the fact that those additional staff would be unnecessary most of the year.

**7. The "pilot project" would undermine Colorado's efforts to identify SNAP fraud.**

192. There is no reason to believe the proposed "pilot project" would be successful in uncovering SNAP fraud. USDA offers no evidence of SNAP fraud among any of Colorado's SNAP recipients, or that the fraud would be uncovered through a mass recertification on an unworkable timeline.

193. SNAP households in Colorado are already generally recertified at regular six-month intervals, exceeding federal requirements. There is no reason to believe USDA's "pilot project" would discover fraud that would not be uncovered at a household's next scheduled recertification or through the State's ongoing fraud detection and prevention efforts.

194. USDA has also not provided any information to support a belief that in-person interviews are more effective at detecting fraud than telephone interviews.

195. In fact, conducting recertifications at the frenzied pace USDA has demanded would be less effective at detecting fraud than conducting recertifications as they come due, when employees have the time and resources necessary to complete them thoroughly.

196. The "pilot project" would require the Recertification Counties to recertify even those households that were recently recertified. For instance, a household that was recertified on December 16 would need to be recertified again sometime between December 17 and January 16. Repeating that same process is exceedingly unlikely to detect fraud and is a poor use of resources.

197. In fact, the "pilot project" is likely to harm Colorado's ability to detect SNAP beneficiary fraud. In an effort to comply with this impossible request, CDHS and the Recertification Counties would be forced to divert resources to recertification efforts at the expense of the fraud prevention programs and other tools that are more useful for discovering fraud than recertifications.

**8. Colorado faces substantial harm from USDA's unlawful action.**

198. The Recertification Letter imposes substantial and immediate harm on Colorado.

199. First, the Recertification Letter imposes enormous, unrecoverable administrative costs. Attempting to certify over 100,000 households in 30 days, including in-person interviews, would be massively burdensome and expensive, creating a dramatic uptick in administrative

costs and resulting in sustained expenditures. USDA has not offered to pay these costs, nor could Colorado recoup them through litigation, as the federal government enjoys sovereign immunity.

200. Second, USDA's "pilot project" will have the inhumane and devastating result of eligible families being dropped from SNAP benefits—not because they are not eligible, but simply because they were unable to complete the recertification process or in-person interview on such a logistically impossible timeline or because county staff were unable to complete their recertifications.

201. Removing these vulnerable and needy households from SNAP transfers the cost to Colorado, its local governments, and Colorado community organizations. Reduced SNAP enrollment will result in an increased reliance on emergency services and public safety net programs, and overall deterioration of Coloradans' health.

202. Community resources like food banks are already strained because USDA cut $500 million in food deliveries this year. *See* Tami Luhy, *Food Banks Scramble After USDA Halts $500 Million in Deliveries*, CNN (Mar. 22, 2025), https://www.cnn.com/2025/03/22/politics/food-banks-usda-delivery-halt. For one of Colorado's critical regional food banks, these cuts equated to about 4 million meals lost and $1.35 million less in purchasing power for that food bank alone. *See* Havalin Haskell & Olivia Bagan, *Empty Shelves, Growing Lines: Colorado Food Banks Adjust to a Decrease in Supply and an Increase in Demand*, CPR News (Aug. 27, 2025), https://www.cpr.org/2025/08/27/colorado-food-banks-decrease-in-supply-demand-high/.

203. The decline in food access will harm Colorado's public health and wellbeing, including by increasing hunger and malnutrition. Children experiencing hunger and food insecurity are less able to learn and concentrate. Lack of access to appropriate nutrient-rich foods impacts children's developing brains and has "been linked to nutrient deficiencies leading to learning and developmental deficits amongst the most vulnerable, infants and toddlers." Francisco J. Rosales et. al., *Understanding the Role of Nutrition in the Brain & Behavioral Development of Toddlers and Preschool Children: Identifying and Overcoming Methodological Barriers*, 12 Nutritional Neurosci. 190 (Oct. 2009) (manuscript available at https://coag.gov/app/uploads/2026/01/Rosales-Nutrition-and-Brain-Development.pdf).

204. The resulting fallout from the "pilot project" would force Colorado to devote funds and resources it does not have in an attempt to address these health and educational problems. Higher healthcare costs, including emergency room visits, hospitalizations, and related costs, as well as increased need for State funding to Colorado's healthcare systems and programs are the inevitable downstream effects of this harmful demand.

205. Third, forcing all of these households to suddenly appear for in-person interview with no notice will undermine the trust that Colorado has built with SNAP participants. Many of these individuals do not have jobs allowing them to take leave with no advance notice, as USDA purports to require here.

206. Those that need food assistance are often reluctant to enroll in SNAP in the first instance. USDA found that in fiscal year 2020, only 78% of eligible people received SNAP

benefits. Colorado has worked hard to build public trust in its SNAP program to increase participation by eligible households and to reduce hunger.

207. Imposing an arbitrary recertification process that involves new interview requirements, even if a household recently received approval or recertification for SNAP benefits erodes trust between SNAP recipients and Colorado. Recipients will be left to wonder what new, onerous, and invasive conditions will be imposed on them in the future. And worse, because it will be Colorado's pilot counties implementing the new conditions, SNAP recipients are likely to form the belief that it is Colorado, as opposed to USDA, imposing these new conditions.

208. Fourth, attempting to comply with the impossible deadlines in the Recertification Letter will lead to more payment errors, which in turn will lead to significant financial consequences for Colorado. Under a new federal law, this increased error rate will require the State to pay a larger portion of the cost of SNAP benefits. *See* 7 U.S.C. § 2013(a)(1)–(2). Errors made during the current fiscal year bear on the assessed penalties. *Id.* § 2013(a)(2)(B)(ii)(I). Implementing a rushed certification, as the "pilot project" requires, will inevitably lead to errors in eligibility determinations and payment calculations. In turn, Colorado's payment error rate would increase, which will have substantial financial consequences.

209. Finally, Colorado faces substantial irreparable harm from the threatened sanctions in the Recertification Letter. As detailed above, Colorado cannot logistically comply with the Recertification Letter. Colorado would therefore be subject to the sanctions Defendants threaten, which includes the loss of SNAP administrative funding and continued participation in SNAP.

Ex. 1. Threatening Colorado's ability to continue participating in SNAP—a consequence not authorized in law—would be devastating to Colorado, drastically magnifying each of the harms discussed above. The loss of substantial administrative funding would also result in dire consequences, as numerous federal courts have recently recognized.

**C. DOT singles out Colorado for termination of $109 million in funding and denies otherwise meritorious award applications.**

210. On December 16, 2025, the day after the President attacked Governor Polis in an Oval Office media event for not releasing Tina Peters following his pardon, the Trump Administration announced through the press that it was terminating $109 million in transportation funding for Colorado and its instrumentalities and political subdivisions. This decision (the "Termination Decision") was based on singling out Colorado. No funding to other States was terminated as part of this decision, notwithstanding that many other States participated in the same programs with projects intended to serve similar objectives.

**1. The terminated funding was part of four DOT programs for projects that were similar to projects in other States that were not cancelled.**

211. Colorado's terminated funding came from four grant programs. Each project was well within the bounds set by Congress for the funds and was similar to projects in other States that were not cancelled, providing further evidence that DOT specifically targeted Colorado for unfavorable treatment.

212. <u>The Electric Vehicle Charger Reliability and Accessibility Accelerator ("EVC-RAA") Program</u>: The National Electric Vehicle Infrastructure ("NEVI") Program was

established as part of the Bipartisan Infrastructure Law, often referred to as the IIJA, to facilitate the deployment of publicly accessible electric vehicle ("EV") charging stations across the United States. Pub. L. No. 117-58, 135 Stat. 429, 1421–22. The IIJA was passed in 2021 in an overwhelmingly bipartisan manner, including a filibuster-proof majority, and reflected a number of Congressional priorities related to the nation's transportation infrastructure, including significant investments in the repair and improvement of America's interstate railways, as well as substantial investments in modern infrastructure related to electric- and hydrogen-powered vehicles.

213. While most NEVI funding is awarded to States based on a statutory formula, the IIJA directed that 10% of the appropriated funds be set aside for "grants to States or localities that require additional assistance to strategically deploy [EV] charging infrastructure" and directed that "the Secretary shall establish a grant program to administer" the set-aside funds. 135 Stat. at 1425.

214. In 2023, DOT created the Electric Vehicle Charger Reliability and Accessibility Accelerator ("EVC-RAA") Program. The program focuses on repairing or replacing non-operational EV chargers. Using the 10% set-aside from the FY2022 and FY2023 NEVI appropriations, DOT awarded $148.8 million to 24 state and local entities in January 2024.

215. Among the announced awardees was the Colorado Department of Transportation ("CDOT"), which was awarded roughly $8.3 million to repair 363 EV charging ports.

216. Colorado's EVC-RAA Project aligned with the statutory selection process and project criteria outlined by Congress in the IIJA and the relevant appropriations statutes. Indeed,

all the awarded projects were focused on repairing or replacing nonoperational EV chargers, which was the sole purpose of Colorado's award. Despite the similarity in the projects, on information and belief, DOT only terminated Colorado's award.

217. The Consolidated Rail and Safety Improvements ("CRISI") Program: America's interstate railways has been a priority of national import and subject to a long history of both federal funding and federal regulation. More recently, Congress established the CRISI Program as part of the 2015 passage of the Fixing America's Surface Transportation ("FAST") Act. Pub. L. No. 114-94, 129 Stat. 1312, 1644–48 (codified as amended at 49 U.S.C. §§ 22907, 22407). Recent funding for the CRISI Program was made available by the 2023 and 2024 Consolidated Appropriations Acts, and through advanced appropriations provided by the IIJA.

218. The CRISI Program invests in a wide range of projects designed to improve railroad safety, efficiency, and reliability across the United States. CRISI-funded projects work to mitigate congestion at both passenger and freight rail chokepoints; support more efficient travel of goods and passengers; enhance multimodal connections; and invest in new and improved Intercity Passenger Rail Transportation corridors. Eligible recipients include States and State agencies, universities, political subdivisions, Amtrak, and other rail carriers.

219. In March 2024, the DOT announced a Notice of Funding Opportunity for over $2.4 billion in CRISI Program funds. Awardees were announced on or around October 29, 2024, including two awards to Colorado instrumentalities.

220. First, DOT awarded roughly $66.4 million to CDOT to fund a project entitled "Modernizing Rail on the Front Range – PTC Installation, Siding, and Grade Crossing Safety

and Operational Improvements" (the "Front Range Modernization Project"). The Front Range Modernization Project provides for positive train control ("PTC") installation and the installation of new siding to upgrade a major freight rail line that runs between Denver and Longmont, Colorado. This project also improves five grade crossings in a corridor that has experienced a history of derailments, train collisions, and other safety hazards. As part of the Front Range Modernization Project, CDOT committed a 30 percent match to the federal funding, worth over $27 million.

221. Second, DOT awarded roughly $11.7 million to Colorado State University's Pueblo campus for a project entitled "Safety Assessment, Testing, and Workforce Development for Hydrogen/Natural Gas Motive Power" (the "CSU-Pueblo Project"). That project was selected as a nonconstruction research project to conduct safety experiments and testing for rail vehicles powered by compressed hydrogen and renewable natural gas. The CSU-Pueblo Project is primarily located at the university's industry-leading Transportation Technology Center and partners with the University of Hawaii and a private company who are together contributing a 36 percent nonfederal match. The CSU-Pueblo Project also qualifies for CRISI's statutory set-aside for projects located in rural areas.

222. Both projects were operating under the pre-obligation phase of the grants' lifecycles. During this phase, the parties finalize terms of track- and project-specific modifications and engage in the final planning, environmental, engineering, and stakeholder processes. Even so, the CRISI Program establishes a procedure for submitting Pre-Authorization

Authority ("PAA") requests to fund steps that must be taken during this early phase of the grant lifecycle.

223. Pursuant to the PAA process, CDOT and CSU-Pueblo were actively engaged in fulfilling their responsibilities under the pre-obligation phase of their grants' lifecycles. For example, both CDOT and CSU-Pueblo timely submitted NEPA/Environmental Resource Approach plans in or around April 2025.

224. In November 2025, CSU-Pueblo also submitted its first PAA request in order to purchase initial engineering and downpayments on long-lead equipment orders that would be needed to complete the objectives of its grant on the project timeline.

225. In other words, CDOT and CSU-Pueblo acted in reliance on the advice provided by DOT at the time awards were announced. The awardees expended time and funds to engage in final planning, to complete environmental assessments, and to set up state- and private-level funding matches following announcement of their awards.

226. Both the Front Range Modernization Project and the CSU-Pueblo Project align with the statutory selection process and project criteria outlined by Congress in the FAST Act, the IIJA, and the relevant appropriations statutes, and DOT has never suggested otherwise.

227. On information and belief, no other CRISI projects besides CDOT and CSU-Pueblo's awards were terminated as part of this action. CRISI awards that funded similar projects to those of CDOT's and CSU-Pueblo's in other States were unaffected.

228. DOT's decision provides no reasoned justification and does not explain how the Front Range Modernization Project—which is an investment in safety infrastructure for a major

freight line—fails to meet the statutory objectives set forth by Congress when it allotted funds for CRISI awards under the FAST Act, the IIJA, and the relevant appropriations statutes. Nor could it. Safety and infrastructure investments are quintessential objectives listed in all these laws.

229. The same is true for CSU-Pueblo's grant. For example, a non-disfavored State instrumentality was awarded a similar hydrogen-powered research grant, and on information and belief, that funding was not terminated.

230. Taken together, these facts and the timing of DOT's actions demonstrate that the Front Range Modernization Project and the CSU-Pueblo Project were targeted specifically as part of the Administration's campaign to punish the State of Colorado for the lawful exercise of its sovereign authority.

231. The RAISE/BUILD Program: As part of the bipartisan American Recovery and Reinvestment Act of 2009, DOT first established the Rebuilding American Infrastructure with Sustainability and Equity ("RAISE") grant program. Pub. L. No. 111-5, 123 Stat. 115, 203–04. The RAISE program operated under annual appropriations acts through November 2021. Thereafter, the RAISE program became part of the Better Utilizing Investments to Leverage Development ("BUILD") grant program, which provides grants for surface transportation infrastructure projects with significant local or regional impact. *See* 49 U.S.C. § 6702 (codifying the program). Congress required that the Secretary "shall establish and carry out" the program. 49 U.S.C. § 6702(b)(1).

232. On or around June 28, 2023, DOT announced an award of $10,713,570 to fund the construction of a new Foothills Transit Station in Fort Collins. As part of that FY2023 funding round, DOT awarded over $2.2 billion to more than 150 projects. This was one of numerous projects to build a local transit station/hub. Over the years, DOT has awarded nearly 1,000 grants in the BUILD/RAISE program, many of which involve local transit stations/hubs.

233. The Foothills Transit Project was a long-conceived project intended to connect Colorado State University's main and foothills campuses, a growing area with many residents and jobs. It is also designed to encourage safe walking, biking, and other multimodal trips in a densely populated area that currently does not have a transit hub.

234. The Foothills Transit Station project is aligned with the statutory selection process and project criteria outlined by Congress. It was the product of considerable time, effort, and project management and had engendered reliance interests. The project had received prior federal award funding, further demonstrating merit and viability.

235. On information and belief, the Foothills Transit Station was the only BUILD/RAISE grant terminated as part of the Termination Decision, notwithstanding that DOT had awarded numerous other similar projects in other States.

236. Strengthening Mobility and Revolutionizing Transportation (SMART) Grants Program: Another grant program established through the IIJA is the SMART Grants Program. The SMART program was established to provide grants to eligible public sector agencies to conduct demonstration projects focused on advanced smart community technologies and systems in order to improve transportation efficiency and safety. Congress appropriated $100 million

annually to DOT for fiscal years 2022–2026 to this program. 135 Stat. at 840–44. SMART is a two-stage program with only Stage 1 awardees eligible to expand their projects during the Stage 2 application process.

237. On or around March 21, 2023, DOT awarded slightly over $1 million to Fort Collins to demonstrate a smart grid EV charge management solution for the City's EV fleet.

238. On or about December 16, 2024, DOT announced its first round of SMART Stage 2 awardees, which was only awarded to those Stage 1 grantees whose projects proved sufficiently successful and meritorious for Stage 2 further funding.

239. Fort Collins received a Stage 2 award intended to significantly expand the City's EV charging infrastructure and integration into a smart grid EV charge management solution. With this grant, the City planned to rapidly expand its fleet of EVs in alignment with its 2030 emissions targets while simultaneously providing benefits to the electric grid and the entire community of Fort Collins.

240. The project aligned with the statutory selection process and project criteria outlined by Congress. On information and belief, no other SMART grants were terminated as part of the action. Presently, the City of Fort Collins SMART grant is the only one listed on the DOT's website of "Stage 2 Implementation Grants by State" as "Under Departmental Review."

#### 2. The Termination Decision was unreasoned and far outside the normal course.

241. The Termination Decision was issued far outside the normal course. It was announced through a newspaper report that Colorado was targeted for $109 million in transportation funding cuts. Prior to this news report, no awardees had any advance notice.

242. When Colorado officials contacted DOT following the press report to ask if the funding was being cut, DOT staff were initially unaware of any decision.

243. The Termination Decision was directed solely at Colorado and involved no reasoned decisionmaking. No funding for any other State was terminated as part the announced action, even though many other States were participants in the same programs, for projects intended to serve similar objectives.

244. DOT attempted to paper the Termination Decision after-the-fact through nearly identical form notices. The notices state identically that the projects "do[] not align with the current Administration's priorities" with no analysis or explanation. In one case, where a grant agreement had existed, it similarly states the grant was terminated because it "no longer effectuates . . . agency priorities." The notices do not explain what those priorities are or why the projects do not align. In fact, these boilerplate statements are pretextual and the true reason for the Termination Decision was to target Colorado for punishment.

### 3. DOT denies Colorado Safe Streets funding for reasons unrelated to the program's goals.

245. The IIJA also funded a competitive grant program administered by DOT called the Safe Streets and Roads for All Program ("SS4A"). The SS4A is open to applications from local governments, municipalities, regional entities, and federally recognized Tribal governments to support planning, infrastructure, and behavioral and operational initiatives designed to prevent fatalities and serious injuries on America's roadways. The SS4A has been funded on an annual basis since fiscal year 2022, with a final year of funding in fiscal year 2027.

246. In every previous funding cycle (fiscal years 2022, 2023, and 2024), applicants in Colorado, including its counties and municipalities, achieved significant success in pursuing SS4A funding. Colorado communities received 20, 13, and 21 awards in fiscal years 2022, 2023, and 2024, respectively.

247. However, on December 23, 2025, when DOT announced the fiscal year 2025 SS4A awards, only Colorado and one other State (Vermont) were left out entirely.

248. For that year's funding cycle, at least nine applications were submitted by Colorado communities, to include multiple counties and towns in both rural and more urban centers. Despite a previous track record of success, no Colorado communities received funding.

249. The 2025 notice of funding opportunity outlined that unsuccessful applicants could request a debrief meeting with DOT staff to learn more about why their applications were denied and to receive input and recommendations for future applications. Several of Colorado's unsuccessful applicants took advantage of that opportunity.

250. During the debrief meetings, which were held with multiple DOT staff, the parties walked through program specifics as well as criteria that had been used to evaluate their applications at the merit review stage. Through this review, at least four unsuccessful Colorado applicants learned that their applications were rated "High/Highly recommended," the highest staff-level rating. In other words, when adjudged by DOT staff, the applications were of the highest merit rating available. But once these applications reached the political appointees, Colorado was denied all funding. Ultimate award decisions rested with the Secretary of DOT.

251. DOT used this opportunity to further punish Colorado's communities. Despite the high merit of the denied applications, DOT denied awards based on retaliatory animus, at the direction of the Administration, rather than for any legitimate reason related to the SS4A's program goals.

## CAUSES OF ACTION

## COUNT ONE

### Violation of the Tenth Amendment, Elections Clause, State Sovereignty, and Separation of Powers (All Defendants)

252. Plaintiff incorporates by reference the allegations in the preceding paragraphs.

253. Federal courts possess the power in equity to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27 (2015).

254. The President's actions may be reviewed for constitutionality. *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952); *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935).

255. Defendants' actions and threats to punish Colorado based on Colorado's lawful exercise of its sovereign authority violates the Tenth Amendment, the Elections Clause, State sovereignty, and separation-of-powers principles. Defendants have unlawfully retaliated against Colorado to punish the State for lawfully exercising its sovereign authority to regulate elections by allowing mail-in voting and its sovereign authority to prosecute those who violate Colorado laws in order to undermine election integrity. Defendants' pattern of actions and threatened

future actions undermine and violate the Constitution by singling out Colorado for harmful executive action based on its exercise of sovereign powers.

256. Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that Defendants' actions and threats to punish Colorado—including the President's decision to relocate U.S. Space Command Headquarters, DOT's Termination Decision, USDA's Recertification Letter, and the various other threats and punishments—based on Colorado's lawful exercise of its sovereign powers are unconstitutional and that the Executive may not retaliate against Colorado based on its exercise of sovereign authority reserved for the States by the Constitution. Plaintiff is also entitled to injunctive relief preventing Agency Defendants from implementing or effectuating the retaliatory actions and threats or from engaging in future retaliatory conduct based on Colorado's lawful exercise of its sovereign authority.

**COUNT TWO**

**Violation of Equal Sovereignty**
**(All Defendants)**

257. Plaintiff incorporates by reference the allegations in the preceding paragraphs.

258. Federal courts possess the power in equity to "grant injunctive relief . . . with respect to violations of federal law by federal officials." *Armstrong*, 575 U.S. at 326–27.

259. The President's actions may be reviewed for constitutionality. *Franklin*, 505 U.S. at 801; *Youngstown Sheet & Tube Co.*, 343 U.S. 579; *Panama Refining Co.*, 293 U.S. 388.

260. Defendants' actions and threats singling out Colorado for disfavored treatment based on Colorado's lawful exercise of its sovereign authority to regulate elections and administer criminal justice violate the equal sovereignty principle. Defendants' actions and

threatened future action undermine and violate the Constitution by singling out Colorado for harmful executive action based on its exercise of these core sovereign powers.

261. Pursuant to 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that Defendants' actions and threats against Colorado—including the President's decision to relocate U.S. Space Command Headquarters, DOT's Termination Decision, USDA's Recertification Letter, and the various other threats and punishments—based on Colorado's lawful exercise of its core sovereign powers are unconstitutional and that the Executive may not single out Colorado for disparate treatment based on its exercise of core sovereign power reserved for the States by the Constitution. Plaintiff is also entitled to injunctive relief preventing Agency Defendants from implementing or effectuating the retaliatory actions and threats or from engaging in future retaliatory conduct based on Colorado's lawful exercise of its sovereign authority.

**COUNT THREE**

**Violation of the Administrative Procedure Act**
**(Against DOD Defendants)**

262. Plaintiff incorporates by reference the allegations in the preceding paragraphs.

263. Under the APA, a reviewing court shall hold unlawful and set aside agency action that is contrary to law, in excess of statutory authority or limitation, or without observance of procedure required by law. 5 U.S.C. § 706(2)(A), (C), (D).

264. DOD Defendants have acted contrary to law, in excess of statutory authority or limitation, and without observance of procedure required by law through their actions to relocate U.S. Space Command headquarters without following the requirements of 10 U.S.C. § 483.

265. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that DOD Defendants acted contrary to law, in excess of statutory authority or limitation, and without observance of procedure required by law, in violation of the APA, through their actions to relocate U.S. Space Command Headquarters without following the requirements of 10 U.S.C. § 483. Plaintiff is also entitled to an injunction preventing DOD Defendants from taking further action to implement the announced change to the headquarters location without first following the requirements of 10 U.S.C. § 483.

## COUNT FOUR

### Violation of the Administrative Procedure Act
### (Against USDA Defendants)

266. Plaintiff incorporates by reference the allegations in the preceding paragraphs.

267. Under the APA, a reviewing court shall hold unlawful and set aside agency action that is contrary to law, in excess of statutory authority or limitation, arbitrary or capricious, or without observance of procedure required by law. 5 U.S.C. § 706(2)(A), (C), (D).

268. The Recertification Letter is a final agency action because it marks the consummation of USDA's decisionmaking process and determines rights or obligations from which legal consequences will flow. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

269. The Recertification Letter violates the APA many times over.

### Procedural Violations

270. The Recertification Letter was issued without observance of procedure required by law for at least three reasons.

271. First, USDA Defendants failed to follow the notice-and-comment requirements that apply to legislative rules.

272. The Recertification Letter constitutes a legislative rule because it "has the force of law, and creates new law or imposes new rights or duties" *Sorenson Commc'ns, Inc. v. FCC*, 567 F.3d 1215, 1222 (10th Cir. 2009) (quoting *FDIC v. Schuchmann*, 235 F.3d 1217, 1222 (10th Cir. 2000); *see also N.H. Hosp. Ass'n v. Azar*, 887 F.3d 62, 70 (1st Cir. 2018) (discussing how a legislative rule "'assigns duties, or imposes obligations, the basic tenor of which is not already outlined in the law itself'"); *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 251–52 (D.C. Cir. 2014) (discussing how legislative rules "purport[] to impose legally binding obligations or prohibitions"). The Recertification Letter imposes new duties and is contrary to existing law and regulation.

273. The APA's notice-and-comment procedures apply to legislative rules. *See* 5 U.S.C. § 553. Those procedures require advanced notice of proposed rulemaking followed by an opportunity to participate by interested persons. *Id.* §§ 553(b)–(c).

274. When an agency promulgates a final rule, it must include "a concise general statement of [its] basis and purpose." 5 U.S.C. § 553(c).

275. Unless an exception applies, a substantive rule must be published or served at least 30 days before its effective date. 5 U.S.C. § 553(d).

276. USDA Defendants failed to follow any of these requirements. USDA Defendants did not provide notice of proposed rulemaking to Colorado, the Recertification Counties, or any interested person. USDA Defendants did not provide any opportunity to participate or comment.

USDA Defendants did not provide a concise statement of the rule's basis and purpose. USDA Defendants made the rule effective immediately, without waiting 30 days after providing final notice.

277. Second, USDA regulations require that "[a]t least 30 days prior to the initiation of a demonstration project, FNS shall publish a General Notice in the Federal Register if the demonstration project will likely have a significant impact on the public. The notice shall set forth the specific operational procedures and shall explain the basis and purpose of the demonstration project." 7 C.F.R. § 282.1(b). The Recertification Letter will have a significant impact on the public, requiring vast numbers of households to appear for an in-person interview with no notice, contrary to longstanding requirements. And if the households do not appear, they will lose their benefits, even if they are entitled to them by law.

278. This notice requirement ensures that the public has a chance to comment and point out flaws in projects affecting the public. The regulation provides that "[i]f significant comments are received in response," USDA is to take appropriate action "prior to implementing the project," including making operational changes and additional notices. 7 C.F.R. § 282.1(b).

279. USDA Defendants failed to comply with this regulatory requirement.

280. Third, USDA Defendants failed to comply with the requirements of the Paperwork Reduction Act. The Paperwork Reduction Act prohibits agencies from conducting or sponsoring a new or revised collection of information unless in advance it complies with numerous procedural requirements, including completing mandatory agency evaluations, publishing the proposed collection in the Federal Register, providing an opportunity for public

comment, obtaining approval from the Director of OMB, and obtaining an OMB control number to be displayed on the collection. 44 U.S.C. §§ 3507, 3506.

281. Through the Recertification Letter and "pilot project," USDA is conducting or sponsoring a new or revised collection of information. No current approved collection of information covers this "pilot project." USDA Defendants purport to require more than 100,000 households in Colorado (and a similar number in Minnesota) to report and provide information at an in-person interview to be conducted within 30 days to recertify eligibility. In addition, the "pilot project" imposes new recordkeeping requirements on Colorado, Minnesota, and 9 counties within Colorado and Minnesota.

282. USDA Defendants did not complete any of these requirements before sponsoring a new or revised collection of information. USDA Defendants did not obtain an OMB control number, and the Recertification Letter does not display a valid OMB control number.

**Contrary-to-Law Violations**

283. The Recertification Letter is also not in accordance with law and in excess of Defendants' statutory authority for several reasons.

284. First, USDA Defendants cannot mandate pilot project participation by an unwilling state. The FNA only permits pilot projects agreed to by both USDA and the participating State agencies or other eligible entities. *See, e.g.*, 7 U.S.C. § 2017(f)(2)(A) (authorizing pilot projects "at the request of 1 or more State agencies"); *id.* § 2036d(a) (authorizing pilot projects "on application of eligible entities"); *id.* § 2025(h)(1)(F)(i)(I) (authorizing pilot projects via "cooperative agreements" with State agencies); *id.*

§ 2021(h)(3)(i)(1)(A) (authorizing pilot projects "to test innovative Federal-State partnerships"). Nothing in the FNA gives Defendants authority to mandate participation in a pilot project by an unwilling participant. Indeed, Congress gave Defendants tools for taking actions against States it believes are maladministering SNAP. *See* 7 U.S.C. §§ 2020(g)–(h). But forced participation in pilot projects was not among them.

285. Second, USDA Defendants cannot unilaterally impose new duties and obligations upon participants in pilot projects. Congress gave the Secretary the authority only to "waive any requirement" of the FNA in connection with a pilot project. 7 U.S.C. § 2026(b)(1)(A). Congress did not give her authority to invent new obligations, like requiring recertifications that have not yet come due or requiring States to perform in-person interviews. USDA Defendants have not, in fact, waived any requirement as part of this purported "pilot project."

286. Third, the "pilot project" violates various statutory restrictions imposed by Congress for SNAP demonstration projects.

287. Congress provided that "[t]he Secretary may not conduct" a pilot project unless "the project is consistent with the goal . . . of providing food assistance to raise levels of nutrition among low-income individuals." 7 U.S.C. § 2026(b)(1)(B)(i)(I). The Recertification Letter asserts that "[m]ore accurate certifications of eligibility for SNAP benefits will ensure that those in need receive assistance, raising levels of nutrition among low-income individuals." Disqualifying existing beneficiaries due to an arbitrary deadline does nothing to help those in need of assistance. And by redirecting all available resources to recertification, this program

would affirmatively harm those in need. For example, staff resources would be diverted from processing new applications to recertifying existing beneficiaries.

288. Congress also prohibited the Secretary from conducting a pilot project under 7 U.S.C. § 2026(b)(1)(A) unless "the project includes an evaluation to determine the effects of the project." 7 U.S.C. § 2026(b)(1)(B)(i)(II). The Recertification Letter contains no provision for an evaluation.

289. Congress provided that "[i]mpermissible projects" include those that "den[y] assistance to an otherwise eligible household or individual" who has complied with SNAP's requirements. 7 U.S.C. § 2026(b)(1)(B)(iv)(III)(bb). This is an "impermissible project" because it would deny assistance to eligible households or individuals who cannot be interviewed in person and recertified in thirty days—requirements Defendants are attempting to impose beyond what is required by statute and regulation, and which recipients may not be able to comply with, through no fault of their own.

290. Congress provided that "[i]mpermissible projects" also include those "inconsistent" with the requirement that each State agency "provide timely, accurate, and fair service" to SNAP applicants and recipients. 7 U.S.C. §§ 2026(b)(1)(B)(iv)(III)(ff), 2020(e)(2)(B)(i). It is the antithesis of fairness to impose significant burdens on recipients that are not provided for by statute or regulation without notice and to retroactively change the rules of the life-sustaining benefits they have already qualified for.

291. Congress further restricted "[p]ermissible projects" to those intended to "improve program administration," "increase the self-sufficiency of [SNAP] recipients;" "test innovative

welfare reform strategies," or "allow greater conformity with the rules of other programs than would be allowed but for this paragraph." 7 U.S.C. §§ 2026(b)(1)(B)(ii)(I)–(IV). This "project" is none of these. Forcing the Recertification Counties to abandon all other SNAP-related work (e.g., processing applications, changes, and appeals) and require all households to be recertified within 30 days, with no reason to believe it will catch more fraud than performing recertifications on their usual timeline does not "improve program administration." It harms it tremendously.

292. Fourth, the "pilot project" would require Colorado to violate several provisions of the FNA and its implementing regulations. USDA has not waived any of these requirements.

293. USDA's regulations provide that "State agencies may not require households to report for an in-office interview during their certification period." 7 C.F.R. § 273.2(e)(1). "For example, State agencies may not require households to report en masse for an in-office interview during their certification periods simply to review their case files, or for any other reason." *Id.* But that is exactly what USDA is purporting to require Colorado to do.

294. Because Colorado cannot compel in-office interviews, home-based interviews would be another potential method of conducting in-person interviews (albeit one requiring significantly more resources). But USDA regulations prohibit home-based interviews unless a household meets specified hardship criteria and requests an in-home interview. 7 C.F.R. § 273.2(e)(2).

295. Regulations permit and encourage State agencies to conduct all recertification interviews by telephone, and State agencies must use telephone interviews in cases of

"household hardship," which must include, at a minimum, "illness, transportation difficulties, care of a household member, hardships due to residency in a rural area, prolonged severe weather, or work or training hours that prevent the household from participating in an in-office interview." 7 C.F.R. § 273.2(e)(2). But here Defendants are purporting to require face-to-face interviews for all households, regardless of hardship.

296. USDA generally prohibits Colorado from "end[ing] a household's certification period earlier than its assigned termination date." 7 C.F.R. § 273.10(f)(4). But the "pilot project" would require Colorado to end certification periods for households who are unable to complete the recertification process and in-person interviews, even if Colorado did not receive any information suggesting the household had become ineligible.

297. The "pilot project" would also require Colorado to violate notice requirements. USDA regulations provide that the first step in the recertification process is providing a notice of expiration ("NOE"). See 7 C.F.R. § 273.14(b)(1)(i). The earliest that State agencies can provide the NOE is "the first day of the next-to-the-last month" in the household's certification period. *Id.* For the vast majority of households, performing the recertification process in the thirty-day window mandated by USDA would require sending NOEs before the date permitted by § 273.14(b)(1)(i).

298. On the other hand, State agencies must provide an NOE "before the first day of the last month of the certification period." 7 C.F.R. § 273.14(b)(1)(i). That is, State agencies are required to give more than one month's notice. That is not possible here, where USDA informed

Colorado of this "pilot project" on December 17, 2025 and required the recertifications to be complete by January 16, 2025.

299. The "pilot project" would further require Colorado to violate its FNS-approved State Plan of operation, in violation of statute and regulation. *See* 7 U.S.C. § 2020(g); 7 C.F.R. § 276.1.

300. Fifth, USDA Defendants lack authority to take the remedial measures threatened in the Recertification Letter if Colorado fails to comply with their demands.

301. The letter threatens "[f]ailure to participate in this pilot project as specified by USDA will trigger noncompliance procedures codified in 7 U.S.C. § 2020(g). It may also affect Colorado's continued participation in SNAP." Ex. 1.

302. 7 U.S.C. § 2020(g) provides that if "there is a failure by a State agency without good cause to comply with any of the provisions of this chapter, the regulations issued pursuant to this chapter, the State plan of operation submitted pursuant to subsection (d) of this section, the State plan for automated data processing submitted pursuant to subsection (o)(2) of this section, or the requirements established pursuant to section 2032 of this title," then the Secretary "shall immediately inform such State agency of such failure" and provide "a specified period of time for the correction of such failure." *Id.* If the State agency does not correct the failure within the specified period, the Secretary may seek injunctive relief and "shall proceed to withhold" administrative funds "as the Secretary determines to be appropriate, subject to administrative and judicial review." *Id.*

303. 7 U.S.C. § 2020(g) does not authorize the Secretary to take any action against Colorado for failure to comply with the Recertification Letter. The Recertification Letter is not part of the provisions of the FNA or the regulations promulgated under it, the State plan of operation, the State plan for automated data processing, or the requirements established under 7 U.S.C. § 2023.

**Arbitrary-and-Capricious Violations**

304. The Recertification Letter is further unlawful because it is arbitrary and capricious.

305. An agency action is arbitrary and capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action[,] including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

306. The Recertification Letter is arbitrary and capricious because the reasons for imposing the "pilot project" upon Colorado are unsupported and irrational; because USDA Defendants rely on factors that Congress has not intended for USDA to consider; because the proposed "pilot project" would not remedy the recipient fraud it supposedly targets; because it

fails to consider the harms and costs it would impose on Colorado, the Recertification Counties, SNAP recipients and applicants, and recipients of other state services who would be harmed while all resources are redirected toward recertification; because it fails to consider the significant reliance interests of those same groups; because it fails to consider important aspects of the problem, including the impossibility of complying with the demands; and because the USDA Defendants imposed the "pilot project" as part of the Trump Administration's retribution campaign against Colorado.

307. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that USDA's Recertification Letter is contrary to law, in excess of statutory authority or limitation, arbitrary and capricious, and without observance of procedure required by law, in violation of the APA. Plaintiff is also entitled to a stay of the effective date of the Recertification Letter pending judicial review, to set aside and vacate the Recertification Letter, and to injunctive relief barring its implementation. *See* 7 U.S.C. §§ 705–06.

**COUNT FIVE**

**Spending Clause Violation**
**(Against USDA Defendants)**

308. Plaintiff realleges and incorporates by reference the allegations set forth above.

309. "Congress may attach conditions on the receipt of federal funds." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). However, any conditions must be imposed "unambiguously" to enable "States to exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* at 207 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)).

310. Defendants are threatening to withhold Colorado's SNAP administrative funding and to disallow its participation in SNAP altogether unless Colorado completes the impossibly onerous tasks they have demanded. This violates the constitutional limitations on the federal government's spending power because Colorado did not have "clear notice" of this condition when it elected to participate in SNAP. *See Arlington Cent. Sch. Dist. v. Murphy*, 548 U.S. 291, 296 (2006).

311. "Though Congress' power to legislate under the spending power is broad, it does not include surprising participating States with post acceptance or 'retroactive' conditions." *Pennhurst*, 451 U.S. at 25. That is, not even Congress could impose these new conditions upon Colorado, and certainly not Defendants acting without—and in fact contrary to—congressional authority.

312. Plaintiff is entitled to preliminary and permanent injunctions barring implementation of the Recertification Letter and, pursuant to 28 U.S.C. § 2201, to a declaration that the Recertification Letter and its implementation violate the Spending Clause.

**COUNT SIX**

**Violation of the Administrative Procedure Act**
**(Against DOT Defendants)**

313. Plaintiff incorporates by reference the allegations in the preceding paragraphs.

314. The DOT Termination Decision is final agency action because it marks the consummation of DOT's decision-making process and determines rights or obligations from which legal consequences will flow. *See Bennett*, 520 U.S. at 177–78.

315. The APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

316. An agency is action is arbitrary and capricious where it is not "reasonable and reasonably explained." *Prometheus Radio Project*, 592 U.S. at 423. An agency must provide "a satisfactory explanation for its action[,] including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

317. The DOT's Termination Decision is not reasonable or reasonably explained. The decision lacks any satisfactory explanation for its action, let alone a rational connection between the facts found and the choices made. DOT fails to identify what its priorities are, what they were previously; how they have ostensibly changed; and why the awardees' projects do not fit those priorities. This leaves the awardees with no genuine justification for the DOT's Termination Decision, let alone a justification that can be scrutinized by the court and the public. *See Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

318. Instead, the DOT Defendants' bald explanation, its targeting only of Colorado funding, and the timing and manner of the Termination Decision—after Colorado's Governor refused to take actions demanded by the President—show that the termination letters are the

DOT Defendants' attempt to paper over a decision made for another reason, namely to punish Colorado for failing to bend its sovereignty to the President's will. Agencies may not rely on explanations that are "contrived" or "incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Dep't of Com.*, 588 U.S. at 785.

319. By terminating Colorado's funding to retaliate and punish the State for its exercise of sovereign authority, the agency relied upon a factor that Congress had not intended it to consider. Similarly, treating Colorado disparately from other States without a valid explained reason also renders the action arbitrary and capricious.

320. The DOT Defendants also failed to account for several important aspects of the problem before them, including, (i) Plaintiffs' reliance interest in awarded grants; (ii) the need for awardees to have clear, unambiguous notice of the circumstances in which their already awarded funding may be withdrawn or terminated; (iii) whether any statutes or regulations permit DOT Defendants to withdraw or terminate grants without advance warning based on a change in agency priorities; (iv) whether any statutes or regulations permit DOT Defendants to terminate discretionary grant programs, even where Congress has directed them to fund those programs; and (v) whether grantees should be given notice of any new agency priorities and an opportunity to modify their grant proposals prior to termination.

321. Likewise, the DOT Defendants failed to consider the substantial reliance interest of the awardees who committed state funds to these projects as part of the selection process.

322. Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiff is entitled to a declaration that DOT's Termination Decision was arbitrary and capricious in violation of the

APA. Plaintiff is also entitled to a stay of the effective date of the Termination Decision pending judicial review, to set aside and vacate the Termination Decision, and to injunctive relief barring implementation of the Termination Decision and preliminarily preserving the availability of terminated funds. *See* 7 U.S.C. §§ 705–06.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court:

a. Declare that Defendants' actions and threats to punish or single out Colorado—including the President's decision to relocate U.S. Space Command Headquarters, DOT's Termination Decision and SS4A denial, USDA's Recertification Letter, FEMA's disaster relief denials, and the various other alleged threats and punishments—based on Colorado's lawful exercise of its sovereign powers are unconstitutional and that the Executive may not retaliate against or single out Colorado based on its exercise of sovereign authority reserved for the States by the Constitution;

b. Enjoin Agency Defendants from implementing or effectuating retaliatory actions and threats or from engaging in future retaliatory conduct based on Colorado's lawful exercise of its sovereign authority;

c. Enjoin DOD Defendants from effectuating a relocation of U.S. Space Command Headquarters based on President Trump's unlawful decision;

d. Declare that DOD Defendants acted contrary to law, in excess of statutory authority or limitation, and without observance of procedure required by law, in violation of the APA, through their actions to move U.S. Space Command Headquarters without following the requirements of 10 U.S.C. § 483;

e. Enjoin DOD Defendants from taking further action to implement the announced change to the U.S. Space Command Headquarters location without following the requirements of 10 U.S.C. § 483;

f. Declare that USDA's Recertification Letter is contrary to law, in excess of statutory authority or limitation, arbitrary and capricious, and without observance of procedure required by law, in violation of the APA;

g. Set aside and vacate the Recertification Letter and stay the effective date pending judicial review;

h. Enjoin USDA Defendants from implementing the Recertification Letter, including any action to sanction or punish based on failure to comply with the Recertification Letter;

i. Declare that DOT's Termination Decision was arbitrary and capricious in violation of the APA;

j. Set aside and vacate the Termination Decision and stay the effective date pending judicial review;

k. Enjoin DOT Defendants from implementing the Termination Decision and grant preliminary injunctive relief to maintain the availability of terminated funds;

l. Award Plaintiff its reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

m. Grant other such relief as this Court may deem proper.

**PHILIP J. WEISER**
Attorney General of Colorado

/s/ David Moskowitz
David Moskowitz
*Deputy Solicitor General*
Talia Kraemer
*Assistant Solicitor General*
Sarah H. Weiss
*Senior Assistant Attorney General*
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov
talia.kraemer@coag.gov
sarah.weiss@coag.gov

Counsel for the State of Colorado

**CERTIFICATE OF SERVICE**

I hereby certify that on May 6, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ David Moskowitz
*Deputy Solicitor General*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**JUDGE R. BROOKE JACKSON**

| | |
|---|---|
| Civil Action: 25-cv-03428-RBJ<br>Courtroom Deputy: Meghan Smotts | Date: August 11, 2026<br>Court Reporter: Kevin Carlin |

| ***Parties*** | ***Counsel*** |
|---|---|
| THE STATE OF COLORADO,<br><br>**Plaintiff,** | *David Moskowitz*<br>*Reed Morgan*<br>*Sarah Weiss* |
| **v.** | |
| DONALD J. TRUMP, in his official capacity as President of the United States,<br>PETE HEGSETH, in his official capacity as Secretary of Defense,<br>TROY MEINK, in his official capacity as Secretary of the Air Force,<br>SEAN P. DUFFY, in his official capacity as Secretary of Transportation,<br>BROOKE ROLLINS, in her official capacity as Secretary of Agriculture,<br>CHRIS WRIGHT, in his official capacity as Secretary of Energy,<br>DOUG BURGUM, in his official capacity as Secretary of the Interior,<br>KRISTI NOEM, in her official capacity as Secretary of Homeland Security,<br>KAREN S. EVANS, in her official capacity as Acting Director of the Federal Emergency Management Agency,<br>PAM BONDI, in her official capacity as Attorney General,<br>BRIAN STONE, in his official capacity as Acting Director of the National Science Foundation,<br>EXECUTIVE OFFICE OF THE PRESIDENT,<br>DEPARTMENT OF DEFENSE,<br>DEPARTMENT OF THE AIR FORCE,<br>DEPARTMENT OF TRANSPORTATION,<br>DEPARTMENT OF AGRICULTURE, | *Adam Fox*<br>*Alexander Severance*<br>*Marianne Kies* |

DEPARTMENT OF ENERGY,
THE DEPARTMENT OF THE INTERIOR,
DEPARTMENT OF HOMELAND SECURITY,
FEDERAL EMERGENCY MANAGEMENT AGENCY,
DEPARTMENT OF JUSTICE, and
NATIONAL SCIENCE FOUNDATION,

**Defendants.**

---

**COURTROOM MINUTES**

---

**DISCOVERY CONFERENCE**
**Court in Session: 10:01 a.m.**

Appearance of counsel – all counsel appear via VTC.

Preliminary remarks by the Court.

Discussion held on discovery disputes as outlined on the record.

**ORDERED:** 1) The Court finds that Defendant Executive Office of President, including its component Office of Management and Budget, are ordered to participate in discovery.

2) The Court finds that discovery including: federal actions or threats directed toward Colorado but not specifically cited in the complaint, is relevant to the scoping out the motive, scoping out the target, and scoping out the means that the administration has chosen to hurt Colorado.

The Court finds that discovery including: federal actions or threats toward other states bearing on whether Colorado was targeted for disparate treatment would be unduly burdensome, unless it is federal action or threats toward states that have been linked together with Colorado as targets.

3) The Court finds that Plaintiff's request for Interrogatory responses regarding oral communications (e.g., meetings, phone calls, etc.) or deleted written communications (e.g., Signal chats) related to the actions or threats against Colorado are not overly broad and Defendants shall provide responses to the related Interrogatories.

**Court in Recess: 11:34 a.m.** **Hearing concluded.** **Total time in Court: 01:33**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 25-cv-3428-RBJ

THE STATE OF COLORADO,

Plaintiff,

vs.

DONALD J. TRUMP et al,

Defendants.

---

REPORTER'S TRANSCRIPT

Discovery Hearing

---

Proceedings before the HONORABLE R. BROOKE JACKSON, Judge, United States District Court for the District of Colorado, commencing on the 11th day of August, 2026, in Courtroom C202, United States Courthouse, Denver, Colorado.

APPEARANCES

For the Plaintiff:
DAVID Z. MOSKOWITZ, SARAH H. WEISS, and REED W. MORGAN, Colorado Department of Law, 1300 Broadway, 10th Floor, Denver, CO 80203

For the Defendants:
ADAM S. FOX, MARIANNE F. KIES, and ALEXANDER J. SEVERANCE, U.S. Department of Justice, 1100 L Street NW, Washington, DC 20005

Reported by KEVIN P. CARLIN, RMR, CRR, 901 19th Street, Room A259, Denver, CO 80294, (303)335-2358

Proceedings reported by mechanical stenography; transcription produced via computer.

P R O C E E D I N G S

(Proceedings commenced at 10:02 a.m.)

THE COURT: Good morning. This is Colorado, that is the State of Colorado, versus Trump, 25-cv-3428. This morning we have a discovery dispute being heard. The parties' counsel are participating remotely with the Court's permission. So, I'm in a relatively empty courtroom this morning, but I'm happy to say good morning to the lawyers on the screen and ask them to enter their appearances, please, for the State of Colorado first.

MR. MOSKOWITZ: Good morning, Your Honor. David Moskowitz for the State of Colorado. And along with me are my colleagues Reed Morgan and Sarah Weiss.

THE COURT: Thank you. And for the defendant?

MR. FOX: Good morning, Your Honor. Adam Fox here for the defendants, along with my colleagues Alex Severance and Marianne Kies, who is in my office with me, just for the record.

THE COURT: Is that Kies, K-E-Y-S?

MR. FOX: K-I-E-S, Your Honor.

THE COURT: Thank you. All right. I've received two things from the State of Colorado in preparation for the hearing. The first was an email copied to the defendant -- I should say defendants -- listing three items of discovery concern. And the second was a copy of a message, an email from Emily Underwood from the White House office, executive office,

to a variety of people, subject, brainstorm call, and dated December 15th, 2025.

So, perhaps we should start with the party requesting the hearing, being the State of Colorado, and ask Mr. Moskowitz or one of his colleagues to proceed.

MR. MOSKOWITZ: Thank you, Your Honor. May it please the Court, this case concerns an unconstitutional scheme to attack and punish the State of Colorado for its lawful exercise of sovereign powers that was orchestrated directly by the Executive Office of the President, EOP. We are here today primarily because, notwithstanding its principal role in this scheme, EOP has unilaterally declined to participate in discovery. It did not seek any relief from this Court. It simply refused to respond.

The evidence produced confirms that EOP is at the heart of this case and has control of critical evidence not available elsewhere, including regarding the motivations for this unconstitutional scheme. I want to start with some of that evidence, and including the email message that you reference, because on December 15th, 2025, EOP organized an interagency call involving the defendants the Department of Transportation, the Department of Agriculture, the Department of Interior, the Department of Energy, and OMB, its subagency. At 2:43 a.m., Ms. Underwood directed these departments and agencies to attend a call later that afternoon. And in a key part, she said,

please come prepared to discuss immediate actions that your department or agency can take with respect to Colorado. Please do not forward this invitation or include others on the call without discussing with me first.

Now, this was right after the Tina Peters purported pardon by the president, and the same day that the president attacked Governor Polis as weak and pathetic for not releasing her, and the many threats from the president to take harsh measures against Colorado.

And this meeting then precipitated the week of attacks against Colorado that is the core focus of this case, which includes the very next day, one -- the announcement of $109 million in transportation funding cuts for Colorado. That same day, DOE leaking to the press that it's threatening $615 million in energy funding cuts. That same day, the administration, through OMB, announcing that it's dismantling NCAR, the really important climate research agency that is located in Colorado.

Two days later, USDA announces the fake SNAP pilot project that we addressed at length back in January. And then two days after that, two disaster relief denials were announced by the administration in cases where the two disasters clearly met the general requirements that had otherwise been in place to obtain disaster relief declarations. And then three days after that, Colorado was denied all Safe Street funding, which was

another Department of Transportation program.

And we see from evidence produced from the agencies that when this meeting happened, it created a mad scramble to comply with this request, to immediately identify actions against Colorado. So, for example, the Department of Agriculture acknowledged in its interrogatory response that this fake pilot project targeting Colorado was its proposed action. They somehow left that out when we had that hearing back in January and produced the explanation of what was the factors that they considered then, but in fact, it was this call and the direction from the White House to take immediate action against Colorado.

DOE, right after this, holds a high-level mandatory, per White House request, please come to the GC's front office now. There is an urgent need for a 30-minute meeting today to discuss what they were going to do. And that leads the chief of staff to contact a reporter the same day to announce that DOE was terminating $615 million in energy funding for Colorado.

The defendant Department of Interior immediately requested on December 15th a compilation of all outstanding grants to Colorado or any entity simply located in Colorado, and it leads them to prepare termination documents shortly thereafter. And OMB orders NSF to dismantle NCAR, and NSF is very clear that this was not their action, and they repeatedly state in their interrogatory responses that their actions were

taken, quote, at the direction of OMB.

And OMB is of course a subagency of EOP. EOP is the heart of this case and the key decision maker. The December 15th meeting is about as clear a smoking gun as one can get, but we have other things from other agencies making clear they're not the decision maker. So, when we asked FEMA, what were the considerations in denying the disaster declarations? They say, not applicable, because they don't have the authority to issue disaster declarations, pointing us back towards EOP, because that's where they say the decision was made.

NSF likewise made clear that its actions were at the direction of OMB. Now, OMB is a subagency of EOP, and a clear player in this action, and they too here in this case are refusing to provide any discovery responses. And this is particularly troubling because OMB has always traditionally been an agency that is subject to FOIA. Anyone -- any person in the world could ask for these documents, and they would be obligated to respond to them and to provide documents and assert whatever privileges they were going to claim, but here, they suggest that they have no -- don't need to respond at all because they happen to be within the Executive Office of the President. And this is a completely baseless and frivolous argument.

EOP also has information that nobody else has. So, for example, when announcing the dismantling of NCAR, a senior White House official told the press the reason for this was in an

emailed statement, maybe if Colorado had a governor who actually wanted to work with the president -- with President Trump, his constituents would be better served. Now, only EOP has this email. It's not privileged. There's no reason that they can't turn it over. But they refuse to do so, because they don't want to admit that they did this or who did it.

We have been getting discovery from EOP, and in particular OMB in many other cases, especially these targeting cases. So, for example, in *Illinois versus Vought*, which was a case involving targeting four states, including Colorado, to cut $1.5 billion in public health and transportation funding, the Court there ordered OMB to produce documents on an expedited basis in less than a week, and records showed that similar to here, OMB was the decision maker ordering the actions against the state.

Like here, they organized calls with a group of agencies, asked them to bring ideas of what they were going -- what actions they could do, and then they pushed and directly approved through the president the actions taken, and they placed the story to announce these cuts with the press.

Similarly, in *New York versus ACF*, which is another targeting case, where the administration targeted five states, including Colorado, to freeze $10 billion for child care services and cash assistance to needy families, we got discovery from both the agency and OMB, and it showed that OMB

specifically ordered that Colorado be targeted.

And in *California versus Wright*, which is another case involving the targeting of numerous states for Department of Energy cuts amounting to $6 billion in cuts, discovery has been had from both the agency and OMB, and they've revealed over 100,000 documents to be reviewed, far larger than in this case.

So, the bottom line here is that EOP has critical evidence that we can't get elsewhere. It has the evidence that the agencies don't about the motivation for targeting that is key to proving our case.

And as to timing, defendants have suggested, well, maybe at some future time in the case they would be willing to provide evidence from EOP, but discovery is now already more than halfway over. We are already significantly delayed by various roadblocks from the defendants, and are highly unlikely to finish by the current October deadline. And none of this was raised with the Court at the beginning of the case to ask for staged discovery or anything else built into the timeline. We've seen what we have from the agencies, which has only made clear that all of the important evidence is with EOP.

Now, we expect that defendants are going to argue that with various cases that there are special separation of powers concerns when seeking evidence directly from EOP. And I don't think that really applies to OMB at all, and they don't really have any cases suggesting that, and that's just a separate

issue. But as to EOP, we aren't contesting that there aren't in the run-of-the-mill case separation of powers issues that would cause a Court to manage and ensure that there is not vexatious litigation being brought against officials there.

But that's not this case, and we would ask the Court to make factual findings about the unique circumstances of this case, make clear that we're not ignoring the separations of powers issues, but the unique facts here warrant obtaining discovery at this point in time from EOP. And that's because not only are we dealing with separation of powers issues, on the other side, we're balancing extremely weighty constitutional concerns with not allowing the State of Colorado to obtain this evidence.

Federalism is a court principle for protecting liberty that the founders put at the core of the Constitution. And what they -- what EOP has done here is orchestrated a scheme to infringe Colorado's state sovereignty. This is unlike any prior cases. It's not about some statutory or procedural issue. This is a fundamental principle underlying our Constitution. And to the extent there's been any constitutional collision here in which they might refer to in cases, it's one of EOP's making. It cannot be the situation that EOP can orchestrate a scheme to attack a state, and then claim it doesn't have to turn over the evidence about it.

Second, EOP is not a bystander here, as in many of the

prior cases. It's the key player. It has evidence that is not available elsewhere. We are not asking them to produce materials already produced by agencies. We are asking to produce the additional evidence that we can't get from the agencies.

Third, we're already heading toward the close of discovery, and they failed to raise this objection in a timely manner before. But to the extent there's any timing concerns, we have now hit it, and it's time for EOP to quickly turn over documents.

Fourth, there's limited burden for discovery on targeting here. We're not seeking a broad search of all sorts of things. This is specifically focused on the targeting of Colorado and other similar targeting schemes. Most agencies were produced maybe a couple hundred or fewer documents, many of which are duplicative. This is not a heavy burden.

And lastly, they're already asserting executive privilege elsewhere, and so this will not be -- this will not cause them to assert executive privilege in some way that they're not already asserting.

And lastly, I would note on this that we have offered many times that to the extent that they think this discovery -- they want to avoid it, that we would engage in factual stipulations to ensure that we could prove our case. We're not looking for discovery for the sake of discovery. We're just

trying to ensure that we can prove our case. And we're happy to engage in that, but to date, they have offered zero factual stipulations and have rejected any factual stipulations we've offered to them.

So, that's the first issue. The second issue -- and I don't know if you would like me to pause there, or if you have any questions on that? Or move on to the second issue?

THE COURT: Go ahead to the second issue.

MR. MOSKOWITZ: Thank you, Your Honor. So, the second issue is refusal to provide information regarding oral communications and deleted communications. So, we've asked various interrogatory requests seeking to understand the defendants' communications about key aspects of this case, like the actions directed to target Colorado. So, the focus here is to understand these key communications, and that would include written communications, but it would also include oral communications like meetings and calls and deleted written communications like Signal chats. This information is critical to understanding the facts and for depositions, and understanding the key players. Lots of the most important communications are never written down. They're in meetings like the December 15th meeting.

In response to this, defendants provided Rule 33(d) responses, where they offered to identify the Bates numbers for us for written communications. But they refused to provide us

any information at all about any response for oral communications or deleted communications. And obviously Rule 33(d) can't apply to records that don't exist, that they can't point us to, because it's not equally easy that we could obtain that information.

It's information solely in their possession, and they have an obligation to respond. But their response to us is, with respect to oral communications, it is neither feasible nor proportional to the needs of the case to require defendants to identify any such communications if they occurred.

So, they won't even acknowledge that there were any oral communications, which we obviously know there were because of all these meetings and other things. And they also keep citing the purported expedited discovery timeline which we all agreed to at the beginning of the case as a basis that they don't have to respond to interrogatory responses about oral communications.

THE COURT: Have we lost Mr. Fox?

MR. FOX: I'm here, Your Honor.

THE COURT: I don't see your image on the screen anymore. It was there before, but it's not there now.

MR. FOX: Okay. I'm --

THE COURT: As long as you're here, I'm happy, but I didn't want you to miss out on this.

MR. FOX: Can you hear me, Your Honor? I can hear you

guys.

THE COURT: I can hear you. I could see you before, just like I can see the other lawyers, but now your image is gone. I don't know why. Something happened with the camera at your end or something like that.

MR. FOX: Yes, Your Honor. I -- I saw something on my screen indicating that my bandwidth, or the connection that I have isn't strong, and so it's turned my camera off. So, I will try and improve that and get my camera back on, but I can hear everything, and it sounds like you guys can hear me as well.

THE COURT: Okay. We can. Thank you, sir.

MR. FOX: Okay. Thank you.

THE COURT: Go ahead, Mr. Moskowitz. And actually, in terms of the three issues that you identified on your email, you've gone from number one to number three; correct?

MR. MOSKOWITZ: Yes. Sorry for going out of order. They're all kind of related. And so, you know, I think this all comes back, then, again, to the December 15th meeting, which demonstrates that much of the action here occurred through meetings and calls. And we clearly have an extremely important need to know what happened during this December 15th meeting, what directions were provided from OMB, what plans were provided and proposals were provided from the agencies, what explanation was given as to why Colorado was to be targeted. All of these are the key things. And the notion that, like, it is not

feasible nor proportional --

(The court reporter interrupted with a technical issue.)

MR. MOSKOWITZ: I was saying that the defendants' argument was that this is not feasible nor proportional to provide us with an explanation as to what happened in key meetings like this. It's inconsistent with the rules of discovery.

Separately, in addition to the oral communications, we have reason to believe that there are many communications that may be deleted, such as Signal chats from senior officials who are using auto delete messaging on Signal. And for example, in *AFGE versus Trump*, a case in the Northern District of California, discovery revealed that high-level FEMA officials and others at DHS at the highest levels, many of the same individuals identified as being involved here, were using Signal for official duties in setting messages to disappear.

And it's notable here that FEMA produced a grand total of ten documents, with no emails and no messages, no message even conveying the decision from EOP that FEMA then later provided denying the disaster relief. And we're entitled to know about these calls, Signal chats, and other communications that are key to this scheme.

The third issue, then, is on the scope of discovery, in particular our focus of our case is on discovery requests concerning the targeting of Colorado. Many of the specific

threats and actions we described in detail in our complaint. It's almost 100 pages long. But our case is about this overall scheme to target Colorado and includes other threats or actions considered or not taken against the state. And they've just refused to include anything that is not expressly described in the complaint as being, quote, inherently irrelevant to the case.

But this is clearly relevant evidence. It's part of the same course of conduct. It's relevant to the motive, which they are denying and forcing us to litigate about. And this is very similar to your ordinary retaliation lawsuit. Discovery is not limited just to the facts described in the complaint. It's limited to the overall scheme and to the motives of the decision makers.

That December 15 meeting, again, provides a great example. Every agency was instructed to come up with actions they could immediately take against Colorado. Each of those actions is relevant. It's relevant to this case regardless of whether it was expressly described in the complaint or whether defendants have yet to follow through. And they seem to just be rehashing their ripeness arguments where they claim that if they haven't taken the action completely yet, they just have this threat hanging over Colorado, then, you know, it's not relevant to the case. And that's just not consistent with the rules of discovery.

This is also very important to the scope of relief that we want to obtain at the end of this. We seek an injunction to end the targeting of Colorado. That is both to undo all of the past targeting, and to prohibit future conduct. And this evidence is all relevant to proving and identifying the scope of the actions that need to be undone, and as to the future conduct, to show that additional actions not yet taken are relevant to the likelihood of future harm.

We've also sought evidence because they've denied, you know, generally that they are targeting states. We saw evidence of targeting other states, because this is also relevant evidence to their course of conduct and motive. There's strong evidence in many newspaper articles about how disaster relief has been used to target states. And we have these numerous other instances targeting in some of the cases I talked about before, including the public health funding, child care and public assistance.

In fact, as the New York Times recently reported and has been filed on cases -- on the docket, they've admitted to targeting states for energy cuts during the government shutdown, and that was the sole exclusive basis for targeting those states and their funding cuts.

This is also relevant to the Government's defenses. They're not admitting they're targeting Colorado or other states. They point to actions they take elsewhere, and with

respect to other states to claim there's no targeting at all. And we're entitled to the evidence to dispute this defense.

But also here that again, this is an across-the-board refusal. They're not engaging about ways to narrow or otherwise claim a particular burden and how we could narrow that burden. They're just simply saying that anything that's not expressly described -- conduct not expressly described in the complaint is, quote, inherently irrelevant.

And again, you know, we're still hoping to a stipulation of facts to the extent this is -- you know, they don't want to produce this, we are open to those types of ideas to narrow this.

And finally, I just note that if we were not able to obtain this discovery, we would ask the Court for leave to amend the complaint so that we can add in other actions that we have now become aware of that are similar to part of this course of conduct so that the defendant could not claim that they don't need to produce evidence related to that.

With that, Your Honor, I am happy to answer any questions or just wait to respond to my friend on the other side.

THE COURT: I do have a question about the second part of what you listed as issue number two, but what became in effect issue number three in your argument. And that is discovery including federal actions or threats towards other

states bearing on whether Colorado was targeted for disparate treatment. I don't know precisely what that means or how broad that attempts to reach, but we're interested here in the targeting, allegedly, of Colorado.

MR. MOSKOWITZ: Correct.

THE COURT: What other states? What actions bear on targeting of Colorado?

MR. MOSKOWITZ: So, in some cases, it's that it's targeting a group of states, so Colorado is part of that. But in other instances, we're talking about here the defense where they're suggesting that Colorado was not singled out. And so if that's their defense to those actions that Colorado is not alone, that we took these same actions to all these other states, well, we are entitled to discovery about that, because we might dispute when it turns out they're saying we took the same actions, but it's not actually remotely the same actions. So, they want to be able to assert this defense but not give us evidence about the defense.

THE COURT: Well, which states are you talking about?

MR. MOSKOWITZ: So, they've, for example, given us a list of -- when we asked about for the Department of Transportation, they've said, well, here are 16 other states that we've cut transportation funds to. And we think, that's all, like, very significantly different scenarios. Nobody had a situation like Colorado where there was this single targeting of

Colorado alone where they announced this cut connected to this particular December 15th meeting. We don't think that anybody else has faced anything like this, but it's still their defense that that's -- that, you know, nothing to see here.

THE COURT: Well, I'm not immune from what is reported in the media. I may be skeptical about some of what I get on the broadcast or print media, but it has been widely reported, I believe, that Minnesota has been targeted, that perhaps California has been targeted. But you're not limiting what you want to one or two states. You're saying all states. It seems pretty broad and pretty almost unmanageable to me in that respect.

MR. MOSKOWITZ: So, I think on that, I mean, we are very much open -- to the extent that this would cause a broad scope of documents, we're not interested in getting mountains of evidence. But we are interested, if there are discussions overall about this pattern of conduct about targeting states that we think that's relevant to proving that Colorado was targeted for the reasons that we're talking about here, and that, you know, the fact that they perhaps -- that they have been targeting Minnesota and California for similar reasons is relevant to showing the believability that they were also targeting Colorado here.

THE COURT: Well, you have this document, the Underwood email that you described as a smoking gun. Do you

have reason to believe that there are similar documents that involve other states targeted like Ms. Underwood has focused on Colorado?

MR. MOSKOWITZ: We have every reason to believe that's the case, and that's in part because with respect to another one of the targeting cases against Colorado and four states, they engaged in the exact same conduct. So, they set up a call. They told all of these extremely high-level officials at agencies across the country to come to this meeting where they came up with a plan to target particular states because they were so called sanctuary jurisdictions, and this included Colorado. And then that led to the scheme to cut $1.5 billion in funding for four states, including Colorado.

So, yeah. We have every reason to believe that this is kind of the way they operate. EOP comes up with somebody that the president wants to target. They set up a call. They come up with a plan, and they take action to target the states.

THE COURT: All right. Thank you. Mr. Fox, I'm not sure I know where you work. Are you here locally, or are you DOJ in D.C. or what?

MR. FOX: Yes, Your Honor. I am DOJ in Washington, D.C.

THE COURT: All right. Thank you. What would you like to say this morning?

MR. FOX: Well, Your Honor, first, you know, I'd

respectfully like to put on the record that it is the position of the Government that these issues raised need to be briefed, that these issues are complex. There are a lot of moving parts, and that we believe that there should be briefing on these issues prior to the Court entering a ruling. And so we would object to any ruling without briefing.

With that being said, though, you know, jumping into my opposing counsel's first point, during his argument, he stated that this is an ordinary lawsuit, or made a comment to the ordinariness of this. This is anything but an ordinary lawsuit, Your Honor. The discovery that the State of Colorado seeks on the Executive Office of the President is -- you know, it is governed by the Supreme Court's case *United States versus Cheney*, 542 U.S. 367.

And, Your Honor, in that case, in *Cheney*, the Supreme Court made clear that discovery on the White House is a last resort, and that prior to allowing discovery to occur on the White House, the requesting party must exhaust all avenues to try to obtain the information that they are seeking from the White House.

Your Honor, there are still avenues of exhaustion that the plaintiff can travel down in this case. For example, my colleague mentioned the letter from -- excuse me -- the email from 12/15/2025, the Underwood email. Your Honor, there are a list of recipients on that email who presumably attended that

meeting, and whose deposition could be taken, and who could be questioned about that meeting, people from the agencies who attended those meetings. And that would be a step in the exhaustion that the plaintiff needs to go through before the possibility of discovery being propounded on the White House can occur.

Your Honor, I would note the Court in its scheduling order has presently allowed the parties up to 20 depositions along with a 30(b)(6) deposition. We have not received one deposition notice at this juncture. Your Honor, plaintiff has also been afforded the ability to serve 50 interrogatories. They've served fewer than half. They've served 22 interrogatories on us. And likewise, they've served less than half of the 30 allowed RFPs that the Court has allowed them to serve at just 14. Finally, they've served no RFAs, which the Court has allowed them to serve up to 30.

So, Your Honor, the -- and opposing counsel did not mention *Cheney* at all, which is the seminal case, and the controlling case on this issue. And *Cheney* and its progeny make very, very clear that exhaustion must occur first prior to going to the next step in the process, which is under *Cheney*, after exhaustion is done, and the requesting party still believes that there's information that they need that they haven't been able to obtain from other avenues, they then have to make that showing and then draft narrowly tailored requests that could

then possibly be served on the White House.

THE COURT: Mr. Fox, could I ask you a question, please?

MR. FOX: Certainly, Your Honor.

THE COURT: With respect to exhaustion and your argument that they haven't taken any depositions and otherwise exhausted, and that they should be deposing all of these people on the Underwood email, are you telling me and the other parties to this call that they're welcome to take Ms. Underwood's deposition and ask her all about this email, and that she will answer those questions openly, truthfully, and there won't be a problem with that?

MR. FOX: Respectfully, no, Your Honor. Ms. Underwood, my understanding, works for the Executive Office of the President, and she would come within the shield of *Cheney*. What -- the point I was making, Your Honor, is that there are numerous people who received that email who work for the agencies whose deposition could be taken to learn about what was said at that meeting without having to go to the Executive Office of the President. That's -- that's -- that's -- the exhaustion in *Cheney* is to seek to obtain the information sought from other sources without having to -- to -- to -- to -- to go to the White House.

And, Your Honor, the constitutional collision that opposing counsel talked about during his argument, it has to do

with the fact that when discovery is served on the White House, and the White House then has to invoke executive privilege in response to certain requests, that then creates the friction between the Courts and the executive, and the Court having to rule on that privilege.

And so *Cheney* and the exhaustion and the narrowly tailoring of requests that might ultimately be served on the White House are all geared towards preventing that instance where the White House is having to invoke privileges, and then we have a Article III Court, you know, ruling on privileges invoked by -- by -- by -- by the chief executive, Your Honor.

THE COURT: So, Mr. Fox, I will admit that I have not read *Cheney* recently. In fact, I am not sure I have read it at all. Nobody called *Cheney* to the Court's attention before this hearing, nor has any briefing been provided to me. That's not surprising, because my procedure is to try to resolve discovery disputes in phone calls like this without extensive motion practice, briefing, et cetera.

But as I understand even what you've said about *Cheney*, *Cheney* doesn't hold that discovery against the Executive Office of the President is not possible. I'm not sure whether *Cheney* even addressed the issue of what type of discovery the EOP must comply with if they are a named defendant in the case. I just don't know the answers to the scope of *Cheney*.

What I do know, though, and I think you might agree

with me if you were able to do so, is that this Underwood email is extraordinary. I've never seen anything like it. I've never even imagined something like it. The very idea that the President of the United States or the Executive Office of the President would target a state because they don't feel that the state and its administrators are in line with the current administration's priorities, is phenomenal.

The Executive Office of the President and the president himself are elected to serve all the people and all the states, not just the states that voted for one side or the other, not just the states that line up perfectly with priorities, but all the people. In fact, there's an oath that's taken to that effect.

Did *Cheney* get into any of that? Was there a fact pattern even remotely like what they're alleging here that gave rise to *Cheney*?

MR. FOX: Your Honor, no. *Cheney* did not involve facts similar to this, other than the fact that the plaintiff in *Cheney* was seeking to serve discovery requests on the White House.

THE COURT: I think we could probably all agree that there's all kinds of litigation that gets filed. It gets filed against the president. It gets filed against Courts, gets filed against the DOJ. Anybody can file a lawsuit, and there have to be protections so that these people aren't harassed to death and

so that critical privileged information is kept that way and so forth. I get all of that.

But these are extraordinary times we're talking about, and this is an extraordinary memo. And it's very troublesome to this Court. And I think it would be very troublesome to most people if this were broadcast in the Denver Post, for example. This is -- this is something that I have never even conceived of before. Anyway, go ahead with your argument, Mr. Fox.

MR. FOX: Your Honor, I -- I -- I -- I'd just like to briefly note that, you know, the exhaustion in *Cheney* and the Courts post *Cheney* that have dealt with *Cheney*, for example *Karnoski versus Trump*, 925 Federal Third 1180, Ninth Circuit, 2019, *Cheney* and its exhaustion and narrowly -- narrow -- narrowing requirements are not based -- they're not fact-dependent.

And, Your Honor, I -- I -- I -- I appreciate what you are saying, but -- but *Cheney* and its progeny stand for exhaustion followed by narrowing. And, for example, in the *Karnoski versus Trump* case, the Ninth Circuit case that I have just mentioned, Your Honor, that -- that had to do with -- with weighty facts. It dealt with orders from, um, DOD and the ability of -- of -- of transgender people serving in the military, Your Honor.

So, you know, these -- these cases involve weighty facts, but, you know, *Cheney* stands for what *Cheney* stands for.

And, you know, again, Your Honor, we are -- we are more than happy to -- to brief this issue, and, you know, we would be, um, um, amenable to a -- a -- a -- um, you know, a -- a increased briefing -- you know, a -- a quicker briefing schedule than normal, but we -- we -- we just very strongly, um, um, believe, given the -- the separation of power concerns at the heart of *Cheney*, that -- that -- that these issues need to be briefed.

THE COURT: All right. Thank you, Mr. Fox.

MR. FOX: Yes. Yes, Your Honor. So, moving to -- and I will -- I will move to what is the second topic in the email provided by plaintiff's counsel. Your Honor, this -- you know, plaintiff is the master of their own complaint. They've alleged that two events led to the alleged threats or actions by the administration here. And those -- those two events are the fact that Colorado allows for mail-in voting and the prosecution of Tina Peters. Your Honor, the discovery that plaintiff seeks goes well beyond what they need to prove that the administration, um, under plaintiff's theory, unconstitutionally retaliated against Colorado because of Tina Peters and mail-in voting.

Your Honor, again, plaintiff has -- has already moved to amend their complaint twice, and haven't -- hasn't included any other acts or threats in those two, um, amendments, um, you know, obviously, you know, information can be learned after -- after the fact, Your Honor, but, you know, the fact those acts

or threats weren't included in a previous, um, amended complaint seems to -- seems to show that there's -- there's in fact not a reasonable basis to allege that -- that -- that those acts or threats have occurred.

THE COURT: I don't follow what you're saying. The fact that the administration was unhappy with the way Tina Peters was treated by the state -- by the state's legal system, or the fact that they don't appreciate mail-in voting may be motives for actions. But what's really at stake here is the scope of the actions that they are taking based on those motives. It's obvious from the Underwood email that they are focusing on Colorado and encouraging all these agencies to take actions against Colorado because they perceive Colorado isn't lining up with the administration's priorities.

I mean, the document says so. Comments about Tina Peters, comments about mail voting, comments about if Polis did a better job of lining himself up with the president, maybe the constituents would be better served, I remember that one from the food stamp piece of this case, we're talking about actions taken because of one or two or three motives. What they're saying is they want to know more about what is motivating this government to take actions against Colorado. That's what the case is about; right?

MR. FOX: Well, exactly, Your Honor. That -- the -- the case is about what is motivating the administration. And

the plaintiff's complaint makes very clear that what is motivating -- what is allegedly motivating the administration is mail-in voting and Tina Peters, and the requests that plaintiff have served in this case go well beyond seeking information about mail-in voting and Tina Peters.

For example, opposing counsel -- there's -- first, Your Honor, I -- I -- I recognize that the interrogatories and the RFPs are not presently in front of the Court. But there is -- is -- there is -- there are requests that we have been served which ask for all acts of Colorado's sovereignty, just extremely overly broad and burdensome requests that -- that -- that seek to -- that -- that pull -- that pulls in motivations, what that -- that go well beyond Tina Peters or mail-in voting, and plaintiff hasn't alleged in their complaint that anything other than mail-in voting and Tina Peters has formed the basis of the threats or actions that are alleged in the complaint.

And so that's -- that's where -- that's where the rubber hits the roads to us, Your Honor. It's that they're seeking information beyond Tina Peters and mail-in voting.

And I -- I'd also like to -- to point out one -- one last issue on -- on this point, Your Honor, just to advise the Court, we have -- we have met and conferred with -- with plaintiff's counsel several times. We have -- we've -- we've tried to -- tried to narrow the request that we've been served. We've been -- I've -- I feel like that we've both been acting in

good faith to -- to -- to try to narrow these requests, and we've -- actually have been able to come to agreement on -- on -- on some issues.

Now, going to the other state portion of -- of issue two, Your Honor, and as -- as -- as you indicated, that threats or acts completed or contemplated involving other states is so unbelievably overbroad and would -- and would create such -- such an undue burden on these nine federal agencies to -- to identify custodians, identify relevant search terms, search for the documents, review the documents, make a privilege log if applicable, it would -- it would -- it would be an extraordinary undue burden that is -- that is not proportional to the needs of the case, especially when here, Your Honor, the -- the plaintiff is -- is a single state, obviously. It is -- it is Colorado. No -- no other states' interests are -- are -- are at play here, and, Your Honor, in order for Colorado to prevail on their claim that the administration allegedly unconstitutionally, um, retaliated against the state because of mail-in voting and Tina Peters, what the administration did or didn't do vis-a-vis other states has no bearing on that ultimate question.

And so our -- our position is that any discovery on that is irrelevant. It would be unduly burdensome and not proportionate to the needs of the case.

And finally, Your Honor, moving to the -- the third point raised in plaintiff counsel's email on the oral

communications and the deleted communications, um, first, Your Honor, it -- it's the -- again, the requests are -- are unbelievably overbroad, and just the -- the practicalities of trying to identify every oral communication that federal employees had at these agencies about the -- the relevant conduct is -- is unbelievably unduly burdensome, and -- and frankly --

THE COURT: Mr. Fox --

MR. FOX: Yes, Your Honor.

THE COURT: I don't read this as being overbroad in the sense that they say communications related to actions or threats against Colorado. That's quite specific. And if it is impossible to recreate an oral communication, if it is impossible to recreate a deleted written communication, although often they can be recreated whether they're deleted or not, then so be it. If you can't do it, you can't do it, but that doesn't mean you're free not to try, does it?

MR. FOX: Well, Your Honor, I -- I respectfully -- as it goes to the oral comms, you know, just trying to track down every person that may have had an oral conversation is -- is -- trying to track that down is -- is an undue burden. Like, that that -- that in and of itself, trying to recreate that, is -- is -- is -- would be unbelievably unduly burdensome.

THE COURT: In other words, there are so many oral communications and so many written communications about actions

or threats against Colorado that it's an undue burden to even try to find them all? Now, if that's the position, take that position in response to an interrogatory, and the State will do what it can with that. It's hard for me to believe that there are that many communications out there focused on putting it to the State of Colorado, but maybe there are.

And you keep saying Tina Peters and mail-in voting. Those might be the only motivations. There might be other motivations. There might be other reasons why, if it is the case, the EOP or the President of the United States are targeting Colorado. That's what they're trying to figure out.

It's extraordinary that the federal government would target a state and retaliate against a state because they don't like the state's politics. That's not the country I think we live in. But if that's what is happening, that's what they want to find out about and then do what they can to stop it.

They're not looking for oral communications and written communications about other things that they may or may not agree with that the administration is doing. They're looking for why, how, when, by whom the top of the federal government is trying to take retribution against Colorado for things that the administration perceives as against its desires or priorities. That's what they're doing. I don't see how that's so burdensome.

MR. FOX: Well, Your Honor, if I may, briefly, first,

you know, I -- I -- I cannot comment on the number of possible oral conversations, but it's -- it's -- it's -- from the fact that there are -- that there are hundreds of thousands of federal employees at these agencies, and -- and -- and it would be impossible for somebody to verify these interrogatories and verify under penalty of perjury that -- that all oral comms regarding whatever topic were -- were included in response to that interrogatory.

THE COURT: Well, then you answer the interrogatory that way. You don't object to the interrogatory and say we won't answer it. You answer it and say, there may be so many of these relevant communications that we can't even get our hands around them. We can't even count them. We can't even make sure we got them all. You do that. That's what happens in discovery. You just don't say, well, we're not going to answer your question, go away.

MR. FOX: Understood, Your Honor. And -- and -- and, you know, I would -- I would also just like to again note, you know, there are -- I'm -- I'm looking at interrogatory number 14, which specifically asks for identify all, um, defendants' comms regarding Colorado's exercise of sovereign authority. That's from a -- a -- a -- our reading of that interrogatory, that asks for all comms by an employee -- a federal employee of one of the agencies sued, including oral comms about Colorado's exercise of sovereign authority.

Your Honor, that is such an overly broad question that that -- that that is not -- it -- it's -- again, I -- I -- I understand where the Court is coming from, and -- and -- and -- and I take to heart what you've mentioned earlier about being able to couch your answer to some of these interrogatories, Your Honor, but that is -- that is an impossible interrogatory to respond to.

THE COURT: Right. You seem almost apoplectic about it. I don't want you to have a heart attack here. I don't necessarily disagree with you. I have never seen interrogatory 14. I have only heard you say what it was. But it sounds to me as if it potentially is overbroad and burdensome. And that is why competent counsel sit down together, as you say you and Mr. Moskowitz have done, and you narrow it down. What they really want is to find out why Colorado is targeted and how they've gone about the process of targeting them. That's basically what their case is about. And you lawyers are smart enough to narrow that number 14 interrogatory to focus more precisely on what it is they're going for.

They're not trying to find out, because they undoubtedly realize it's impossible, every oral communication at the lowest level of the Department of Energy about what's going on with Colorado these days. They're trying to figure out from the top down what's going on where an administration is apparently targeting Colorado for retribution and retaliation,

which, again, to me, makes no sense in our democracy.

Do you have anything else to say, Mr. Fox?

MR. FOX: Your Honor, thank you very much for your time. I have nothing further to say. Thank you.

THE COURT: All right. Mr. Moskowitz, do you have any further remarks to make?

MR. MOSKOWITZ: If I could, Your Honor, with the Court's indulgence? I wanted to address a couple of items. First, on the -- that we said *Cheney*, and this was an ordinary lawsuit. We 100 percent agree with the Government that this is not an ordinary lawsuit. It's shocking that we are where we are, because I don't think in the history of this country, we've dealt with a situation where a state was targeted in this manner until this administration.

And *Cheney* involved a situation where it involved a state or a -- an attempt to get discovery that everyone agreed was overbroad and beyond the federal -- it was a Federal Advisory Committee Act claim. It's a purely procedural claim under statute. And there was this dispute about whether FACA even applied or not, and they were doing discovery into whether it applied. And long story short, the Supreme Court was concerned, and overall everybody decided, FACA in fact didn't apply, and so all that discovery was unnecessary.

But the primary holding of that case was that the executive branch did not need to assert executive privilege

prior to challenging discovery. That was what the mandamus was granted on, and the focus is that of protecting the executive branch from vexatious litigation. We don't disagree that in the run-of-the-mill case, there are separations of powers concerns where if any litigant can simply add EOP to a case that they can, you know, get discovery from the White House.

But this isn't, for the reasons I explained before, the run-of-the-mill case. It's extraordinary, and it's extraordinary because the scheme was run directly out of EOP. They have the evidence that nobody else has. And so the District Court in that case had ordered discovery, and had not allowed the United States to challenge discovery, and said they had to first assert executive privilege. And that's what -- the case was overruled.

Now, there is a discussion in there about the concerns of the separation of powers concerns, and the line that they're quoting for this purported exhaustion thing is that in recognition of these concerns, there are sound precedents in the District of Columbia itself for District Courts to explore other avenues short of forcing the executive to invoke privilege when they are asked to enforce against the executive branch unnecessarily broad subpoenas.

That's where this whole thing comes from. It's a dicta line discussing broadly that, you know, where the evidence is available elsewhere, you should explore other avenues. We've

been exploring the other avenues. We don't have any reason to believe that the people from these agencies know anything about this. And I would note that while they say we could go depose every single one of these people on the list of the agencies on this email, when we asked them for which people had anything to do with these actions, almost none of these individuals are even on that list. They've told us that they don't have any information about this.

So, while we think that they clearly have some, but we don't know if they attended the call or not, if they sent somebody else. We have no idea who actually attended the call, because they won't give us any information about any oral communications or meetings and the like. And we don't have -- you know, I think you can ask them, if you asked those people at the -- at that meeting, would they know why EOP was targeting Colorado? I think they'd say the answer is no. They would just have to speculate. Like, they have a good guess, but I don't know that -- but we don't have any reason to believe that the White House told the agencies we're targeting Colorado for Tina Peters or we're targeting Colorado because it's a sanctuary jurisdiction or whatever ended up being the motivation. We don't have any reason to believe it.

And when we've asked for this in the explanation of the things that they considered and what motivated this, from these agencies in interrogatory responses, we have gotten none of

that. Not one of them identified any of those things, and we don't have any reason to believe the agencies know. Only EOP knows this. And so we've explored other avenues, but we're not required to spend months and months and months going down fruitless avenues to avoid seeking evidence from the party that is responsible for this action.

Second, I'd just like to note that -- oh. A second thing on this is that a big concern in *Cheney* is about forcing the Government to raise executive privilege, and that they can't object to discovery first, that they needed to raise executive privilege. Well, they've already raised executive privilege here. So, it seems hard to understand what the different burden would be between the executive burden that -- or the executive privilege that they've already raised and that we're going to have to like address already in this Court, versus having EOP for whatever small number of documents it has, raise executive privilege.

Third, there are -- beyond *Cheney*, there are a number of court decisions. They overread *Cheney* by a lot, because the holding is actually far narrower. The Supreme Court has completely reiterated that even discovery on the president may be appropriate in certain circumstances. So, for example, in *Trump versus Mazars* in 2020, they said, we have held that burdens on the president's time and attention stemming from judicial process and litigation without more generally do not

cross constitutional lines.

200 years ago, it was established that presidents may be subpoenaed during federal criminal proceedings. And earlier today, we extended that to state criminal proceedings. Nearly 50 years ago, we held that a federal prosecutor could obtain information from a president despite assertions of executive privilege, and more recently removed the rule that private litigants could subject a president to a damage suit and appropriate discovery obligations in federal court.

And elsewhere, the Supreme Court has ruled, for example, even while granting damages immunity to the president, they have recognized that the president -- when judicial action is needed to serve broad public interests as when the Court acts not in derogation of the separation of powers, but to maintain their proper balance or to vindicate the public interest in an ongoing criminal prosecution, the exercise of jurisdiction has been held warranted.

And what we have here is a situation where we're asking to get discovery from EOP after having examined alternative avenues, found they're not -- the information is not available, that the broad public interests here, because of this unique attack on the State of Colorado in violation of core federalism, state sovereignty principles, warrants allowing this discovery into EOP.

THE COURT: All right. Are you finished?

MR. MOSKOWITZ: I think that's it. Yes.

THE COURT: Okay. So, to remind everyone, we're here today for a hearing on a discovery dispute violation. Nothing has been briefed. No proposed findings of fact have been submitted. Consistent with this Court's practice in civil litigation, I hear these discovery disputes and attempt to resolve them quickly, clearly, and without the need for excessive motion practice.

I will leave it to you lawyers to decide whether you think you need further motion practice, further briefing, further proposed findings, and you can do what you need to do, but I need to resolve a discovery dispute this morning.

When this case, State of Colorado versus Trump, was initially filed, if I remember correctly, the focus was on the decision to move the Space Command from Colorado to Alabama. And the allegation, among others, was that that proposed action was motivated by animus against the State of Colorado for various things that the administration disagreed with. There's been a lot of talk today about the treatment of Tina Peters. There has been talk about mail-in voting. Whatever the motivation was, the claim was that Colorado was targeted, and it was being treated badly as a result.

I have some familiarity with a second phase of this trial -- this case, when the whole issue about the SNAP program and putting Colorado through what turned out to be an impossible

chore pilot program that would likely have cost many Colorado people their food stamps and so forth, whether that too was motivated by animus against Colorado. And there were people associated with the administration who couldn't resist the opportunity to speak publicly and say things such as, if Governor Polis would play ball with the administration, then maybe things would turn out better for the people he represents here in Colorado.

We've been through that whole SNAP program phase already in this case, but what is the most extraordinary thing of all, from this Court's perspective, is this email from Emily A. Underwood, who is at the Executive Office of the President, to a whole list of people, some of whom are at the EOP, some of whom are at the Office of Management and Budget, some of whom are in the various agencies such as HUD, Department of Energy, and others.

And I want to read so that anybody who reads this record will clearly understand what my concern is about this memo. She calls it a brainstorm call. This was December 15th, 2025. And in this email to all these people, she says, and I'm quoting, the purpose of this call is to prioritize Colorado for the purposes of ensuring grants and federal support are in line with administration priorities. Please come prepared to discuss immediate actions that your department or agency can take with respect to Colorado. Please do not forward this invitation or

include others on the call without discussing with me first. Thank you.

Mr. Moskowitz at the beginning of his remarks today listed a number of things, I don't even remember them all, which he says were retribution against Colorado that began to happen on this very day and within the next few days, apparently in response to the brainstorm call that Ms. Underwood convened.

This is not a typical or an ordinary case. I respect, obviously, the Supreme Court's thinking and decision in *Cheney*. I respect the need to protect the president and the Executive Office of the President and people working there from everyday litigation, from frivolous litigation, from the burdensome litigation while they're trying to run the country. I get all of that.

But even in *Cheney*, it was noted, and Mr. Fox candidly noted that discovery of this nature is a last resort. It is not impossible. It is not prohibited. It is not to be just avoided in every case. He -- Mr. Fox suggests that the plaintiff has to explore other avenues first, exhaust their opportunities to obtain the information from, for example, all these recipients of the Underwood email. Of course, several of the recipients are part of the EOP or OMB, and Mr. Fox candidly indicated that they wouldn't respond to depositions voluntarily.

These other people were given instructions and asked to come up with ways to penalize Colorado, but they weren't the

ones that were making the decisions to do these things.

Here, the Executive Office of the President is a named defendant. It is a named defendant in part because it did apparently organize this meeting to find new ways to hurt Colorado. It is beyond my comprehension that they would do such a thing, but having done such a thing, having been the people who initiated this meeting and this procedure, I can't even conceive that they would then say, we're a party, but we don't choose to participate in discovery. It just doesn't work that way.

So, in response to the three issues that were raised by the plaintiff, the State of Colorado, today, I have the following to say:

Number one, they say the defendant Executive Office of the President, including its component Office of Management and Budget, objects to and refuses to participate in discovery. My response, nuts to that. They're a party. They're obviously very centrally involved in the issues, and they are ordered by this Court to participate in discovery like any other party.

Number two -- again, the numbering comes from the email that was submitted to the Court before the hearing. It says, defendants' position that discovery must be confined to specific actions taken against Colorado that have been pleaded in the complaint rather than other information also relevant to plaintiff's claims, including the first subpart, federal actions

or threats directed toward Colorado but not specifically cited in the complaint, I find that is entirely relevant and appropriate.

The focus is on actions, threats, harms directed towards Colorado. The plaintiff's lawyers might not even know how many of these have been ordered by the administration, but it's very relevant to scoping out the motive, scoping out the target, scoping out the means that the administration has chosen to hurt Colorado.

Now, I am inclined to agree with Mr. Fox with respect to the second part of item two, where the State wants discovery about federal actions or threats towards other states bearing on whether Colorado was targeted for disparate treatment. If we're talking about federal actions or threats toward states that have been linked together with Colorado as targets, I have no problem with the discovery. But if we're just talking about actions or threats against any old state having nothing to do with Colorado, because the president or his people have some other beef against that state, let's say the State of Indiana, they for whatever reason might have a gripe against Indiana, and there are memos like Ms. Underwood's that convene meetings to figure out ways to target Indiana for retribution, I don't consider that to be relevant. I do agree that trying to go through all of that would be unduly burdensome, and so to that extent, I agree with Mr. Fox.

Item number three, defendant's refusal to provide interrogatory responses regarding oral communications, e.g. meetings, phones, phone calls, et cetera, or deleted written communications, e.g. Signal chats related to the actions or threats against Colorado, that isn't overly broad. It's focused on one topic, and that is threats or actions against the State of Colorado. And any -- EOP or OMB or other defendant, oral communications, written communications, deleted or not, that relate to the actions or threats that have been taken or were requested to be taken against Colorado is fair game.

Now, Mr. Fox says it may be impossible to identify all such oral communications. It may be impossible to identify or recreate deleted written communications. If so, then they answer the interrogatory that way. It would seem odd, perhaps, that there have been so many threats and so many communications about taking action against Colorado that it would be burdensome to track them all down, but if that's the position the defendants wish to take, they have to say so in response to the interrogatories. And then if there's a dispute about that, we can deal with it.

So, those are the Court's rulings basically in agreement with the State of Colorado on items one, two, 2A, and three, but in agreement with the defendant on item 2B. Is there anything else this morning?

MR. MOSKOWITZ: Your Honor, this is David Moskowitz.

Just one clarification, which I think was covered, but one of the -- like, encompassed within the threats and actions against Colorado, we had discussed that we wanted, like, all motivations, because we wanted to understand everything, and that -- I just want to make clear on the record that this would cover motivations that are not just Tina Peters or mail-in voting. For example, if they were also motivated in these actions by the so called labeling of Colorado as a sanctuary jurisdiction, that that would be encompassed within these.

THE COURT: Absolutely. Whatever the reasons are for the administration's targeting Colorado -- and I can say targeting of Colorado rather than alleged targeting now, because I've read Ms. Underwood's email. Whatever the motivations for doing this kind of thing are ought to come out, ought to be produced, ought to be discussed, ought to be dealt with, and one would hope ought to be reversed by the people who have decided that it's a good idea to take such negative actions against a particular state.

Mr. Fox, anything further on your end?

MR. FOX: Yes, Your Honor. Briefly. Again, you know, it seems like that the Court has -- the Court has indeed ruled. We would again request that these issues be briefed, and object to the Court ruling without briefing. And, you know, we -- the Government also requests that the Court hold its order today and stay it for 14 days so as to allow the Government to consider

whether to seek mandamus.

THE COURT: All right. The latter request is denied. As far as briefing is concerned, if the Government thinks it's necessary and a worthwhile use of their time and the Department of Justice's time to file a motion for reconsideration and brief it, they can do that. All right. That concludes the hearing. Good day.

(Proceedings concluded at 11:34 a.m.)

REPORTER'S CERTIFICATE

I, KEVIN P. CARLIN, Official Court Reporter for the United States District Court for the District of Colorado, a Registered Merit Reporter and Certified Realtime Reporter, do hereby certify that I reported by machine shorthand the proceedings contained herein at the time and place aforementioned and that the foregoing pages constitute a full, true, and correct transcript.

Dated this 12th day of August, 2026.

Kevin P. Carlin, RMR, CRR
Official Court Reporter

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 25-cv-3428-RBJ

THE STATE OF COLORADO,

Plaintiff,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al*.,

Defendants.

---

**PLAINTIFF'S MOTION FOR FURTHER PROPOSED FINDINGS**

---

Defendants have indicated that they intend to file a mandamus petition with respect to the Court's order requiring that the Executive Office of the President (EOP) participate in discovery. During the hearing, Plaintiff requested that the Court make certain findings. The Court noted that it did not have any proposed findings, consistent with its practice standards, but permitted either party to submit further briefing or proposed further findings. ECF No. 102, ("Tr.") at 40 (leaving it to the parties "to decide whether [they] think [they] need further motion practice, further briefing, further proposed findings"). While Defendants have now determined not to seek additional briefing, despite repeated earlier requests, Tr. at 27, 46-47, Plaintiff submits these proposed findings with evidentiary support consistent with the Court's invitation. These findings can be taken under this Court's consideration and provide a complete understanding of the Court's ruling. They also will ensure that the Tenth Circuit has a fulsome record on review and will prevent any distortion of the record. For example, Defendants have indicated they intend to argue the Court failed to consider separation-of-powers concerns. But together with the hearing

transcript, these proposed findings reflect the Court's consideration of such concerns in its ruling.

At the hearing, Defendants identified two cases as relevant for the Court's consideration (Tr. at 21-23, 26): *Cheney v. U.S. District Court*, 542 U.S. 367 (2004), and *Karnoski v. Trump*, 926 F.3d 1180, 1205 (9th Cir. 2019). Both are distinguishable from this case.

In *Cheney*, the Court addressed errors by the lower courts, which refused to narrow significantly overbroad discovery requests against the Vice President and his close advisors. *Cheney* involved alleged violations of the Federal Advisory Committee Act (FACA). The Supreme Court held that the lower courts wrongly ignored attempts to narrow the overbroad discovery, mistakenly believing that the only option to narrow the requests was for the Executive to assert executive privilege. *Cheney*, 542 U.S. at 389 ("Contrary to the District Court's and the Court of Appeals' conclusions, *Nixon* does not leave them the sole option of inviting the Executive Branch to invoke executive privilege while remaining otherwise powerless to modify a party's overly broad discovery requests."). While recognizing that courts must take into consideration separation-of-powers concerns and protecting the Executive from "vexatious litigation," it reaffirmed that even the President is not above the law and that discovery may be appropriate when necessary for "the fair administration of justice." *Id.* at 382.

The Court was also concerned about unnecessary collisions between the Judiciary and the Executive. "In recognition of these concerns, there is sound precedent in the District of Columbia itself for district courts to explore other avenues, short of forcing the Executive to invoke privilege, when they are asked to enforce against the Executive Branch unnecessarily broad

subpoenas." *Id.* at 390. But the Court refused to determine that all discovery was improper, noting only the lower courts "should be mindful of the burdens imposed on the Executive Branch in future proceedings." *Id.* at 391. On remand, the D.C. Circuit ruled that FACA did not apply at all to the circumstances, underscoring the concerns animating the Supreme Court's decision about unnecessarily overbroad discovery. *In re Cheney*, 406 F.3d 723 (D.C. Cir. 2005) (en banc).

*Karnoski* is an even narrower decision. As in *Cheney*, "the district court appears to have 'labored under the mistaken assumption' that the President had to assert the presidential communications privilege to the specific documents covered by Plaintiffs' discovery requests before Defendants could lodge a separation-of-powers objection." 926 F.3d 1180, 1204–05. But the Court did not indicate that discovery from the Executive was off limits. To the contrary, it gave lengthy guidance on how the lower court should apply executive privilege as the case proceeded. *Id.* at 1205-07.

As detailed below, the Court should make the further findings, consistent with the application of *Cheney* to this case.[1] A draft set of proposed findings is attached to this motion for the Court's convenience.

[1] Defendants have indicated that they oppose the Court making additional findings. But they have pointed to no law preventing a court from making further findings in support of an oral ruling. To the contrary, Rule 54 allows a court to revise any decision at any time prior to entry of judgment.

## PROPOSED FURTHER FINDINGS

**1. The evidence sought is directly relevant, tailored, and not available elsewhere.**

The Complaint alleges a scheme orchestrated directly by EOP to attack, retaliate against, and punish Colorado for the lawful exercise of its sovereign authority, including the prosecution of Tina Peters, the use of mail-in voting, and so-called "sanctuary" laws. The evidence produced for the Court's review (Exhibit 1), which the Court discussed at length, is extraordinary evidence that EOP directed this attack against Colorado, including directing departments and agencies to "come prepared to discuss immediate actions that your department or agency can take with respect to Colorado." Ex. 1. Following that meeting on December 15, beginning the next day, the Executive Branch took and announced an unprecedented set of actions and threats targeting Colorado, described during the hearing and in the Complaint. Defendants produced evidence showing that the agencies took these actions at EOP's request and that EOP was directly involved in approving the actions. *E.g.*, Ex. 2, Ex. 3.

The Court's oral discovery order made clear that it was permitting discovery into the targeting of Colorado (but not other States), including the motivations for targeting Colorado. Tr. at 43-46. This evidence is directly relevant and tailored to the claims asserted. By ordering that EOP participate in discovery, the Court indicated that this tailored discovery is directly relevant and that EOP's across-the-board refusal to participate is unwarranted in the extraordinary circumstances of this case. EOP remains free to lodge objections, including separation-of-powers objections, to any particular discovery requests, and the Court can consider those objections in due course.

Consistent with *Cheney*, the Court has explored other avenues to obtain this directly relevant evidence but determined that EOP's participation in discovery is necessary in the unique and extraordinary circumstances of this case at this juncture in discovery. Given EOP's unique role in directing the targeting of Colorado, EOP has critical evidence not available from any other source, including regarding the motivations for targeting Colorado. EOP is not required to reproduce documents that Defendant Agencies have already produced. But Plaintiff has represented that despite months of discovery and substantial discovery requests made, Defendant Agencies have produced no documents or revealed any information as to EOP's motivations for targeting Colorado.[2] But even if they had, it is clear that the party orchestrating the targeting of Colorado possesses unique information that cannot be replicated elsewhere both as to the scope of the targeting and EOP's motivations.

Other discovery responses from Defendant Agencies further indicate that EOP has evidence not available elsewhere. Defendant National Science Foundation, for example, when asked by interrogatory to explain its actions in dismantling the National Center for Atmospheric Research (NCAR), stated that they were taken "at the direction of OMB." Defendants

[2] Defendants argued that Plaintiff could exhaust more discovery requests, but there is no reason to believe that asking the same questions in different ways will lead to different results. Nor does that address the unique evidence and information that only EOP has access to.

Defendants further suggested as to the December 15 meeting, Plaintiff could depose all the non-EOP participants as to the substance of that meeting. But as addressed below, Defendants have asserted executive privilege, including presidential communications privilege, as to all substantive communications involving EOP officials, such as Emily Underwood. Defendants have made no representations that they will not invoke executive privilege as to the substance of the December 15 meeting, as they have to all other similar meetings and conversations.

Department of Homeland Security and FEMA likewise responded that the interrogatory was not applicable to their agencies, pointing back to EOP and the President for the decisions to deny Colorado disaster relief.

Further, during the targeting of Colorado, an EOP official emailed the media a statement: "Maybe if Colorado had a governor who actually wanted to work with President Trump, his constituents would be better served." ECF No. 78 ("Compl.") ¶ 93. Only EOP has access to discovery surrounding this threat, including the copy of the email and the identity of the individual issuing the threat.

Stipulations of fact are another alternative that could narrow discovery. But Plaintiff represented, and Defendants did not dispute, that Defendants have failed to offer any stipulations despite repeated offers from Plaintiff.

In sum, EOP has critical evidence not available elsewhere that is directly relevant to the core issues of this case. EOP is not a bystander in this case. The evidence provided shows that EOP is the key player that orchestrated the scheme to target the State of Colorado for punishment and retaliation. Having considered available alternatives, EOP has access to critical, unique information not available elsewhere that goes to the heart of the case.

**2. The weighty need for this evidence overcomes separation-of-powers concerns.**

In reaching this decision, the Court carefully considered Defendants' separation-of-powers objections. The Court did not mistakenly assume that executive privilege must be asserted before considering separation-of-powers objections. The Court fully recognized the unique role of the President, the special considerations with the Executive Branch's interests in

maintaining autonomy and safeguarding the confidentiality of its communications, the intrusions and burden from discovery, and the need to protect the Executive Branch from vexatious litigation. Those important separation-of-powers concerns are weighty, and the Court did not minimize them. But those concerns are also only one facet of the problem. *Cheney*, 542 U.S. at 385. The Court must also weigh Plaintiff's need for the information and the weighty constitutional claims at issue. Here, those factors overcome Defendants' separation-of-powers concerns.

This case is starkly different from *Cheney.* Not only did *Cheney* concern vastly overbroad discovery unnecessary to the resolution of the case, but it also involved no counterbalancing constitutional claims. The Supreme Court recognized that, at worst, the inability to obtain the requested discovery would make it "more difficult for private complainants to vindicate Congress' policy objectives under FACA." *Id.* at 385. In contrast, this case involves the unprecedented attack by the Executive against Colorado, one of 50 co-equal sovereign states. The evidence shows the attack was directly orchestrated by EOP. Discovery is narrowly tailored to the targeting of Colorado, including the Executive's motivations for attacking Colorado. This critical evidence is necessary to allow Colorado to present its weighty constitutional claims that the Executive infringed its sovereignty and violated the Tenth Amendment. This case is not vexatious. It is brought by a sovereign State to protect its own sovereignty. This is no ordinary litigation, where the balancing would be quite different.

The Court thus must consider the critical need for the information described above and that the claims directly implicate the Constitution's core federalism and dual-sovereignty

principles. As the Supreme Court has emphasized, "the Constitution divides authority between federal and state governments for the protection of individuals. State sovereignty is not just an end in itself: 'Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power.'" *New York v. United States*, 505 U.S. 144, 181 (1992). "Just as the separation and independence of the coordinate branches of the Federal Government serves to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991). Denying this critical discovery, unavailable elsewhere, would harm Colorado's ability to present its weighty constitutional claims and unnecessarily delay these proceedings.

The Supreme Court has repeatedly recognized that the President is not above the law. "[W]e have long held that when the President takes official action, the Court has the authority to determine whether he has acted within the law." *Clinton v. Jones*, 520 U.S. 681, 703 (1997) (holding that the President is subject to discovery and trial while serving as President). Since the early days of the republic, it has been recognized that "[t]he propriety of introducing any paper into a case, as testimony, must depend on the character of the paper, not on the character of the person who holds it." *United States v. Burr*, 25 F. Cas. 30, 34 (C.C.D. Va. 1807) (Marshall, C.J.) (upholding a document subpoena served directly against the President). The "burdens on the President's time and attention stemming from judicial process and litigation, without more, generally do not cross constitutional lines." *Trump v. Mazars USA, LLP*, 591 U.S. 848, 871 (2020); *see also Clinton*, 520 U.S. at 703 ("[I]t is also settled that the President is subject to

judicial process in appropriate circumstances"). Such discovery is appropriate where, as here, "judicial action is needed to serve broad public interests." *Nixon v. Fitgerald*, 457 U.S. 731, 754 (1982).

Consistent with this case law, the Court has concluded that the extraordinary circumstances of this case override Defendants' separation-of-powers concerns. The directly relevant, critical discovery from EOP, focused specifically on the targeting of Colorado, will not significantly impair the Executive Branch's conduct of its constitutional duties. But the weighty need for the evidence for these constitutional claims—in support of the Court's important truth-seeking functions—override Defendants' separation-of-powers concerns.

**3. Defendants have already broadly invoked executive privilege.**

Much of the Supreme Court's concern in *Cheney* was focused on avoiding unnecessary collisions between the Judiciary and the Executive Branch when there are available alternatives to avoid unnecessarily broad discovery. *Cheney*, 542 U.S. at 389 ("Contrary to the District Court's and the Court of Appeals' conclusions, *Nixon* does not leave them the sole option of inviting the Executive Branch to invoke executive privilege while remaining otherwise powerless to modify a party's overly broad discovery requests."). "Once executive privilege is asserted, coequal branches of the Government are set on a collision course. The Judiciary is forced into the difficult task of balancing the need for information in a judicial proceeding and the Executive's Article II prerogatives." *Id.* In *Cheney*, the lower courts failed to consider options to narrow unnecessarily overbroad discovery that would have fully avoided the invocation of executive privilege and thereby avoided this collision between the branches.

This case is vastly different. Not only is the discovery directly relevant and tailored, *see supra*, the Executive has already broadly asserted executive privilege more than a thousand times, including the presidential communications privilege more than 100 times.[3] *See* Ex. 4 (privilege log excerpts). Indeed, the Executive has asserted presidential communication privilege over every single substantive communication involving Emily Underwood, the organizer of the scheme to target Colorado for retribution. *See, e.g.*, Ex. 3. Plaintiff expects to challenge these privilege assertions shortly. The Court is thus already forced to make the difficult balance between the need for this information against the Executive's Article II prerogatives. Put differently, the collision is already here. This case thus differs substantially from *Cheney* where the lower courts could avoid ruling on executive privilege through alternative routes.

**4. Further delay is unwarranted.**

The Court further considered that discovery from EOP is necessary at this juncture in the case and that further delay is unwarranted. Defendants agreed to and jointly proposed the Scheduling Order adopted by the Court. According to the schedule to which Defendants agreed, discovery is supposed to close at the end of October. Defendants did not request staged discovery, nor did they seek to stay discovery, either as to EOP or as to the case as whole. Instead, EOP unilaterally decided not to participate in discovery across-the-board. At this point in time, where the discovery deadline is fast approaching, the Court has determined that further

---

[3] Plaintiff represents that Defendants have asserted deliberative process or presidential communications privilege, in full or part, with respect to more than half of all documents and with respect to large portions of the interrogatory responses.

delay is unwarranted. The Court has fully considered Defendants' separation-of-powers concerns in its management of the case, including the "timing and scope of discovery." *Clinton*, 520 U.S. at 707. Based on that consideration and the Court's broad authority to manage its docket, the Court determined that the tailored discovery from EOP focused specifically on the targeting of Colorado is necessary at this juncture.

**5. OMB's refusal to participate in discovery is particularly without merit.**

During the hearing, Plaintiff further identified that the Office of Management and Budget's (OMB) broad refusal to participate in discovery is especially without merit. Tr. at 6:11-22. OMB is an administrative agency located within EOP. Because of significant independent functions extending far beyond simply advising the President, OMB along with several other agencies within EOP have long been held to be agencies subject to both the Administrative Procedure Act (APA) and the Freedom of Information Act (FOIA). *See, e.g.*, *Sierra Club v. Andrus*, 581 F.2d 895, 902 (D.C. Cir. 1978). In other words, anyone in the world can submit a FOIA request, and OMB is required by law to respond. Yet here, OMB erroneously claims exemption from all discovery. OMB has further been ordered to provide (or has provided without objection) discovery in numerous other targeting cases, including *Illinois v. Vought*, 1:26-cv-01566 (N.D. Ill.) (ECF No. 50); and *California v. Wright*, No. 3:26-cv-01417-RFL (N.D. Cal.) (ECF No. 112).

When presented with these specific arguments regarding OMB, Defendants did not offer any response, including no citation to case law or any analysis specific to OMB.

There is no basis for OMB to refuse to participate in discovery, especially where the

evidence shows actions to retaliate against Colorado, for example, the dismantling of NCAR, were taken expressly "at the direction of OMB."

**CONCLUSION**

The Court should make additional findings in support of its prior oral ruling, as reflected in the attached draft set of proposed findings.

Dated: August 19, 2026

Respectfully submitted,

**PHILIP J. WEISER**
Attorney General of Colorado

/s/ David Moskowitz
David Moskowitz, *Deputy Solicitor General*
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
david.moskowitz@coag.gov
Counsel for the State of Colorado

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 25-cv-03428-RBJ

THE STATE OF COLORADO,

Plaintiff,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

Defendants.

---

**DEFENDANTS' OBJECTIONS AND RESPONSES TO
PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION**

---

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Defendants[1] hereby respond to Plaintiff's First Set of Requests for Production of Documents, as follows.

[1] President Trump, in his official capacity, and the Executive Office of the President; Pete Hegseth, in his official capacity as Secretary of War (and the Department of War); Troy Meink, in his official capacity as Secretary of the Air Force (and the Department of the Air Force); Sean Duffy, in his official capacity as Secretary of Transportation (and the Department of Transportation); Brooke Rollins, in her official capacity as Secretary of Agriculture (and the Department of Agriculture); Chris Wright, in his official capacity as Secretary of Energy (and the Department of Energy); Doug Burgum, in his official capacity as Secretary of the Interior (and the Department of the Interior); Markwayne Mullin, in his official capacity as Secretary of Homeland Security (and the Department of Homeland Security); Robert Fenton, in his official capacity as Senior Official Performing the Duties of Administrator of the Federal Emergency Management Agency ("FEMA") (and FEMA); and Brian Stone, in his official capacity as Senior Official Performing the Duties of Director of the National Science Foundation ("NSF") (and NSF).

**REQUEST FOR PRODUCTION NO. 1:** All documents, electronically stored information, and communications regarding each of the actions or threats against Colorado, its political subdivisions or instrumentalities, or entities within Colorado described in the operative Complaint, whether dated before or after the action, including but not limited to those reflecting how and why Defendants took each action or threat, the timing of each action or threat, any costs and/or benefits that Defendants considered, the implementation of each action or threat, and whether Defendants considered the same and/or a similar action or threat against any other states, political subdivisions or instrumentalities of other states, or entities within other states and why they were or were not subjected to the same and/or a similar action or threat.

**OBJECTIONS AND RESPONSE TO RFP 1:** Defendants object to this Request because it seeks documents and communications "whether dated before or after the action," which is vague and overbroad as to timeframe. Defendants interpret this Request to encompass the timeframe January 20, 2025, to January 8, 2026 (the date of filing of the Amended Complaint).

Defendants further object to this Request because it does not define the "actions or threats against Colorado" about which it seeks discovery. Defendants interpret the "actions or threats against Colorado" to refer to the conduct challenged in the Second Amended Complaint ("SAC", ECF 78), as follows: (i) with respect to the Departments of War and Air Force, the decision to relocate U.S. Space Command Headquarters (SAC ¶ 78); (ii) with respect to the Department of Transportation, the decision to withdraw four awards, and terminate one grant agreement, constituting approximately $109 million that had been allocated to Colorado entities (*see* ECF 80 (stipulation)) and the decision to select recipients for FY2025 Safe Streets and Roads for All grants (SAC ¶ 106); (iii) with respect to the Department of Energy, "plans to terminate $615 million in DOE funds earmarked only for Colorado" (SAC ¶ 91); (iv) with respect to the National Science Foundation, its announcement regarding restructuring the National Center for Atmospheric Research (SAC ¶ 93); (v) with respect to the Department of Agriculture, its direction to Colorado to comply with a SNAP pilot project (SAC ¶ 97); (vi) with respect to the Federal Emergency

Management Agency, a component of the Department of Homeland Security, the alleged denial of two disaster relief assistance requests (SAC ¶ 101); and (vii) with respect to the Department of Interior, "compil[ation] [of] a list of all grants earmarked for Colorado, its instrumentalities, and political subdivisions for possible termination" (SAC ¶ 109)—henceforth, collectively, the "Challenged Conduct."

Defendants also object to this Request because it seeks irrelevant information that is also not proportionate to the needs of the case, particularly, information regarding Defendants' contemplated conduct toward non-parties ("whether Defendants considered the same and/or a similar action or threat against *any other states, political subdivisions or instrumentalities of other states, or entities within other states*" (emphasis added)). That aspect of this Request is further objectionable because it is vague and overbroad insofar as it seeks information about "similar" conduct towards "political subdivisions," "instrumentalities," and "entities" within other States. Plaintiff's Counts One and Two challenge that Defendants have discriminated against the State of Colorado because Colorado allows mail-in voting and prosecuted former County Clerk Tina Peters. Undefined "similar" conduct towards the other 49 States is not relevant to this issue, and even if it were, it is not proportionate to the needs of this single-Plaintiff case.

Defendants further object to this Request because its request for information about non-parties facially seeks information that is protected by at least the deliberative-process privilege ("whether Defendants *considered* the same and/or a similar action or threat against any other states, political subdivisions or instrumentalities of other states, or entities within other states" (emphasis added)). The deliberative-process privilege shields "documents reflecting advisory opinions, recommendations and deliberations compromising part of a process by which governmental

decisions and policies are formulated." *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). Recognizing that "officials will not communicate candidly among themselves if each remark is a potential item of discovery," the deliberative-process privilege is primarily designed to "enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government." *Id.* at 8–9 (cleaned up). It further serves to prevent the premature disclosure of proposed policies, and avoids "misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action." *Trentadue v. Integrity Comm.*, 501 F.3d 1215, 1226 (10th Cir. 2007) (cleaned up).

Defendant DHS objects to this Request because there are no allegations in the operative Complaint, at all, concerning it. DHS appears to be included as a named Defendant solely because the Federal Emergency Management Agency, also a named Defendant, is a component of DHS. Because there are no allegations in the operative Complaint against DHS, DHS will not respond to discovery.

Finally, Defendants object to the extent the Request seeks discovery from the President, the Executive Office of the President, and/or the White House. Such discovery is improper at least at this juncture because, among other things, it would contravene "[t]he high respect that is owed to the office of the Chief Executive," which "is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery." *Clinton v. Jones*, 520 U.S. 681, 707 (1997); *see also Nixon v. Fitzgerald*, 457 U.S. 731, 749, 753 (1982) ("The President occupies a unique position in the constitutional scheme" that "counsel[s] judicial deference and restraint."). Plaintiff's discovery requests treat the President like any other civil litigant and fail to account for

the "special considerations applicable to the President." *Cheney v. U.S. Dist. Ct. for Dist. of Columbia*, 542 U.S. 367, 385 (2004). Requiring their response would improperly "detract [the President] from energetic performance of [his] constitutional duties." *Id.* at 382; *see also id.* at 381–82 ("In no case . . . would a court be required to proceed against the president as against an ordinary individual." (quoting *United States v. Burr*, 25 F. Cas. 187, 192 (No. 14,694) (CC Va. 1807) (Marshall, J.))). That is, separation-of-powers concerns necessarily prevent such discovery from proceeding now. *See, e.g.*, *Cheney*, 542 U.S. at 388–91 (court of appeals failed to properly consider separation-of-powers concerns when it denied government's request for mandamus relief to prevent discovery against the Vice President, which discovery, the government argued, threatened "substantial intrusions on the process by which those in closest operational proximity to the President advise the President"; court of appeals also erred in finding that the Vice President must first assert executive privilege); *see also U.S. Doge Serv. v. Citizens for Resp. & Ethics in Washington*, 145 S. Ct. 1981 (2025) ("[S]eparation of powers concerns counsel judicial deference and restraint in the context of discovery regarding internal Executive Branch communications.").

While *Cheney* alone counsels against any discovery against the President, Plaintiff's discovery against the President and EOP is particularly improper here because Plaintiff is already pursuing extensive discovery against the Agency Defendants that may well yield at least substantially the information that Plaintiff seeks without burdening the President. *See, e.g.*, Order, *Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019) (requiring Plaintiff to exhaust all discovery on other Defendants before considering whether there was "continuing need for discovery sought on the White House"); *Wagafe v. Trump*, 2017 WL 5990134, at *3 (W.D. Wash. Oct. 19, 2017) ("intruding on the Executive in this context is a matter of last resort"); *United States*

*v. McGraw-Hill Cos.*, 2014 WL 1647385, at *13 (C.D. Cal. Apr. 15, 2014); *cf. Karnoski v. Trump*, 926 F.3d 1180, 1203–07 (9th Cir. 2019) (granting government's writ of mandamus to vacate district court's discovery order against the President because district court failed to apply *Cheney* or "explore other avenues, short of forcing the Executive to invoke privilege" (quoting *Cheney*, 542 U.S. at 390)).

Accordingly, and consistent with settled precedent, the President, EOP, and the White House will not be responding to Plaintiff's Request for Production at this time.

Pursuant to Rule 34(b)(2)(C), Defendants will conduct a reasonable search for documents and communications from the Agency Defendants regarding the Challenged Conduct, within the relevant timeframe of January 20, 2025, to January 8, 2026, and will produce any non-privileged, responsive results that exist on a rolling basis, with substantial completion expected to occur by July 31, 2026. Defendants will also provide, as appropriate, privilege logs at the conclusion of their rolling productions.

**REQUEST FOR PRODUCTION NO. 2:** All documents, electronically stored information, and communications regarding any action or threat identified in response to Interrogatory No. 4, whether dated before or after the action, including but not limited to those reflecting how and why Defendants took each action or threat, the timing of each action or threat, any costs and/or benefits that Defendants considered, the implementation of each action or threat, and whether Defendants considered the same and/or a similar action or threat against any other states, political subdivisions or instrumentalities of other states, or entities within other states and why they were or were not subjected to the same and/or a similar action or threat. In responding to this request, please exclude actions or threats that were taken as to all states, political subdivisions or instrumentalities of all states, or entities within all states.

**OBJECTIONS AND RESPONSE TO RFP 2:** Defendants object to this Request because it seeks documents and communications "whether dated before or after the action," which is vague and overbroad as to timeframe. Defendants interpret this Request to encompass the timeframe January 20, 2025, to January 8, 2026 (the date of filing of the Amended Complaint).

Defendants further object to this Request because it does not define the "actions or threats against Colorado" about which it seeks discovery. Defendants interpret the "actions or threats against Colorado" to refer to the conduct challenged in the Second Amended Complaint ("SAC", ECF 78), as follows: (i) with respect to the Departments of War and Air Force, the decision to relocate U.S. Space Command Headquarters (SAC ¶ 78); (ii) with respect to the Department of Transportation, the decision to withdraw four awards, and terminate one grant agreement, constituting approximately $109 million that had been allocated to Colorado entities (*see* ECF 80 (stipulation)) and the decision to select recipients for FY2025 Safe Streets and Roads for All grants (SAC ¶ 106); (iii) with respect to the Department of Energy, "plans to terminate $615 million in DOE funds earmarked only for Colorado" (SAC ¶ 91); (iv) with respect to the National Science Foundation, its announcement regarding restructuring the National Center for Atmospheric Research (SAC ¶ 93); (v) with respect to the Department of Agriculture, its direction to Colorado to comply with a SNAP pilot project (SAC ¶ 97); (vi) with respect to the Federal Emergency Management Agency, a component of the Department of Homeland Security, the alleged denial of two disaster relief assistance requests (SAC ¶ 101); and (vii) with respect to the Department of Interior, "compil[ation] [of] a list of all grants earmarked for Colorado, its instrumentalities, and political subdivisions for possible termination" (SAC ¶ 109)—henceforth, collectively, the "Challenged Conduct."

Defendants also object to this Request for Production because it seeks irrelevant information that is also not proportionate to the needs of the case, particularly, information regarding Defendants' contemplated conduct toward non-parties ("whether Defendants considered the same and/or a similar action or threat against *any other states, political subdivisions or*

*instrumentalities of other states, or entities within other states*" (emphasis added)). That aspect of this Request is further objectionable because it is vague and overbroad insofar as it seeks information about "similar" conduct towards "political subdivisions," "instrumentalities," and "entities" within other States. Plaintiff's Counts One and Two challenge that Defendants have discriminated against the State of Colorado because Colorado allows mail-in voting and prosecuted former County Clerk Tina Peters. Undefined "similar" conduct towards the other 49 States is not relevant to this issue, and even if it were, it is not proportionate to the needs of this single-Plaintiff case.

Defendants further object to this Request because its request for information about non-parties facially seeks information that is protected by at least the deliberative-process privilege ("whether Defendants *considered* the same and/or a similar action or threat against any other states, political subdivisions or instrumentalities of other states, or entities within other states" (emphasis added)). The deliberative-process privilege shields "documents reflecting advisory opinions, recommendations and deliberations compromising part of a process by which governmental decisions and policies are formulated." *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). Recognizing that "officials will not communicate candidly among themselves if each remark is a potential item of discovery," the deliberative-process privilege is primarily designed to "enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government." *Id.* at 8–9 (cleaned up). It further serves to prevent the premature disclosure of proposed policies, and avoids "misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were

not in fact the ultimate reasons for the agency's action." *Trentadue v. Integrity Comm.*, 501 F.3d 1215, 1226 (10th Cir. 2007) (cleaned up).

Defendants also object to this Request (and Interrogatory 4, which it references), because it seeks irrelevant information that is not proportionate to the needs of this case insofar as it requests documents and communications regarding "any other threat or adverse action" directed to Colorado or "entities within Colorado" that is *not* described in the operative Complaint. Conduct that is not described in the Complaint is inherently irrelevant, and even if it were not, it is not proportionate to the needs of this case to require Defendants to search for information outside the scope of the Complaint that Plaintiff chose to plead. *Cf., e.g.*, *Cuomo v. Clearing House Ass'n*, 557 U.S. 519, 531 (2009) (observing that judges are trusted to prevent "fishing expeditions" or an undirected rummaging through materials for evidence of some unknown wrongdoing); *accord, e.g.*, *Harriman v. Smart*, 2023 WL 11911575, at *2–3 (D. Colo. June 14, 2023) ("The relevant and proportional scope of discovery . . . is limited to the well-pleaded factual allegations and related claims asserted in the [operative complaint]."; citing cases). Plaintiff has sued nine different federal Agency Defendants, plus the Executive Office of the President, and it would be enormously burdensome to require them to search for "[a]ll documents, electronically stored information, and communications" regarding contemplated conduct toward non-parties, particularly during the expedited discovery timeframe ordered by the Court.

Defendant DHS objects to this Request because there are no allegations in the operative Complaint, at all, concerning it. DHS appears to be included as a named Defendant solely because the Federal Emergency Management Agency, also a named Defendant, is a component of DHS.

Because there are no allegations in the operative Complaint against DHS, DHS will not respond to discovery.

Finally, Defendants object to the extent the Request seeks discovery from the President, the Executive Office of the President, and/or the White House. Such discovery is improper at least at this juncture because, among other things, it would contravene "[t]he high respect that is owed to the office of the Chief Executive," which "is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery." *Clinton v. Jones*, 520 U.S. 681, 707 (1997); *see also Nixon v. Fitzgerald*, 457 U.S. 731, 749, 753 (1982) ("The President occupies a unique position in the constitutional scheme" that "counsel[s] judicial deference and restraint."). Plaintiff's discovery requests treat the President like any other civil litigant and fail to account for the "special considerations applicable to the President." *Cheney v. U.S. Dist. Ct. for Dist. of Columbia*, 542 U.S. 367, 385 (2004). Requiring their response would improperly "detract [the President] from energetic performance of [his] constitutional duties." *Id.* at 382; *see also id.* at 381–82 ("In no case . . . would a court be required to proceed against the president as against an ordinary individual." (quoting *United States v. Burr*, 25 F. Cas. 187, 192 (No. 14,694) (CC Va. 1807) (Marshall, J.))). That is, separation-of-powers concerns necessarily prevent such discovery from proceeding now. *See, e.g.*, *Cheney*, 542 U.S. at 388–91 (court of appeals failed to properly consider separation-of-powers concerns when it denied government's request for mandamus relief to prevent discovery against the Vice President, which discovery, the government argued, threatened "substantial intrusions on the process by which those in closest operational proximity to the President advise the President"; court of appeals also erred in finding that the Vice President must first assert executive privilege); *see also U.S. Doge Serv. v. Citizens for Resp. & Ethics in*

*Washington*, 145 S. Ct. 1981 (2025) ("[S]eparation of powers concerns counsel judicial deference and restraint in the context of discovery regarding internal Executive Branch communications.").

While *Cheney* alone counsels against any discovery against the President, Plaintiff's discovery against the President and EOP is particularly improper here because Plaintiff is already pursuing extensive discovery against the Agency Defendants that may well yield at least substantially the information that Plaintiff seeks without burdening the President. *See, e.g.*, Order, *Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019) (requiring Plaintiff to exhaust all discovery on other Defendants before considering whether there was "continuing need for discovery sought on the White House"); *Wagafe v. Trump*, 2017 WL 5990134, at *3 (W.D. Wash. Oct. 19, 2017) ("intruding on the Executive in this context is a matter of last resort"); *United States v. McGraw-Hill Cos.*, 2014 WL 1647385, at *13 (C.D. Cal. Apr. 15, 2014); *cf. Karnoski v. Trump*, 926 F.3d 1180, 1203–07 (9th Cir. 2019) (granting government's writ of mandamus to vacate district court's discovery order against the President because district court failed to apply *Cheney* or "explore other avenues, short of forcing the Executive to invoke privilege" (quoting *Cheney*, 542 U.S. at 390)).

Accordingly, and consistent with settled precedent, the President, EOP, and the White House will not be responding to Plaintiff's Request for Production at this time.

Pursuant to Rule 34(b)(2)(C), Defendants will conduct a reasonable search for documents and communications from the Agency Defendants regarding the Challenged Conduct, within the relevant timeframe of January 20, 2025, to January 8, 2026, and will produce any non-privileged, responsive results that exist on a rolling basis, with substantial completion expected to occur by

July 31, 2026. Defendants will also provide, as appropriate, privilege logs at the conclusion of their rolling productions.

**REQUEST FOR PRODUCTION NO. 3:** All documents, electronically stored information, and communications regarding all instances in which any Defendant considered but did not take an action or threat identified in response to Interrogatory No. 7, including but not limited to those reflecting how and why Defendants considered each action or threat, any costs and/or benefits that Defendants considered, and whether Defendants considered the same and/or a similar action or threat against any other states, political subdivisions or instrumentalities of other states, or entities within other states and why they were or were not subjected to the same and/or a similar action or threat. In responding to this request, please exclude actions or threats that were considered as to all states, political subdivisions or instrumentalities of all states, or entities within all states.

**OBJECTIONS AND RESPONSE TO RFP 3:** Defendants object to this Request because it is vague and overbroad as to timeframe. Defendants interpret this Request to encompass the timeframe January 20, 2025, to January 8, 2026 (the date of filing of the Amended Complaint). Defendants further object to this Request because it does not define the "actions or threats against Colorado" about which it seeks discovery, to the extent this Request seeks discovery about actions or threats not otherwise pled in the operative Complaint.

Indeed, Defendants also object to this Request (and Interrogatory 7, which it references), because it seeks irrelevant information that is not proportionate to the needs of this case to the extent it requests documents and communications regarding contemplated actions that are not pled in the operative Complaint, and indeed were not even taken. Conduct that is not described in the Complaint is inherently irrelevant, and even if it were not, it is not proportionate to the needs of this case to require Defendants to search for information outside the scope of the Complaint that Plaintiff chose to plead. *Cf., e.g.*, *Cuomo v. Clearing House Ass'n*, 557 U.S. 519, 531 (2009) (observing that judges are trusted to prevent "fishing expeditions" or an undirected rummaging through materials for evidence of some unknown wrongdoing); *accord, e.g.*, *Harriman v. Smart*,

2023 WL 11911575, at *2–3 (D. Colo. June 14, 2023) ("The relevant and proportional scope of discovery . . . is limited to the well-pleaded factual allegations and related claims asserted in the [operative complaint]."; citing cases).

This Request for Production seeks irrelevant information that is not proportionate to the needs of the case for the additional reason that it seeks information regarding Defendants' contemplated conduct toward non-parties ("whether Defendants considered the same and/or a similar action or threat against *any other states, political subdivisions or instrumentalities of other states, or entities within other states*" (emphasis added)). That aspect of this Request is further objectionable because it is vague and overbroad insofar as it seeks information about "similar" conduct towards "political subdivisions," "instrumentalities," and "entities" within other States. Plaintiff's Counts One and Two challenge that Defendants have discriminated against the State of Colorado because Colorado allows mail-in voting and prosecuted former County Clerk Tina Peters. Undefined "similar" conduct towards the other 49 States is not relevant to this issue, and even if it were, it is not proportionate to the needs of this single-Plaintiff case. Plaintiff has sued nine different federal Agency Defendants, plus the Executive Office of the President, and it would be enormously burdensome to require them to search for "[a]ll documents, electronically stored information, and communications" regarding contemplated conduct toward non-parties, particularly during the expedited discovery timeframe ordered by the Court.

Defendants further object to this Request (and Interrogatory 7, which it references), because it facially seeks information that is protected by at least the deliberative-process privilege (with respect to Colorado: "[a]ll documents, electronically stored information, and communications regarding all instances in which any Defendant *considered but did not take* an

action or threat"; with respect to non-parties: ("whether Defendants *considered* the same and/or a similar action or threat" (emphases added)). The deliberative-process privilege shields "documents reflecting advisory opinions, recommendations and deliberations compromising part of a process by which governmental decisions and policies are formulated." *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). Recognizing that "officials will not communicate candidly among themselves if each remark is a potential item of discovery," the deliberative-process privilege is primarily designed to "enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government." *Id.* at 8–9 (cleaned up). It further serves to prevent the premature disclosure of proposed policies, and avoids "misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action." *Trentadue v. Integrity Comm.*, 501 F.3d 1215, 1226 (10th Cir. 2007) (cleaned up).

Defendant DHS objects to this Request because there are no allegations in the operative Complaint, at all, concerning it. DHS appears to be included as a named Defendant solely because the Federal Emergency Management Agency, also a named Defendant, is a component of DHS. Because there are no allegations in the operative Complaint against DHS, DHS will not respond to discovery.

Finally, Defendants object to the extent the Request seeks discovery from the President, the Executive Office of the President, and/or the White House. Such discovery is improper at least at this juncture because, among other things, it would contravene "[t]he high respect that is owed to the office of the Chief Executive," which "is a matter that should inform the conduct of the

entire proceeding, including the timing and scope of discovery." *Clinton v. Jones*, 520 U.S. 681, 707 (1997); *see also Nixon v. Fitzgerald*, 457 U.S. 731, 749, 753 (1982) ("The President occupies a unique position in the constitutional scheme" that "counsel[s] judicial deference and restraint."). Plaintiff's discovery requests treat the President like any other civil litigant and fail to account for the "special considerations applicable to the President." *Cheney v. U.S. Dist. Ct. for Dist. of Columbia*, 542 U.S. 367, 385 (2004). Requiring their response would improperly "detract [the President] from energetic performance of [his] constitutional duties." *Id.* at 382; *see also id.* at 381–82 ("In no case . . . would a court be required to proceed against the president as against an ordinary individual." (quoting *United States v. Burr*, 25 F. Cas. 187, 192 (No. 14,694) (CC Va. 1807) (Marshall, J.))). That is, separation-of-powers concerns necessarily prevent such discovery from proceeding now. *See, e.g.*, *Cheney*, 542 U.S. at 388–91 (court of appeals failed to properly consider separation-of-powers concerns when it denied government's request for mandamus relief to prevent discovery against the Vice President, which discovery, the government argued, threatened "substantial intrusions on the process by which those in closest operational proximity to the President advise the President"; court of appeals also erred in finding that the Vice President must first assert executive privilege); *see also U.S. Doge Serv. v. Citizens for Resp. & Ethics in Washington*, 145 S. Ct. 1981 (2025) ("[S]eparation of powers concerns counsel judicial deference and restraint in the context of discovery regarding internal Executive Branch communications.").

While *Cheney* alone counsels against any discovery against the President, Plaintiff's discovery against the President and EOP is particularly improper here because Plaintiff is already pursuing extensive discovery against the Agency Defendants that may well yield at least substantially the information that Plaintiff seeks without burdening the President. *See, e.g.*, Order,

*Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019) (requiring Plaintiff to exhaust all discovery on other Defendants before considering whether there was "continuing need for discovery sought on the White House"); *Wagafe v. Trump*, 2017 WL 5990134, at *3 (W.D. Wash. Oct. 19, 2017) ("intruding on the Executive in this context is a matter of last resort"); *United States v. McGraw-Hill Cos.*, 2014 WL 1647385, at *13 (C.D. Cal. Apr. 15, 2014); *cf. Karnoski v. Trump*, 926 F.3d 1180, 1203–07 (9th Cir. 2019) (granting government's writ of mandamus to vacate district court's discovery order against the President because district court failed to apply *Cheney* or "explore other avenues, short of forcing the Executive to invoke privilege" (quoting *Cheney*, 542 U.S. at 390)).

Accordingly, and consistent with settled precedent, the President, EOP, and the White House will not be responding to Plaintiff's Request for Production at this time.

Pursuant to Rule 34(b)(2)(C), Defendants will not produce documents in response to this Request.

**REQUEST FOR PRODUCTION NO. 4:** All documents, communications, and electronically stored information describing or relating to any communications between individuals in the Executive Office of the President, including the Office of Management and Budget, on the one hand, and any individuals at any Defendant agency on the other hand, regarding any guidance, instructions, requests, or communications relating to taking, considering, or proposing any action (e.g., terminating, not renewing, taking away federal funding or services, auditing, not granting funds, or investigation) against some but not all states, including the date, content, form of the communication[,] and individuals involved, whether as a listener or participant. This request is directed at circumstances where states have been targeted for differential treatment.

**OBJECTIONS AND RESPONSE TO RFP 4:** Defendants object to this Request because it is vague and overbroad as to timeframe. Defendants interpret this Request to encompass the timeframe January 20, 2025, to January 8, 2026 (the date of filing of the Amended Complaint).

Defendants further object to this Request because it facially seeks information that is protected by, at least, the deliberative-process and presidential-communications privileges. The deliberative-process privilege shields "documents reflecting advisory opinions, recommendations and deliberations compromising part of a process by which governmental decisions and policies are formulated." *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). Recognizing that "officials will not communicate candidly among themselves if each remark is a potential item of discovery," the deliberative-process privilege is primarily designed to "enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government." *Id.* at 8–9 (cleaned up). It further serves to prevent the premature disclosure of proposed policies, and avoids "misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action." *Trentadue v. Integrity Comm.*, 501 F.3d 1215, 1226 (10th Cir. 2007) (cleaned up). This Request facially invokes privileged deliberative communications, seeking "[a]ll documents, communications, and electronically stored information" regarding "any *guidance*, *instructions*, *requests*, or communications relating to taking, *considering*, or *proposing* any action" (emphases added).

The presidential communications privilege is a "'presumptive privilege for [p]residential communications,'" *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008) (quoting *United States v. Nixon*, 418 U.S. 683, 708 (1974)), which "preserves the President's ability to obtain candid and informed opinions from his advisors and to make decisions confidentially." *Id.* (citing *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1112 (D.C. Cir. 2004)). Accordingly, the privilege protects communications that are "in performance of a President's responsibilities," "of

his office," and made "in the process of shaping policies and making decisions." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1977) (cleaned up). This Request facially invokes privileged presidential communications, seeking "[a]ll documents, communications, and electronically stored information describing or relating to any communications *between individuals in the Executive Office of the President* . . . and any individuals at any Defendant agency."

Defendants also object to this Request because it seeks irrelevant information that is not proportionate to the needs of this case because it requests documents and communications regarding contemplated actions that are not pled in the operative Complaint, and indeed were not even taken, and are not even specific to Plaintiff State of Colorado (seeking documents and communications about action taken "against some but not all states"). Conduct that is not described in the Complaint is inherently irrelevant, and even if it were not, it is not proportionate to the needs of this case to require Defendants to search for information outside the scope of the Complaint that Plaintiff chose to plead. *Cf., e.g.*, *Cuomo v. Clearing House Ass'n*, 557 U.S. 519, 531 (2009) (observing that judges are trusted to prevent "fishing expeditions" or an undirected rummaging through materials for evidence of some unknown wrongdoing); *accord, e.g.*, *Harriman v. Smart*, 2023 WL 11911575, at *2–3 (D. Colo. June 14, 2023) ("The relevant and proportional scope of discovery . . . is limited to the well-pleaded factual allegations and related claims asserted in the [operative complaint]."; citing cases). Plaintiff has sued nine different federal Agency Defendants, plus the Executive Office of the President, and it would be enormously burdensome to require them to search for "[a]ll documents, electronically stored information, and communications" regarding contemplated conduct toward non-parties, particularly during the expedited discovery timeframe ordered by the Court.

Defendant DHS objects to this Request because there are no allegations in the operative Complaint, at all, concerning it. DHS appears to be included as a named Defendant solely because the Federal Emergency Management Agency, also a named Defendant, is a component of DHS. Because there are no allegations in the operative Complaint against DHS, DHS will not respond to discovery.

Finally, Defendants object to the extent the Request seeks discovery from the President, the Executive Office of the President, and/or the White House. Such discovery is improper at least at this juncture because, among other things, it would contravene "[t]he high respect that is owed to the office of the Chief Executive," which "is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery." *Clinton v. Jones*, 520 U.S. 681, 707 (1997); *see also Nixon v. Fitzgerald*, 457 U.S. 731, 749, 753 (1982) ("The President occupies a unique position in the constitutional scheme" that "counsel[s] judicial deference and restraint."). Plaintiff's discovery requests treat the President like any other civil litigant and fail to account for the "special considerations applicable to the President." *Cheney v. U.S. Dist. Ct. for Dist. of Columbia*, 542 U.S. 367, 385 (2004). Requiring their response would improperly "detract [the President] from energetic performance of [his] constitutional duties." *Id.* at 382; *see also id.* at 381–82 ("In no case . . . would a court be required to proceed against the president as against an ordinary individual." (quoting *United States v. Burr*, 25 F. Cas. 187, 192 (No. 14,694) (CC Va. 1807) (Marshall, J.))). That is, separation-of-powers concerns necessarily prevent such discovery from proceeding now. *See, e.g.*, *Cheney*, 542 U.S. at 388–91 (court of appeals failed to properly consider separation-of-powers concerns when it denied government's request for mandamus relief to prevent discovery against the Vice President, which discovery, the government argued,

threatened "substantial intrusions on the process by which those in closest operational proximity to the President advise the President"; court of appeals also erred in finding that the Vice President must first assert executive privilege); *see also U.S. Doge Serv. v. Citizens for Resp. & Ethics in Washington*, 145 S. Ct. 1981 (2025) ("[S]eparation of powers concerns counsel judicial deference and restraint in the context of discovery regarding internal Executive Branch communications.").

While *Cheney* alone counsels against any discovery against the President, Plaintiff's discovery against the President and EOP is particularly improper here because Plaintiff is already pursuing extensive discovery against the Agency Defendants that may well yield at least substantially the information that Plaintiff seeks without burdening the President. *See, e.g.*, Order, *Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019) (requiring Plaintiff to exhaust all discovery on other Defendants before considering whether there was "continuing need for discovery sought on the White House"); *Wagafe v. Trump*, 2017 WL 5990134, at *3 (W.D. Wash. Oct. 19, 2017) ("intruding on the Executive in this context is a matter of last resort"); *United States v. McGraw-Hill Cos.*, 2014 WL 1647385, at *13 (C.D. Cal. Apr. 15, 2014); *cf. Karnoski v. Trump*, 926 F.3d 1180, 1203–07 (9th Cir. 2019) (granting government's writ of mandamus to vacate district court's discovery order against the President because district court failed to apply *Cheney* or "explore other avenues, short of forcing the Executive to invoke privilege" (quoting *Cheney*, 542 U.S. at 390)).

Accordingly, and consistent with settled precedent, the President, EOP, and the White House will not be responding to Plaintiff's Request for Production at this time.

Pursuant to Rule 34(b)(2)(C), Defendants will not produce documents in response to this Request.

**REQUEST FOR PRODUCTION NO. 5:** All documents, electronically stored information, and communications regarding Tina Peters's prosecution, incarceration, and/or any efforts to assist in and/or effect her release from custody.

**OBJECTIONS AND RESPONSE TO RFP 5:** Defendants object to the extent this Request seeks discovery from the President, the Executive Office of the President, and/or the White House. Such discovery is improper at least at this juncture because, among other things, it would contravene "[t]he high respect that is owed to the office of the Chief Executive," which "is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery." *Clinton v. Jones*, 520 U.S. 681, 707 (1997); *see also Nixon v. Fitzgerald*, 457 U.S. 731, 749, 753 (1982) ("The President occupies a unique position in the constitutional scheme" that "counsel[s] judicial deference and restraint."). Plaintiff's discovery requests treat the President like any other civil litigant and fail to account for the "special considerations applicable to the President." *Cheney v. U.S. Dist. Ct. for Dist. of Columbia*, 542 U.S. 367, 385 (2004). Requiring their response would improperly "detract [the President] from energetic performance of [his] constitutional duties." *Id.* at 382; *see also id.* at 381–82 ("In no case . . . would a court be required to proceed against the president as against an ordinary individual." (quoting *United States v. Burr*, 25 F. Cas. 187, 192 (No. 14,694) (CC Va. 1807) (Marshall, J.))). That is, separation-of-powers concerns necessarily prevent such discovery from proceeding now. *See, e.g.*, *Cheney*, 542 U.S. at 388–91 (court of appeals failed to properly consider separation-of-powers concerns when it denied government's request for mandamus relief to prevent discovery against the Vice President, which discovery, the government argued, threatened "substantial intrusions on the process by which those in closest operational proximity to the President advise the President"; court of appeals also erred in finding that the Vice President must first assert executive privilege); *see also U.S. Doge Serv. v. Citizens*

*for Resp. & Ethics in Washington*, 145 S. Ct. 1981 (2025) ("[S]eparation of powers concerns counsel judicial deference and restraint in the context of discovery regarding internal Executive Branch communications.").

While *Cheney* alone counsels against any discovery against the President, Plaintiff's discovery against the President and EOP is particularly improper here because Plaintiff is already pursuing extensive discovery against the Agency Defendants that may well yield at least substantially the information that Plaintiff seeks without burdening the President. *See, e.g.*, Order, *Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019) (requiring Plaintiff to exhaust all discovery on other Defendants before considering whether there was "continuing need for discovery sought on the White House"); *Wagafe v. Trump*, 2017 WL 5990134, at *3 (W.D. Wash. Oct. 19, 2017) ("intruding on the Executive in this context is a matter of last resort"); *United States v. McGraw-Hill Cos.*, 2014 WL 1647385, at *13 (C.D. Cal. Apr. 15, 2014); *cf. Karnoski v. Trump*, 926 F.3d 1180, 1203–07 (9th Cir. 2019) (granting government's writ of mandamus to vacate district court's discovery order against the President because district court failed to apply *Cheney* or "explore other avenues, short of forcing the Executive to invoke privilege" (quoting *Cheney*, 542 U.S. at 390)).

Accordingly, and consistent with settled precedent, the President, EOP, and the White House will not be responding to Plaintiff's Request for Production at this time.

Defendant DHS objects to this Request because there are no allegations in the operative Complaint, at all, concerning it. DHS appears to be included as a named Defendant solely because the Federal Emergency Management Agency, also a named Defendant, is a component of DHS.

Because there are no allegations in the operative Complaint against DHS, DHS will not respond to discovery.

Defendants will conduct a reasonable search for documents and communications from the Agency Defendants regarding Tina Peters's prosecution and incarceration within the relevant timeframe of January 20, 2025, to January 8, 2026, and will produce any non-privileged, responsive results that exist on a rolling basis, with substantial completion expected to occur by July 31, 2026. Defendants will also provide, as appropriate, privilege logs at the conclusion of their rolling productions.

**REQUEST FOR PRODUCTION NO. 6:** All documents, electronically stored information, and communications regarding Colorado's use of mail-in voting and/or any efforts by Defendants to stop and/or change Colorado's use of mail-in voting.

**OBJECTIONS AND RESPONSE TO RFP 6:** Defendants object to the extent this Request seeks discovery from the President, the Executive Office of the President, and/or the White House. Such discovery is improper at least at this juncture because, among other things, it would contravene "[t]he high respect that is owed to the office of the Chief Executive," which "is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery." *Clinton v. Jones*, 520 U.S. 681, 707 (1997); *see also Nixon v. Fitzgerald*, 457 U.S. 731, 749, 753 (1982) ("The President occupies a unique position in the constitutional scheme" that "counsel[s] judicial deference and restraint."). Plaintiff's discovery requests treat the President like any other civil litigant and fail to account for the "special considerations applicable to the President." *Cheney v. U.S. Dist. Ct. for Dist. of Columbia*, 542 U.S. 367, 385 (2004). Requiring their response would improperly "detract [the President] from energetic performance of [his] constitutional duties." *Id.* at 382; *see also id.* at 381–82 ("In no case . . . would a court be required to proceed against the

president as against an ordinary individual." (quoting *United States v. Burr*, 25 F. Cas. 187, 192 (No. 14,694) (CC Va. 1807) (Marshall, J.))). That is, separation-of-powers concerns necessarily prevent such discovery from proceeding now. *See, e.g.*, *Cheney*, 542 U.S. at 388–91 (court of appeals failed to properly consider separation-of-powers concerns when it denied government's request for mandamus relief to prevent discovery against the Vice President, which discovery, the government argued, threatened "substantial intrusions on the process by which those in closest operational proximity to the President advise the President"; court of appeals also erred in finding that the Vice President must first assert executive privilege); *see also U.S. Doge Serv. v. Citizens for Resp. & Ethics in Washington*, 145 S. Ct. 1981 (2025) ("[S]eparation of powers concerns counsel judicial deference and restraint in the context of discovery regarding internal Executive Branch communications.").

While *Cheney* alone counsels against any discovery against the President, Plaintiff's discovery against the President and EOP is particularly improper here because Plaintiff is already pursuing extensive discovery against the Agency Defendants that may well yield at least substantially the information that Plaintiff seeks without burdening the President. *See, e.g.*, Order, *Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019) (requiring Plaintiff to exhaust all discovery on other Defendants before considering whether there was "continuing need for discovery sought on the White House"); *Wagafe v. Trump*, 2017 WL 5990134, at *3 (W.D. Wash. Oct. 19, 2017) ("intruding on the Executive in this context is a matter of last resort"); *United States v. McGraw-Hill Cos.*, 2014 WL 1647385, at *13 (C.D. Cal. Apr. 15, 2014); *cf. Karnoski v. Trump*, 926 F.3d 1180, 1203–07 (9th Cir. 2019) (granting government's writ of mandamus to vacate district court's discovery order against the President because district court failed to apply *Cheney*

or "explore other avenues, short of forcing the Executive to invoke privilege" (quoting *Cheney*, 542 U.S. at 390)). Accordingly, and consistent with settled precedent, the President, EOP, and the White House will not be responding to Plaintiff's Request for Production at this time.

Defendant DHS objects to this Request because there are no allegations in the operative Complaint, at all, concerning it. DHS appears to be included as a named Defendant solely because the Federal Emergency Management Agency, also a named Defendant, is a component of DHS. Because there are no allegations in the operative Complaint against DHS, DHS will not respond to discovery.

Defendants will conduct a reasonable search for documents and communications from the Agency Defendants regarding Colorado's use of mail-in voting within the relevant timeframe of January 20, 2025, to January 8, 2026, and will produce any non-privileged, responsive results that exist on a rolling basis, with substantial completion expected to occur by July 31, 2026. Defendants will also provide, as appropriate, privilege logs at the conclusion of their rolling productions.

**REQUEST FOR PRODUCTION NO. 7:** All documents, electronically stored information, and communications regarding Colorado's exercise of sovereign authority, (e.g., Colorado's and/or any political subdivision's enactment of any so-called "sanctuary" laws, regulation of elections, and prosecution of individuals under Colorado state law).

**OBJECTIONS AND RESPONSE TO RFP 7:** Defendants object to this Request because it is vague and overbroad as to timeframe. Defendants interpret this Request to encompass the timeframe January 20, 2025, to January 8, 2026 (the date of filing of the Amended Complaint).

Defendants also object to this Request as vague and undefined to the extent it seeks information regarding "Colorado's exercise of sovereign authority." As written, that request includes literally everything the State of Colorado does.

Relatedly, Defendants also object to this Request because it seeks irrelevant information that is not proportionate to the needs of this case to the extent it requests documents and communications regarding actions that are not pled in the operative Complaint. Conduct that is not described in the Complaint is inherently irrelevant, and even if it were not, it is not proportionate to the needs of this case to require Defendants to search for information outside the scope of the Complaint that Plaintiff chose to plead. *Cf., e.g.*, *Cuomo v. Clearing House Ass'n*, 557 U.S. 519, 531 (2009) (observing that judges are trusted to prevent "fishing expeditions" or an undirected rummaging through materials for evidence of some unknown wrongdoing); *accord, e.g.*, *Harriman v. Smart*, 2023 WL 11911575, at *2–3 (D. Colo. June 14, 2023) ("The relevant and proportional scope of discovery . . . is limited to the well-pleaded factual allegations and related claims asserted in the [operative complaint]."; citing cases). Plaintiff's allegations in this case are that it has been discriminated against because it (i) allows mail-in voting and (ii) prosecuted Tina Peters. *See, e.g.*, Second Am. Compl. ¶¶ 1, 4, 7. Discovery generally into "Colorado's exercise of sovereign authority," a term which the Request does not define, and without even any limitation to actions taken *against* Colorado *by Defendants* because of said "exercise of sovereign authority," is overbroad and not proportional to the needs of this case.

Defendant DHS objects to this Request because there are no allegations in the operative Complaint, at all, concerning it. DHS appears to be included as a named Defendant solely because the Federal Emergency Management Agency, also a named Defendant, is a component of DHS. Because there are no allegations in the operative Complaint against DHS, DHS will not respond to discovery.

Finally, Defendants object to the extent the Request seeks discovery from the President, the Executive Office of the President, and/or the White House. Such discovery is improper at least at this juncture because, among other things, it would contravene "[t]he high respect that is owed to the office of the Chief Executive," which "is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery." *Clinton v. Jones*, 520 U.S. 681, 707 (1997); *see also Nixon v. Fitzgerald*, 457 U.S. 731, 749, 753 (1982) ("The President occupies a unique position in the constitutional scheme" that "counsel[s] judicial deference and restraint."). Plaintiff's discovery requests treat the President like any other civil litigant and fail to account for the "special considerations applicable to the President." *Cheney v. U.S. Dist. Ct. for Dist. of Columbia*, 542 U.S. 367, 385 (2004). Requiring their response would improperly "detract [the President] from energetic performance of [his] constitutional duties." *Id.* at 382; *see also id.* at 381–82 ("In no case . . . would a court be required to proceed against the president as against an ordinary individual." (quoting *United States v. Burr*, 25 F. Cas. 187, 192 (No. 14,694) (CC Va. 1807) (Marshall, J.))). That is, separation-of-powers concerns necessarily prevent such discovery from proceeding now. *See, e.g.*, *Cheney*, 542 U.S. at 388–91 (court of appeals failed to properly consider separation-of-powers concerns when it denied government's request for mandamus relief to prevent discovery against the Vice President, which discovery, the government argued, threatened "substantial intrusions on the process by which those in closest operational proximity to the President advise the President"; court of appeals also erred in finding that the Vice President must first assert executive privilege); *see also U.S. Doge Serv. v. Citizens for Resp. & Ethics in Washington*, 145 S. Ct. 1981 (2025) ("[S]eparation of powers concerns counsel judicial deference and restraint in the context of discovery regarding internal Executive Branch communications.").

While *Cheney* alone counsels against any discovery against the President, Plaintiff's discovery against the President and EOP is particularly improper here because Plaintiff is already pursuing extensive discovery against the Agency Defendants that may well yield at least substantially the information that Plaintiff seeks without burdening the President. *See, e.g.*, Order, *Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019) (requiring Plaintiff to exhaust all discovery on other Defendants before considering whether there was "continuing need for discovery sought on the White House"); *Wagafe v. Trump*, 2017 WL 5990134, at *3 (W.D. Wash. Oct. 19, 2017) ("intruding on the Executive in this context is a matter of last resort"); *United States v. McGraw-Hill Cos.*, 2014 WL 1647385, at *13 (C.D. Cal. Apr. 15, 2014); *cf. Karnoski v. Trump*, 926 F.3d 1180, 1203–07 (9th Cir. 2019) (granting government's writ of mandamus to vacate district court's discovery order against the President because district court failed to apply *Cheney* or "explore other avenues, short of forcing the Executive to invoke privilege" (quoting *Cheney*, 542 U.S. at 390)). Accordingly, and consistent with settled precedent, the President, EOP, and the White House will not be responding to Plaintiff's Request for Production at this time.

Pursuant to Rule 34(b)(2)(C), and as stated above in response to Request Nos. 5 and 6, Defendants will conduct a reasonable search for documents and communications from Agency Defendants regarding Colorado's prosecution/incarceration of Tina Peters and use of mail-in voting within the relevant timeframe of January 20, 2025, to January 8, 2026, and will produce any non-privileged, responsive results that exist on a rolling basis, with substantial completion expected to occur by July 31, 2026. Defendants will also provide, as appropriate, privilege logs at the conclusion of their rolling productions.

**REQUEST FOR PRODUCTION NO. 8:** All documents, electronically stored information, and communications regarding taking any action or threat against or because of Governor Polis or any of his statements, his policies, his actions, or his positions.

**OBJECTIONS AND RESPONSE TO RFP 8:** Defendants object to this Request because it is vague and overbroad as to timeframe. Defendants interpret this Request to encompass the timeframe January 20, 2025, to January 8, 2026 (the date of filing of the Amended Complaint).

Defendants also object to this request as vague and undefined to the extent it seeks information regarding "Governor Polis" or "any of his statements, his policies, his actions, or his positions." As written, that request includes literally everything the State of Colorado does.

Relatedly, Defendants also object to this Request because it seeks irrelevant information that is not proportionate to the needs of this case to the extent it requests documents and communications regarding actions that are not pled in the operative Complaint. Conduct that is not described in the Complaint is inherently irrelevant, and even if it were not, it is not proportionate to the needs of this case to require Defendants to search for information outside the scope of the Complaint that Plaintiff chose to plead. *Cf., e.g.*, *Cuomo v. Clearing House Ass'n*, 557 U.S. 519, 531 (2009) (observing that judges are trusted to prevent "fishing expeditions" or an undirected rummaging through materials for evidence of some unknown wrongdoing); *accord, e.g.*, *Harriman v. Smart*, 2023 WL 11911575, at *2–3 (D. Colo. June 14, 2023) ("The relevant and proportional scope of discovery . . . is limited to the well-pleaded factual allegations and related claims asserted in the [operative complaint]."; citing cases). Plaintiff's allegations in this case are that it has been discriminated against because it (i) allows mail-in voting and (ii) prosecuted Tina Peters. *See, e.g.*, Second Am. Compl. ¶¶ 1, 4, 7. Discovery generally into actions against or because Governor Polis,

"or any of his statements, his policies, his actions, or his positions," is overbroad and not proportional to the needs of this case.

Defendant DHS objects to this Request because there are no allegations in the operative Complaint, at all, concerning it. DHS appears to be included as a named Defendant solely because the Federal Emergency Management Agency, also a named Defendant, is a component of DHS. Because there are no allegations in the operative Complaint against DHS, DHS will not respond to discovery.

Finally, Defendants object to the extent the Request seeks discovery from the President, the Executive Office of the President, and/or the White House. Such discovery is improper at least at this juncture because, among other things, it would contravene "[t]he high respect that is owed to the office of the Chief Executive," which "is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery." *Clinton v. Jones*, 520 U.S. 681, 707 (1997); *see also Nixon v. Fitzgerald*, 457 U.S. 731, 749, 753 (1982) ("The President occupies a unique position in the constitutional scheme" that "counsel[s] judicial deference and restraint."). Plaintiff's discovery requests treat the President like any other civil litigant and fail to account for the "special considerations applicable to the President." *Cheney v. U.S. Dist. Ct. for Dist. of Columbia*, 542 U.S. 367, 385 (2004). Requiring their response would improperly "detract [the President] from energetic performance of [his] constitutional duties." *Id.* at 382; *see also id.* at 381–82 ("In no case . . . would a court be required to proceed against the president as against an ordinary individual." (quoting *United States v. Burr*, 25 F. Cas. 187, 192 (No. 14,694) (CC Va. 1807) (Marshall, J.))). That is, separation-of-powers concerns necessarily prevent such discovery from proceeding now. *See, e.g.*, *Cheney*, 542 U.S. at 388–91 (court of appeals failed to properly

consider separation-of-powers concerns when it denied government's request for mandamus relief to prevent discovery against the Vice President, which discovery, the government argued, threatened "substantial intrusions on the process by which those in closest operational proximity to the President advise the President"; court of appeals also erred in finding that the Vice President must first assert executive privilege); *see also U.S. Doge Serv. v. Citizens for Resp. & Ethics in Washington*, 145 S. Ct. 1981 (2025) ("[S]eparation of powers concerns counsel judicial deference and restraint in the context of discovery regarding internal Executive Branch communications.").

While *Cheney* alone counsels against any discovery against the President, Plaintiff's discovery against the President and EOP is particularly improper here because Plaintiff is already pursuing extensive discovery against the Agency Defendants that may well yield at least substantially the information that Plaintiff seeks without burdening the President. *See, e.g.*, Order, *Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019) (requiring Plaintiff to exhaust all discovery on other Defendants before considering whether there was "continuing need for discovery sought on the White House"); *Wagafe v. Trump*, 2017 WL 5990134, at *3 (W.D. Wash. Oct. 19, 2017) ("intruding on the Executive in this context is a matter of last resort"); *United States v. McGraw-Hill Cos.*, 2014 WL 1647385, at *13 (C.D. Cal. Apr. 15, 2014); *cf. Karnoski v. Trump*, 926 F.3d 1180, 1203–07 (9th Cir. 2019) (granting government's writ of mandamus to vacate district court's discovery order against the President because district court failed to apply *Cheney* or "explore other avenues, short of forcing the Executive to invoke privilege" (quoting *Cheney*, 542 U.S. at 390)). Accordingly, and consistent with settled precedent, the President, EOP, and the White House will not be responding to Plaintiff's Request for Production at this time.

Pursuant to Rule 34(b)(2)(C), and as stated above in response to Request Nos. 5 and 6, Defendants will conduct a reasonable search for documents and communications from Agency Defendants regarding Colorado's prosecution/incarceration of Tina Peters and use of mail-in voting within the relevant timeframe of January 20, 2025, to January 8, 2026, and will produce any non-privileged, responsive results that exist on a rolling basis, with substantial completion expected to occur by July 31, 2026. Defendants will also provide, as appropriate, privilege logs at the conclusion of their rolling productions.

**REQUEST FOR PRODUCTION NO. 9:** All documents, electronically stored information, and communications regarding any communications Defendants had with and/or planned to have with any reporter and/or member and/or employee of the press regarding any actions identified in response to Interrogatory Nos. 2, 4, and 7, press reports described in the operative Complaint, Tina Peters, Colorado's use of mail-in voting, Colorado's exercise of sovereign authority (e.g., Colorado's and/or any political subdivision's enactment of any so-called "sanctuary" laws, regulation of elections, and prosecution of individuals under Colorado state law), or Governor Polis.

**OBJECTIONS AND RESPONSE TO RFP 9:** Defendants object to this Request because it is vague and overbroad as to timeframe. Defendants interpret this Request to encompass the timeframe January 20, 2025, to January 8, 2026 (the date of filing of the Amended Complaint).

Defendants also object to this request as vague and undefined to the extent it seeks information regarding "Colorado's exercise of sovereign authority." As written, that request includes literally everything the State of Colorado does.

Relatedly, Defendants also object to this Request because it seeks irrelevant information that is not proportionate to the needs of this case to the extent it requests documents and communications regarding actions that are not pled in the operative Complaint. Conduct that is not described in the Complaint is inherently irrelevant, and even if it were not, it is not proportionate to the needs of this case to require Defendants to search for information outside the scope of the

Complaint that Plaintiff chose to plead. *Cf., e.g.*, *Cuomo v. Clearing House Ass'n*, 557 U.S. 519, 531 (2009) (observing that judges are trusted to prevent "fishing expeditions" or an undirected rummaging through materials for evidence of some unknown wrongdoing); *accord, e.g.*, *Harriman v. Smart*, 2023 WL 11911575, at *2–3 (D. Colo. June 14, 2023) ("The relevant and proportional scope of discovery . . . is limited to the well-pleaded factual allegations and related claims asserted in the [operative complaint]."; citing cases). Plaintiff's allegations in this case are that *it* has been discriminated against *because* it (i) allows mail-in voting and (ii) prosecuted Tina Peters. *See, e.g.*, Second Am. Compl. ¶¶ 1, 4, 7. In particular, the request for information regarding communications Defendants "planned to have" but in fact did not have is vague, undefined, and not relevant to any issues in this case.

Defendants further object to this Request (and the Interrogatories it references), because it facially seeks information that is protected by at least the deliberative-process privilege (seeking "[a]ll documents, electronically stored information, and communications regarding any communications Defendants had with *and/or planned to have* with any reporter and/or member and/or employee of the press (emphasis added)). The deliberative-process privilege shields "documents reflecting advisory opinions, recommendations and deliberations compromising part of a process by which governmental decisions and policies are formulated." *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). Recognizing that "officials will not communicate candidly among themselves if each remark is a potential item of discovery," the deliberative-process privilege is primarily designed to "enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government." *Id.* at 8–9 (cleaned up). It further serves to prevent the premature disclosure of

proposed policies, and avoids "misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action." *Trentadue v. Integrity Comm.*, 501 F.3d 1215, 1226 (10th Cir. 2007) (cleaned up). The deliberative-process privilege "cover[s] agency deliberations about how to respond to media inquiries regarding prior agency actions, as well as discussions about press coverage of existing agency policies, and suggested talking points about how to answer questions regarding the duties assigned to agency employees." *Competitive Enter. Inst. v. EPA*, 12 F. Supp. 3d 100, 118 (D.D.C. 2014) (citations omitted). This is because "internal deliberations about public relations efforts are not simply routine operational decisions: they are 'deliberations about policy, even if they involve "massaging" the agency's public image.'" *Comm. on Oversight & Gov't Reform, U.S. House of Reps. v. Lynch*, 156 F. Supp. 3d 101, 111 (D.D.C. 2016) (quoting *ICM Registry, LLC v. Dep't of Commerce*, 538 F. Supp. 2d 130, 136 (D.D.C. 2008)).

Defendant DHS objects to this Request because there are no allegations in the operative Complaint, at all, concerning it. DHS appears to be included as a named Defendant solely because the Federal Emergency Management Agency, also a named Defendant, is a component of DHS. Because there are no allegations in the operative Complaint against DHS, DHS will not respond to discovery.

Finally, Defendants object to the extent the Request seeks discovery from the President, the Executive Office of the President, and/or the White House. Such discovery is improper at least at this juncture because, among other things, it would contravene "[t]he high respect that is owed to the office of the Chief Executive," which "is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery." *Clinton v. Jones*, 520 U.S. 681,

707 (1997); *see also Nixon v. Fitzgerald*, 457 U.S. 731, 749, 753 (1982) ("The President occupies a unique position in the constitutional scheme" that "counsel[s] judicial deference and restraint."). Plaintiff's discovery requests treat the President like any other civil litigant and fail to account for the "special considerations applicable to the President." *Cheney v. U.S. Dist. Ct. for Dist. of Columbia*, 542 U.S. 367, 385 (2004). Requiring their response would improperly "detract [the President] from energetic performance of [his] constitutional duties." *Id.* at 382; *see also id.* at 381–82 ("In no case . . . would a court be required to proceed against the president as against an ordinary individual." (quoting *United States v. Burr*, 25 F. Cas. 187, 192 (No. 14,694) (CC Va. 1807) (Marshall, J.))). That is, separation-of-powers concerns necessarily prevent such discovery from proceeding now. *See, e.g.*, *Cheney*, 542 U.S. at 388–91 (court of appeals failed to properly consider separation-of-powers concerns when it denied government's request for mandamus relief to prevent discovery against the Vice President, which discovery, the government argued, threatened "substantial intrusions on the process by which those in closest operational proximity to the President advise the President"; court of appeals also erred in finding that the Vice President must first assert executive privilege); *see also U.S. Doge Serv. v. Citizens for Resp. & Ethics in Washington*, 145 S. Ct. 1981 (2025) ("[S]eparation of powers concerns counsel judicial deference and restraint in the context of discovery regarding internal Executive Branch communications.").

While *Cheney* alone counsels against any discovery against the President, Plaintiff's discovery against the President and EOP is particularly improper here because Plaintiff is already pursuing extensive discovery against the Agency Defendants that may well yield at least substantially the information that Plaintiff seeks without burdening the President. *See, e.g.*, Order, *Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019) (requiring Plaintiff to exhaust all

discovery on other Defendants before considering whether there was "continuing need for discovery sought on the White House"); *Wagafe v. Trump*, 2017 WL 5990134, at *3 (W.D. Wash. Oct. 19, 2017) ("intruding on the Executive in this context is a matter of last resort"); *United States v. McGraw-Hill Cos.*, 2014 WL 1647385, at *13 (C.D. Cal. Apr. 15, 2014); *cf. Karnoski v. Trump*, 926 F.3d 1180, 1203–07 (9th Cir. 2019) (granting government's writ of mandamus to vacate district court's discovery order against the President because district court failed to apply *Cheney* or "explore other avenues, short of forcing the Executive to invoke privilege" (quoting *Cheney*, 542 U.S. at 390)). Accordingly, and consistent with settled precedent, the President, EOP, and the White House will not be responding to Plaintiff's Request for Production at this time.

Pursuant to Rule 34(b)(2)(C), Defendants will conduct a reasonable search for communications Agency Defendants have had with members of the press regarding press reports described in the operative Complaint; Colorado's prosecution/incarceration of Tina Peters; and Colorado's use of mail-in voting, within the relevant timeframe of January 20, 2025, to January 8, 2026, and will produce any non-privileged, responsive results that exist on a rolling basis, with substantial completion expected to occur by July 31, 2026. Defendants will also provide, as appropriate, privilege logs at the conclusion of their rolling productions.

**REQUEST FOR PRODUCTION NO. 10:** All documents, electronically stored information, and communications since January 2025 regarding whether and how FEMA considered and/or weighed the identity of the state requesting the disaster relief, as opposed to the facts and circumstances of the disaster, in determining whether to grant disaster relief. For example, this would include circumstances where FEMA considered that a state was a so-called "blue state," or had a Democratic Governor, or exercised its sovereign authority to adopt policies that the Trump Administration did not like.

**OBJECTIONS AND RESPONSE TO RFP 10:** Defendants object to this Request because it contains the inaccurate factual assumption that the Federal Emergency Management Agency

("FEMA") has the authority to declare a disaster. The President—not FEMA or DHS—has authority to declare a disaster. 42 U.S.C. § 5170.

Defendants further object to this Request for Production because it is vague as to which request(s) for "disaster relief" it encompasses. Defendants assume this Request refers to Colorado's two requests for disaster relief referenced in the Second Amended Complaint. *See* Second Am. Compl. ¶¶ 6, 101–04. Defendants object to this Request to the extent it requests documents and communications regarding requests for disaster relief, by Colorado or another State, that are not pled in the operative Complaint. Conduct that is not described in the Complaint is inherently irrelevant, and even if it were not, it is not proportionate to the needs of this case to require Defendants to search for information outside the scope of the Complaint that Plaintiff chose to plead. *Cf., e.g.*, *Cuomo v. Clearing House Ass'n*, 557 U.S. 519, 531 (2009) (observing that judges are trusted to prevent "fishing expeditions" or an undirected rummaging through materials for evidence of some unknown wrongdoing); *accord, e.g.*, *Harriman v. Smart*, 2023 WL 11911575, at *2–3 (D. Colo. June 14, 2023) ("The relevant and proportional scope of discovery . . . is limited to the well-pleaded factual allegations and related claims asserted in the [operative complaint]."; citing cases).

Defendants further object to this Request because it appears to seek information that is protected by, at least, the deliberative-process and presidential-communications privileges. The deliberative-process privilege shields "documents reflecting advisory opinions, recommendations and deliberations compromising part of a process by which governmental decisions and policies are formulated." *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). Recognizing that "officials will not communicate candidly among themselves if each

remark is a potential item of discovery," the deliberative-process privilege is primarily designed to "enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government." *Id.* at 8–9 (cleaned up). It further serves to prevent the premature disclosure of proposed policies, and avoids "misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action." *Trentadue v. Integrity Comm.*, 501 F.3d 1215, 1226 (10th Cir. 2007) (cleaned up).

The presidential communications privilege is a "'presumptive privilege for [p]residential communications,'" *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008) (quoting *United States v. Nixon*, 418 U.S. 683, 708 (1974)), which "preserves the President's ability to obtain candid and informed opinions from his advisors and to make decisions confidentially." *Id.* (citing *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1112 (D.C. Cir. 2004)). Accordingly, the privilege protects communications that are "in performance of a President's responsibilities," "of his office," and made "in the process of shaping policies and making decisions." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1977) (cleaned up).

Defendant DHS objects to this Request because there are no allegations in the operative Complaint, at all, concerning it. DHS appears to be included as a named Defendant solely because the Federal Emergency Management Agency, also a named Defendant, is a component of DHS. Because there are no allegations in the operative Complaint against DHS, DHS will not respond to discovery.

Finally, Defendants object to the extent the Request seeks discovery from the President, the Executive Office of the President, and/or the White House. Such discovery is improper at least

at this juncture because, among other things, it would contravene "[t]he high respect that is owed to the office of the Chief Executive," which "is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery." *Clinton v. Jones*, 520 U.S. 681, 707 (1997); *see also Nixon v. Fitzgerald*, 457 U.S. 731, 749, 753 (1982) ("The President occupies a unique position in the constitutional scheme" that "counsel[s] judicial deference and restraint."). Plaintiff's discovery requests treat the President like any other civil litigant and fail to account for the "special considerations applicable to the President." *Cheney v. U.S. Dist. Ct. for Dist. of Columbia*, 542 U.S. 367, 385 (2004). Requiring their response would improperly "detract [the President] from energetic performance of [his] constitutional duties." *Id.* at 382; *see also id.* at 381–82 ("In no case . . . would a court be required to proceed against the president as against an ordinary individual." (quoting *United States v. Burr*, 25 F. Cas. 187, 192 (No. 14,694) (CC Va. 1807) (Marshall, J.))). That is, separation-of-powers concerns necessarily prevent such discovery from proceeding now. *See, e.g.*, *Cheney*, 542 U.S. at 388–91 (court of appeals failed to properly consider separation-of-powers concerns when it denied government's request for mandamus relief to prevent discovery against the Vice President, which discovery, the government argued, threatened "substantial intrusions on the process by which those in closest operational proximity to the President advise the President"; court of appeals also erred in finding that the Vice President must first assert executive privilege); *see also U.S. Doge Serv. v. Citizens for Resp. & Ethics in Washington*, 145 S. Ct. 1981 (2025) ("[S]eparation of powers concerns counsel judicial deference and restraint in the context of discovery regarding internal Executive Branch communications.").

While *Cheney* alone counsels against any discovery against the President, Plaintiff's discovery against the President and EOP is particularly improper here because Plaintiff is already

pursuing extensive discovery against the Agency Defendants that may well yield at least substantially the information that Plaintiff seeks without burdening the President. *See, e.g.*, Order, *Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019) (requiring Plaintiff to exhaust all discovery on other Defendants before considering whether there was "continuing need for discovery sought on the White House"); *Wagafe v. Trump*, 2017 WL 5990134, at *3 (W.D. Wash. Oct. 19, 2017) ("intruding on the Executive in this context is a matter of last resort"); *United States v. McGraw-Hill Cos.*, 2014 WL 1647385, at *13 (C.D. Cal. Apr. 15, 2014); *cf. Karnoski v. Trump*, 926 F.3d 1180, 1203–07 (9th Cir. 2019) (granting government's writ of mandamus to vacate district court's discovery order against the President because district court failed to apply *Cheney* or "explore other avenues, short of forcing the Executive to invoke privilege" (quoting *Cheney*, 542 U.S. at 390)). Accordingly, and consistent with settled precedent, the President, EOP, and the White House will not be responding to Plaintiff's Request for Production at this time.

Pursuant to Rule 34(b)(2)(C), Defendants will conduct a reasonable search for communications Agency Defendants have had regarding the denial of the two disaster relief assistance requests referenced in the Second Amended Complaint, and will produce any non-privileged, responsive results that exist on a rolling basis, with substantial completion expected to occur by July 31, 2026. Defendants will also provide, as appropriate, privilege logs at the conclusion of their rolling productions.

**REQUEST FOR PRODUCTION NO. 11:** All documents, electronically stored information, and communications regarding Defendants' use of artificial intelligence (AI) tools (e.g., Grok, Chat GPT, Claude) to determine whether to take any action directed at or to Colorado identified in response to Interrogatory Nos. 2, 4, and 7, including training materials, guidance documents, documents reflecting the software version of the AI tool used, date(s) used, inputs and outputs, any software tracking information, and any efforts to preserve records related to the use of those AI tools or the inputs and outputs submitted to the AI tools.

**OBJECTIONS AND RESPONSE TO RFP 11:** Defendants object to this Request because it seeks information that is irrelevant to Plaintiff's case and is therefore outside the scope of discovery permitted by Federal Rule of Civil Procedure 26. The operative, Second Amended Complaint does not contain any allegation—plausible or otherwise—that any of the actions Defendants have taken against Colorado were supported or otherwise informed by "artificial intelligence (AI) tools." Defendants further object because it is not proportional to the needs of this case to identify AI tools Defendants used to: (i) take actions regarding Colorado that are *themselves* not pled in the Complaint, as requested in the referenced Interrogatory 4; or (ii) *consider* (but not take) actions against Colorado or against non-parties, as requested in the referenced Interrogatory 7. Conduct that is not described in the Complaint is inherently irrelevant, and even if it were not, it is not proportionate to the needs of this case to require Defendants to search for information outside the scope of the Complaint that Plaintiff chose to plead. *Cf., e.g.*, *Cuomo v. Clearing House Ass'n*, 557 U.S. 519, 531 (2009) (observing that judges are trusted to prevent "fishing expeditions" or an undirected rummaging through materials for evidence of some unknown wrongdoing); *accord, e.g.*, *Harriman v. Smart*, 2023 WL 11911575, at *2–3 (D. Colo. June 14, 2023) ("The relevant and proportional scope of discovery . . . is limited to the well-pleaded factual allegations and related claims asserted in the [operative complaint]."; citing cases).

Defendant DHS objects to this Request because there are no allegations in the operative Complaint, at all, concerning it. DHS appears to be included as a named Defendant solely because the Federal Emergency Management Agency, also a named Defendant, is a component of DHS. Because there are no allegations in the operative Complaint against DHS, DHS will not respond to discovery.

Finally, Defendants object to the extent the Request seeks discovery from the President, the Executive Office of the President, and/or the White House. Such discovery is improper at least at this juncture because, among other things, it would contravene "[t]he high respect that is owed to the office of the Chief Executive," which "is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery." *Clinton v. Jones*, 520 U.S. 681, 707 (1997); *see also Nixon v. Fitzgerald*, 457 U.S. 731, 749, 753 (1982) ("The President occupies a unique position in the constitutional scheme" that "counsel[s] judicial deference and restraint."). Plaintiff's discovery requests treat the President like any other civil litigant and fail to account for the "special considerations applicable to the President." *Cheney v. U.S. Dist. Ct. for Dist. of Columbia*, 542 U.S. 367, 385 (2004). Requiring their response would improperly "detract [the President] from energetic performance of [his] constitutional duties." *Id.* at 382; *see also id.* at 381–82 ("In no case . . . would a court be required to proceed against the president as against an ordinary individual." (quoting *United States v. Burr*, 25 F. Cas. 187, 192 (No. 14,694) (CC Va. 1807) (Marshall, J.))). That is, separation-of-powers concerns necessarily prevent such discovery from proceeding now. *See, e.g.*, *Cheney*, 542 U.S. at 388–91 (court of appeals failed to properly consider separation-of-powers concerns when it denied government's request for mandamus relief to prevent discovery against the Vice President, which discovery, the government argued, threatened "substantial intrusions on the process by which those in closest operational proximity to the President advise the President"; court of appeals also erred in finding that the Vice President must first assert executive privilege); *see also U.S. Doge Serv. v. Citizens for Resp. & Ethics in Washington*, 145 S. Ct. 1981 (2025) ("[S]eparation of powers concerns counsel judicial deference and restraint in the context of discovery regarding internal Executive Branch communications.").

While *Cheney* alone counsels against any discovery against the President, Plaintiff's discovery against the President and EOP is particularly improper here because Plaintiff is already pursuing extensive discovery against the Agency Defendants that may well yield at least substantially the information that Plaintiff seeks without burdening the President. *See, e.g.*, Order, *Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019) (requiring Plaintiff to exhaust all discovery on other Defendants before considering whether there was "continuing need for discovery sought on the White House"); *Wagafe v. Trump*, 2017 WL 5990134, at *3 (W.D. Wash. Oct. 19, 2017) ("intruding on the Executive in this context is a matter of last resort"); *United States v. McGraw-Hill Cos.*, 2014 WL 1647385, at *13 (C.D. Cal. Apr. 15, 2014); *cf. Karnoski v. Trump*, 926 F.3d 1180, 1203–07 (9th Cir. 2019) (granting government's writ of mandamus to vacate district court's discovery order against the President because district court failed to apply *Cheney* or "explore other avenues, short of forcing the Executive to invoke privilege" (quoting *Cheney*, 542 U.S. at 390)). Accordingly, and consistent with settled precedent, the President, EOP, and the White House will not be responding to Plaintiff's Request for Production at this time.

Pursuant to Rule 34(b)(2)(C), Defendants will not produce documents in response to this Request.

**REQUEST FOR PRODUCTION NO. 12:** All documents, electronically stored information, and communications used, referenced, or consulted by Defendants in responding to any Interrogatory.

**OBJECTIONS AND RESPONSE TO RFP 12:** Defendant DHS objects to this Request because there are no allegations in the operative Complaint, at all, concerning it. DHS appears to be included as a named Defendant solely because the Federal Emergency Management Agency, also a named Defendant, is a component of DHS. Because there are no allegations in the operative Complaint against DHS, DHS will not respond to discovery.

Defendants will conduct a reasonable search for documents Agency Defendants relied upon in responding to any Interrogatory and will produce any non-privileged, responsive results that exist on a rolling basis, with substantial completion expected to occur by July 31, 2026. Defendants will also provide, as appropriate, privilege logs at the conclusion of their rolling productions.

**REQUEST FOR PRODUCTION NO. 13:** All documents, electronically stored information, and communications regarding Defendants' retention of documents responsive to these document requests.

**OBJECTIONS AND RESPONSE TO RFP 13:** Defendants object to this Request to the extent that it calls for the disclosure of attorney work product or attorney-client privileged information. Defendants further object to this Request because it is premature and would be appropriate only if, for example, there were evidence to support the loss or unavailability of relevant information due to its alleged destruction. *See, e.g.*, *Al Otro Lado, Inc. v. Wolf*, 2020 WL 4432026, at *2 (S.D. Cal. July 31, 2020).

Defendant DHS objects to this Request because there are no allegations in the operative Complaint, at all, concerning it. DHS appears to be included as a named Defendant solely because the Federal Emergency Management Agency, also a named Defendant, is a component of DHS. Because there are no allegations in the operative Complaint against DHS, DHS will not respond to discovery.

Finally, Defendants object to the extent the Request seeks discovery from the President, the Executive Office of the President, and/or the White House. Such discovery is improper at least at this juncture because, among other things, it would contravene "[t]he high respect that is owed to the office of the Chief Executive," which "is a matter that should inform the conduct of the

entire proceeding, including the timing and scope of discovery." *Clinton v. Jones*, 520 U.S. 681, 707 (1997); *see also Nixon v. Fitzgerald*, 457 U.S. 731, 749, 753 (1982) ("The President occupies a unique position in the constitutional scheme" that "counsel[s] judicial deference and restraint."). Plaintiff's discovery requests treat the President like any other civil litigant and fail to account for the "special considerations applicable to the President." *Cheney v. U.S. Dist. Ct. for Dist. of Columbia*, 542 U.S. 367, 385 (2004). Requiring their response would improperly "detract [the President] from energetic performance of [his] constitutional duties." *Id.* at 382; *see also id.* at 381–82 ("In no case . . . would a court be required to proceed against the president as against an ordinary individual." (quoting *United States v. Burr*, 25 F. Cas. 187, 192 (No. 14,694) (CC Va. 1807) (Marshall, J.))). That is, separation-of-powers concerns necessarily prevent such discovery from proceeding now. *See, e.g.*, *Cheney*, 542 U.S. at 388–91 (court of appeals failed to properly consider separation-of-powers concerns when it denied government's request for mandamus relief to prevent discovery against the Vice President, which discovery, the government argued, threatened "substantial intrusions on the process by which those in closest operational proximity to the President advise the President"; court of appeals also erred in finding that the Vice President must first assert executive privilege); *see also U.S. Doge Serv. v. Citizens for Resp. & Ethics in Washington*, 145 S. Ct. 1981 (2025) ("[S]eparation of powers concerns counsel judicial deference and restraint in the context of discovery regarding internal Executive Branch communications.").

While *Cheney* alone counsels against any discovery against the President, Plaintiff's discovery against the President and EOP is particularly improper here because Plaintiff is already pursuing extensive discovery against the Agency Defendants that may well yield at least substantially the information that Plaintiff seeks without burdening the President. *See, e.g.*, Order,

*Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019) (requiring Plaintiff to exhaust all discovery on other Defendants before considering whether there was "continuing need for discovery sought on the White House"); *Wagafe v. Trump*, 2017 WL 5990134, at *3 (W.D. Wash. Oct. 19, 2017) ("intruding on the Executive in this context is a matter of last resort"); *United States v. McGraw-Hill Cos.*, 2014 WL 1647385, at *13 (C.D. Cal. Apr. 15, 2014); *cf. Karnoski v. Trump*, 926 F.3d 1180, 1203–07 (9th Cir. 2019) (granting government's writ of mandamus to vacate district court's discovery order against the President because district court failed to apply *Cheney* or "explore other avenues, short of forcing the Executive to invoke privilege" (quoting *Cheney*, 542 U.S. at 390)). Accordingly, and consistent with settled precedent, the President, EOP, and the White House will not be responding to Plaintiff's Request for Production at this time.

Pursuant to Federal Rule of Civil Procedure 34(b)(2)(C), Defendants will not, at this time, search for and produce "[a]ll documents, electronically stored information, and communications regarding Defendants' retention of documents responsive to these document requests."

**REQUEST FOR PRODUCTION NO. 14:** All documents, electronically stored information, and communications listed by Defendants in their initial disclosures or that Defendants may rely upon in this matter.

**OBJECTIONS AND RESPONSE TO RFP 14:** Defendant DHS objects to this Request because there are no allegations in the operative Complaint, at all, concerning it. DHS appears to be included as a named Defendant solely because the Federal Emergency Management Agency, also a named Defendant, is a component of DHS. Because there are no allegations in the operative Complaint against DHS, DHS will not respond to discovery.

Agency Defendants will conduct a reasonable search for documents that they may rely upon in this matter and will produce any non-privileged, responsive results that exist on a rolling

basis. Defendants will also provide, as appropriate, privilege logs at the conclusion of their rolling productions.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

*/s/ Marianne F. Kies*
JOSEPH E. BORSON
MARIANNE F. KIES
Assistant Branch Directors
Federal Programs Branch

ALEXANDER J. SEVERANCE
Trial Attorney
Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Alexander.J.Severance@usdoj.gov
Tel.: 202-598-3123

**CERTIFICATE OF SERVICE**

I certify that on June 18, 2026, I electronically served the foregoing, via email, on counsel of record for Plaintiff.

*s/ Marianne F. Kies*
U.S. Department of Justice

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 25-cv-03428-RBJ

THE STATE OF COLORADO,

Plaintiff,

v.

DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,

Defendants.

---

**DEFENDANTS' FIRST SUPPLEMENTAL OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES**

---

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, as well as this Court's Scheduling Order (ECF 76 at 10), Defendants[1] hereby supplement their June 18, 2026, responses to Plaintiff's First Set of Interrogatories, as follows.

***

[1] President Trump, in his official capacity, and the Executive Office of the President; Pete Hegseth, in his official capacity as Secretary of War (and the Department of War); Troy Meink, in his official capacity as Secretary of the Air Force (and the Department of the Air Force); Sean Duffy, in his official capacity as Secretary of Transportation (and the Department of Transportation); Brooke Rollins, in her official capacity as Secretary of Agriculture (and the Department of Agriculture); Chris Wright, in his official capacity as Secretary of Energy (and the Department of Energy); Doug Burgum, in his official capacity as Secretary of the Interior (and the Department of the Interior); Markwayne Mullin, in his official capacity as Secretary of Homeland Security (and the Department of Homeland Security); Robert Fenton, in his official capacity as Senior Official Performing the Duties of Administrator of the Federal Emergency Management Agency ("FEMA") (and FEMA); and Brian Stone, in his official capacity as Senior Official Performing the Duties of Director of the National Science Foundation ("NSF") (and NSF).

**INTERROGATORY NO. 1:** Identify all individuals that had any role in each of the actions or threats against either Colorado, its political subdivisions or instrumentalities, or entities within Colorado described in the operative Complaint – whether in making, adopting, approving, implementing, being briefed on and/or attending meetings regarding the action or threat – including their identity (e.g., position and responsibilities with any Defendant), role in and/or how they contributed to the action or threat, and dates they were involved in the action or threat.

**SUPPLEMENTAL RESPONSE:** Defendants object to the extent the Interrogatory seeks discovery from the President, the Executive Office of the President, and/or the White House. Such discovery is improper at least at this juncture because, among other things, it would contravene "[t]he high respect that is owed to the office of the Chief Executive," which "is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery." *Clinton v. Jones*, 520 U.S. 681, 707 (1997); *see also Nixon v. Fitzgerald*, 457 U.S. 731, 749, 753 (1982) ("The President occupies a unique position in the constitutional scheme" that "counsel[s] judicial deference and restraint."). Plaintiff's discovery requests treat the President like any other civil litigant and fail to account for the "special considerations applicable to the President." *Cheney v. U.S. Dist. Ct. for Dist. of Columbia*, 542 U.S. 367, 385 (2004). Requiring their response would improperly "detract [the President] from energetic performance of [his] constitutional duties." *Id.* at 382; *see also id.* at 381–82 ("In no case . . . would a court be required to proceed against the president as against an ordinary individual." (quoting *United States v. Burr*, 25 F. Cas. 187, 192 (No. 14,694) (CC Va. 1807) (Marshall, J.))). That is, separation-of-powers concerns necessarily prevent such discovery from proceeding now. *See, e.g.*, *Cheney*, 542 U.S. at 388–91 (court of appeals failed to properly consider separation-of-powers concerns when it denied government's request for mandamus relief to prevent discovery against the Vice President, which discovery, the government argued, threatened "substantial intrusions on the process by which those in closest operational proximity to the President advise the President"; court of appeals also erred in finding

that the Vice President must first assert executive privilege); *see also U.S. Doge Serv. v. Citizens for Resp. & Ethics in Washington*, 145 S. Ct. 1981 (2025) ("[S]eparation of powers concerns counsel judicial deference and restraint in the context of discovery regarding internal Executive Branch communications.").

While *Cheney* alone counsels against any discovery against the President, Plaintiff's discovery against the President and EOP is particularly improper here because Plaintiff is already pursuing extensive discovery against the Agency Defendants that may well yield at least substantially the information that Plaintiff seeks without burdening the President. *See, e.g.*, Order, *Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019) (requiring Plaintiff to exhaust all discovery on other Defendants before considering whether there was "continuing need for discovery sought on the White House"); *Wagafe v. Trump*, 2017 WL 5990134, at *3 (W.D. Wash. Oct. 19, 2017) ("intruding on the Executive in this context is a matter of last resort"); *United States v. McGraw-Hill Cos.*, 2014 WL 1647385, at *13 (C.D. Cal. Apr. 15, 2014); *cf. Karnoski v. Trump*, 926 F.3d 1180, 1203–07 (9th Cir. 2019) (granting government's writ of mandamus to vacate district court's discovery order against the President because district court failed to apply *Cheney* or "explore other avenues, short of forcing the Executive to invoke privilege" (quoting *Cheney*, 542 U.S. at 390)).

Accordingly, and consistent with settled precedent, the President and EOP will not be responding to Plaintiff State of Colorado's Interrogatories at this time.

Defendants also object to this Interrogatory because the phrase "actions or threats" is vague and undefined. Defendants construe that phrase as follows: (i) with respect to the Departments of War and Air Force, the decision to relocate U.S. Space Command Headquarters (SAC ¶ 78); (ii)

with respect to the Department of Transportation, the decision to withdraw four awards, and terminate one grant agreement, constituting approximately $109 million that had been allocated to Colorado entities (*see* ECF 80 (stipulation)) and the decision to select recipients for FY2025 Safe Streets and Roads for All grants (SAC ¶ 106); (iii) with respect to the Department of Energy, "plans to terminate $615 million in DOE funds earmarked only for Colorado" (SAC ¶ 91); (iv) with respect to the National Science Foundation, its announcement regarding restructuring the National Center for Atmospheric Research (SAC ¶ 93), (v) with respect to the Department of Agriculture, its direction to Colorado to comply with a SNAP pilot project (SAC ¶ 97); (vi) with respect to the Federal Emergency Management Agency, a component of the Department of Homeland Security, denial of two disaster relief assistance requests (SAC ¶ 101); and (vii) with respect to the Department of Interior, "compil[ation] [of] a list of all grants earmarked for Colorado, its instrumentalities, and political subdivisions for possible termination" (SAC ¶ 109)—henceforth, collectively, the "Challenged Conduct."

Defendants Department of Energy, National Science Foundation, and Department of Interior further object to this Interrogatory because, as to them, it facially seeks information that is protected by at least the deliberative-process privilege, insofar as Plaintiff's allegations in this case against DOE, NSF, and DOI challenge alleged intended conduct that has not materialized into agency action. The deliberative-process privilege shields "documents reflecting advisory opinions, recommendations and deliberations compromising part of a process by which governmental decisions and policies are formulated." *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). Recognizing that "officials will not communicate candidly among themselves if each remark is a potential item of discovery," the deliberative-process privilege is

primarily designed to "enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government." *Id.* at 8–9 (cleaned up). It further serves to prevent the premature disclosure of proposed policies, and avoids "misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action." *Trentadue v. Integrity Comm.*, 501 F.3d 1215, 1226 (10th Cir. 2007) (cleaned up).

Defendant Department of Homeland Security ("DHS") objects to this Interrogatory because there are no allegations in the operative Complaint, at all, concerning it. DHS appears to be included as a named Defendant solely because the Federal Emergency Management Agency, also a named Defendant, is a component of DHS. Nonetheless, in the spirit of compromise, and although Defendants do not concede that Plaintiff has established the relevance and proportionality of discovery directed to DHS—when it is already receiving discovery from FEMA, the agency alleged to have taken action against Colorado—DHS will respond to Plaintiff's discovery requests. Specifically, DHS will provide answers to Plaintiff's Interrogatories (subject to Defendants' other objections) on or before September 18, 2026.

Based on a reasonably diligent search, Agency Defendants (other than DHS—*see supra*) identify the following individuals who had a role in the Challenged Conduct. The dates each of these individuals became involved with the Challenged Conduct will be reflected within Defendant's forthcoming responses to Plaintiff's Requests for Production. Namely, in response to (at least) Plaintiff's Request for Production No. 1, Agency Defendants will conduct a reasonable search for documents and communications regarding the Challenged Conduct, within the

timeframe of April 1, 2025, to July 1, 2026 (revised at Plaintiff's request),[2] and, following that search, will produce relevant, non-privileged documents. If responsive, relevant, non-privileged documents exist and are produced, Agency Defendants will supplement their answer to this Interrogatory to indicate the Bates numbers. Fed. R. Civ. P. 33(d)(1). The dates will, alternatively, appear in privilege logs.

***Department of War (Supplemental Response):*** The individuals listed below were involved in and/or briefed on the decision.

1. Hon. Pete Hegseth, Secretary of War.
   - On July 21, 2025, met with a Colorado Congressional Delegation to discuss the forthcoming presidential Space Command basing decision.
   - Briefed by Secretary of War Chief of Staff Ricky Buria on DoW's position regarding the forthcoming presidential Space Command basing decision during an August 2025 meeting with Secretary of the Air Force Troy Meink, Chief of Staff to the Secretary of the Air Force Benjamin Schramm; Deputy Secretary of War Steve Feinberg; and Chief of Staff to the Deputy Secretary of War James Sapp. The information provided in that briefing is protected from disclosure by the deliberative process privilege. The information is pre-decisional and deliberative

[2] Defendants do not concede that this timeframe is relevant to Plaintiff's claims, or proportional to the needs of the case, as to discovery against any Defendant.

The Parties are conferring with respect to the discovery timeframe applicable to the United States Air Force, "USAF." USAF has not agreed to a discovery timeframe of April 1, 2025, to July 1, 2026. Defendants will supplement their discovery responses, in writing, when agreement is reached with respect to USAF.

because it concerns DoW's position regarding the forthcoming basing decision prior to President Trump making a final decision.

- In August 2025, met with President Trump and Secretary Meink regarding the forthcoming presidential Space Command basing decision. The information provided in that meeting is protected from disclosure by executive privilege because it concerns presidential communications. The information is also protected from disclosure by the deliberative process privilege. The information is pre-decisional and deliberative because it concerns discussion of the forthcoming basing decision prior to President Trump making a final decision.
- Invited to and attended White House event on September 2, 2025 with senior White House and DoW officials and the Alabama Congressional Delegation for President Trump's announcement of the Space Command basing decision.
- After the announcement, discussed plans to implement the President's decision with Secretary Meink and Commander for U.S. Space Command, Gen. Stephen Whiting.

2. Hon. Steve Feinberg, Deputy Secretary of War. Briefed by Secretary of War Chief of Staff Ricky Buria on DoW's position regarding the forthcoming presidential Space Command basing decision during an August 2025 meeting with Secretary Hegseth; Secretary of the Air Force Troy Meink; Chief of Staff to the Secretary of the Air Force Benjamin Schramm; and Chief of Staff to the Deputy Secretary of War James Sapp. The information provided in that briefing is protected from disclosure by the deliberative process privilege. The information is pre-decisional and deliberative

because it concerns DoW's position regarding the forthcoming basing decision prior to President Trump making a final decision.

3. Ricky Buria, Chief of Staff to the Secretary of War.
   - On July 21, 2025, attended a meeting between a Colorado Congressional Delegation and Secretary of War Pete Hegseth regarding the forthcoming presidential Space Command basing decision.
   - Briefed Secretary Hegseth, Secretary of the Air Force Troy Meink, Chief of Staff to the Secretary of the Air Force Benjamin Schramm, Deputy Secretary of War Feinberg, and Chief of Staff to the Deputy Secretary of War James Sapp on DoW's position regarding the forthcoming presidential Space Command basing decision in August 2025. The information provided in that briefing is protected from disclosure by the deliberative process privilege. The information is pre-decisional and deliberative because it concerns DoW's position regarding the forthcoming basing decision prior to President Trump making a final decision. Coordinated on congressional notifications of the Space Command basing decision to congressional Armed Services committees.
4. Patrick Weaver, Deputy Chief of Staff to the Secretary of War. General awareness of the Space Command basing decision through discussions with DoW officials.
5. Hon. Earl G. Matthews, General Counsel, Department of War ("DoW"). Served as DoW General Counsel and provided legal advice in that capacity. Conversations about the 2025 U.S. Space Command basing decision are protected by attorney-client privilege.

6. Eric Geressy, Senior Advisor to the Secretary of War for Strategy. General awareness of the Space Command basing decision. Discussed the basing decision with Space Command Staff during a February 2026 visit to Space Command.
7. Hon. Dane Hughes, Assistant Secretary of War for Legislative Affairs. After the September 2, 2025, public announcement of the decision, coordinated with the Office of the Secretary of War, White House Legislative Affairs, and the Office of the Secretary of the Air Force to provide notification of the decision to Congress.
8. Sean Parnell, Senior Advisor and Assistant to the Secretary of War for Public Affairs. In capacity as Assistant to the Secretary of War for Public Affairs, made press statement on behalf of DoW regarding the Space command basing decision and efforts to implement that decision.
9. James Sapp, Acting Co-Chief of Staff to the Deputy Secretary of War and Principal Deputy Assistant Secretary of War for Legislative Affairs. Coordinated meetings and congressional notifications of the Space Command basing decision with White House Legislative officials (Brian Brody, Joe Ballard, Drew Dziak), Office of the Secretary of the Air Force (Benjamin Schramm, Maj. Gen. Benjamin Maitre), and the Office of the Secretary of War (Ricky Buria and Patrick Weaver). The information provided in coordinating with White House officials is protected from disclosure by the executive privilege because it concerns communications with the White House.
10. President Donald Trump.
    - In August 2025, met with Secretary Hegseth and Secretary Meink regarding the forthcoming presidential Space Command basing decision. The information

provided in that meeting is protected from disclosure by executive privilege because it concerns presidential communications. The information is also protected from disclosure by the deliberative process privilege. The information is pre-decisional and deliberative because it concerns discussion of the forthcoming basing decision prior to President Trump making a final decision.

- Hosted White House event on September 2, 2025, and invited senior DoW officials and the Alabama Congressional Delegation for announcement of the Space Command basing decision.

11. Brian Brody (White House Legislative Affairs). Coordinated congressional notifications of the Space Command basing decision with DoW officials.
12. Joseph Ballard (White House Legislative Affairs). Coordinated congressional notifications of the Space Command basing decision with DoW officials.
13. Drew Dziak (White House Legislative Affairs). Coordinated congressional notifications of the Space Command basing decision with DoW officials.

Out of an abundance of caution, DoW previously listed the below individuals as having been involved in and/or briefed on the decision but has since confirmed that they were not:

1. Hon. Charles Young III, General Counsel, Department of the Army; former Principal Deputy General Counsel, DoW.
2. General Christopher LaNeve, Vice Chief of Staff of the Army; former Senior Military Advisor to the Secretary of War.

***Department of Air Force (Supplemental Response):*** The individuals listed below were briefed on the decision and/or have since been involved with implementing the decision.

1. Hon. Dr. Troy Meink, Secretary of the Air Force

    - Briefed by Secretary of War Chief of Staff Ricky Buria on DoW's position regarding the forthcoming presidential Space Command basing decision during an August 2025 meeting with senior DoW officials. The information provided in that briefing is protected from disclosure by the deliberative process privilege. The information is pre-decisional and deliberative because it concerns DoW's position regarding the forthcoming basing decision prior to President Trump making a final decision.
    - In August 2025, met with President Trump and Secretary Hegseth regarding the forthcoming presidential Space Command basing decision. The information provided in that meeting is protected from disclosure by executive privilege because it concerns presidential communications. The information is also protected from disclosure by the deliberative process privilege. The information is pre-decisional and deliberative because it concerns discussion of the forthcoming basing decision prior to President Trump making a final decision.

2. General Stephen Whiting, Commander, U.S. SPACE Command. Based on public reporting that the USSPACECOM HQ basing location decision was under review, began preparing plans for execution if such a decision was made. Shortly prior to September 2, 2025, invited to a White House event with the Alabama Congressional Delegation and senior DoW officials but did not attend the event. Learned of the decision for the first time while watching President Trump's announcement on September 2, 2025, on television. Following the September 2 announcement,

discussed plans and actions to implement the decision with the Secretary of War, the Secretary of the Air Force, and Congressional Delegations for Colorado, Alabama, and Tennessee. Also had post-announcement conversations about the decision and progress on relocation with state and local officials in Alabama and Colorado, other federal agencies with operations at Redstone Arsenal in Alabama (including NASA and FBI), foreign military leaders with liaisons assigned to USSPACECOM HQ, and other civic and corporate stakeholders with interests in the relocation decision.

3. Benjamin Schramm, Chief of Staff to the Secretary of the Air Force. Briefed by Secretary of War Chief of Staff Ricky Buria on DoW's position regarding the forthcoming presidential Space Command basing decision during an August 2025 meeting with senior DoW officials. The information provided in that briefing is protected from disclosure by the deliberative process privilege. The information is pre-decisional and deliberative because it concerns DoW's position regarding the forthcoming basing decision prior to President Trump making a final decision. Coordinated with DoW officials regarding congressional notifications of the Space Command basing decision.
4. Maj. Gen. Benjamin Maitre, Director, Legislative Liaison, Office of the Secretary of the Air Force. Coordinated with DoW officials regarding congressional notifications of the Space Command basing decision.
5. Nancy Balkus, Deputy Assistant Secretary of the Air Force for Infrastructure, Energy and Environment (SAF/IEE). After the decision was made on September 2, 2025, has worked directly in pursuit of the military construction project to build the new

USSPACECOM HQ facility in Alabama.

6. Robert Moriarty, Deputy Assistant Secretary of the Air Force for Installations (SAF/IEI). Supported leasing space for USSPACECOM in Colorado Springs and Huntsville and provided information about the previous rounds of the USSPACECOM basing decision and cost estimates.
7. Carol Ann Beda, Associate Director for Installations (SAF/IEI). Generally aware through public reporting that the basing location decision was under review. After the September 2, 2025, announcement of the decision, participated in teams discussing implementation of the decision, including the USSPACECOM Transition Team beginning on or around September 22, 2025.
8. Michael Saunders, Principal Deputy Assistant Secretary of the Air Force for Energy, Installations and Environment (SAF/IEI). Provided information to the Secretary of the Air Force and other senior leaders regarding the original basing decision, and at the time, DoD Inspector General and Government Accountability Office (GAO) restrictions limiting the Department of the Air Force's (DAF) ability to execute planning activities related to the prior basing decision, including military construction design and execution.
9. Major Robert D. Young, Executive Officer, USAF (SAF/IEI). As Executive Officer to the Deputy Assistant Secretary (DAS) for Installations, coordinated information from action officers within the Directorate to senior USAF leaders and coordinated meetings for the DAS.
10. Lieutenant Colonel Ferdinand Maldonado, Deputy Chair, Installations Support Panel,

USAF (SAF/IE). In June 2025, copied on email communications with SAF offices regarding the history of the prior USSPACECOM basing decision. In August 2025, copied on email communications with DoW Legislative Affairs and SAF offices to support preparation of materials for discussion with congressional defense committees on the rough order of magnitude (ROM) costs of military construction for Redstone Arsenal. Following the public announcement of the basing decision, copied on SAF/IE email communications about supporting USAF congressional engagement on the decision; contributed to email communications with SAF/IE about proposed construction methods for the new USSPACECOM facility; copied on email communications with SAF/IE discussing execution methodologies for construction of the new USSPACECOM facility; copied on email communications providing transition planning update to senior leaders.

11. Lieutenant Colonel Jimmy M. Oxendine, Director, Installations Planning, USAF (SAF/IEI). Following the September 2, 2025 public announcement of the decision, coordinated meetings and engagements between SAF/IE and the Office of the Secretary of the Air Force regarding implementation of the decision.

12. Christopher A. Lopez, Director of Congressional and Public Affairs (SAF/IE). Coordinated information from USAF's prior recommendation on the USSPACECOM basing location with SAF offices.

Out of an abundance of caution, USAF previously listed the below individuals as having been briefed on the decision and/or having since been involved with implementing the decision but has since confirmed that they were not.

1. Jason Burnside, Principal Director (Built Infrastructure Policy & Programs) (SAF/IEE).
2. Roberto I. Guerrero, Deputy Assistant Secretary of the Air Force for Operational Energy (SAF/IEN).
3. Lieutenant Colonel Nambia Fagan, Executive Officer, USAF (SAF/IEE).

***Department of Agriculture:***

1. Secretary Brooke Rollins—requested call with Chief of Staff Kailee Buller to discuss CO pilot letter.
2. Kailee Buller, former Chief of Staff to the Secretary—briefed Secretary Rollins.
3. Jennifer Tiller, Chief of Staff to the Deputy Secretary—liaised with the Executive Office of the President; drafted letter.
4. Shiela Corley, former Chief of Staff to Deputy Under Secretary for FNCS—general awareness of the then-forthcoming pilot letter.
5. Gina Brand, Senior Policy Advisor for Integrity—analyzed underlying data.
6. Patrick Penn, former Deputy Under Secretary for FNCS—signatory.
7. Stacy Swanson, Director of Oversight—formatting / reviewing / sending the final letter.
8. Alec Varsamis, former Deputy Communications Director—formatting / reviewing / sending the final letter.
9. Audra Weeks, former Deputy Chief of Staff for Policy—formatting / reviewing / sending the final letter.
10. Andres Talero, Acting Deputy Director (Detailee), Office of the Executive Secretariat —formatting / reviewing / sending the final letter.

11. Taylor Keel, Senior Advisor for the Food and Nutrition Administration—formatting / reviewing/ sending the final letter.
12. Jasmine Fletcher, Senior Administrative Support Specialist—administrative assistance; formatted and prepared pilot letter.
13. Shelly Beatty, Special Assistant to the Administrator—administrative assistance; formatted and prepared pilot letter.
14. Isabel Applewhite, Assistant to the Secretary—formatting / reviewing / sending the final letter.
15. Emily Underwood, Deputy Assistant to the President and Senior Policy Strategist, EOP—given updates on status of pilot letter.
16. Sam Adolphsen, former Deputy Assistant to the President for Domestic Policy, EOP—given updates on status of pilot letter.
17. Daniel Wasserman, Policy Advisor, EOP—given updates on status of pilot letter.
18. Abigail Jackson, Deputy Press Secretary, EOP—given updates on status of pilot letter.
19. Taylor Rogers, Assistant Press Secretary, EOP—given updates on status of pilot letter.

***Department of Transportation (Supplemental Response):***

1. Mindy Barry, former Senior Counsel to the General Counsel, Office of the General Counsel, Office of the Secretary of Transportation—Member of the Senior Review Team for FY25 Safe Streets and Roads for All (SS4A) grant applications.
2. Leslie Becera, Principal Deputy Assistant Secretary for Government Affairs (formerly Deputy Assistant Secretary for Congressional Affairs (House), Office of Governmental Affairs), Office of the Secretary of Transportation—Member of the Senior Review

Team for FY25 SS4A grant applications.

3. David Bell, former Director of the Office of Governmental Affairs, Policy and Strategic Planning, National Highway Traffic Safety Administration—Member of the Senior Review Team for FY25 SS4A grant applications.

4. Brian Buskard, Deputy Assistant Secretary for Research and Technology (formerly Deputy Assistant Secretary for Congressional Affairs (Senate), Office of Governmental Affairs), Office of the Secretary of Transportation—Member of the Senior Review Team for FY25 SS4A grant applications.

5. John Cater, Division Administrator-Colorado, Federal Highway Administration—sent cover email to Colorado Department of Transportation terminating NEVI grant.

6. Sophia Dudkovsky, Special Assistant, Office of the Administrator, National Highway Traffic Safety Administration—Member of the Senior Review Team for FY25 SS4A grant applications.

7. Sean Duffy, Secretary of Transportation—responsible for "establish[ing] and carry[ing] out . . . the Safe Streets and Roads for All program" pursuant to the Infrastructure Investment and Jobs Act § 24112, Pub. L. 117-58, 135 Stat. 429, 815-16 (2021).

8. Andrew Emanuele, Program Manager, SS4A Team, Office of the Secretary of Transportation—administers the SS4A program.

9. Drew Feeley, Deputy Administrator, Federal Railroad Administration (FRA)—sent letters to (1) Colorado Department of Transportation withdrawing CRISI award; and (2) Colorado State University withdrawing CRISI award.

10. Kyle Fields, Deputy General Counsel (formerly Chief Counsel, FRA)—sent cover emails to (1) Colorado Department of Transportation attaching FRA letter withdrawing CRISI award; and (2) Colorado State University attaching FRA letter withdrawing CRISI award.

11. Arlan Finfrock, Associate Administrator for Administration, Federal Highway Administration—sent letter to Colorado Department of Transportation terminating NEVI grant.

12. Mike Giordano, Policy Advisor, Office of the Assistant Secretary for Transportation Policy—Member of the Senior Review Team for FY25 SS4A grant applications.

13. Luisa Guerra-Young, Deputy Assistant Secretary for Policy, Office of the Assistant Secretary for Transportation Policy, Office of the Secretary of Transportation—Member of the Senior Review Team for FY25 SS4A grant applications.

14. Carolyn Mulvihill, Program Support, SS4A Team, Office of the Secretary of Transportation—administers the SS4A program.

15. Melissa Newton, former Director of Governmental and Legislative Affairs, Office of Governmental Affairs, Office of the Secretary of Transportation—Member of the Senior Review Team for FY25 SS4A grant applications.

16. Thy Nguyen, SMART Agreements Officer, Office of the Assistant Secretary for Research & Technology—sent cover email to the City of Fort Collins withdrawing SMART award.

17. Abigail Orlaski, former Senior Advisor for Congressional Affairs, Office of Governmental Affairs, Office of the Secretary of Transportation—Member of the

Senior Review Team for FY25 SS4A grant applications and assisted in withdrawing four unobligated grant awards for which Colorado entities had been selected, and terminating one grant agreement with a Colorado recipient

18. Jay Payne, Deputy Administrator, Federal Highway Administration—Member of the Senior Review Team for FY25 SS4A grant applications.
19. Kris Riesenberg, Program Support, SS4A Team, Office of the Secretary of Transportation—administers the SS4A program.
20. Loren Smith, Deputy Assistant Secretary for Transportation Policy, Office of the Secretary of Transportation—Member of the Senior Review Team for FY25 SS4A grant applications and assisted in withdrawing four unobligated grant awards for which Colorado entities had been selected, and terminating one grant agreement with a Colorado recipient.
21. Suzanne TeBeau-Rohde, Chief Counsel, Federal Highway Administration—Member of the Senior Review Team for FY25 SS4A grant applications.
22. Devin Ure, Deputy Assistant Secretary for Budget and Programs, Office of the Secretary of Transportation—Member of the Senior Review Team for FY25 SS4A grant applications.
23. Steve Walling, White House Liaison, Office of the Secretary of Transportation—Member of the Senior Review Team for FY25 SS4A grant applications.
24. Jason Wied, Senior Counselor to the Deputy Secretary, Office of the Deputy Secretary of Transportation, Office of the Secretary of Transportation—Member of the Senior Review Team for FY25 SS4A grant applications.

25. Christopher Yablonski, Senior Advisor, Office of the Assistant Secretary for Transportation Policy, Office of the Secretary of Transportation—Member of the Senior Review Team for FY25 SS4A grant applications and assisted in withdrawing four unobligated grant awards for which Colorado entities had been selected, and terminating one grant agreement with a Colorado recipient.

In addition, there are 100+ DOT employees comprising various evaluation teams that engage in a Merit Criteria Review of each SS4A grant application. Additional information on the grant review and selection process can be found at the website listed in DOT's response to Interrogatory No. 2.

***Department of Interior (Supplemental Response):***

1. Matt Luby, Chief Strategy Officer, Office of the Chief Information Officer (formerly, Senior Advisor, Assistant Secretary for Policy Management and Budget). Requested that the Office of Grants Management ("PGM") compile a list of DOI financial assistance awards to Colorado and Colorado-based entities, and created and circulated the initial compilation, "DOI Open Grants – State of Colorado" (Dec. 15, 2025). Specific information provided in Mr. Luby's email communications regarding the review of financial assistance awards to Colorado and Colorado-based entities is protected from disclosure by the deliberative process privilege. The information is pre-decisional and deliberative because it concerns communications relating to decisions that were ultimately never made by the Department, including decisions regarding whether certain financial assistance awards should be terminated.
2. Cara Whitehead, former Director, PGM. Oversaw PGM's compilation of the December

2025 list of open awards to Colorado and Colorado-based entities.

3. Michelle Maher, former Policy Analyst, PGM. Compiled the requested list of awards to Colorado entities and prepared PGM's submission responding to the January 2026 OMB Budget Data Request.

4. Yolande Norman-Moore, Deputy Director, PGM. Deputy director of the compiling office and copied on the related correspondence; no substantive role beyond that identified.

5. Megan Olsen, Director, Office of Acquisition and Property Management ("PAM"). Participated in intra-Departmental correspondence coordinating DOI's response regarding contracts under the January 2026 data call (BDR-26-09, "Federal Awards to Entities in Select States").

6. Christopher Felton, Financial Assistance Chief, Bureau of Reclamation ("BOR") (former BOR financial-assistance staff consolidated into PGM). Copied on the December 2025 grant-review correspondence in that capacity; no substantive role beyond that identified.

7. Edmund Weakland, Supervisory Grants Management Specialist, BOR (former BOR financial-assistance staff consolidated into PGM). Participated in the December 2025 grant-review correspondence (Dec. 18–23, 2025) circulating the data-call spreadsheet, template documents, and bureau programmatic responses.

8. Leanne Robinson, Grants Management Officer, BOR (former BOR financial-assistance staff consolidated into PGM). Copied on the December 2025 grant-review correspondence in that capacity; no substantive role beyond that identified.

9. Denise Flanagan, Director of Budget. Head of the Budget Office through which the January 2026 OMB Budget Data Request was routed. Participated in the coordination of information related to the Budget Data Request, including review and approval by relevant political leadership before submission to OMB.

***Federal Emergency Management Agency (Supplemental Response):***

1. Victoria Barton, Associate Administrator, Office of External Affairs. Reviewed FEMA's disaster declaration packages regarding Colorado. The information contained in FEMA's declaration packages are protected from disclosure by the deliberative process privilege. The information is pre-decisional and deliberative because it concerns discussion of the forthcoming decision regarding disaster relief to Colorado prior to President Trump making a final decision.
2. William Bilicic, Management and Program Analyst. Forwarded FEMA disaster declaration packages to FEMA Headquarters Declarations team to send to FEMA Executive Secretariat. The information contained in FEMA's declaration packages are protected from disclosure by the deliberative process privilege. The information is pre-decisional and deliberative because it concerns discussion of the forthcoming decision regarding disaster relief to Colorado prior to President Trump making a final decision.
3. Renee Byrd, Attorney Advisor, FEMA Office of Chief Counsel. Provided legal review of draft disaster declaration packages. The information contained in FEMA's declaration packages are protected from disclosure by the deliberative process privilege. The information is pre-decisional and deliberative because it concerns discussion of the forthcoming decision regarding disaster relief to Colorado prior to

President Trump making a final decision. Also, the contents of Ms. Byrd's advice are protected by the attorney-client and work-product privileges.

4. Maia Davis, Emergency Management Specialist, FEMA Declarations Section. Distributed Colorado's disaster declaration requests to FEMA Declarations team and transmitted FEMA declaration packages to FEMA Executive Secretariat to forward to DHS Executive Secretariat. The information contained in FEMA's declaration packages are protected from disclosure by the deliberative process privilege. The information is pre-decisional and deliberative because it concerns discussion of the forthcoming decision regarding disaster relief to Colorado prior to President Trump making a final decision.
5. Karen Evans, former Senior Official Performing the Duties of the Administrator of FEMA. Reviewed and signed FEMA disaster declaration packages regarding Colorado. The information contained in FEMA's declaration packages are protected from disclosure by the deliberative process privilege. The information is pre-decisional and deliberative because it concerns discussion of the forthcoming decision regarding disaster relief to Colorado prior to President Trump making a final decision.
6. Katie Fisk Cooper, Program Analyst, FEMA Region VIII. Forwarded Colorado's disaster declaration requests to FEMA Headquarters Declarations Inbox. The information contained in FEMA's declaration packages are protected from disclosure by the deliberative process privilege. The information is pre-decisional and deliberative because it concerns discussion of the forthcoming decision regarding disaster relief to Colorado prior to President Trump making a final decision.

7. Katherine Fox, Deputy Regional Director, FEMA Region VIII. Forwarded Colorado's disaster declaration requests to FEMA Headquarters Declarations Inbox. The information contained in FEMA's declaration packages are protected from disclosure by the deliberative process privilege. The information is pre-decisional and deliberative because it concerns discussion of the forthcoming decision regarding disaster relief to Colorado prior to President Trump making a final decision.
8. Hart Gillespie, Policy Specialist, FEMA Region VIII. Forwarded Colorado's disaster declaration requests to FEMA Headquarters Declarations Inbox. The information contained in FEMA's declaration packages are protected from disclosure by the deliberative process privilege. The information is pre-decisional and deliberative because it concerns discussion of the forthcoming decision regarding disaster relief to Colorado prior to President Trump making a final decision.
9. Chadwick Gilmer, Deputy Director, DHS Exec Sec. Forwarded confirmation of FEMA declaration packages to DHS Executive Secretariat. The information contained in FEMA's declaration packages are protected from disclosure by the deliberative process privilege. The information is pre-decisional and deliberative because it concerns discussion of the forthcoming decision regarding disaster relief to Colorado prior to President Trump making a final decision.
10. Thomas Lawin, Attorney Advisor, FEMA Office of Chief Counsel. Provided legal review of draft disaster declaration packages. The information contained in FEMA's declaration packages are protected from disclosure by the deliberative process privilege. The information is pre-decisional and deliberative because it concerns

discussion of the forthcoming decision regarding disaster relief to Colorado prior to President Trump making a final decision. Also, the contents of Mr. Lawin's advice are protected by the attorney-client and work-product privileges.

11. Alison Lipscomb, Environmental Protection Specialist. Forwarded confirmation of FEMA declaration packages to DHS Executive Secretariat. The information contained in FEMA's declaration packages are protected from disclosure by the deliberative process privilege. The information is pre-decisional and deliberative because it concerns discussion of the forthcoming decision regarding disaster relief to Colorado prior to President Trump making a final decision.

12. Nakia Collins, former FEMA contractor. Provided Hazard Mitigation recommendation regarding Colorado's disaster declaration requests. The information contained in FEMA's declaration packages are protected from disclosure by the deliberative process privilege. The information is pre-decisional and deliberative because it concerns discussion of the forthcoming decision regarding disaster relief to Colorado prior to President Trump making a final decision.

13. Leigh-Andrea Phillips, Supervisory Emergency Management Specialist, FEMA Region VIII. Forwarded Colorado's disaster declaration requests to FEMA Headquarters Declarations Inbox. The information contained in FEMA's declaration packages are protected from disclosure by the deliberative process privilege. The information is pre-decisional and deliberative because it concerns discussion of the forthcoming decision regarding disaster relief to Colorado prior to President Trump making a final decision.

14. Shoshana Resnick, FEMA National Cadre Manager. Provided Public Assistance recommendation regarding Colorado's disaster declaration requests. The information contained in FEMA's declaration packages are protected from disclosure by the deliberative process privilege. The information is pre-decisional and deliberative because it concerns discussion of the forthcoming decision regarding disaster relief to Colorado prior to President Trump making a final decision.
15. David Richardson, former Senior Official Performing the Duties of the Administrator of FEMA. Provided Public Assistance recommendation regarding Colorado's disaster declaration requests. The information contained in FEMA's declaration packages are protected from disclosure by the deliberative process privilege. The information is pre-decisional and deliberative because it concerns discussion of the forthcoming decision regarding disaster relief to Colorado prior to President Trump making a final decision.
16. Keith Turi, FEMA Deputy Associate Administrator, Response & Recovery. Provided concurrence regarding Colorado's disaster declaration requests. The information contained in FEMA's declaration packages are protected from disclosure by the deliberative process privilege. The information is pre-decisional and deliberative because it concerns discussion of the forthcoming decision regarding disaster relief to Colorado prior to President Trump making a final decision.
17. Kara Voorhies. Reviewed FEMA's disaster declaration packages regarding Colorado. The information contained in FEMA's declaration packages are protected from disclosure by the deliberative process privilege. The information is pre-decisional and

deliberative because it concerns discussion of the forthcoming decision regarding disaster relief to Colorado prior to President Trump making a final decision.

18. Dean Webster, FEMA Declarations Section Chief. Transmitted FEMA declaration packages from FEMA Executive Secretariat to forward to DHS Executive Secretariat. The information contained in FEMA's declaration packages are protected from disclosure by the deliberative process privilege. The information is pre-decisional and deliberative because it concerns discussion of the forthcoming decision regarding disaster relief to Colorado prior to President Trump making a final decision.

19. Kristi Noem, former Secretary of Homeland Security. Provided Memorandum for the President regarding Colorado's disaster declaration requests. The information contained in FEMA's declaration packages are protected from disclosure by the deliberative process privilege. The information is pre-decisional and deliberative because it concerns discussion of the forthcoming decision regarding disaster relief to Colorado prior to President Trump making a final decision. Moreover, the information provided in the declaration packages is protected from disclosure by executive privilege because it concerns presidential communications.

20. Stephen Miller, EOP. Provided Memorandum for the President regarding Colorado's disaster declaration requests. The information contained in FEMA's declaration packages are protected from disclosure by the deliberative process privilege. The information is pre-decisional and deliberative because it concerns discussion of the forthcoming decision regarding disaster relief to Colorado prior to President Trump making a final decision. Moreover, the information provided in the declaration

packages is protected from disclosure by executive privilege because it concerns presidential communications.

FEMA reiterates that only the President has the authority to declare a major disaster under the Robert T. Stafford Disaster Relief and Emergency Assistance Act. 42 U.S.C. § 5170.

***Department of Energy (Supplemental Response):*** The individuals identified below sent or received emails and/or attended meetings regarding the Challenged Conduct with respect to DOE in December 2025 and January 2026. Information about the details and substance of these communications is subject to the deliberative process privilege and withheld on that basis, as DOE did not terminate awards to Colorado in this timeframe, and the communications identified constitute part of DOE's predecisional inter- or intra-agency deliberations by which governmental decisions are formulated. Additionally, information about the details and substance of communications with White House officials (designated below as "EOP/WHO" or "EOP/OMB") is subject to the executive privilege because it concerns communications in performance of the duties of the President and his office, associated with shaping policies and making decisions.

1. Audrey Barrios, Advisor to the Secretary. Received email on the following dates regarding potential termination of DOE financial awards: December 16, 2025.
2. Jonathan Brightbill, General Counsel. Sent and/or received privileged attorney-client communications and/or attorney work product regarding potential termination of DOE financial awards on the following dates: December 15, 16, 17, 18, 19, and 23, 2025.
3. Emily Burdick, Principal Deputy Director for Cybersecurity, Energy Security, and Emergency Response. Received email on the following dates regarding potential

termination of DOE financial awards: December 16, 2025.

4. G. Michael Brown, Deputy Chief of Staff, Operations. Sent and/or received email on the following dates regarding potential termination of DOE financial awards: December 5, 8, 14, 15, 16, 17, 18, 19, 22, 23, 29, 30, and 31, 2025, and January 2, 2026.
5. Carl Coe, Chief of Staff. Asked Ben Dietderich to help place a story with a reporter regarding potential termination of DOE financial awards and sent and/or received email on the following dates regarding potential termination of DOE financial awards: December 5, 8, 14, 15, 16, 17, 18, 19, 23, 29, 30, and 31, 2025, and January 2, 2026.
6. Derek Cohen, Associate Principal Deputy Assistant Secretary, Hydrocarbons and Geothermal Energy Office. Received email on the following dates regarding potential termination of DOE financial awards: December 16, 2025.
7. Charlie Dankert, Deputy Chief of Staff for Policy. Received email on the following dates regarding potential termination of DOE financial awards: December 15, 23, 29, 30, and 31, 2025, and January 2, 2026.
8. Ben Dietderich, Press Secretary. Communicated by text message with Thomas Catenacci on or about December 16, 2025, regarding potential termination of DOE financial awards, and sent and/or received email on the following dates regarding potential termination of DOE financial awards: December 16, 17, 18, 23, 29, 30, and 31, 2025, and January 2, 2026.
9. Katherine Donley, Director, Office of Budget. Received email on the following dates regarding potential termination of DOE financial awards: January 2, 2026.
10. Katie Fairclough, Director of Public Affairs. Sent and/or received email on the

following dates regarding potential termination of DOE financial awards: December 17, 18, 23, 29, 30, and 31, 2025, and January 2, 2026.

11. Alex Fitzsimmons, Associate Deputy Secretary of Energy. Received email on the following dates regarding potential termination of DOE financial awards: December 16, 2025.
12. Tina Francone, Director, Grid Deployment Office. Received email on the following dates regarding potential termination of DOE financial awards: December 16, 2025.
13. Marshall Ghee, Chief of Staff, Office of Congressional and Intergovernmental Affairs. Received email on the following dates regarding potential termination of DOE financial awards: December 23, 2026.
14. Michael Helmer, Principal Deputy Assistant Secretary, Office of Critical Minerals and Energy Innovation. Received email on the following date regarding potential termination of DOE financial awards: December 16, 2026.
15. Michael Inguanta, Deputy Assistant Secretary for House Affairs, Office of Congressional and Intergovernmental Affairs. Received email on the following dates regarding potential termination of DOE financial awards: December 22 and 23, 2025.
16. Christopher Johns, Deputy Chief Financial Officer. Sent and/or received email on the following dates regarding potential termination of DOE financial awards: December 23, 29, 30, and 31, 2025, and January 2, 2026.
17. Joshua Jones, Senior Advisor, Office of Management. Sent and/or received email on the following dates regarding potential termination of DOE financial awards: December 14, 22, 23, 29, 30, and 31, 2025, and January 2, 2026.

18. Bryan Kellogg, Principal Deputy Assistant Secretary, Office of Congressional and Intergovernmental Affairs. Sent and/or received email on the following dates regarding potential termination of DOE financial awards: December 22, 23, 29, 30, and 31, 2025, and January 2, 2026.
19. Therese Keokuk, Executive Coordinator, Office of the General Counsel. Sent meeting invitation on the following date regarding potential termination of DOE financial awards: December 16, 2025.
20. Tim Kocher, Deputy Director for Cybersecurity, Energy Security, and Emergency Response. Received email on the following dates regarding potential termination of DOE financial awards: December 16, 2025.
21. Angelos Kokkinos, Senior Advisor, Hydrocarbons and Geothermal Energy Office. Received email on the following dates regarding potential termination of DOE financial awards: December 16, 2025.
22. Thomas Mapes, Chief of Staff, Office of Nuclear Energy. Received email on the following dates regarding potential termination of DOE financial awards: December 16, 2025.
23. Eric Mahroum, Director, Office of Indian Energy Policy and Programs. Received email on the following dates regarding potential termination of DOE financial awards: December 16, 2025.
24. Scott Marks, Deputy Assistant Secretary for Senate Affairs, Office of Congressional and Intergovernmental Affairs. Received email on the following dates regarding potential termination of DOE financial awards: December 22 and 23, 2025.

25. Daniel Nesvet, Management and Program Analyst, Office of Intelligence and Counterintelligence. Received email on the following dates regarding potential termination of DOE financial awards: Dec. 23, 29, 30, and 31, 2025, and January 2, 2026.
26. Jeffrey Novak, Principal Deputy General Counsel. Sent and/or received privileged attorney-client communications and/or attorney work product regarding potential termination of DOE financial awards on the following dates: December 15, 16, 17, 18, 19, 22, 23, 29, 30, and 31, 2025, and January 2, 2026.
27. Tina Pierce, Chief Financial Officer. Sent and/or received email on the following dates regarding potential termination of DOE financial awards: December 22, 23, 29, 30, and 31, 2025, and January 2, 2026.
28. Emma Quigg, Special Advisor, Office of the Under Secretary for Science. Received email on the following dates regarding potential termination of DOE financial awards: December 16, 2025.
29. Megan Roessing, Deputy Chief of Staff, Office of Nuclear Energy. Received email on the following date regarding potential termination of DOE financial awards: January 2, 2026.
30. Adam Shapiro, Congressional Liaison, Office of External Coordination for Appropriations. Received email on the following dates regarding potential termination of DOE financial awards: December 23, 29, 30, and 31, 2025, and January 2, 2026.
31. Spencer Silverman, Senior Advisor and Chief of Staff, ARPA-E. Received email on the following date regarding potential termination of DOE financial awards: December

16, 2025.

32. Alicia Stetin, Chief of Staff, Office of Environmental Management. Received email on the following date regarding potential termination of DOE financial awards: December 16, 2025.
33. Kevin Tatulyan, Chief of Staff to the Associate Deputy Secretary of Energy. Received email on the following date regarding potential termination of DOE financial awards: December 16, 2025.
34. Tim Walsh, Assistant Secretary of Energy Environmental Management. Received email on the following date regarding potential termination of DOE financial awards: December 16, 2025.
35. James Young, Chief of Staff, Office of Electricity. Received email on the following date regarding potential termination of DOE financial awards: December 16, 2025.
36. Rachel Cauley (EOP/OMB). Sent and/or received email on the following date regarding potential termination of DOE financial awards: December 16, 2025.
37. Nicholas Flocken (EOP/OMB). Sent and/or received email on the following date regarding potential termination of DOE financial awards: December 17, 2025.
38. Abigail Jackson (EOP/WHO). Sent and/or received email on the following date regarding potential termination of DOE financial awards: December 16, 2025.
39. Victoria LaCivita (EOP/WHO). Received email on the following date regarding potential termination of DOE financial awards: December 16, 2025.
40. Stuart Levenbach (EOP/OMB). Sent and/or received email on the following dates regarding potential termination of DOE financial awards: December 15 and 16, 2025.

41. Mark Paoletta (EOP/OMB). Sent and/or received privileged attorney-client communications and/or attorney work product regarding potential termination of DOE financial awards on the following dates: December 17 and 18, 2025.
42. Katharine Sullivan (EOP/OMB). Received email on the following dates regarding potential termination of DOE financial awards: December 15 and 16, 2025.
43. Taylor Rogers (EOP/WHO). Sent and/or received email on the following date regarding potential termination of DOE financial awards: December 16, 2025.
44. Emily Underwood (EOP/WHO). Sent and/or received email on the following dates regarding potential termination of DOE financial awards: December 15 and 16, 2025.
45. Russell Vought (EOP/OMB). Sent and/or received email on the following dates regarding potential termination of DOE financial awards: December 15 and 16, 2025.

***National Science Foundation (Supplemental Response):***

The following individuals sent or received emails and/or attended meetings regarding the Challenged Conduct with respect to NSF.

1. Brian Stone, Senior Official Performing the Duties of the NSF Director—
   a. Consulted with individuals from the Office of Management & Budget ("OMB") regarding OMB's direction with respect to options for the restructuring of the NSF National Center for Atmospheric Research ("NCAR"), including coordinating the preparation of NSF's Notice of Intent to Restructure Critical Weather Science Infrastructure, as issued on December 17, 2025; preparation of a Dear Colleague Letter regarding the intent to restructure critical weather science infrastructure at NCAR ("the DCL"); and other options for restructuring

components of NCAR, including the NCAR-Wyoming Supercomputing Center. The OMB representatives involved in those consultations were Russell Vought, Director, and Stuart Levenbach, Associate Director for Agriculture, Commerce, Resources, Energy, and Science.. The information regarding these discussions is protected from disclosure by deliberative process privilege. The information is pre-decisional and deliberative.

b. Briefed NSF leadership and/or participated in NSF leadership meetings regarding OMB's direction with respect to options for the restructuring of NCAR, including preparation of NSF's Notice of Intent to Restructure Critical Weather Science Infrastructure, as issued on December 17, 2025; preparation of the DCL; and other options for restructuring components of NCAR, including the NCAR-Wyoming Supercomputing Center. The information regarding these discussions is protected from disclosure by the deliberative process privilege. The information is pre-decisional and deliberative.

2. Rebecca Keiser, Acting Chief of Staff—attended and/or participated in NSF leadership meetings regarding OMB's direction with respect to options for the restructuring of NCAR, including preparation of NSF's Notice of Intent to Restructure Critical Weather Science Infrastructure, as issued on December 17, 2025; preparation of the DCL; and other options for restructuring components of NCAR, including the NCAR-Wyoming Supercomputing Center. The information regarding these discussions is protected from disclosure by the deliberative process privilege. The information is pre-decisional and deliberative.

3. Simon Malcomber, Chief Science Officer—attended and/or participated in NSF leadership meetings regarding OMB's direction with respect to options for the restructuring of NCAR, including preparation of NSF's Notice of Intent to Restructure Critical Weather Science Infrastructure, as issued on December 17, 2025; preparation of the DCL; and other options for restructuring components of NCAR, including the NCAR-Wyoming Supercomputing Center. The information regarding these discussions is protected from disclosure by the deliberative process privilege. The information is pre-decisional and deliberative.
4. Micah Cheatham, Chief Management Officer—attended and/or participated in NSF leadership meetings regarding OMB's direction with respect to options for the restructuring of NCAR, including preparation of NSF's Notice of Intent to Restructure Critical Weather Science Infrastructure, as issued on December 17, 2025; preparation of the DCL; and other options for restructuring components of NCAR, including the NCAR-Wyoming Supercomputing Center. The information regarding these discussions is protected from disclosure by the deliberative process privilege. The information is pre-decisional and deliberative.
5. Angel Williams, General Counsel—attended and/or participated in NSF leadership meetings regarding OMB's direction with respect to options for the restructuring of NCAR, including preparation of NSF's Notice of Intent to Restructure Critical Weather Science Infrastructure, as issued on December 17, 2025; preparation of the DCL; and other options for restructuring components of NCAR, including the NCAR-Wyoming Supercomputing Center. The information regarding these discussions is protected from

disclosure by the attorney-client privilege because it contains legal advice, relates to legal advice sought, and/or reflects legal advice. The information regarding these discussions is also protected from disclosure by the attorney-work product privilege where prepared or collected at direction of counsel and/or prepared in anticipation of litigation, active litigation, or other legal proceedings. Further, the information is protected from disclosure by the deliberative process privilege. The information is pre-decisional and deliberative.

6. Robert Moller, Head, Office of Legislative and Policy Affairs–attended and/or participated in NSF leadership meetings regarding OMB's direction with respect to options for the restructuring of NCAR, including preparation of NSF's Notice of Intent to Restructure Critical Weather Science Infrastructure, as issued on December 17, 2025; preparation of the DCL; and other options for restructuring components of NCAR, including the NCAR-Wyoming Supercomputing Center. The information regarding these discussions is protected from disclosure by the deliberative process privilege. The information is pre-decisional and deliberative.

**INTERROGATORY NO. 2**: Describe in detail how Defendants decided to take each of the actions or threats against either Colorado, its political subdivisions or instrumentalities, or entities within Colorado described in the operative Complaint, including when, how, and why Defendants began to consider each action or threat, all facts and considerations taken into account in making the decision, and whether Defendants considered the same and/or a similar action or threat against any other states and why those states were or were not subjected to the same and/or a similar action or threat.

**SUPPLEMENTAL RESPONSE:** Defendants object to the extent the Interrogatory seeks discovery from the President, the Executive Office of the President, and/or the White House. Such discovery is improper at least at this juncture because, among other things, it would contravene

"[t]he high respect that is owed to the office of the Chief Executive," which "is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery." *Clinton v. Jones*, 520 U.S. 681, 707 (1997); *see also Nixon v. Fitzgerald*, 457 U.S. 731, 749, 753 (1982) ("The President occupies a unique position in the constitutional scheme" that "counsel[s] judicial deference and restraint."). Plaintiff's discovery requests treat the President like any other civil litigant and fail to account for the "special considerations applicable to the President." *Cheney v. U.S. Dist. Ct. for Dist. of Columbia*, 542 U.S. 367, 385 (2004). Requiring their response would improperly "detract [the President] from energetic performance of [his] constitutional duties." *Id.* at 382; *see also id.* at 381–82 ("In no case . . . would a court be required to proceed against the president as against an ordinary individual." (quoting *United States v. Burr*, 25 F. Cas. 187, 192 (No. 14,694) (CC Va. 1807) (Marshall, J.))). That is, separation-of-powers concerns necessarily prevent such discovery from proceeding now. *See, e.g.*, *Cheney*, 542 U.S. at 388–91 (court of appeals failed to properly consider separation-of-powers concerns when it denied government's request for mandamus relief to prevent discovery against the Vice President, which discovery, the government argued, threatened "substantial intrusions on the process by which those in closest operational proximity to the President advise the President"; court of appeals also erred in finding that the Vice President must first assert executive privilege); *see also U.S. Doge Serv. v. Citizens for Resp. & Ethics in Washington*, 145 S. Ct. 1981 (2025) ("[S]eparation of powers concerns counsel judicial deference and restraint in the context of discovery regarding internal Executive Branch communications.").

While *Cheney* alone counsels against any discovery against the President, Plaintiff's discovery against the President and EOP is particularly improper here because Plaintiff is already

pursuing extensive discovery against the Agency Defendants that may well yield at least substantially the information that Plaintiff seeks without burdening the President. *See, e.g.*, Order, *Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019) (requiring Plaintiff to exhaust all discovery on other Defendants before considering whether there was "continuing need for discovery sought on the White House"); *Wagafe v. Trump*, 2017 WL 5990134, at *3 (W.D. Wash. Oct. 19, 2017) ("intruding on the Executive in this context is a matter of last resort"); *United States v. McGraw-Hill Cos.*, 2014 WL 1647385, at *13 (C.D. Cal. Apr. 15, 2014); *cf. Karnoski v. Trump*, 926 F.3d 1180, 1203–07 (9th Cir. 2019) (granting government's writ of mandamus to vacate district court's discovery order against the President because district court failed to apply *Cheney* or "explore other avenues, short of forcing the Executive to invoke privilege" (quoting *Cheney*, 542 U.S. at 390)).

Accordingly, and consistent with settled precedent, the President and EOP will not be responding to Plaintiff State of Colorado's Interrogatories at this time.

Defendants also object to this Interrogatory because the phrase "actions or threats" is vague and undefined. Defendants construe that phrase as follows: (i) with respect to the Departments of War and Air Force, the decision to relocate U.S. Space Command Headquarters (SAC ¶ 78); (ii) with respect to the Department of Transportation, the decision to withdraw four awards, and terminate one grant agreement, constituting approximately $109 million that had been allocated to Colorado entities (*see* ECF 80 (stipulation)) and the decision to select recipients for FY2025 Safe Streets and Roads for All grants (SAC ¶ 106); (iii) with respect to the Department of Energy, "plans to terminate $615 million in DOE funds earmarked only for Colorado" (SAC ¶ 91); (iv) with respect to the National Science Foundation, its announcement regarding restructuring the

National Center for Atmospheric Research (SAC ¶ 93), (v) with respect to the Department of Agriculture, its direction to Colorado to comply with a SNAP pilot project (SAC ¶ 97); (vi) with respect to the Federal Emergency Management Agency, a component of the Department of Homeland Security, denial of two disaster relief assistance requests (SAC ¶ 101); and (vii) with respect to the Department of Interior, "compil[ation] [of] a list of all grants earmarked for Colorado, its instrumentalities, and political subdivisions for possible termination" (SAC ¶ 109)—henceforth, collectively, the "Challenged Conduct."

Defendants Department of Energy, National Science Foundation, and Department of Interior further object to this Interrogatory because, as to them, it facially seeks information that is protected by at least the deliberative-process privilege, insofar as Plaintiff's allegations in this case against DOE, NSF, and DOI challenge alleged intended conduct that has not materialized into agency action. The deliberative-process privilege shields "documents reflecting advisory opinions, recommendations and deliberations compromising part of a process by which governmental decisions and policies are formulated." *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). Recognizing that "officials will not communicate candidly among themselves if each remark is a potential item of discovery," the deliberative-process privilege is primarily designed to "enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government." *Id.* at 8–9 (cleaned up). It further serves to prevent the premature disclosure of proposed policies, and avoids "misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action." *Trentadue v. Integrity Comm.*, 501 F.3d 1215, 1226 (10th Cir. 2007) (cleaned up).

Defendant DHS objects to this Interrogatory because there are no allegations in the operative Complaint, at all, concerning it. DHS appears to be included as a named Defendant solely because the Federal Emergency Management Agency, also a named Defendant, is a component of DHS. Nonetheless, in the spirit of compromise, and although Defendants do not concede that Plaintiff has established the relevance and proportionality of discovery directed to DHS—when it is already receiving discovery from FEMA, the agency alleged to have taken action against Colorado—DHS will respond to Plaintiff's discovery requests. Specifically, DHS will provide answers to Plaintiff's Interrogatories (subject to Defendants' other objections) on or before September 18, 2026.

Based on a reasonably diligent search, Agency Defendants (other than DHS—*see supra*) identify below how the Agency Defendants decided to take the Challenged Conduct, as follows:

**Department of War/Department of Air Force (Supplemental Response):** DoW and Air Force refer Plaintiff to the Administrative Record. By way of further response, in 2025, the White House, in consultation with DoW and the Department of the Air Force, reconsidered President Biden's July 2023 decision to locate the permanent U.S. Space Command ("USSC") headquarters in Colorado Springs. In the 2020 and 2021 basing analysis (provided in the Administrative Record), which was initially undertaken during President Trump's first administration, the Secretary of the Air Force had identified Huntsville, Alabama as the preferred location for the new USSC permanent headquarters. Under President Biden's administration, the Department of the Air Force re-evaluated the basing analysis (provided in the AR), and the Secretary of the Air Force again identified Huntsville as the preferred location. However, in 2023, President Biden exercised his authority as

Commander in Chief to decide to locate the USSC headquarters in Colorado Springs. In 2025, based on USAF's prior analysis and recommendation, and DoW and USAF's reaffirmance of that analysis, President Trump subsequently exercised his authority as Commander in Chief to supersede President Biden's decision and made the decision to locate the USSC permanent headquarters in Huntsville.

**Department of Agriculture (Supplemental Response):** In alignment with Executive Order No. 14243, "Stopping Waste, Fraud, and Abuse by Eliminating Information Silos," and as authorized by the Food and Nutrition Act of 2008, USDA established the SNAP Information Database to ensure program integrity by compiling SNAP data that will be used to "identify and rectify any ineligible, duplicate, or fraudulent SNAP enrollments or transactions," including "verifying eligibility based on immigration status, identifying and eliminating duplicate enrollments, assisting States in mitigating identity theft, and performing other eligibility and program integrity checks." 90 Fed. Reg. 26521, 26522 (June 23, 2025).

As of July 1, 2026, 30 States, including Guam, have provided the requested data to the SNAP Information Database. Four States that, like Colorado, have delegated the responsibility of SNAP administration to their counties are within that count. A review of the data from county-administered States compared to that of non-county-administered States indicated to USDA that States with a county-administered program are generally more likely to have higher rates of fraud, waste, and abuse than States that do not delegate administration of SNAP to the county level.

Colorado, specifically, also has a recent history of integrity concerns. In February

2023, FNS conducted a Recipient Integrity and Claims Review Management Evaluation of Colorado that identified issues with the establishment of overissuance claims against households and disqualification actions for fraud, resulting from guidance provided to the counties by the State agency. *See* Corley Declaration, Ex. B, ECF # 52-1 at 11-12, 17-18. Despite the county investigators' thorough and evidence-based substantiation of fraud, county eligibility staff failed to follow through and establish a claim for repayment or initiate a disqualification, despite being required to do so by federal regulation. *See e.g.*, 7 C.F.R. §§ 273.16(a)(1), 273.18; Ex. B at 11-12. In Colorado's Management Evaluation for 2024, USDA found that Colorado did not correct these issues. And, by early December 2025, public reports concerning apparently illegal activities in Colorado, including Denver area gang operations and abuse of public benefits, led USDA to consider whether SNAP program integrity should be reevaluated in Colorado.

In mid-December 2025, USDA participated in an inter-agency call hosted by EOP to discuss Colorado. USDA shared that it was considering replicating a pilot program requiring SNAP recertifications in certain counties, similar to a pilot it had implemented elsewhere.

**Department of Transportation (Supplemental Response):** DOT refers Plaintiff to the Administrative Record. By way of further response, in December 2025, DOT withdrew four unobligated grant awards for which Colorado entities had been selected, and it terminated one grant agreement with a Colorado recipient. DOT took each of these actions because the projects did not align with Administration priorities. Since January 2025, DOT has withdrawn unobligated grant awards or terminated grant agreements with entities in

the following States other than Colorado: Alabama, California, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Maryland, Massachusetts, Michigan, New Jersey, New Mexico, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, South Carolina, Utah, Virginia, and Wisconsin.

Also in December 2025, DOT made its selections for Fiscal Year (FY) 2025 Safe Streets for All grant awards. Information about the selection process is available on DOT's website at https://www.transportation.gov/grants/SS4A. DOT did not select any Colorado projects. DOT also did not select any Vermont projects.

Any additional information regarding deliberative and pre-decisional discussions requested in Interrogatory No. 2 is protected from disclosure by the deliberative process privilege.

**Department of Interior (Supplemental Response):** DOI did not decide to take, and did not take, any action to terminate or withhold financial assistance to Colorado or any Colorado-based recipient; it terminated no award and issued no termination letter to Colorado, any political subdivision, or any grantee.

The only related activity was limited to internal information-gathering: in December 2025, at the request of the Office of the Assistant Secretary for Policy, Management and Budget, the Office of Grants Management ("PGM") compiled a list of open awards to Colorado and Colorado-based entities; and in January 2026, DOI responded to an OMB Budget Data Request (BDR-26-09, "Federal Awards to Entities in Select States") seeking award information for entities in sixteen States, of which Colorado was one. Neither effort resulted in any termination or the issuance of any termination letter. As

to consideration of similar action toward other States, the January 2026 data call encompassed sixteen States and was not specific to Colorado. To the extent the Interrogatory seeks the substance of the internal deliberations during this information-gathering, DOI withholds that information on the basis of the deliberative-process privilege.

**Federal Emergency Management Agency (Supplemental Response):** FEMA did not take any action or threat against Colorado. Any details regarding the extent to which FEMA considered taking such an action or threat are subject to the deliberative process privilege.

**Department of Energy (Supplemental Response):** With respect to the Challenged Conduct, DOE considered potential termination of DOE financial awards and Ben Dietderich communicated with reporter Thomas Catenacci on or about December 16 regarding potential termination of DOE financial awards. However, DOE did not terminate financial awards or take any action or threat against Colorado. Any details regarding the extent to which DOE considered taking such an action or threat are subject to the deliberative process privilege.

**National Science Foundation (Supplemental Response):** At the direction of OMB, NSF began considering options for the potential restructuring of NCAR in December 2025. NSF consulted with OMB regarding NSF's Notice of Intent to Restructure Critical Weather Science Infrastructure, as issued on December 17, 2025. Beginning December 2025, NSF also consulted with OMB with respect to preparation, issuance, and responses to the DCL, and other options for restructuring components of NCAR, including the NCAR-Wyoming Supercomputing Center. To the extent the Interrogatory seeks the substance of the internal

deliberations, NSF withholds that information on the basis of the deliberative-process privilege. NSF did not consider the same and/or similar action or threat against any other entity.

**INTERROGATORY NO. 3:** For each individual identified in response to Interrogatory No. 1, identify all their communications regarding the action or threat, regardless of whether the communication was part of the decision-making process for that action or threat and/or occurred after-the-fact, including the date, content, form of the communication (e.g., meeting, social media post, email, text message), and other individuals involved, whether as a listener or participant.

**SUPPLEMENTAL RESPONSE:** Defendants incorporate, by reference, their objections to Interrogatory No. 1 (including their objection to discovery from the President, the Executive Office of the President, and/or the White House, and from DHS).

In response to (at least) Plaintiff's Request for Production No. 1, Agency Defendants will conduct a reasonable search for documents and communications regarding the Challenged Conduct, within the timeframe of April 1, 2025, to July 1, 2026 (revised at Plaintiff's request),[3] and, following that search, will produce relevant, non-privileged documents. If responsive, relevant, non-privileged documents exist and are produced, Agency Defendants will supplement their answer to this Interrogatory to indicate the Bates numbers. Fed. R. Civ. P. 33(d)(1).

**INTERROGATORY NO. 4:** Describe in detail all instances in which any Defendant took any other threat or adverse action (e.g., terminating, not renewing, or taking away federal funding or services; auditing; not granting funds; or investigation) directed at or to either Colorado, its political subdivisions or instrumentalities, or entities within Colorado that is not described in the operative Complaint, including when, how, and why Defendants began to consider the action or threat, all facts and considerations taken into account in making the decision, and whether Defendants considered the same and/or a similar action or threat against any other states, political subdivisions or instrumentalities of other states, or entities within other states and why they were or were not subjected to the same and/or a similar action or threat. In identifying actions or threats responsive to this Interrogatory, please exclude actions or threats that were taken as to all states, political subdivisions or instrumentalities of all states, or entities within all states.

[3] As noted *supra*, the Parties are conferring with respect to the relevant timeframe for USAF.

**SUPPLEMENTAL RESPONSE:** Defendants object to the extent the Interrogatory seeks discovery from the President, the Executive Office of the President, and/or the White House. Such discovery is improper at least at this juncture because, among other things, it would contravene "[t]he high respect that is owed to the office of the Chief Executive," which "is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery." *Clinton v. Jones*, 520 U.S. 681, 707 (1997); *see also Nixon v. Fitzgerald*, 457 U.S. 731, 749, 753 (1982) ("The President occupies a unique position in the constitutional scheme" that "counsel[s] judicial deference and restraint."). Plaintiff's discovery requests treat the President like any other civil litigant and fail to account for the "special considerations applicable to the President." *Cheney v. U.S. Dist. Ct. for Dist. of Columbia*, 542 U.S. 367, 385 (2004). Requiring their response would improperly "detract [the President] from energetic performance of [his] constitutional duties." *Id.* at 382; *see also id.* at 381–82 ("In no case . . . would a court be required to proceed against the president as against an ordinary individual." (quoting *United States v. Burr*, 25 F. Cas. 187, 192 (No. 14,694) (CC Va. 1807) (Marshall, J.))). That is, separation-of-powers concerns necessarily prevent such discovery from proceeding now. *See, e.g.*, *Cheney*, 542 U.S. at 388–91 (court of appeals failed to properly consider separation-of-powers concerns when it denied government's request for mandamus relief to prevent discovery against the Vice President, which discovery, the government argued, threatened "substantial intrusions on the process by which those in closest operational proximity to the President advise the President"; court of appeals also erred in finding that the Vice President must first assert executive privilege); *see also U.S. Doge Serv. v. Citizens for Resp. & Ethics in Washington*, 145 S. Ct. 1981 (2025) ("[S]eparation of powers concerns

counsel judicial deference and restraint in the context of discovery regarding internal Executive Branch communications.").

While *Cheney* alone counsels against any discovery against the President, Plaintiff's discovery against the President and EOP is particularly improper here because Plaintiff is already pursuing extensive discovery against the Agency Defendants that may well yield at least substantially the information that Plaintiff seeks without burdening the President. *See, e.g.*, Order, *Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019) (requiring Plaintiff to exhaust all discovery on other Defendants before considering whether there was "continuing need for discovery sought on the White House"); *Wagafe v. Trump*, 2017 WL 5990134, at *3 (W.D. Wash. Oct. 19, 2017) ("intruding on the Executive in this context is a matter of last resort"); *United States v. McGraw-Hill Cos.*, 2014 WL 1647385, at *13 (C.D. Cal. Apr. 15, 2014); *cf. Karnoski v. Trump*, 926 F.3d 1180, 1203–07 (9th Cir. 2019) (granting government's writ of mandamus to vacate district court's discovery order against the President because district court failed to apply *Cheney* or "explore other avenues, short of forcing the Executive to invoke privilege" (quoting *Cheney*, 542 U.S. at 390)).

Accordingly, and consistent with settled precedent, the President and EOP will not be responding to Plaintiff State of Colorado's Interrogatories at this time.

Defendants also object to this Interrogatory because it is facially overbroad as to timeframe (there is none) and because it seeks irrelevant information that is not proportionate to the needs of this case insofar as it asks Defendants to describe "any other threat or adverse action" directed to Colorado or "entities within Colorado" that is *not* described in the operative Complaint. Conduct that is not described in the Complaint is inherently irrelevant, and even if it were not, it is not

proportionate to the needs of this case to require Defendants to search for information outside the scope of the Complaint that Plaintiff chose to plead. *Cf., e.g.*, *Cuomo v. Clearing House Ass'n*, 557 U.S. 519, 531 (2009) (observing that judges are trusted to prevent "fishing expeditions" or an undirected rummaging through materials for evidence of some unknown wrongdoing); *accord, e.g.*, *Harriman v. Smart*, 2023 WL 11911575, at *2–3 (D. Colo. June 14, 2023) ("The relevant and proportional scope of discovery . . . is limited to the well-pleaded factual allegations and related claims asserted in the [operative complaint]."; citing cases).

Defendant DHS objects to this Interrogatory because there are no allegations in the operative Complaint, at all, concerning it. DHS appears to be included as a named Defendant solely because the Federal Emergency Management Agency, also a named Defendant, is a component of DHS. Nonetheless, in the spirit of compromise, and although Defendants do not concede that Plaintiff has established the relevance and proportionality of discovery directed to DHS—when it is already receiving discovery from FEMA, the agency alleged to have taken action against Colorado—DHS will respond to Plaintiff's discovery requests. Specifically, DHS will provide answers to Plaintiff's Interrogatories (subject to Defendants' other objections) on or before September 18, 2026.

Defendants will not answer this Interrogatory.

**INTERROGATORY NO. 5:** Identify all individuals that had any role in each of the actions or threats described in response to Interrogatory No. 4 – whether in making, adopting, approving, implementing, being briefed on and/or attending meetings regarding the action or threat – including their identity (e.g., position and responsibilities with any Defendant), role in and/or how they contributed to the action or threat, and dates they were involved in the action or threat.

**SUPPLEMENTAL RESPONSE:** Consistent with their response to Interrogatory No. 4, which is incorporated by reference (including their objection to discovery from the President, the

Executive Office of the President, and/or the White House, and from DHS), Defendants object to this Interrogatory because it is facially overbroad as to timeframe (there is none) and because it seeks irrelevant information that is not proportionate to the needs of this case insofar as it asks Defendants to identify "all individuals" who had any role in "any other threat or adverse action" directed to Colorado or "entities within Colorado" that is *not* described in the operative Complaint. Conduct that is not described in the Complaint is inherently irrelevant, and even if it were not, it is not proportionate to the needs of this case to require Defendants to search for information outside the scope of the Complaint that Plaintiff chose to plead. *Cf., e.g.*, *Cuomo v. Clearing House Ass'n*, 557 U.S. 519, 531 (2009) (observing that judges are trusted to prevent "fishing expeditions" or an undirected rummaging through materials for evidence of some unknown wrongdoing); *accord, e.g.*, *Harriman v. Smart*, 2023 WL 11911575, at *2–3 (D. Colo. June 14, 2023) ("The relevant and proportional scope of discovery . . . is limited to the well-pleaded factual allegations and related claims asserted in the [operative complaint]."; citing cases).

Defendants will not answer this Interrogatory.

**INTERROGATORY NO. 6:** For each individual identified in response to Interrogatory No. 5, identify all their communications regarding the action or threat, regardless of whether the communication was part of the decision-making process for that action or threat and/or occurred after-the-fact, including the date, content, form of the communication (e.g., meeting, social media post, email, text message), and other individuals involved, whether as a listener or participant.

**SUPPLEMENTAL RESPONSE:** Consistent with their responses to Interrogatory Nos. 4 and 5, which are incorporated by reference (including their objection to discovery from the President, the Executive Office of the President, and/or the White House, and from DHS), Defendants object to this Interrogatory because it is facially overbroad as to timeframe (there is none) and because it seeks irrelevant information that is not proportionate to the needs of this case

insofar as it asks Defendants to identify "all . . . communications" for each individual who had any role in "any other threat or adverse action" directed to Colorado or "entities within Colorado" that is *not* described in the operative Complaint. Conduct that is not described in the Complaint is inherently irrelevant, and even if it were not, it is not proportionate to the needs of this case to require Defendants to search for information outside the scope of the Complaint that Plaintiff chose to plead. *Cf., e.g.*, *Cuomo v. Clearing House Ass'n*, 557 U.S. 519, 531 (2009) (observing that judges are trusted to prevent "fishing expeditions" or an undirected rummaging through materials for evidence of some unknown wrongdoing); *accord, e.g.*, *Harriman v. Smart*, 2023 WL 11911575, at *2–3 (D. Colo. June 14, 2023) ("The relevant and proportional scope of discovery . . . is limited to the well-pleaded factual allegations and related claims asserted in the [operative complaint]."; citing cases).

Defendants will not answer this Interrogatory.

**INTERROGATORY NO. 7:** Describe in detail all instances in which any Defendant considered but did not take any threat or adverse action (e.g., terminating, not renewing, or taking away federal funding or services; auditing; not granting funds; or investigation) directed at or to either Colorado, its political subdivisions or instrumentalities, or entities within Colorado including when, how, and why Defendants began to consider each action or threat, all facts and considerations taken into account in making the decision, and whether Defendants considered the same and/or a similar action or threat against any other states, political subdivisions or instrumentalities of other states, or entities within other states and why they were or were not subjected to the same and/or a similar action or threat. In identifying considered actions or threats responsive to this Interrogatory, please exclude considered actions or threats that were considered as to all states, political subdivisions or instrumentalities of all states, or entities within all states.

**SUPPLEMENTAL RESPONSE:** Defendants object to the extent the Interrogatory seeks discovery from the President, the Executive Office of the President, and/or the White House. Such discovery is improper at least at this juncture because, among other things, it would contravene "[t]he high respect that is owed to the office of the Chief Executive," which "is a matter that should

inform the conduct of the entire proceeding, including the timing and scope of discovery." *Clinton v. Jones*, 520 U.S. 681, 707 (1997); *see also Nixon v. Fitzgerald*, 457 U.S. 731, 749, 753 (1982) ("The President occupies a unique position in the constitutional scheme" that "counsel[s] judicial deference and restraint."). Plaintiff's discovery requests treat the President like any other civil litigant and fail to account for the "special considerations applicable to the President." *Cheney v. U.S. Dist. Ct. for Dist. of Columbia*, 542 U.S. 367, 385 (2004). Requiring their response would improperly "detract [the President] from energetic performance of [his] constitutional duties." *Id.* at 382; *see also id.* at 381–82 ("In no case . . . would a court be required to proceed against the president as against an ordinary individual." (quoting *United States v. Burr*, 25 F. Cas. 187, 192 (No. 14,694) (CC Va. 1807) (Marshall, J.))). That is, separation-of-powers concerns necessarily prevent such discovery from proceeding now. *See, e.g.*, *Cheney*, 542 U.S. at 388–91 (court of appeals failed to properly consider separation-of-powers concerns when it denied government's request for mandamus relief to prevent discovery against the Vice President, which discovery, the government argued, threatened "substantial intrusions on the process by which those in closest operational proximity to the President advise the President"; court of appeals also erred in finding that the Vice President must first assert executive privilege); *see also U.S. Doge Serv. v. Citizens for Resp. & Ethics in Washington*, 145 S. Ct. 1981 (2025) ("[S]eparation of powers concerns counsel judicial deference and restraint in the context of discovery regarding internal Executive Branch communications.").

While *Cheney* alone counsels against any discovery against the President, Plaintiff's discovery against the President and EOP is particularly improper here because Plaintiff is already pursuing extensive discovery against the Agency Defendants that may well yield at least

substantially the information that Plaintiff seeks without burdening the President. *See, e.g.*, Order, *Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019) (requiring Plaintiff to exhaust all discovery on other Defendants before considering whether there was "continuing need for discovery sought on the White House"); *Wagafe v. Trump*, 2017 WL 5990134, at *3 (W.D. Wash. Oct. 19, 2017) ("intruding on the Executive in this context is a matter of last resort"); *United States v. McGraw-Hill Cos.*, 2014 WL 1647385, at *13 (C.D. Cal. Apr. 15, 2014); *cf. Karnoski v. Trump*, 926 F.3d 1180, 1203–07 (9th Cir. 2019) (granting government's writ of mandamus to vacate district court's discovery order against the President because district court failed to apply *Cheney* or "explore other avenues, short of forcing the Executive to invoke privilege" (quoting *Cheney*, 542 U.S. at 390)).

Accordingly, and consistent with settled precedent, the President and EOP will not be responding to Plaintiff State of Colorado's Interrogatories at this time.

Defendants also object to this Interrogatory because it is facially overbroad as to timeframe (there is none). Defendants further object to this Interrogatory because it seeks irrelevant information that is not proportionate to the needs of this case to the extent it asks Defendants to describe contemplated actions that are not pled in the operative Complaint, and indeed were not even taken. Conduct that is not described in the Complaint is inherently irrelevant, and even if it were not, it is not proportionate to the needs of this case to require Defendants to search for information outside the scope of the Complaint that Plaintiff chose to plead. *Cf., e.g.*, *Cuomo v. Clearing House Ass'n*, 557 U.S. 519, 531 (2009) (observing that judges are trusted to prevent "fishing expeditions" or an undirected rummaging through materials for evidence of some unknown wrongdoing); *accord, e.g.*, *Harriman v. Smart*, 2023 WL 11911575, at *2–3 (D. Colo.

June 14, 2023) ("The relevant and proportional scope of discovery . . . is limited to the well-pleaded factual allegations and related claims asserted in the [operative complaint]."; citing cases).

This Interrogatory seeks irrelevant information that is not proportionate to the needs of the case for the additional reason that it seeks information regarding Defendants' contemplated conduct toward non-parties ("whether Defendants considered the same and/or a similar action or threat against *any other states, political subdivisions or instrumentalities of other states, or entities within other states*" (emphasis added)). That aspect of this Interrogatory is further objectionable because it is vague and overbroad insofar as it seeks information about "similar" conduct towards "political subdivisions," "instrumentalities," and "entities" within other States. Plaintiff's Counts One and Two challenge that Defendants have discriminated against the State of Colorado because Colorado allows mail-in voting and prosecuted former County Clerk Tina Peters. Undefined "similar" conduct towards the other 49 States is not relevant to this issue, and even if it were, it is not proportionate to the needs of this single-Plaintiff case. Plaintiff has sued nine different federal Agencies, and it would be enormously burdensome to require them to "[d]escribe in detail all instances" regarding contemplated conduct toward non-parties, particularly during the expedited discovery timeframe ordered by the Court.

Defendants further object to this Interrogatory because it facially seeks information that is protected by at least the deliberative-process privilege. The deliberative-process privilege shields "documents reflecting advisory opinions, recommendations and deliberations compromising part of a process by which governmental decisions and policies are formulated." *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). Recognizing that "officials will not communicate candidly among themselves if each remark is a potential item of discovery,"

the deliberative-process privilege is primarily designed to "enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government." *Id.* at 8–9 (cleaned up). It further serves to prevent the premature disclosure of proposed policies, and avoids "misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action." *Trentadue v. Integrity Comm.*, 501 F.3d 1215, 1226 (10th Cir. 2007) (cleaned up).

Defendant DHS objects to this Interrogatory because there are no allegations in the operative Complaint, at all, concerning it. DHS appears to be included as a named Defendant solely because the Federal Emergency Management Agency, also a named Defendant, is a component of DHS. Nonetheless, in the spirit of compromise, and although Defendants do not concede that Plaintiff has established the relevance and proportionality of discovery directed to DHS—when it is already receiving discovery from FEMA, the agency alleged to have taken action against Colorado—DHS will respond to Plaintiff's discovery requests. Specifically, DHS will provide answers to Plaintiff's Interrogatories (subject to Defendants' other objections) on or before September 18, 2026.

Defendants will not answer this Interrogatory.

**INTERROGATORY NO. 8:** Identify all individuals that had any role in each of the considered actions or threats described in response to Interrogatory No. 7 – whether in proposing, making, rejecting, and/or being briefed on and/or attending meetings regarding the considered action – including their identity (e.g., position and responsibilities with any Defendant), role in and/or how they contributed to the considered action or threat, and dates they were involved in the considered action or threat.

**SUPPLEMENTAL RESPONSE:** Consistent with their response to Interrogatory No. 7, which is incorporated by reference (including their objection to discovery from the President, the

Executive Office of the President, and/or the White House, and from DHS), Defendants object to this Interrogatory because it is facially overbroad as to timeframe (there is none). Defendants further object to this Interrogatory because it seeks irrelevant information that is not proportionate to the needs of this case to the extent it asks Defendants to identify individuals involved in contemplated actions that are not pled in the operative Complaint, and indeed were not even taken. Conduct that is not described in the Complaint is inherently irrelevant, and even if it were not, it is not proportionate to the needs of this case to require Defendants to search for information outside the scope of the Complaint that Plaintiff chose to plead. *Cf., e.g.*, *Cuomo v. Clearing House Ass'n*, 557 U.S. 519, 531 (2009) (observing that judges are trusted to prevent "fishing expeditions" or an undirected rummaging through materials for evidence of some unknown wrongdoing); *accord, e.g.*, *Harriman v. Smart*, 2023 WL 11911575, at *2–3 (D. Colo. June 14, 2023) ("The relevant and proportional scope of discovery . . . is limited to the well-pleaded factual allegations and related claims asserted in the [operative complaint]."; citing cases).

This Interrogatory seeks irrelevant information that is not proportionate to the needs of the case for the additional reason that it seeks information regarding Defendants' contemplated conduct toward non-parties ("whether Defendants considered the same and/or a similar action or threat against *any other states, political subdivisions or instrumentalities of other states, or entities within other states*" (emphasis added)). That aspect of this Interrogatory is further objectionable because it is vague and overbroad insofar as it seeks information about "similar" conduct towards "political subdivisions," "instrumentalities," and "entities" within other States. Plaintiff's Counts One and Two challenge that Defendants have discriminated against the State of Colorado because Colorado allows mail-in voting and prosecuted former County Clerk Tina Peters. Undefined

"similar" conduct towards the other 49 States is not relevant to this issue, and even if it were, it is not proportionate to the needs of this single-Plaintiff case. Plaintiff has sued nine different federal Agencies, and it would be enormously burdensome to require them to "[i]dentify all individuals that had any role in each of the considered actions or threats" regarding contemplated conduct toward non-parties, particularly during the expedited discovery timeframe ordered by the Court.

Defendants further object to this Interrogatory because it facially seeks information that is protected by at least the deliberative-process privilege. The deliberative-process privilege shields "documents reflecting advisory opinions, recommendations and deliberations compromising part of a process by which governmental decisions and policies are formulated." *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). Recognizing that "officials will not communicate candidly among themselves if each remark is a potential item of discovery," the deliberative-process privilege is primarily designed to "enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government." *Id.* at 8–9 (cleaned up). It further serves to prevent the premature disclosure of proposed policies, and avoids "misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action." *Trentadue v. Integrity Comm.*, 501 F.3d 1215, 1226 (10th Cir. 2007) (cleaned up).

Defendants will not answer this Interrogatory.

**INTERROGATORY NO. 9:** For each individual identified in response to Interrogatory No. 8, identify all their communications regarding the considered action or threat, regardless of whether the communication was part of the decision-making process for that action or threat and/or occurred after-the-fact, including the date, content, form of the communication (e.g., meeting, social media post, email, text message), and other individuals involved, whether as a listener or participant.

**SUPPLEMENTAL RESPONSE:** Consistent with their response to Interrogatory Nos. 7 and 8, which are incorporated by reference (including their objection to discovery from the President, the Executive Office of the President, and/or the White House, and from DHS), Defendants object to this Interrogatory because it is facially overbroad as to timeframe (there is none). Defendants further object to this Interrogatory because it seeks irrelevant information that is not proportionate to the needs of this case to the extent it asks Defendants to identify "all . . . communications" for each individual involved in contemplated actions that are not pled in the operative Complaint, and indeed were not even taken. Conduct that is not described in the Complaint is inherently irrelevant, and even if it were not, it is not proportionate to the needs of this case to require Defendants to search for information outside the scope of the Complaint that Plaintiff chose to plead. *Cf., e.g.*, *Cuomo v. Clearing House Ass'n*, 557 U.S. 519, 531 (2009) (observing that judges are trusted to prevent "fishing expeditions" or an undirected rummaging through materials for evidence of some unknown wrongdoing); *accord, e.g.*, *Harriman v. Smart*, 2023 WL 11911575, at *2–3 (D. Colo. June 14, 2023) ("The relevant and proportional scope of discovery . . . is limited to the well-pleaded factual allegations and related claims asserted in the [operative complaint]."; citing cases).

This Interrogatory seeks irrelevant information that is not proportionate to the needs of the case for the additional reason that it seeks information regarding Defendants' contemplated conduct toward non-parties ("whether Defendants considered the same and/or a similar action or threat against *any other states, political subdivisions or instrumentalities of other states, or entities within other states*" (emphasis added)). That aspect of this Interrogatory is further objectionable because it is vague and overbroad insofar as it seeks information about "similar" conduct towards

"political subdivisions," "instrumentalities," and "entities" within other States. Plaintiff's Counts One and Two challenge that Defendants have discriminated against the State of Colorado because Colorado allows mail-in voting and prosecuted former County Clerk Tina Peters. Undefined "similar" conduct towards the other 49 States is not relevant to this issue, and even if it were, it is not proportionate to the needs of this single-Plaintiff case. Plaintiff has sued nine different federal Agencies, and it would be enormously burdensome to require them to "identify all . . . communications" for each individual that had any role in each of the considered actions or threats" regarding contemplated conduct toward non-parties, particularly during the expedited discovery timeframe ordered by the Court.

Defendants further object to this Interrogatory because it facially seeks information that is protected by at least the deliberative-process privilege. The deliberative-process privilege shields "documents reflecting advisory opinions, recommendations and deliberations compromising part of a process by which governmental decisions and policies are formulated." *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). Recognizing that "officials will not communicate candidly among themselves if each remark is a potential item of discovery," the deliberative-process privilege is primarily designed to "enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government." *Id.* at 8–9 (cleaned up). It further serves to prevent the premature disclosure of proposed policies, and avoids "misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action." *Trentadue v. Integrity Comm.*, 501 F.3d 1215, 1226 (10th Cir. 2007) (cleaned up).

Defendants will not answer this Interrogatory.

**INTERROGATORY NO. 10:** Identify all Defendants' communications regarding Tina Peters's prosecution, incarceration, and/or any efforts to assist in and/or effect her release from custody, including the date, content, form of the communication (e.g., meeting, social media post, email, text message), and individuals involved, whether as a listener or participant.

**SUPPLEMENTAL RESPONSE:** Defendants object to the extent the Interrogatory seeks discovery from the President, the Executive Office of the President, and/or the White House. Such discovery is improper at least at this juncture because, among other things, it would contravene "[t]he high respect that is owed to the office of the Chief Executive," which "is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery." *Clinton v. Jones*, 520 U.S. 681, 707 (1997); *see also Nixon v. Fitzgerald*, 457 U.S. 731, 749, 753 (1982) ("The President occupies a unique position in the constitutional scheme" that "counsel[s] judicial deference and restraint."). Plaintiff's discovery requests treat the President like any other civil litigant and fail to account for the "special considerations applicable to the President." *Cheney v. U.S. Dist. Ct. for Dist. of Columbia*, 542 U.S. 367, 385 (2004). Requiring their response would improperly "detract [the President] from energetic performance of [his] constitutional duties." *Id.* at 382; *see also id.* at 381–82 ("In no case . . . would a court be required to proceed against the president as against an ordinary individual." (quoting *United States v. Burr*, 25 F. Cas. 187, 192 (No. 14,694) (CC Va. 1807) (Marshall, J.))). That is, separation-of-powers concerns necessarily prevent such discovery from proceeding now. *See, e.g.*, *Cheney*, 542 U.S. at 388–91 (court of appeals failed to properly consider separation-of-powers concerns when it denied government's request for mandamus relief to prevent discovery against the Vice President, which discovery, the government argued, threatened "substantial intrusions on the process by which those in closest operational proximity to the President advise the President"; court of appeals also erred in finding

that the Vice President must first assert executive privilege); *see also U.S. Doge Serv. v. Citizens for Resp. & Ethics in Washington*, 145 S. Ct. 1981 (2025) ("[S]eparation of powers concerns counsel judicial deference and restraint in the context of discovery regarding internal Executive Branch communications.").

While *Cheney* alone counsels against any discovery against the President, Plaintiff's discovery against the President and EOP is particularly improper here because Plaintiff is already pursuing extensive discovery against the Agency Defendants that may well yield at least substantially the information that Plaintiff seeks without burdening the President. *See, e.g.*, Order, *Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019) (requiring Plaintiff to exhaust all discovery on other Defendants before considering whether there was "continuing need for discovery sought on the White House"); *Wagafe v. Trump*, 2017 WL 5990134, at *3 (W.D. Wash. Oct. 19, 2017) ("intruding on the Executive in this context is a matter of last resort"); *United States v. McGraw-Hill Cos.*, 2014 WL 1647385, at *13 (C.D. Cal. Apr. 15, 2014); *cf. Karnoski v. Trump*, 926 F.3d 1180, 1203–07 (9th Cir. 2019) (granting government's writ of mandamus to vacate district court's discovery order against the President because district court failed to apply *Cheney* or "explore other avenues, short of forcing the Executive to invoke privilege" (quoting *Cheney*, 542 U.S. at 390)).

Accordingly, and consistent with settled precedent, the President and EOP will not be responding to Plaintiff State of Colorado's Interrogatories at this time.

Defendant DHS objects to this Interrogatory because there are no allegations in the operative Complaint, at all, concerning it. DHS appears to be included as a named Defendant solely because the Federal Emergency Management Agency, also a named Defendant, is a component of

DHS. Nonetheless, in the spirit of compromise, and although Defendants do not concede that Plaintiff has established the relevance and proportionality of discovery directed to DHS—when it is already receiving discovery from FEMA, the agency alleged to have taken action against Colorado—DHS will respond to Plaintiff's discovery requests. Specifically, DHS will provide answers to Plaintiff's Interrogatories (subject to Defendants' other objections) on or before September 18, 2026.

In response to (at least) Plaintiff's Request for Production No. 5, Agency Defendants will conduct a reasonable search for documents and communications regarding Tina Peters's prosecution and incarceration within the timeframe of April 1, 2025, to July 1, 2026 (revised at Plaintiff's request),[4] and, following that search, will produce relevant, non-privileged documents. If responsive, relevant, non-privileged documents exist and are produced, Agency Defendants will supplement their answer to this Interrogatory to indicate the Bates numbers. Fed. R. Civ. P. 33(d)(1).

**INTERROGATORY NO. 11:** Describe in detail all actions Defendants considered or took regarding Tina Peters's prosecution, incarceration, and/or potential release from Colorado state prison, including the action considered, whether and why Defendants ultimately did or did not take the action, the identities of individuals involved and how they contributed, and all facts and considerations taken into account in deciding whether to take the action.

**SUPPLEMENTAL RESPONSE:** Defendants object to the extent the Interrogatory seeks discovery from the President, the Executive Office of the President, and/or the White House. Such discovery is improper at least at this juncture because, among other things, it would contravene "[t]he high respect that is owed to the office of the Chief Executive," which "is a matter that should

[4] As noted *supra*, the Parties are conferring with respect to the relevant timeframe for USAF.

inform the conduct of the entire proceeding, including the timing and scope of discovery." *Clinton v. Jones*, 520 U.S. 681, 707 (1997); *see also Nixon v. Fitzgerald*, 457 U.S. 731, 749, 753 (1982) ("The President occupies a unique position in the constitutional scheme" that "counsel[s] judicial deference and restraint."). Plaintiff's discovery requests treat the President like any other civil litigant and fail to account for the "special considerations applicable to the President." *Cheney v. U.S. Dist. Ct. for Dist. of Columbia*, 542 U.S. 367, 385 (2004). Requiring their response would improperly "detract [the President] from energetic performance of [his] constitutional duties." *Id.* at 382; *see also id.* at 381–82 ("In no case . . . would a court be required to proceed against the president as against an ordinary individual." (quoting *United States v. Burr*, 25 F. Cas. 187, 192 (No. 14,694) (CC Va. 1807) (Marshall, J.))). That is, separation-of-powers concerns necessarily prevent such discovery from proceeding now. *See, e.g.*, *Cheney*, 542 U.S. at 388–91 (court of appeals failed to properly consider separation-of-powers concerns when it denied government's request for mandamus relief to prevent discovery against the Vice President, which discovery, the government argued, threatened "substantial intrusions on the process by which those in closest operational proximity to the President advise the President"; court of appeals also erred in finding that the Vice President must first assert executive privilege); *see also U.S. Doge Serv. v. Citizens for Resp. & Ethics in Washington*, 145 S. Ct. 1981 (2025) ("[S]eparation of powers concerns counsel judicial deference and restraint in the context of discovery regarding internal Executive Branch communications.").

While *Cheney* alone counsels against any discovery against the President, Plaintiff's discovery against the President and EOP is particularly improper here because Plaintiff is already pursuing extensive discovery against the Agency Defendants that may well yield at least

substantially the information that Plaintiff seeks without burdening the President. *See, e.g.*, Order, *Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019) (requiring Plaintiff to exhaust all discovery on other Defendants before considering whether there was "continuing need for discovery sought on the White House"); *Wagafe v. Trump*, 2017 WL 5990134, at *3 (W.D. Wash. Oct. 19, 2017) ("intruding on the Executive in this context is a matter of last resort"); *United States v. McGraw-Hill Cos.*, 2014 WL 1647385, at *13 (C.D. Cal. Apr. 15, 2014); *cf. Karnoski v. Trump*, 926 F.3d 1180, 1203–07 (9th Cir. 2019) (granting government's writ of mandamus to vacate district court's discovery order against the President because district court failed to apply *Cheney* or "explore other avenues, short of forcing the Executive to invoke privilege" (quoting *Cheney*, 542 U.S. at 390)).

Accordingly, and consistent with settled precedent, the President and EOP will not be responding to Plaintiff State of Colorado's Interrogatories at this time.

Defendants further object to this Interrogatory because it facially seeks information that is protected by at least the deliberative-process privilege, by asking Defendants to describe actions "considered" but not taken. The deliberative-process privilege shields "documents reflecting advisory opinions, recommendations and deliberations compromising part of a process by which governmental decisions and policies are formulated." *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). Recognizing that "officials will not communicate candidly among themselves if each remark is a potential item of discovery," the deliberative-process privilege is primarily designed to "enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government." *Id.* at 8–9 (cleaned up). It further serves to prevent the premature disclosure of proposed policies, and avoids

"misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action." *Trentadue v. Integrity Comm.*, 501 F.3d 1215, 1226 (10th Cir. 2007) (cleaned up).

Defendant DHS objects to this Interrogatory because there are no allegations in the operative Complaint, at all, concerning it. DHS appears to be included as a named Defendant solely because the Federal Emergency Management Agency, also a named Defendant, is a component of DHS. Nonetheless, in the spirit of compromise, and although Defendants do not concede that Plaintiff has established the relevance and proportionality of discovery directed to DHS—when it is already receiving discovery from FEMA, the agency alleged to have taken action against Colorado—DHS will respond to Plaintiff's discovery requests. Specifically, DHS will provide answers to Plaintiff's Interrogatories (subject to Defendants' other objections) on or before September 18, 2026.

In response to (at least) Plaintiff's Request for Production No. 5, Agency Defendants will conduct a reasonable search for documents and communications regarding Tina Peters's prosecution and incarceration within the timeframe of April 1, 2025, to July 1, 2026 (revised at Plaintiff's request),[5] and, following that search, will produce relevant, non-privileged documents. If responsive, relevant, non-privileged documents exist and are produced, Agency Defendants will supplement their answer to this Interrogatory to indicate the Bates numbers. Fed. R. Civ. P. 33(d)(1).

**INTERROGATORY NO. 12:** Identify all Defendants' communications regarding Colorado's use of mail-in voting and/or any efforts by Defendants to stop and/or change Colorado's use of

[5] As noted *supra*, the Parties are conferring with respect to the relevant timeframe for USAF.

mail-in voting, including the date, content, form of the communication (e.g., meeting, social media post, email, text message), and individuals involved, whether as a listener or participant.

**SUPPLEMENTAL RESPONSE:** Defendants object to the extent the Interrogatory seeks discovery from the President, the Executive Office of the President, and/or the White House. Such discovery is improper at least at this juncture because, among other things, it would contravene "[t]he high respect that is owed to the office of the Chief Executive," which "is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery." *Clinton v. Jones*, 520 U.S. 681, 707 (1997); *see also Nixon v. Fitzgerald*, 457 U.S. 731, 749, 753 (1982) ("The President occupies a unique position in the constitutional scheme" that "counsel[s] judicial deference and restraint."). Plaintiff's discovery requests treat the President like any other civil litigant and fail to account for the "special considerations applicable to the President." *Cheney v. U.S. Dist. Ct. for Dist. of Columbia*, 542 U.S. 367, 385 (2004). Requiring their response would improperly "detract [the President] from energetic performance of [his] constitutional duties." *Id.* at 382; *see also id.* at 381–82 ("In no case . . . would a court be required to proceed against the president as against an ordinary individual." (quoting *United States v. Burr*, 25 F. Cas. 187, 192 (No. 14,694) (CC Va. 1807) (Marshall, J.))). That is, separation-of-powers concerns necessarily prevent such discovery from proceeding now. *See, e.g.*, *Cheney*, 542 U.S. at 388–91 (court of appeals failed to properly consider separation-of-powers concerns when it denied government's request for mandamus relief to prevent discovery against the Vice President, which discovery, the government argued, threatened "substantial intrusions on the process by which those in closest operational proximity to the President advise the President"; court of appeals also erred in finding that the Vice President must first assert executive privilege); *see also U.S. Doge Serv. v. Citizens for Resp. & Ethics in Washington*, 145 S. Ct. 1981 (2025) ("[S]eparation of powers concerns

counsel judicial deference and restraint in the context of discovery regarding internal Executive Branch communications.").

While *Cheney* alone counsels against any discovery against the President, Plaintiff's discovery against the President and EOP is particularly improper here because Plaintiff is already pursuing extensive discovery against the Agency Defendants that may well yield at least substantially the information that Plaintiff seeks without burdening the President. *See, e.g.*, Order, *Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019) (requiring Plaintiff to exhaust all discovery on other Defendants before considering whether there was "continuing need for discovery sought on the White House"); *Wagafe v. Trump*, 2017 WL 5990134, at *3 (W.D. Wash. Oct. 19, 2017) ("intruding on the Executive in this context is a matter of last resort"); *United States v. McGraw-Hill Cos.*, 2014 WL 1647385, at *13 (C.D. Cal. Apr. 15, 2014); *cf. Karnoski v. Trump*, 926 F.3d 1180, 1203–07 (9th Cir. 2019) (granting government's writ of mandamus to vacate district court's discovery order against the President because district court failed to apply *Cheney* or "explore other avenues, short of forcing the Executive to invoke privilege" (quoting *Cheney*, 542 U.S. at 390)).

Accordingly, and consistent with settled precedent, the President and EOP will not be responding to Plaintiff State of Colorado's Interrogatories at this time.

Defendant DHS objects to this Interrogatory because there are no allegations in the operative Complaint, at all, concerning it. DHS appears to be included as a named Defendant solely because the Federal Emergency Management Agency, also a named Defendant, is a component of DHS. Nonetheless, in the spirit of compromise, and although Defendants do not concede that Plaintiff has established the relevance and proportionality of discovery directed to DHS—when it

is already receiving discovery from FEMA, the agency alleged to have taken action against Colorado—DHS will respond to Plaintiff's discovery requests. Specifically, DHS will provide answers to Plaintiff's Interrogatories (subject to Defendants' other objections) on or before September 18, 2026.

In response to (at least) Plaintiff's Request for Production No. 6, Agency Defendants will conduct a reasonable search for documents and communications from the Agency Defendants regarding Colorado's use of mail-in voting within the timeframe of April 1, 2025, to July 1, 2026 (revised at Plaintiff's request),[6] and, following that search, will produce relevant, non-privileged documents. If responsive, relevant, non-privileged documents exist and are produced, Agency Defendants will supplement their answer to this Interrogatory to indicate the Bates numbers. Fed. R. Civ. P. 33(d)(1).

**INTERROGATORY NO. 13:** Describe in detail all actions Defendants considered or took as a result of Colorado's exercise of sovereign authority (e.g., Colorado's and/or any political subdivision's enactment of any so-called "sanctuary" laws, regulation of elections, and prosecution of individuals under Colorado state law) including the action considered, whether and why Defendants ultimately did or did not take the action, the identities of individuals involved and how they contributed, and all facts and considerations taken into account in considering the action.

**SUPPLEMENTAL RESPONSE:** Defendants object to the extent the Interrogatory seeks discovery from the President, the Executive Office of the President, and/or the White House. Such discovery is improper at least at this juncture because, among other things, it would contravene "[t]he high respect that is owed to the office of the Chief Executive," which "is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery." *Clinton v. Jones*, 520 U.S. 681, 707 (1997); *see also Nixon v. Fitzgerald*, 457 U.S. 731, 749, 753 (1982)

---

[6] As noted *supra*, the Parties are conferring with respect to the relevant timeframe for USAF.

("The President occupies a unique position in the constitutional scheme" that "counsel[s] judicial deference and restraint."). Plaintiff's discovery requests treat the President like any other civil litigant and fail to account for the "special considerations applicable to the President." *Cheney v. U.S. Dist. Ct. for Dist. of Columbia*, 542 U.S. 367, 385 (2004). Requiring their response would improperly "detract [the President] from energetic performance of [his] constitutional duties." *Id.* at 382; *see also id.* at 381–82 ("In no case . . . would a court be required to proceed against the president as against an ordinary individual." (quoting *United States v. Burr*, 25 F. Cas. 187, 192 (No. 14,694) (CC Va. 1807) (Marshall, J.))). That is, separation-of-powers concerns necessarily prevent such discovery from proceeding now. *See, e.g.*, *Cheney*, 542 U.S. at 388–91 (court of appeals failed to properly consider separation-of-powers concerns when it denied government's request for mandamus relief to prevent discovery against the Vice President, which discovery, the government argued, threatened "substantial intrusions on the process by which those in closest operational proximity to the President advise the President"; court of appeals also erred in finding that the Vice President must first assert executive privilege); *see also U.S. Doge Serv. v. Citizens for Resp. & Ethics in Washington*, 145 S. Ct. 1981 (2025) ("[S]eparation of powers concerns counsel judicial deference and restraint in the context of discovery regarding internal Executive Branch communications.").

While *Cheney* alone counsels against any discovery against the President, Plaintiff's discovery against the President and EOP is particularly improper here because Plaintiff is already pursuing extensive discovery against the Agency Defendants that may well yield at least substantially the information that Plaintiff seeks without burdening the President. *See, e.g.*, Order, *Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019) (requiring Plaintiff to exhaust all

discovery on other Defendants before considering whether there was "continuing need for discovery sought on the White House"); *Wagafe v. Trump*, 2017 WL 5990134, at *3 (W.D. Wash. Oct. 19, 2017) ("intruding on the Executive in this context is a matter of last resort"); *United States v. McGraw-Hill Cos.*, 2014 WL 1647385, at *13 (C.D. Cal. Apr. 15, 2014); *cf. Karnoski v. Trump*, 926 F.3d 1180, 1203–07 (9th Cir. 2019) (granting government's writ of mandamus to vacate district court's discovery order against the President because district court failed to apply *Cheney* or "explore other avenues, short of forcing the Executive to invoke privilege" (quoting *Cheney*, 542 U.S. at 390)).

Accordingly, and consistent with settled precedent, the President and EOP will not be responding to Plaintiff State of Colorado's Interrogatories at this time.

Defendants further object to this Interrogatory it is vague and overbroad as to timeframe (there is none). Defendants also object to this Interrogatory as vague and undefined to the extent it seeks information regarding "Colorado's exercise of sovereign authority." As written, that request includes literally everything the State of Colorado does.

Relatedly, Defendants also object to this Interrogatory because it seeks irrelevant information that is not proportionate to the needs of this case to the extent it requires them to "[d]escribe in detail all actions Defendants considered or took" regarding actions that are not pled in the operative Complaint. Conduct that is not described in the Complaint is inherently irrelevant, and even if it were not, it is not proportionate to the needs of this case to require Defendants to search for information outside the scope of the Complaint that Plaintiff chose to plead. *Cf., e.g.*, *Cuomo v. Clearing House Ass'n*, 557 U.S. 519, 531 (2009) (observing that judges are trusted to prevent "fishing expeditions" or an undirected rummaging through materials for evidence of some

unknown wrongdoing); *accord, e.g.*, *Harriman v. Smart*, 2023 WL 11911575, at *2–3 (D. Colo. June 14, 2023) ("The relevant and proportional scope of discovery . . . is limited to the well-pleaded factual allegations and related claims asserted in the [operative complaint]."; citing cases). Plaintiff's allegations in this case are that it has been discriminated against because it (i) allows mail-in voting and (ii) prosecuted Tina Peters. *See, e.g.*, Second Am. Compl. ¶¶ 1, 4, 7. Discovery generally into "Colorado's exercise of sovereign authority," a term which the Interrogatory does not define, and without even any limitation to actions taken *against* Colorado *by Defendants* because of said "exercise of sovereign authority," is overbroad and not proportional to the needs of this case.

Defendants further object to this Interrogatory because it facially seeks information that is protected by at least the deliberative-process privilege. The deliberative-process privilege shields "documents reflecting advisory opinions, recommendations and deliberations compromising part of a process by which governmental decisions and policies are formulated." *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). Recognizing that "officials will not communicate candidly among themselves if each remark is a potential item of discovery," the deliberative-process privilege is primarily designed to "enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government." *Id.* at 8–9 (cleaned up). It further serves to prevent the premature disclosure of proposed policies, and avoids "misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action." *Trentadue v. Integrity Comm.*, 501 F.3d 1215, 1226 (10th Cir. 2007) (cleaned up).

Defendant DHS objects to this Interrogatory because there are no allegations in the operative Complaint, at all, concerning it. DHS appears to be included as a named Defendant solely because the Federal Emergency Management Agency, also a named Defendant, is a component of DHS. Nonetheless, in the spirit of compromise, and although Defendants do not concede that Plaintiff has established the relevance and proportionality of discovery directed to DHS—when it is already receiving discovery from FEMA, the agency alleged to have taken action against Colorado—DHS will respond to Plaintiff's discovery requests. Specifically, DHS will provide answers to Plaintiff's Interrogatories (subject to Defendants' other objections) on or before September 18, 2026.

Defendants will not answer this Interrogatory.

**INTERROGATORY NO. 14:** Identify all Defendants' communications regarding Colorado's exercise of sovereign authority (e.g., Colorado's and/or any political subdivision's enactment of any so-called "sanctuary" laws, regulation of elections, and prosecution of individuals under Colorado state law), including the date, content, form of the communication (e.g., meeting, social media post, email, text message), and individuals involved, whether as a listener or participant.

**RESPONSE:** Consistent with their response to Interrogatory No. 13, which is incorporated by reference (including their objection to discovery from the President, the Executive Office of the President, and/or the White House, and from DHS), Defendants object to this Interrogatory as it is vague and overbroad as to timeframe (there is none). Agency Defendants also object to this Interrogatory as vague and undefined to the extent it seeks information regarding "Colorado's exercise of sovereign authority." As written, that request includes literally everything the State of Colorado does.

Relatedly, Defendants also object to this Interrogatory because it seeks irrelevant information that is not proportionate to the needs of this case to the extent it requires them to

"identify all . . . communications" regarding actions that are not pled in the operative Complaint. Conduct that is not described in the Complaint is inherently irrelevant, and even if it were not, it is not proportionate to the needs of this case to require Defendants to search for information outside the scope of the Complaint that Plaintiff chose to plead. *Cf., e.g.*, *Cuomo v. Clearing House Ass'n*, 557 U.S. 519, 531 (2009) (observing that judges are trusted to prevent "fishing expeditions" or an undirected rummaging through materials for evidence of some unknown wrongdoing); *accord, e.g.*, *Harriman v. Smart*, 2023 WL 11911575, at *2–3 (D. Colo. June 14, 2023) ("The relevant and proportional scope of discovery . . . is limited to the well-pleaded factual allegations and related claims asserted in the [operative complaint]."; citing cases). Plaintiff's allegations in this case are that it has been discriminated against because it (i) allows mail-in voting and (ii) prosecuted Tina Peters. *See, e.g.*, Second Am. Compl. ¶¶ 1, 4, 7. Discovery generally into "Colorado's exercise of sovereign authority," a term which the Interrogatory does not define, and without even any limitation to actions taken *against* Colorado *by Defendants* because of said "exercise of sovereign authority," is overbroad and not proportional to the needs of this case.

Defendants further object to this Interrogatory because it facially seeks information that is protected by at least the deliberative-process privilege. The deliberative-process privilege shields "documents reflecting advisory opinions, recommendations and deliberations compromising part of a process by which governmental decisions and policies are formulated." *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). Recognizing that "officials will not communicate candidly among themselves if each remark is a potential item of discovery," the deliberative-process privilege is primarily designed to "enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the

Government." *Id.* at 8–9 (cleaned up). It further serves to prevent the premature disclosure of proposed policies, and avoids "misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action." *Trentadue v. Integrity Comm.*, 501 F.3d 1215, 1226 (10th Cir. 2007) (cleaned up).

Defendants will not answer this Interrogatory.

**INTERROGATORY NO. 15:** Identify all communications Defendants have had regarding threating [sic] or taking any adverse action (e.g., terminating, not renewing, or taking away federal funding or services; auditing; not granting funds; or investigation) directed at or to either Colorado, its political subdivisions or instrumentalities, or entities within Colorado because of Governor Polis or any of his statements, policies, actions, or positions, including the date, content, form of the communication (e.g., meeting, social media post, email, text message), and individuals involved, whether as a listener or participant.

**SUPPLEMENTAL RESPONSE:** Defendants object to the extent the Interrogatory seeks discovery from the President, the Executive Office of the President, and/or the White House. Such discovery is improper at least at this juncture because, among other things, it would contravene "[t]he high respect that is owed to the office of the Chief Executive," which "is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery." *Clinton v. Jones*, 520 U.S. 681, 707 (1997); *see also Nixon v. Fitzgerald*, 457 U.S. 731, 749, 753 (1982) ("The President occupies a unique position in the constitutional scheme" that "counsel[s] judicial deference and restraint."). Plaintiff's discovery requests treat the President like any other civil litigant and fail to account for the "special considerations applicable to the President." *Cheney v. U.S. Dist. Ct. for Dist. of Columbia*, 542 U.S. 367, 385 (2004). Requiring their response would improperly "detract [the President] from energetic performance of [his] constitutional duties." *Id.* at 382; *see also id.* at 381–82 ("In no case . . . would a court be required to proceed against the

president as against an ordinary individual." (quoting *United States v. Burr*, 25 F. Cas. 187, 192 (No. 14,694) (CC Va. 1807) (Marshall, J.))). That is, separation-of-powers concerns necessarily prevent such discovery from proceeding now. *See, e.g.*, *Cheney*, 542 U.S. at 388–91 (court of appeals failed to properly consider separation-of-powers concerns when it denied government's request for mandamus relief to prevent discovery against the Vice President, which discovery, the government argued, threatened "substantial intrusions on the process by which those in closest operational proximity to the President advise the President"; court of appeals also erred in finding that the Vice President must first assert executive privilege); *see also U.S. Doge Serv. v. Citizens for Resp. & Ethics in Washington*, 145 S. Ct. 1981 (2025) ("[S]eparation of powers concerns counsel judicial deference and restraint in the context of discovery regarding internal Executive Branch communications.").

While *Cheney* alone counsels against any discovery against the President, Plaintiff's discovery against the President and EOP is particularly improper here because Plaintiff is already pursuing extensive discovery against the Agency Defendants that may well yield at least substantially the information that Plaintiff seeks without burdening the President. *See, e.g.*, Order, *Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019) (requiring Plaintiff to exhaust all discovery on other Defendants before considering whether there was "continuing need for discovery sought on the White House"); *Wagafe v. Trump*, 2017 WL 5990134, at *3 (W.D. Wash. Oct. 19, 2017) ("intruding on the Executive in this context is a matter of last resort"); *United States v. McGraw-Hill Cos.*, 2014 WL 1647385, at *13 (C.D. Cal. Apr. 15, 2014); *cf. Karnoski v. Trump*, 926 F.3d 1180, 1203–07 (9th Cir. 2019) (granting government's writ of mandamus to vacate district court's discovery order against the President because district court failed to apply *Cheney*

or "explore other avenues, short of forcing the Executive to invoke privilege" (quoting *Cheney*, 542 U.S. at 390)).

Accordingly, and consistent with settled precedent, the President and EOP will not be responding to Plaintiff State of Colorado's Interrogatories at this time.

Defendants further object to this Interrogatory because it is vague and overbroad as to timeframe (there is none). Agency Defendants also object to this request as vague and undefined to the extent it seeks information regarding "Governor Polis" or "any of his statements, his policies, his actions, or his positions." As written, that request includes literally everything the State of Colorado does.

Relatedly, Defendants also object to this Interrogatory because it seeks irrelevant information that is not proportionate to the needs of this case to the extent it requests communications regarding actions that are not pled in the operative Complaint. Conduct that is not described in the Complaint is inherently irrelevant, and even if it were not, it is not proportionate to the needs of this case to require Defendants to search for information outside the scope of the Complaint that Plaintiff chose to plead. *Cf., e.g.*, *Cuomo v. Clearing House Ass'n*, 557 U.S. 519, 531 (2009) (observing that judges are trusted to prevent "fishing expeditions" or an undirected rummaging through materials for evidence of some unknown wrongdoing); *accord, e.g.*, *Harriman v. Smart*, 2023 WL 11911575, at *2–3 (D. Colo. June 14, 2023) ("The relevant and proportional scope of discovery . . . is limited to the well-pleaded factual allegations and related claims asserted in the [operative complaint]."; citing cases). Plaintiff's allegations in this case are that it has been discriminated against because it (i) allows mail-in voting and (ii) prosecuted Tina Peters. *See, e.g.*, Second Am. Compl. ¶¶ 1, 4, 7. Discovery generally into actions against or because Governor Polis,

"or any of his statements, his policies, his actions, or his positions," is overbroad and not proportional to the needs of this case.

Defendant DHS objects to this Interrogatory because there are no allegations in the operative Complaint, at all, concerning it. DHS appears to be included as a named Defendant solely because the Federal Emergency Management Agency, also a named Defendant, is a component of DHS. Nonetheless, in the spirit of compromise, and although Defendants do not concede that Plaintiff has established the relevance and proportionality of discovery directed to DHS—when it is already receiving discovery from FEMA, the agency alleged to have taken action against Colorado—DHS will respond to Plaintiff's discovery requests. Specifically, DHS will provide answers to Plaintiff's Interrogatories (subject to Defendants' other objections) on or before September 18, 2026.

In response to (at least) Plaintiff's Request for Production No. 8, Agency Defendants will conduct a reasonable search for documents and communications regarding Colorado's prosecution/incarceration of Tina Peters and use of mail-in voting within the timeframe of April 1, 2025, to July 1, 2026 (revised at Plaintiff's request),[7] and, following that search, will produce relevant, non-privileged documents. If responsive, relevant, non-privileged documents exist and are produced, Agency Defendants will supplement their answer to this Interrogatory to indicate the Bates numbers. Fed. R. Civ. P. 33(d)(1).

**INTERROGATORY NO. 16:** Identify all communications Defendants have had with any reporter and/or member and/or employee of the press regarding any adverse actions or threats identified in response to Interrogatory Nos. 2, 4, and 7, press reports described in the operative Complaint, Tina Peters, Colorado's use of mail-in voting, Colorado's exercise of sovereign authority (e.g., Colorado's and/or any political subdivision's enactment of any so-called

[7] As noted *supra*, the Parties are conferring with respect to the relevant timeframe for USAF.

"sanctuary" laws, regulation of elections, and prosecution of individuals under Colorado state law), or Governor Polis including the date, content, form of the communication, and individuals involved, whether as a listener or participant.

**SUPPLEMENTAL RESPONSE:** Defendants object to the extent the Interrogatory seeks discovery from the President, the Executive Office of the President, and/or the White House. Such discovery is improper at least at this juncture because, among other things, it would contravene "[t]he high respect that is owed to the office of the Chief Executive," which "is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery." *Clinton v. Jones*, 520 U.S. 681, 707 (1997); *see also Nixon v. Fitzgerald*, 457 U.S. 731, 749, 753 (1982) ("The President occupies a unique position in the constitutional scheme" that "counsel[s] judicial deference and restraint."). Plaintiff's discovery requests treat the President like any other civil litigant and fail to account for the "special considerations applicable to the President." *Cheney v. U.S. Dist. Ct. for Dist. of Columbia*, 542 U.S. 367, 385 (2004). Requiring their response would improperly "detract [the President] from energetic performance of [his] constitutional duties." *Id.* at 382; *see also id.* at 381–82 ("In no case . . . would a court be required to proceed against the president as against an ordinary individual." (quoting *United States v. Burr*, 25 F. Cas. 187, 192 (No. 14,694) (CC Va. 1807) (Marshall, J.))). That is, separation-of-powers concerns necessarily prevent such discovery from proceeding now. *See, e.g.*, *Cheney*, 542 U.S. at 388–91 (court of appeals failed to properly consider separation-of-powers concerns when it denied government's request for mandamus relief to prevent discovery against the Vice President, which discovery, the government argued, threatened "substantial intrusions on the process by which those in closest operational proximity to the President advise the President"; court of appeals also erred in finding that the Vice President must first assert executive privilege); *see also U.S. Doge Serv. v. Citizens*

*for Resp. & Ethics in Washington*, 145 S. Ct. 1981 (2025) ("[S]eparation of powers concerns counsel judicial deference and restraint in the context of discovery regarding internal Executive Branch communications.").

While *Cheney* alone counsels against any discovery against the President, Plaintiff's discovery against the President and EOP is particularly improper here because Plaintiff is already pursuing extensive discovery against the Agency Defendants that may well yield at least substantially the information that Plaintiff seeks without burdening the President. *See, e.g.*, Order, *Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019) (requiring Plaintiff to exhaust all discovery on other Defendants before considering whether there was "continuing need for discovery sought on the White House"); *Wagafe v. Trump*, 2017 WL 5990134, at *3 (W.D. Wash. Oct. 19, 2017) ("intruding on the Executive in this context is a matter of last resort"); *United States v. McGraw-Hill Cos.*, 2014 WL 1647385, at *13 (C.D. Cal. Apr. 15, 2014); *cf. Karnoski v. Trump*, 926 F.3d 1180, 1203–07 (9th Cir. 2019) (granting government's writ of mandamus to vacate district court's discovery order against the President because district court failed to apply *Cheney* or "explore other avenues, short of forcing the Executive to invoke privilege" (quoting *Cheney*, 542 U.S. at 390)).

Accordingly, and consistent with settled precedent, the President and EOP will not be responding to Plaintiff State of Colorado's Interrogatories at this time.

Defendants further object to this Interrogatory because it is vague and overbroad as to timeframe (there is none). Agency Defendants also object to this request as vague and undefined to the extent it seeks information regarding "Colorado's exercise of sovereign authority." As written, that request includes literally everything the State of Colorado does.

Relatedly, Defendants also object to this Interrogatory because it seeks irrelevant information that is not proportionate to the needs of this case to the extent it requests communications regarding actions that are not pled in the operative Complaint. Conduct that is not described in the Complaint is inherently irrelevant, and even if it were not, it is not proportionate to the needs of this case to require Defendants to search for information outside the scope of the Complaint that Plaintiff chose to plead. *Cf., e.g.*, *Cuomo v. Clearing House Ass'n*, 557 U.S. 519, 531 (2009) (observing that judges are trusted to prevent "fishing expeditions" or an undirected rummaging through materials for evidence of some unknown wrongdoing); *accord, e.g.*, *Harriman v. Smart*, 2023 WL 11911575, at *2–3 (D. Colo. June 14, 2023) ("The relevant and proportional scope of discovery . . . is limited to the well-pleaded factual allegations and related claims asserted in the [operative complaint]."; citing cases). Plaintiff's allegations in this case are that *it* has been discriminated against *because* it (i) allows mail-in voting and (ii) prosecuted Tina Peters. *See, e.g.*, Second Am. Compl. ¶¶ 1, 4, 7.

Defendant DHS objects to this Interrogatory because there are no allegations in the operative Complaint, at all, concerning it. DHS appears to be included as a named Defendant solely because the Federal Emergency Management Agency, also a named Defendant, is a component of DHS. Nonetheless, in the spirit of compromise, and although Defendants do not concede that Plaintiff has established the relevance and proportionality of discovery directed to DHS—when it is already receiving discovery from FEMA, the agency alleged to have taken action against Colorado—DHS will respond to Plaintiff's discovery requests. Specifically, DHS will provide answers to Plaintiff's Interrogatories (subject to Defendants' other objections) on or before September 18, 2026.

In response to (at least) Plaintiff's Request for Production No. 9, Agency Defendants will conduct a reasonable search for communications Agency Defendants have had with members of the press regarding press reports described in the operative Complaint; Colorado's prosecution/incarceration of Tina Peters; and Colorado's use of mail-in voting, within the timeframe of April 1, 2025, to July 1, 2026 (revised at Plaintiff's request),[8] and, following that search, will produce relevant, non-privileged documents. If responsive, relevant, non-privileged documents exist and are produced, Agency Defendants will supplement their answer to this Interrogatory to indicate the Bates numbers. Fed. R. Civ. P. 33(d)(1).

**INTERROGATORY NO. 17:** Identify all communications between individuals in the Executive Office of the President, including the Office of Management and Budget, on the one hand, and any individuals at any Defendant agency on the other hand, regarding any guidance, instructions, requests, or communications relating to taking, considering, or proposing any adverse action or threat (e.g., terminating, not renewing, taking away federal funding or services, auditing, not granting funds, or investigation) against some but not all states, including the date, content, form of the communication, and individuals involved, whether as a listener or participant. This Interrogatory is directed at circumstances where states have been targeted for differential treatment.

**SUPPLEMENTAL RESPONSE:** Defendants object to the extent the Interrogatory seeks discovery from the President, the Executive Office of the President, and/or the White House. Such discovery is improper at least at this juncture because, among other things, it would contravene "[t]he high respect that is owed to the office of the Chief Executive," which "is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery." *Clinton v. Jones*, 520 U.S. 681, 707 (1997); *see also Nixon v. Fitzgerald*, 457 U.S. 731, 749, 753 (1982) ("The President occupies a unique position in the constitutional scheme" that "counsel[s] judicial

[8] As noted *supra*, the Parties are conferring with respect to the relevant timeframe for USAF.

deference and restraint."). Plaintiff's discovery requests treat the President like any other civil litigant and fail to account for the "special considerations applicable to the President." *Cheney v. U.S. Dist. Ct. for Dist. of Columbia*, 542 U.S. 367, 385 (2004). Requiring their response would improperly "detract [the President] from energetic performance of [his] constitutional duties." *Id.* at 382; *see also id.* at 381–82 ("In no case . . . would a court be required to proceed against the president as against an ordinary individual." (quoting *United States v. Burr*, 25 F. Cas. 187, 192 (No. 14,694) (CC Va. 1807) (Marshall, J.))). That is, separation-of-powers concerns necessarily prevent such discovery from proceeding now. *See, e.g.*, *Cheney*, 542 U.S. at 388–91 (court of appeals failed to properly consider separation-of-powers concerns when it denied government's request for mandamus relief to prevent discovery against the Vice President, which discovery, the government argued, threatened "substantial intrusions on the process by which those in closest operational proximity to the President advise the President"; court of appeals also erred in finding that the Vice President must first assert executive privilege); *see also U.S. Doge Serv. v. Citizens for Resp. & Ethics in Washington*, 145 S. Ct. 1981 (2025) ("[S]eparation of powers concerns counsel judicial deference and restraint in the context of discovery regarding internal Executive Branch communications.").

While *Cheney* alone counsels against any discovery against the President, Plaintiff's discovery against the President and EOP is particularly improper here because Plaintiff is already pursuing extensive discovery against the Agency Defendants that may well yield at least substantially the information that Plaintiff seeks without burdening the President. *See, e.g.*, Order, *Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019) (requiring Plaintiff to exhaust all discovery on other Defendants before considering whether there was "continuing need for

discovery sought on the White House"); *Wagafe v. Trump*, 2017 WL 5990134, at *3 (W.D. Wash. Oct. 19, 2017) ("intruding on the Executive in this context is a matter of last resort"); *United States v. McGraw-Hill Cos.*, 2014 WL 1647385, at *13 (C.D. Cal. Apr. 15, 2014); *cf. Karnoski v. Trump*, 926 F.3d 1180, 1203–07 (9th Cir. 2019) (granting government's writ of mandamus to vacate district court's discovery order against the President because district court failed to apply *Cheney* or "explore other avenues, short of forcing the Executive to invoke privilege" (quoting *Cheney*, 542 U.S. at 390)).

Accordingly, and consistent with settled precedent, the President and EOP will not be responding to Plaintiff State of Colorado's Interrogatories at this time.

Defendants further object to this Interrogatory because it is vague and overbroad as to timeframe (there is none). Defendants further object to this Interrogatory because it facially seeks information that is protected by, at least, the deliberative-process and presidential-communications privileges. The deliberative-process privilege shields "documents reflecting advisory opinions, recommendations and deliberations compromising part of a process by which governmental decisions and policies are formulated." *Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). Recognizing that "officials will not communicate candidly among themselves if each remark is a potential item of discovery," the deliberative-process privilege is primarily designed to "enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government." *Id.* at 8–9 (cleaned up). It further serves to prevent the premature disclosure of proposed policies, and avoids "misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action." *Trentadue v. Integrity Comm.*, 501 F.3d

1215, 1226 (10th Cir. 2007) (cleaned up). This Interrogatory facially invokes privileged deliberative communications, seeking "all communications" regarding "any *guidance*, *instructions*, *requests*, or communications relating to taking, *considering*, or *proposing* any action" (emphases added).

The presidential communications privilege is a "'presumptive privilege for [p]residential communications,'" *Loving v. Dep't of Def.*, 550 F.3d 32, 37 (D.C. Cir. 2008) (quoting *United States v. Nixon*, 418 U.S. 683, 708 (1974)), which "preserves the President's ability to obtain candid and informed opinions from his advisors and to make decisions confidentially." *Id.* (citing *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1112 (D.C. Cir. 2004)). Accordingly, the privilege protects communications that are "in performance of a President's responsibilities," "of his office," and made "in the process of shaping policies and making decisions." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 449 (1977) (cleaned up). This Request facially invokes privileged presidential communications, seeking "all communications" "describing or relating to any communications *between individuals in the Executive Office of the President* . . . and any individuals at any Defendant agency."

Defendants also object to this Request because it seeks irrelevant information that is not proportionate to the needs of this case because it requests communications regarding contemplated actions that are not pled in the operative Complaint, and indeed were not even taken, and are not even specific to Plaintiff State of Colorado (seeking communications about action taken "against some but not all states"). Conduct that is not described in the Complaint is inherently irrelevant, and even if it were not, it is not proportionate to the needs of this case to require Defendants to search for information outside the scope of the Complaint that Plaintiff chose to plead. *Cf., e.g.*,

*Cuomo v. Clearing House Ass'n*, 557 U.S. 519, 531 (2009) (observing that judges are trusted to prevent "fishing expeditions" or an undirected rummaging through materials for evidence of some unknown wrongdoing); *accord, e.g.*, *Harriman v. Smart*, 2023 WL 11911575, at *2–3 (D. Colo. June 14, 2023) ("The relevant and proportional scope of discovery . . . is limited to the well-pleaded factual allegations and related claims asserted in the [operative complaint]."; citing cases). Plaintiff has sued nine different federal Agency Defendants, and it would be enormously burdensome to require them to search for "all communications" regarding contemplated conduct toward non-parties, particularly during the expedited discovery timeframe ordered by the Court.

Defendant DHS objects to this Interrogatory because there are no allegations in the operative Complaint, at all, concerning it. DHS appears to be included as a named Defendant solely because the Federal Emergency Management Agency, also a named Defendant, is a component of DHS. Nonetheless, in the spirit of compromise, and although Defendants do not concede that Plaintiff has established the relevance and proportionality of discovery directed to DHS—when it is already receiving discovery from FEMA, the agency alleged to have taken action against Colorado—DHS will respond to Plaintiff's discovery requests. Specifically, DHS will provide answers to Plaintiff's Interrogatories (subject to Defendants' other objections) on or before September 18, 2026.

Defendants will not answer this Interrogatory.

**INTERROGATORY NO. 18:** For the 2025 Safe Streets and Roads for All competitive grant program described in the operative Complaint, identify the key details for all submitted grant applications, including the applicant, the state where the applicant is located, the grant program to which the applicant applied, the staff recommendation (e.g., Highly Recommended, etc.), and the final funding decision with the amount awarded and decision-maker(s).

**SUPPLEMENTAL RESPONSE:** Defendants object to the extent the Interrogatory seeks discovery from the President, the Executive Office of the President, and/or the White House. Such discovery is improper at least at this juncture because, among other things, it would contravene "[t]he high respect that is owed to the office of the Chief Executive," which "is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery." *Clinton v. Jones*, 520 U.S. 681, 707 (1997); *see also Nixon v. Fitzgerald*, 457 U.S. 731, 749, 753 (1982) ("The President occupies a unique position in the constitutional scheme" that "counsel[s] judicial deference and restraint."). Plaintiff's discovery requests treat the President like any other civil litigant and fail to account for the "special considerations applicable to the President." *Cheney v. U.S. Dist. Ct. for Dist. of Columbia*, 542 U.S. 367, 385 (2004). Requiring their response would improperly "detract [the President] from energetic performance of [his] constitutional duties." *Id.* at 382; *see also id.* at 381–82 ("In no case . . . would a court be required to proceed against the president as against an ordinary individual." (quoting *United States v. Burr*, 25 F. Cas. 187, 192 (No. 14,694) (CC Va. 1807) (Marshall, J.))). That is, separation-of-powers concerns necessarily prevent such discovery from proceeding now. *See, e.g.*, *Cheney*, 542 U.S. at 388–91 (court of appeals failed to properly consider separation-of-powers concerns when it denied government's request for mandamus relief to prevent discovery against the Vice President, which discovery, the government argued, threatened "substantial intrusions on the process by which those in closest operational proximity to the President advise the President"; court of appeals also erred in finding that the Vice President must first assert executive privilege); *see also U.S. Doge Serv. v. Citizens for Resp. & Ethics in Washington*, 145 S. Ct. 1981 (2025) ("[S]eparation of powers concerns

counsel judicial deference and restraint in the context of discovery regarding internal Executive Branch communications.”).

While *Cheney* alone counsels against any discovery against the President, Plaintiff’s discovery against the President and EOP is particularly improper here because Plaintiff is already pursuing extensive discovery against the Agency Defendants that may well yield at least substantially the information that Plaintiff seeks without burdening the President. *See, e.g.*, Order, *Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019) (requiring Plaintiff to exhaust all discovery on other Defendants before considering whether there was “continuing need for discovery sought on the White House”); *Wagafe v. Trump*, 2017 WL 5990134, at *3 (W.D. Wash. Oct. 19, 2017) (“intruding on the Executive in this context is a matter of last resort”); *United States v. McGraw-Hill Cos.*, 2014 WL 1647385, at *13 (C.D. Cal. Apr. 15, 2014); *cf. Karnoski v. Trump*, 926 F.3d 1180, 1203–07 (9th Cir. 2019) (granting government’s writ of mandamus to vacate district court’s discovery order against the President because district court failed to apply *Cheney* or “explore other avenues, short of forcing the Executive to invoke privilege” (quoting *Cheney*, 542 U.S. at 390)).

Accordingly, and consistent with settled precedent, the President and EOP will not be responding to Plaintiff State of Colorado’s Interrogatories at this time.

Defendant DHS objects to this Interrogatory because there are no allegations in the operative Complaint, at all, concerning it. DHS appears to be included as a named Defendant solely because the Federal Emergency Management Agency, also a named Defendant, is a component of DHS. Nonetheless, in the spirit of compromise, and although Defendants do not concede that Plaintiff has established the relevance and proportionality of discovery directed to DHS—when it

is already receiving discovery from FEMA, the agency alleged to have taken action against Colorado—DHS will respond to Plaintiff's discovery requests. Specifically, DHS will provide answers to Plaintiff's Interrogatories (subject to Defendants' other objections) on or before September 18, 2026.

As this Interrogatory concerns a Department of Transportation grant, Defendants object to having Defendants other than the Department of Transportation attempt to answer it. **DOT** answers it, as follows: Information for the Fiscal Year 2025 Safe Streets for All competitive grant program, including key details for grant applicants and selections, is available online at DOT's website: https://www.transportation.gov/grants/ss4a/2025-awards. The Department received 1,255 applications, and the Secretary selected 521 for awards. Additional information for the awarded projects is available at the website listed above. DOT will also conduct a reasonable search for information on the applications and will produce any relevant and non-privileged documents responsive to this request.

**INTERROGATORY NO. 19:** Explain whether and how artificial intelligence (AI) tools (e.g., Grok, Chat GPT, Claude) were used in deciding whether to take any action against Colorado identified in response to Interrogatory Nos. 2, 4, and 7, including the software version of the AI tool used, date(s) used, inputs and outputs, whether any software tracked use of the AI tool, and whether and when any steps were taken to collect and preserve such use of any AI tool.

**SUPPLEMENTAL RESPONSE:** Defendants object to the extent the Interrogatory seeks discovery from the President, the Executive Office of the President, and/or the White House. Such discovery is improper at least at this juncture because, among other things, it would contravene "[t]he high respect that is owed to the office of the Chief Executive," which "is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery." *Clinton v. Jones*, 520 U.S. 681, 707 (1997); *see also Nixon v. Fitzgerald*, 457 U.S. 731, 749, 753 (1982)

("The President occupies a unique position in the constitutional scheme" that "counsel[s] judicial deference and restraint."). Plaintiff's discovery requests treat the President like any other civil litigant and fail to account for the "special considerations applicable to the President." *Cheney v. U.S. Dist. Ct. for Dist. of Columbia*, 542 U.S. 367, 385 (2004). Requiring their response would improperly "detract [the President] from energetic performance of [his] constitutional duties." *Id.* at 382; *see also id.* at 381–82 ("In no case . . . would a court be required to proceed against the president as against an ordinary individual." (quoting *United States v. Burr*, 25 F. Cas. 187, 192 (No. 14,694) (CC Va. 1807) (Marshall, J.))). That is, separation-of-powers concerns necessarily prevent such discovery from proceeding now. *See, e.g.*, *Cheney*, 542 U.S. at 388–91 (court of appeals failed to properly consider separation-of-powers concerns when it denied government's request for mandamus relief to prevent discovery against the Vice President, which discovery, the government argued, threatened "substantial intrusions on the process by which those in closest operational proximity to the President advise the President"; court of appeals also erred in finding that the Vice President must first assert executive privilege); *see also U.S. Doge Serv. v. Citizens for Resp. & Ethics in Washington*, 145 S. Ct. 1981 (2025) ("[S]eparation of powers concerns counsel judicial deference and restraint in the context of discovery regarding internal Executive Branch communications.").

While *Cheney* alone counsels against any discovery against the President, Plaintiff's discovery against the President and EOP is particularly improper here because Plaintiff is already pursuing extensive discovery against the Agency Defendants that may well yield at least substantially the information that Plaintiff seeks without burdening the President. *See, e.g.*, Order, *Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019) (requiring Plaintiff to exhaust all

discovery on other Defendants before considering whether there was "continuing need for discovery sought on the White House"); *Wagafe v. Trump*, 2017 WL 5990134, at *3 (W.D. Wash. Oct. 19, 2017) ("intruding on the Executive in this context is a matter of last resort"); *United States v. McGraw-Hill Cos.*, 2014 WL 1647385, at *13 (C.D. Cal. Apr. 15, 2014); *cf. Karnoski v. Trump*, 926 F.3d 1180, 1203–07 (9th Cir. 2019) (granting government's writ of mandamus to vacate district court's discovery order against the President because district court failed to apply *Cheney* or "explore other avenues, short of forcing the Executive to invoke privilege" (quoting *Cheney*, 542 U.S. at 390)).

Accordingly, and consistent with settled precedent, the President and EOP will not be responding to Plaintiff State of Colorado's Interrogatories at this time.

Defendants further object to this Interrogatory because it seeks information that is irrelevant to Plaintiff's case and is therefore outside the scope of discovery permitted by Federal Rule of Civil Procedure 26. The operative, Second Amended Complaint does not contain any allegation—plausible or otherwise—that any of the actions Defendants have taken against Colorado were supported or otherwise informed by "artificial intelligence (AI) tools." Defendants further object because it is not proportional to the needs of this case to "[e]xplain whether and how" Defendants used AI tools to: (i) take actions regarding Colorado that are *themselves* not pled in the Complaint, as requested in the referenced Interrogatory 4; or (ii) *consider* (but not take) actions against Colorado or against non-parties, as requested in the referenced Interrogatory 7. Conduct that is not described in the Complaint is inherently irrelevant, and even if it were not, it is not proportionate to the needs of this case to require Defendants to search for information outside the scope of the Complaint that Plaintiff chose to plead. *Cf., e.g.*, *Cuomo v. Clearing House Ass'n*,

557 U.S. 519, 531 (2009) (observing that judges are trusted to prevent "fishing expeditions" or an undirected rummaging through materials for evidence of some unknown wrongdoing); *accord, e.g.*, *Harriman v. Smart*, 2023 WL 11911575, at *2–3 (D. Colo. June 14, 2023) ("The relevant and proportional scope of discovery . . . is limited to the well-pleaded factual allegations and related claims asserted in the [operative complaint]."; citing cases).

Defendant DHS objects to this Interrogatory because there are no allegations in the operative Complaint, at all, concerning it. DHS appears to be included as a named Defendant solely because the Federal Emergency Management Agency, also a named Defendant, is a component of DHS. Nonetheless, in the spirit of compromise, and although Defendants do not concede that Plaintiff has established the relevance and proportionality of discovery directed to DHS—when it is already receiving discovery from FEMA, the agency alleged to have taken action against Colorado—DHS will respond to Plaintiff's discovery requests. Specifically, DHS will provide answers to Plaintiff's Interrogatories (subject to Defendants' other objections) on or before September 18, 2026.

Defendants will not answer this Interrogatory.

**INTERROGATORY NO. 20:** For each individual identified in any interrogatory response, identify all means of communications that such individual used and/or uses in their work with Defendants, regardless of whether on a personal or Defendant-issued device, including instant messaging apps (e.g., iMessage, Signal, Teams, WhatsApp), email applications, phone, social media, and/or oral and written communications, and where applicable, the name, number, and/or address that the individual uses to identify themselves with that means of communication, and whether and when steps were taken to collect and preserve such communications.

**SUPPLEMENTAL RESPONSE:** Defendants object to the extent the Interrogatory seeks discovery from the President, the Executive Office of the President, and/or the White House. Such discovery is improper at least at this juncture because, among other things, it would contravene

"[t]he high respect that is owed to the office of the Chief Executive," which "is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery." *Clinton v. Jones*, 520 U.S. 681, 707 (1997); *see also Nixon v. Fitzgerald*, 457 U.S. 731, 749, 753 (1982) ("The President occupies a unique position in the constitutional scheme" that "counsel[s] judicial deference and restraint."). Plaintiff's discovery requests treat the President like any other civil litigant and fail to account for the "special considerations applicable to the President." *Cheney v. U.S. Dist. Ct. for Dist. of Columbia*, 542 U.S. 367, 385 (2004). Requiring their response would improperly "detract [the President] from energetic performance of [his] constitutional duties." *Id.* at 382; *see also id.* at 381–82 ("In no case . . . would a court be required to proceed against the president as against an ordinary individual." (quoting *United States v. Burr*, 25 F. Cas. 187, 192 (No. 14,694) (CC Va. 1807) (Marshall, J.))). That is, separation-of-powers concerns necessarily prevent such discovery from proceeding now. *See, e.g.*, *Cheney*, 542 U.S. at 388–91 (court of appeals failed to properly consider separation-of-powers concerns when it denied government's request for mandamus relief to prevent discovery against the Vice President, which discovery, the government argued, threatened "substantial intrusions on the process by which those in closest operational proximity to the President advise the President"; court of appeals also erred in finding that the Vice President must first assert executive privilege); *see also U.S. Doge Serv. v. Citizens for Resp. & Ethics in Washington*, 145 S. Ct. 1981 (2025) ("[S]eparation of powers concerns counsel judicial deference and restraint in the context of discovery regarding internal Executive Branch communications.").

While *Cheney* alone counsels against any discovery against the President, Plaintiff's discovery against the President and EOP is particularly improper here because Plaintiff is already

pursuing extensive discovery against the Agency Defendants that may well yield at least substantially the information that Plaintiff seeks without burdening the President. *See, e.g.*, Order, *Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019) (requiring Plaintiff to exhaust all discovery on other Defendants before considering whether there was "continuing need for discovery sought on the White House"); *Wagafe v. Trump*, 2017 WL 5990134, at *3 (W.D. Wash. Oct. 19, 2017) ("intruding on the Executive in this context is a matter of last resort"); *United States v. McGraw-Hill Cos.*, 2014 WL 1647385, at *13 (C.D. Cal. Apr. 15, 2014); *cf. Karnoski v. Trump*, 926 F.3d 1180, 1203–07 (9th Cir. 2019) (granting government's writ of mandamus to vacate district court's discovery order against the President because district court failed to apply *Cheney* or "explore other avenues, short of forcing the Executive to invoke privilege" (quoting *Cheney*, 542 U.S. at 390)).

Accordingly, and consistent with settled precedent, the President and EOP will not be responding to Plaintiff State of Colorado's Interrogatories at this time.

Defendants further object to this Interrogatory to the extent that it calls for the disclosure of attorney work product or attorney-client privileged information. Defendants further object to this Interrogatory because it is premature and would be appropriate only if, for example, there were evidence to support the loss or unavailability of relevant information due to its alleged destruction. *See, e.g.*, *Al Otro Lado, Inc. v. Wolf*, 2020 WL 4432026, at *2 (S.D. Cal. July 31, 2020).

Relatedly, Defendants further object to this Interrogatory because it is not proportional to the needs of the case to "identify all means of communications" that any individual identified in an interrogatory response "used and/or uses in their work with Defendants"—particularly when this Interrogatory has no relevant timeframe. The Interrogatory is not even limited to individuals

who communicated *regarding the Challenged Conduct* alleged in the Second Amended Complaint. The Interrogatory is also highly invasive with respect to personally identifiable information ("PII"), seeking "the name, number, and/or address that the individual uses to identify themselves with that means of communication."

Defendant DHS objects to this Interrogatory because there are no allegations in the operative Complaint, at all, concerning it. DHS appears to be included as a named Defendant solely because the Federal Emergency Management Agency, also a named Defendant, is a component of DHS. Nonetheless, in the spirit of compromise, and although Defendants do not concede that Plaintiff has established the relevance and proportionality of discovery directed to DHS—when it is already receiving discovery from FEMA, the agency alleged to have taken action against Colorado—DHS will respond to Plaintiff's discovery requests. Specifically, DHS will provide answers to Plaintiff's Interrogatories (subject to Defendants' other objections) on or before September 18, 2026.

When the parties meet-and-confer regarding an ESI Protocol, as contemplated by the Scheduling Order (ECF 76 at 7), the parties can negotiate, *inter alia*, custodians and search terms.

Defendants will not answer this Interrogatory.

**INTERROGATORY NO. 21:** For each individual identified in any interrogatory response, describe all steps taken to ensure they comply with the Federal Records Act with respect to any communication identified in any interrogatory response, including the dates and content of any training received, and safeguards taken by the individual or IT personnel for each means of communication that the individual uses for their work with Defendants.

**SUPPLEMENTAL RESPONSE:** Defendants object to the extent the Interrogatory seeks discovery from the President, the Executive Office of the President, and/or the White House. Such discovery is improper at least at this juncture because, among other things, it would contravene

"[t]he high respect that is owed to the office of the Chief Executive," which "is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery." *Clinton v. Jones*, 520 U.S. 681, 707 (1997); *see also Nixon v. Fitzgerald*, 457 U.S. 731, 749, 753 (1982) ("The President occupies a unique position in the constitutional scheme" that "counsel[s] judicial deference and restraint."). Plaintiff's discovery requests treat the President like any other civil litigant and fail to account for the "special considerations applicable to the President." *Cheney v. U.S. Dist. Ct. for Dist. of Columbia*, 542 U.S. 367, 385 (2004). Requiring their response would improperly "detract [the President] from energetic performance of [his] constitutional duties." *Id.* at 382; *see also id.* at 381–82 ("In no case . . . would a court be required to proceed against the president as against an ordinary individual." (quoting *United States v. Burr*, 25 F. Cas. 187, 192 (No. 14,694) (CC Va. 1807) (Marshall, J.))). That is, separation-of-powers concerns necessarily prevent such discovery from proceeding now. *See, e.g.*, *Cheney*, 542 U.S. at 388–91 (court of appeals failed to properly consider separation-of-powers concerns when it denied government's request for mandamus relief to prevent discovery against the Vice President, which discovery, the government argued, threatened "substantial intrusions on the process by which those in closest operational proximity to the President advise the President"; court of appeals also erred in finding that the Vice President must first assert executive privilege); *see also U.S. Doge Serv. v. Citizens for Resp. & Ethics in Washington*, 145 S. Ct. 1981 (2025) ("[S]eparation of powers concerns counsel judicial deference and restraint in the context of discovery regarding internal Executive Branch communications.").

While *Cheney* alone counsels against any discovery against the President, Plaintiff's discovery against the President and EOP is particularly improper here because Plaintiff is already

pursuing extensive discovery against the Agency Defendants that may well yield at least substantially the information that Plaintiff seeks without burdening the President. *See, e.g.*, Order, *Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019) (requiring Plaintiff to exhaust all discovery on other Defendants before considering whether there was "continuing need for discovery sought on the White House"); *Wagafe v. Trump*, 2017 WL 5990134, at *3 (W.D. Wash. Oct. 19, 2017) ("intruding on the Executive in this context is a matter of last resort"); *United States v. McGraw-Hill Cos.*, 2014 WL 1647385, at *13 (C.D. Cal. Apr. 15, 2014); *cf. Karnoski v. Trump*, 926 F.3d 1180, 1203–07 (9th Cir. 2019) (granting government's writ of mandamus to vacate district court's discovery order against the President because district court failed to apply *Cheney* or "explore other avenues, short of forcing the Executive to invoke privilege" (quoting *Cheney*, 542 U.S. at 390)).

Accordingly, and consistent with settled precedent, the President and EOP will not be responding to Plaintiff State of Colorado's Interrogatories at this time.

Defendants further object to this Interrogatory to the extent that it calls for the disclosure of attorney work product or attorney-client privileged information. Defendants further object to this Interrogatory because it is premature and would be appropriate only if, for example, there were evidence to support the loss or unavailability of relevant information due to its alleged destruction. *See, e.g.*, *Al Otro Lado, Inc. v. Wolf*, 2020 WL 4432026, at *2 (S.D. Cal. July 31, 2020).

Relatedly, Defendants further object to this Interrogatory because it is not proportional to the needs of the case to "describe all steps taken to ensure they comply with the Federal Records Act" by any individual identified in an interrogatory response—particularly when this

Interrogatory has no relevant timeframe. The Interrogatory is not even limited to individuals who communicated *regarding the Challenged Conduct* alleged in the Second Amended Complaint.

Defendant DHS objects to this Interrogatory because there are no allegations in the operative Complaint, at all, concerning it. DHS appears to be included as a named Defendant solely because the Federal Emergency Management Agency, also a named Defendant, is a component of DHS. Nonetheless, in the spirit of compromise, and although Defendants do not concede that Plaintiff has established the relevance and proportionality of discovery directed to DHS—when it is already receiving discovery from FEMA, the agency alleged to have taken action against Colorado—DHS will respond to Plaintiff's discovery requests. Specifically, DHS will provide answers to Plaintiff's Interrogatories (subject to Defendants' other objections) on or before September 18, 2026.

Defendants will not answer this Interrogatory.

**INTERROGATORY NO. 22:** Describe in detail all steps Defendants took to retain documents relating to the allegations in this action since its filing on October 29, 2025, including the identity of each employee that was told to maintain documents relating to the allegations in this action, the date of such communication, what documents they were informed to maintain, whether any automatic deletion of certain types of documents (e.g., email, iMessage, Teams, Slack, Signal etc.) was disabled for that employee, and whether any documents responsive to the requests for production were deleted.

**SUPPLEMENTAL RESPONSE:** Defendants object to the extent the Interrogatory seeks discovery from the President, the Executive Office of the President, and/or the White House. Such discovery is improper at least at this juncture because, among other things, it would contravene "[t]he high respect that is owed to the office of the Chief Executive," which "is a matter that should inform the conduct of the entire proceeding, including the timing and scope of discovery." *Clinton v. Jones*, 520 U.S. 681, 707 (1997); *see also Nixon v. Fitzgerald*, 457 U.S. 731, 749, 753 (1982)

("The President occupies a unique position in the constitutional scheme" that "counsel[s] judicial deference and restraint."). Plaintiff's discovery requests treat the President like any other civil litigant and fail to account for the "special considerations applicable to the President." *Cheney v. U.S. Dist. Ct. for Dist. of Columbia*, 542 U.S. 367, 385 (2004). Requiring their response would improperly "detract [the President] from energetic performance of [his] constitutional duties." *Id.* at 382; *see also id.* at 381–82 ("In no case . . . would a court be required to proceed against the president as against an ordinary individual." (quoting *United States v. Burr*, 25 F. Cas. 187, 192 (No. 14,694) (CC Va. 1807) (Marshall, J.))). That is, separation-of-powers concerns necessarily prevent such discovery from proceeding now. *See, e.g.*, *Cheney*, 542 U.S. at 388–91 (court of appeals failed to properly consider separation-of-powers concerns when it denied government's request for mandamus relief to prevent discovery against the Vice President, which discovery, the government argued, threatened "substantial intrusions on the process by which those in closest operational proximity to the President advise the President"; court of appeals also erred in finding that the Vice President must first assert executive privilege); *see also U.S. Doge Serv. v. Citizens for Resp. & Ethics in Washington*, 145 S. Ct. 1981 (2025) ("[S]eparation of powers concerns counsel judicial deference and restraint in the context of discovery regarding internal Executive Branch communications.").

While *Cheney* alone counsels against any discovery against the President, Plaintiff's discovery against the President and EOP is particularly improper here because Plaintiff is already pursuing extensive discovery against the Agency Defendants that may well yield at least substantially the information that Plaintiff seeks without burdening the President. *See, e.g.*, Order, *Centro Presente*, No. 1:18-cv-10340 (D. Mass. May 15, 2019) (requiring Plaintiff to exhaust all

discovery on other Defendants before considering whether there was "continuing need for discovery sought on the White House"); *Wagafe v. Trump*, 2017 WL 5990134, at *3 (W.D. Wash. Oct. 19, 2017) ("intruding on the Executive in this context is a matter of last resort"); *United States v. McGraw-Hill Cos.*, 2014 WL 1647385, at *13 (C.D. Cal. Apr. 15, 2014); *cf. Karnoski v. Trump*, 926 F.3d 1180, 1203–07 (9th Cir. 2019) (granting government's writ of mandamus to vacate district court's discovery order against the President because district court failed to apply *Cheney* or "explore other avenues, short of forcing the Executive to invoke privilege" (quoting *Cheney*, 542 U.S. at 390)). Accordingly, and consistent with settled precedent, the President and EOP will not be responding to Plaintiff State of Colorado's Interrogatories at this time.

Defendants further object to this Interrogatory because it calls for the disclosure of attorney work product or attorney-client privileged information. Defendants further object to this Request because it is premature and would be appropriate only if, for example, there were evidence to support the loss or unavailability of relevant information due to its alleged destruction. *See, e.g.*, *Al Otro Lado, Inc. v. Wolf*, 2020 WL 4432026, at *2 (S.D. Cal. July 31, 2020).

Defendant DHS objects to this Interrogatory because there are no allegations in the operative Complaint, at all, concerning it. DHS appears to be included as a named Defendant solely because the Federal Emergency Management Agency, also a named Defendant, is a component of DHS. Nonetheless, in the spirit of compromise, and although Defendants do not concede that Plaintiff has established the relevance and proportionality of discovery directed to DHS—when it is already receiving discovery from FEMA, the agency alleged to have taken action against Colorado—DHS will respond to Plaintiff's discovery requests. Specifically, DHS will provide

answers to Plaintiff's Interrogatories (subject to Defendants' other objections) on or before September 18, 2026.

Defendants will not answer this Interrogatory.

Respectfully submitted, ***as to objections***,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

/s/ Marianne F. Kies
JOSEPH E. BORSON
MARIANNE F. KIES
Assistant Branch Directors
Federal Programs Branch

ALEXANDER J. SEVERANCE
ADAM S. FOX
Trial Attorneys
Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
Marianne.F.Kies@usdoj.gov
Tel.: 202-353-1819

**CERTIFICATE OF SERVICE**

I certify that on July 29, 2026, I electronically served the foregoing, via email, on counsel of record for Plaintiff.

*s/ Marianne F. Kies*
U.S. Department of Justice

**From:** David Moskowitz
**To:** Jackson Chambers; Severance, Alexander J (CIV)
**Cc:** Sarah Weiss; Talia Kraemer; Kies, Marianne F (CIV); Fox, Adam S (CIV); Reed Morgan
**Subject:** [EXTERNAL] RE: Colorado v. Trump, 1:25-cv-03428-RBJ -- Request for discovery hearing
**Date:** Monday, August 10, 2026 4:56:59 PM
**Attachments:** US-USDA_0000084.pdf

Dear Ms. Williams,

I am attaching a courtesy copy for the court of a document we expect to discuss at tomorrow's hearing.

We also wanted to confirm that the link for the VTC has not yet been sent.

Thanks,
David

**From:** Jackson Chambers <Jackson_Chambers@cod.uscourts.gov>
**Sent:** Sunday, August 2, 2026 1:42 PM
**To:** David Moskowitz <David.Moskowitz@coag.gov>; Jackson Chambers <Jackson_Chambers@cod.uscourts.gov>; Severance, Alexander J (CIV) <Alexander.J.Severance@usdoj.gov>
**Cc:** Sarah Weiss <Sarah.Weiss@coag.gov>; Talia Kraemer <Talia.Kraemer@coag.gov>; Kies, Marianne F (CIV) <Marianne.F.Kies@usdoj.gov>; Fox, Adam S (CIV) <Adam.S.Fox@usdoj.gov>; Reed Morgan <Reed.Morgan@coag.gov>
**Subject:** RE: Colorado v. Trump, 1:25-cv-03428-RBJ -- Request for discovery hearing

Everything we do is on the record. No additional materials are required at this time. It will be by VTC, and you will receive a link allowing you to connect.

**From:** David Moskowitz <David.Moskowitz@coag.gov>
**Sent:** Friday, July 31, 2026 8:55 PM
**To:** Jackson Chambers <Jackson_Chambers@cod.uscourts.gov>; Severance, Alexander J (CIV) <Alexander.J.Severance@usdoj.gov>
**Cc:** Sarah Weiss <Sarah.Weiss@coag.gov>; Talia Kraemer <Talia.Kraemer@coag.gov>; Kies, Marianne F (CIV) <Marianne.F.Kies@usdoj.gov>; Fox, Adam S (CIV) <Adam.S.Fox@usdoj.gov>; Reed Morgan <Reed.Morgan@coag.gov>
**Subject:** RE: Colorado v. Trump, 1:25-cv-03428-RBJ -- Request for discovery hearing

**CAUTION - EXTERNAL:**

Dear Ms. Williams,

The parties conferred and are available at 10:00 am MDT on August 11. We just wanted to confirm the format of this hearing (teleconference, video, etc.) and whether it will be on the record. Please also let us know if the Court would like us to provide any materials or information in advance of the hearing.

Thank you very much. I hope that you have a nice weekend.

Thanks,
David

---

**From:** Jackson Chambers <Jackson_Chambers@cod.uscourts.gov>
**Sent:** Friday, July 31, 2026 3:37 PM
**To:** David Moskowitz <David.Moskowitz@coag.gov>; Severance, Alexander J (CIV) <Alexander.J.Severance@usdoj.gov>
**Cc:** Sarah Weiss <Sarah.Weiss@coag.gov>; Talia Kraemer <Talia.Kraemer@coag.gov>; Kies, Marianne F (CIV) <Marianne.F.Kies@usdoj.gov>; Fox, Adam S (CIV) <Adam.S.Fox@usdoj.gov>
**Subject:** RE: Colorado v. Trump, 1:25-cv-03428-RBJ -- Request for discovery hearing

Dear All,

August 11 is best for the Court. You can choose between 10:00 a.m., 11:00 a.m., or 2:30 p.m. MDT. Please let me know which of these times is best.

Thank you,
Hannah

---

**From:** David Moskowitz <David.Moskowitz@coag.gov>
**Sent:** Monday, July 27, 2026 2:55 PM
**To:** Jackson Chambers <Jackson_Chambers@cod.uscourts.gov>; Severance, Alexander J (CIV) <Alexander.J.Severance@usdoj.gov>
**Cc:** Sarah Weiss <Sarah.Weiss@coag.gov>; Talia Kraemer <Talia.Kraemer@coag.gov>; Kies, Marianne F (CIV) <Marianne.F.Kies@usdoj.gov>; Fox, Adam S (CIV) <Adam.S.Fox@usdoj.gov>
**Subject:** RE: Colorado v. Trump, 1:25-cv-03428-RBJ -- Request for discovery hearing

**CAUTION - EXTERNAL:**

Dear Ms. Williams,

The parties conferred and are available August 6, 7, 10, or 11. We presume that any hearing would be via phone or video, but please let us know if that is not accurate, as that may impact Defendants' availability. Of those dates, Defendants prefer August 11 and Plaintiff prefers August 6. Please let us know if you need any additional information from us.

Thanks,
David

---

**From:** Jackson Chambers <Jackson_Chambers@cod.uscourts.gov>
**Sent:** Friday, July 24, 2026 1:10 PM
**To:** Severance, Alexander J (CIV) <Alexander.J.Severance@usdoj.gov>; David Moskowitz <David.Moskowitz@coag.gov>
**Cc:** Sarah Weiss <Sarah.Weiss@coag.gov>; Talia Kraemer <Talia.Kraemer@coag.gov>; Kies, Marianne F (CIV) <Marianne.F.Kies@usdoj.gov>; Fox, Adam S (CIV) <Adam.S.Fox@usdoj.gov>
**Subject:** RE: Colorado v. Trump, 1:25-cv-03428-RBJ -- Request for discovery hearing

Dear Mr. Moskowitz and Mr. Severance,

Thank you both for your emails. I have received them and will confer with the judge regarding scheduling.

In the meantime, to help with scheduling, it appears that the judge may have availability on August 4, 6, 7, 10, 11, 13, and 14. If any of these dates work for your schedules, please let me know. If not, I would be happy to provide additional options. Once I receive your responses, I will discuss them with the judge and then follow up to confirm a hearing date.

Best,
Hannah, Law Clerk

---

**From:** Severance, Alexander J (CIV) <Alexander.J.Severance@usdoj.gov>
**Sent:** Friday, July 24, 2026 8:34 AM
**To:** Jackson Chambers <Jackson_Chambers@cod.uscourts.gov>
**Cc:** Sarah Weiss <Sarah.Weiss@coag.gov>; Talia Kraemer <Talia.Kraemer@coag.gov>; Kies, Marianne F (CIV) <Marianne.F.Kies@usdoj.gov>; Fox, Adam S (CIV) <Adam.S.Fox@usdoj.gov>; David Moskowitz <David.Moskowitz@coag.gov>
**Subject:** RE: Colorado v. Trump, 1:25-cv-03428-RBJ -- Request for discovery hearing

**CAUTION - EXTERNAL:**

Good morning, Your Honor,

We respectfully disagree with Plaintiffs' characterization of Defendants' positions as to the disputed issues but are available at the Court's convenience to discuss.

Respectfully,
Alex Severance

**Alex Severance** | Trial Attorney
United States Department of Justice
Civil Division – Federal Programs Branch
(202) 598-3123 | alexander.j.severance@usdoj.gov

---

**From:** David Moskowitz <David.Moskowitz@coag.gov>
**Sent:** Thursday, July 23, 2026 6:30 PM
**To:** Jackson_Chambers@cod.uscourts.gov
**Cc:** Sarah Weiss <Sarah.Weiss@coag.gov>; Talia Kraemer <Talia.Kraemer@coag.gov>; Kies, Marianne F (CIV) <Marianne.F.Kies@usdoj.gov>; Severance, Alexander J (CIV) <Alexander.J.Severance@usdoj.gov>; Fox, Adam S (CIV) <Adam.S.Fox@usdoj.gov>
**Subject:** [EXTERNAL] Colorado v. Trump, 1:25-cv-03428-RBJ -- Request for discovery hearing

Dear Judge Jackson,

We are writing on behalf of Plaintiff State of Colorado to request a discovery hearing, pursuant to your practice standards, in *Colorado v. Trump*, No. 1:25-cv-03428-RBJ. The parties have had four video conferrals and numerous emails and letters back and forth, but we have reached an impasse on three important threshold issues on the scope of discovery:

1) Defendant Executive Office of President, including its component Office of Management and Budget, objects to and refuses to participate in discovery.

2) Defendants' position that discovery must be confined to specific actions taken against Colorado that have been pleaded in the complaint, rather than other information also relevant to Plaintiff's claims, including:

- federal actions or threats directed toward Colorado but not specifically cited in the complaint, and
- federal actions or threats toward other states bearing on whether Colorado was targeted for disparate treatment.

3) Defendants' refusal to provide Interrogatory responses regarding oral communications (e.g., meetings, phone calls, etc.) or deleted written communications (e.g., Signal chats) related to the actions or threats against Colorado.

We are available for a hearing at the Court's convenience and can provide any additional information or briefing that would aid the Court. Defendants' counsel are cc'd on this request. We appreciate your consideration.

Respectfully submitted,
David Moskowitz

**David Moskowitz**
**Deputy Solicitor General**
Colorado Department of Law
P: 720-508-6784 | David.Moskowitz@coag.gov

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

⚠ **EXTERNAL EMAIL:** This email has originated outside of the organization.

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

⚠ **EXTERNAL EMAIL:** This email has originated outside of the organization.

**CAUTION - EXTERNAL EMAIL:** This email originated outside the Judiciary. Exercise caution when opening attachments or clicking on links.

⚠ **EXTERNAL EMAIL:** This email has originated outside of the organization.

Appointment

**From**: Underwood, Emily A. EOP/WHO [Emily.A.Underwood@who.eop.gov]
**Sent**: 12/15/2025 2:43:16 AM
**To**: Underwood, Emily A. EOP/WHO [Emily.A.Underwood@who.eop.gov]; Wasserman, Daniel F. EOP/WHO [Daniel.F.Wasserman@who.eop.gov]; Hoyt, Joshua T. EOP/WHO [Joshua.T.Hoyt@who.eop.gov]; Sullivan, Katharine T. EOP/OMB [Katharine.T.Sullivan@omb.eop.gov]; Coe, Carl [carl.coe@hq.doe.gov]; Dankert, Charlie [charlie.dankert@hq.doe.gov]; rachel.oglesby@ed.gov; Meachum, Pete (OST) [charles.meachum@dot.gov]; McCormack, Ryan (OST) [ryan.mccormack@dot.gov]; Hughes, Andrew D [Andrew.Hughes@hud.gov]; Hanson, JoDee M [jodee_hanson@ios.doi.gov]; Wischer, Gregory D [gregory_wischer@ios.doi.gov]; Buller, Kailee - OSEC, DC [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=5f784248fa8b4ecdbb5beea12377680d-058983ed-18]; Tiller, Jennifer - OSEC, DC [/o=ExchangeLabs/ou=Exchange Administrative Group (FYDIBOHF23SPDLT)/cn=Recipients/cn=d1b7b64780504bdca4915f61070151dc-8c7da4bd-fa]; Adolphsen, Sam G. EOP/WHO [Samuel.G.Adolphsen@who.eop.gov]

**Subject**: Brainstorm Call
**Location**: WebEx

**Start**: 12/15/2025 2:30:00 PM
**End**: 12/15/2025 3:00:00 PM
**Show Time As**: Busy

**Recurrence**: (none)

The purpose of this call is to prioritize Colorado for the purposes of ensuring grants and federal support are in line with Administration priorities. Please come prepared to discuss immediate actions that your department or agency can take with respect to Colorado. Please do not forward this invitation or include others on the call without discussing with me first. Thank you.

-- Do not delete or change any of the following text. --

**When it's time, join your Webex meeting here.**

Join meeting

**More ways to join:**

**Join from the meeting link**
https://pitc.webex.com/pitc/j.php?MTID=m47fb81739578714b49d188ca0c5ae74d

**Join by meeting number**
Meeting number (access code): 2822 009 7971
Meeting password: p3QsKuJh@82 (73775854 when dialing from a phone)

**Tap to join from a mobile device (attendees only)**
415-527-5035,,28220097971#73775854# United States Toll

Some mobile devices may ask attendees to enter a numeric password.

**Join by phone**
415-527-5035 United States Toll
Global call-in numbers

**Join from a video system or application**
Dial 28220097971@pitc.webex.com
You can also dial 207.182.190.20 and enter your meeting number.

If you are a host, click here and login site to view host information.

Need help? Go to https://help.webex.com

**From:** Reed Morgan
**To:** Fox, Adam S (CIV); David Moskowitz; Sarah Weiss; Kies, Marianne F (CIV); Severance, Alexander J (CIV)
**Subject:** [EXTERNAL] RE: Colorado v. Trump: Request for Conferral
**Date:** Monday, August 17, 2026 6:02:22 PM
**Attachments:** image001.png

Hi, Adam - At this point, I think we are just talking past each other. We did not indicate Defendants need to take any particular steps. Colorado merely communicated our expectation--informed by the fact that we served our discovery in May--that Defendants would need to move quickly to comply with any final ruling. That is true regardless of whether there is a stay or merely just our agreement not to enforce.

If Defendants decide to move forward with their motion to stay, Colorado's position should be noted as follows: "Colorado takes no position on Defendants' request for a stay of the Court's August 11 Order with respect to EOP, but Colorado has confirmed that it will not move to enforce EOP's discovery responses pending final resolution of this issue. As permitted by the Court, Tr. at 40, Colorado plans to request further proposed findings, which should be resolved before Defendants proceed with their mandamus petition."

Please confirm Defendants do not oppose Colorado's request for further factual findings on this issue.

Reed William Morgan (he/him)
Senior Assistant Attorney General/
Assistant Solicitor General
Colorado Department of Law
Direct: (720) 508-6335
Reed.Morgan@coag.gov

---

**From:** Fox, Adam S (CIV) <Adam.S.Fox@usdoj.gov>
**Sent:** Monday, August 17, 2026 2:16 PM
**To:** David Moskowitz <David.Moskowitz@coag.gov>; Sarah Weiss <Sarah.Weiss@coag.gov>; Kies, Marianne F (CIV) <Marianne.F.Kies@usdoj.gov>; Severance, Alexander J (CIV) <Alexander.J.Severance@usdoj.gov>
**Cc:** Reed Morgan <Reed.Morgan@coag.gov>
**Subject:** RE: Colorado v. Trump: Request for Conferral

David:

We had understood Plaintiff's August 13 offer "not . . . to enforce any discovery obligations against EOP" until reconsideration is resolved to encompass the burdens of complying with discovery, such as identifying custodians; collecting documents and information; processing data; reviewing

documents; and drafting interrogatory answers. After all, those are the precise discovery burdens with which *Cheney* is concerned. However, based on your email from August 14, where you demand that the EOP "be in a position to comply with any final ruling quickly within a week[,]" it is clear that Plaintiff intends to enforce the burdens of discovery against EOP immediately.

As a result, we will move for an immediate stay in District Court pending our forthcoming mandamus petition no later than **4 pm MT today.** Please advise us of Plaintiff's position by then, so that we may timely move for our stay.

Thank you.

**Adam S. Fox | Trial Attorney**
U.S. Department of Justice
Civil Division | Federal Programs Branch
Email: Adam.S.Fox@usdoj.gov
Telephone: (202) 598-3791

---

**From:** David Moskowitz <David.Moskowitz@coag.gov>
**Sent:** Friday, August 14, 2026 7:29 PM
**To:** Fox, Adam S (CIV) <Adam.S.Fox@usdoj.gov>; Sarah Weiss <Sarah.Weiss@coag.gov>; Kies, Marianne F (CIV) <Marianne.F.Kies@usdoj.gov>; Severance, Alexander J (CIV) <Alexander.J.Severance@usdoj.gov>
**Cc:** Reed Morgan <Reed.Morgan@coag.gov>
**Subject:** [EXTERNAL] RE: Colorado v. Trump: Request for Conferral

Adam,

The Court was clear that the parties could file additional briefing or proposed findings, as needed. Tr. at 40 ("I will leave it to you lawyers to decide whether you think you need further motion practice, further briefing, further proposed findings, and you can do what you need to do . . ."). If you now intend to move for reconsideration, we believe that we can encompass what we need in response to your motion. We therefore should revert to the original agreed schedule: (1) Defendants move for reconsideration on August 20; (2) Plaintiff responds on August 27; and (3) Defendants reply on September 2.

We do not think a stay is necessary nor that seeking one is wise given that the court earlier denied a stay. Parties regularly seek reconsideration of discovery and other orders without seeking a stay. We have given you assurances that avoid any need for a stay. We would recommend simply filing a notice that defendants intend to seek reconsideration of that part of the order and that the parties have reached agreement on an expedited schedule to quickly resolve that motion.

If you nevertheless insist on moving for a stay, we take no position.

Since we did not address the other issues we had discussed, we note the following:

1. We expect that Defendants will immediately comply with other obligations from the discovery order. We expect to receive supplemental responses by next Friday, including a detailed description of the December 15 call. If you intend to assert any privilege, we expect to receive proper privilege assertions. To the extent Defendants continue to delay, we will seek further relief from the Court.

2. Once the dispute over EOP is fully resolved, we expect Defendants will be in position to comply with any final ruling quickly within a week. If Defendants choose not to make necessary preparations, that is not an excuse for delay.

3. The record is clear that this case has been substantially delayed by Defendants' slow productions, missed deadlines, incomplete discovery responses, and withheld information without basis. We are in the middle of August still trying to get complete responses for requests made in early May. Our agreement to an expedited, orderly resolution of the EOP issue should not be understood as an agreement that this is not delaying discovery. We hope your clients will be reasonable regarding extending discovery and that this will not be a contentious issue. But if not, we are confident the Court will provide appropriate relief.

Thanks,
David

---

**From:** Fox, Adam S (CIV) <Adam.S.Fox@usdoj.gov>
**Sent:** Friday, August 14, 2026 1:52 PM
**To:** David Moskowitz <David.Moskowitz@coag.gov>; Sarah Weiss <Sarah.Weiss@coag.gov>; Kies, Marianne F (CIV) <Marianne.F.Kies@usdoj.gov>; Severance, Alexander J (CIV) <Alexander.J.Severance@usdoj.gov>
**Cc:** Reed Morgan <Reed.Morgan@coag.gov>
**Subject:** RE: Colorado v. Trump: Request for Conferral

David,

The Parties now seem to agree that EOP discovery should not go forward pending the District Court's resolution of forthcoming briefing. We want that commitment to be on the record, with the Court's approval. We are therefore preparing a Joint Motion to Stay that we would file prior to any further briefing on "findings" (Plaintiff) and reconsideration (Defendants). With the stay on the record, we are willing to forego filing a petition for a writ of mandamus in the Tenth Circuit at this time. We expect to send the draft Joint Motion to you today.

We note that nothing in the Court's Order regarding EOP discovery indicated that the Court was contemplating—much less authorizing—Plaintiff to file a post-Order motion explaining to the Court why Plaintiff thinks the Court was right. If Plaintiff nonetheless intends to move for findings, Defendants offer the following four-brief schedule: (1) Plaintiff files its Motion for Proposed Findings (August 21); (2) Defendants file their Opposition and Cross Motion for Reconsideration (August 28); (3) Plaintiff files its Reply (September 2); and (4) Defendants file their Reply (September 7). Please confirm this timing works for Plaintiff and we will include it in the draft Joint Motion to Stay.

Thank you.

**Adam S. Fox | Trial Attorney**
U.S. Department of Justice
Civil Division | Federal Programs Branch
Email: Adam.S.Fox@usdoj.gov
Telephone: (202) 598-3791

---

**From:** David Moskowitz <David.Moskowitz@coag.gov>
**Sent:** Thursday, August 13, 2026 11:56 PM
**To:** Fox, Adam S (CIV) <Adam.S.Fox@usdoj.gov>; Sarah Weiss <Sarah.Weiss@coag.gov>; Kies, Marianne F (CIV) <Marianne.F.Kies@usdoj.gov>; Severance, Alexander J (CIV) <Alexander.J.Severance@usdoj.gov>
**Cc:** Reed Morgan <Reed.Morgan@coag.gov>
**Subject:** [EXTERNAL] RE: Colorado v. Trump: Request for Conferral

Adam:

The tone of your email tonight is not consistent with the good-faith negotiations that we thought were ongoing. Your email from yesterday accurately summarized the various requests discussed in yesterday's call. You did not request a response. As you will recall, when you asked whether various requests were non-negotiable during the call, I indicated they were not non-negotiable but that they would be helpful to reach an agreement. We were therefore surprised by your response, which offered no explanation of what aspects of the requests were unacceptable or any alternative compromises.

Our proposal was extended in good faith. As I noted on our call, our intent was to offer Defendants some assurance that they could filing briefing - as you argued for at the hearing - in an expedited yet humane manner. We thought our requests were reasonable and would ensure Defendants could brief the motion without fear of complaints about delay from our side while still offering us some reassurance that discovery would not stall or the discovery window be wasted in the meantime. We presumed that the parties would continue to confer as needed. It appears Defendants simply changed their mind about desiring further briefing.

Given Defendants' decision not to seek reconsideration, we intend to submit a motion with further proposed findings of fact and supporting evidence, as the court permitted. We will not seek to enforce any discovery obligations against EOP until that is resolved. That should avoid any need for mandamus for the timing being. Please confirm that you do not oppose our motion.

Thanks,
David

---

**From:** Fox, Adam S (CIV) <Adam.S.Fox@usdoj.gov>
**Sent:** Thursday, August 13, 2026 4:34 PM
**To:** David Moskowitz <David.Moskowitz@coag.gov>; Sarah Weiss <Sarah.Weiss@coag.gov>; Kies, Marianne F (CIV) <Marianne.F.Kies@usdoj.gov>; Severance, Alexander J (CIV) <Alexander.J.Severance@usdoj.gov>
**Cc:** Reed Morgan <Reed.Morgan@coag.gov>
**Subject:** RE: Colorado v. Trump: Request for Conferral

Counsel,

Having received no response to my email, and consistent with our oral discussion that preceded it, we understand that the terms laid out in my email are indeed Plaintiff's conditions for agreeing to not enforce the discovery order on EOP until after briefing and ruling on a motion for reconsideration. We cannot accept these conditions. Therefore, we cannot and will not be moving for reconsideration.

Given the nature of the Court's Order, and the expedited timetable we are under, we intend to move for a stay of the Court's Order pending our forthcoming petition for mandamus. Please advise us by August 14, 2026 at 9:00 am MT of Plaintiff's position on that motion.

Thank you.

**Adam S. Fox | Trial Attorney**
U.S. Department of Justice
Civil Division | Federal Programs Branch
Email: Adam.S.Fox@usdoj.gov
Telephone: (202) 598-3791

---

**From:** Fox, Adam S (CIV)
**Sent:** Wednesday, August 12, 2026 5:03 PM
**To:** 'David Moskowitz' <David.Moskowitz@coag.gov>; Sarah Weiss <Sarah.Weiss@coag.gov>; Kies, Marianne F (CIV) <Marianne.F.Kies@usdoj.gov>; Severance, Alexander J (CIV) <Alexander.J.Severance@usdoj.gov>
**Cc:** Reed Morgan <Reed.Morgan@coag.gov>

**Subject:** RE: Colorado v. Trump: Request for Conferral

David,

Thank you for the call. We are writing to confirm our understanding of the terms Plaintiff requests in exchange for not enforcing the Court's 8/11/2026 discovery order on EOP, until after briefing and ruling on Defendants' Motion for Reconsideration. Plaintiff seeks the following:

- OMB is not included in the non-enforcement of the discovery order;
- While briefing of the Motion to Reconsider occurs and while under consideration by the Court, EOP begins the process of identifying custodians, running searches, collecting documents and other information, so that if appropriate, after the Court rules on the Motion to Reconsider, EOP can quickly provide its responses to Plaintiff's interrogatories and requests for production;
- A commitment by Defendants to provide supplemental interrogatory responses based on the Court's order from 8/11 by a date certain; and
- An understanding that the non-enforcement of the discovery order may create the need to extend the discovery deadline.

We discussed that if we are able to agree to the terms of the non-enforcement of the Court's discovery order, the briefing schedule would be as follows: Defendants' Opening Brief Due August 20, 2026; Plaintiff's Response Due August 27, 2026; and Defendants' Reply Due September 2, 2026.

Thank you.

**Adam S. Fox | Trial Attorney**
U.S. Department of Justice
Civil Division | Federal Programs Branch
Email: Adam.S.Fox@usdoj.gov
Telephone: (202) 598-3791

---

**From:** David Moskowitz <David.Moskowitz@coag.gov>
**Sent:** Wednesday, August 12, 2026 12:35 PM
**To:** Fox, Adam S (CIV) <Adam.S.Fox@usdoj.gov>; Sarah Weiss <Sarah.Weiss@coag.gov>; Kies, Marianne F (CIV) <Marianne.F.Kies@usdoj.gov>; Severance, Alexander J (CIV) <Alexander.J.Severance@usdoj.gov>
**Cc:** Reed Morgan <Reed.Morgan@coag.gov>
**Subject:** [EXTERNAL] RE: Colorado v. Trump: Request for Conferral

Thanks, Adam. We can do 3pm.

**From:** Fox, Adam S (CIV) <Adam.S.Fox@usdoj.gov>
**Sent:** Wednesday, August 12, 2026 10:09 AM
**To:** David Moskowitz <David.Moskowitz@coag.gov>; Sarah Weiss <Sarah.Weiss@coag.gov>; Kies, Marianne F (CIV) <Marianne.F.Kies@usdoj.gov>; Severance, Alexander J (CIV) <Alexander.J.Severance@usdoj.gov>
**Cc:** Reed Morgan <Reed.Morgan@coag.gov>
**Subject:** RE: Colorado v. Trump: Request for Conferral

David,

We are available this afternoon between 3:00 and 4:00 pm ET to discuss. Please advise if this works, and if so, we will send a Teams invite. If not, please provide your availability for tomorrow (8/13). Thank you.

**Adam S. Fox | Trial Attorney**
U.S. Department of Justice
Civil Division | Federal Programs Branch
Email: Adam.S.Fox@usdoj.gov
Telephone: (202) 598-3791

**From:** David Moskowitz <David.Moskowitz@coag.gov>
**Sent:** Wednesday, August 12, 2026 11:35 AM
**To:** Fox, Adam S (CIV) <Adam.S.Fox@usdoj.gov>; Sarah Weiss <Sarah.Weiss@coag.gov>; Kies, Marianne F (CIV) <Marianne.F.Kies@usdoj.gov>; Severance, Alexander J (CIV) <Alexander.J.Severance@usdoj.gov>
**Cc:** Reed Morgan <Reed.Morgan@coag.gov>
**Subject:** [EXTERNAL] RE: Colorado v. Trump: Request for Conferral

Adam,

We want this issue to be resolved in an orderly, expedited manner. Cognizant that the court denied a stay of its order granting discovery from EOP, we are open to reaching an agreement to delay enforcing any obligations with respect to EOP, which would have the same effect, but we would need to work out the contours, which is why we suggest a call to discuss.

Thanks,
David

**From:** Fox, Adam S (CIV) <Adam.S.Fox@usdoj.gov>
**Sent:** Wednesday, August 12, 2026 9:13 AM
**To:** Sarah Weiss <Sarah.Weiss@coag.gov>; Kies, Marianne F (CIV) <Marianne.F.Kies@usdoj.gov>; Severance, Alexander J (CIV) <Alexander.J.Severance@usdoj.gov>
**Cc:** David Moskowitz <David.Moskowitz@coag.gov>; Reed Morgan <Reed.Morgan@coag.gov>

**Subject:** RE: Colorado v. Trump: Request for Conferral

Counsel,

Thank you for your message. We are open to discussing briefing on a motion for reconsideration, but we would only consider such further briefing if Plaintiff is willing to stay discovery to the EOP until that briefing is complete and the Court has ruled on it. So that we do not waste your time, can you please let us know Plaintiff's position on our stay request as an initial matter?

**Adam S. Fox | Trial Attorney**
U.S. Department of Justice
Civil Division | Federal Programs Branch
Email: Adam.S.Fox@usdoj.gov
Telephone: (202) 598-3791

---

**From:** Sarah Weiss <Sarah.Weiss@coag.gov>
**Sent:** Tuesday, August 11, 2026 2:05 PM
**To:** Kies, Marianne F (CIV) <Marianne.F.Kies@usdoj.gov>; Fox, Adam S (CIV) <Adam.S.Fox@usdoj.gov>; Severance, Alexander J (CIV) <Alexander.J.Severance@usdoj.gov>
**Cc:** David Moskowitz <David.Moskowitz@coag.gov>; Reed Morgan <Reed.Morgan@coag.gov>
**Subject:** [EXTERNAL] Colorado v. Trump: Request for Conferral

Counsel:

Would you have = availability to confer briefly this afternoon? We take that you are interested in further written briefing and reconsideration, and we would like to discuss our proposal for a schedule.

Our team can work around your side's availability, so please just let us know what would work best.

Thank you,
Sarah

**Sarah H. Weiss**
**Senior Assistant Attorney General**
Office of the Attorney General
Pronouns: she/her

P: 720-508-6910 | Sarah.Weiss@coag.gov

The statements and opinions in this email do not represent the statements and opinions of the Attorney General.

⚠ **EXTERNAL EMAIL:** This email has originated outside of the organization.

⚠ **EXTERNAL EMAIL:** This email has originated outside of the organization.

⚠ **EXTERNAL EMAIL:** This email has originated outside of the organization.

⚠ **EXTERNAL EMAIL:** This email has originated outside of the organization.

⚠ **EXTERNAL EMAIL:** This email has originated outside of the organization.